# SUSSMAN SHANK LLP

A T T O R N E Y S   A T   L A W





**Martin P. Meyers**
Attorney • Admitted in Oregon & Washington

JAN 2 5 2010



BY _____
DEPUTY CLERK

**1000 SW Broadway • Suite 1400**
**Portland, Oregon  97205-3089**

*direct line:* 503.243.1661 x 274
martin@sussmanshank.com

503.227.1111 or 800.352.7078
*fax:* 503.248.0130
www.sussmanshank.com

January 22, 2010

**VIA FEDERAL EXPRESS**

*10- mc - 8   FCD   DAD*

United States District Court
California Eastern District Court
4-200 Robert T. Matsui United States Courthouse
501 I Street
Sacramento, CA  95814-7300

      Re:    Wells Fargo Capital Finance Inc. v. North Pacific Group, Inc. et al.
               Case No.: 3:10:cv-00065-ST
               Our File No.: 20692-002

Dear Clerk:

On January 20, 2010 the United States District Court, District of Oregon ordered the appointment of a receiver in the above captioned case.  We are submitting this filing on behalf of the appointed receiver Edward I. Hostmann, Inc.

Pursuant to 28 USC §754, we enclose the following documents for filing with this District Court:

               1.  Complaint For Breach of Contract; Appointment of Receiver; Injunction in Aid of Recover filed January 20, 2010; and

               2.  Order Appointing Receiver entered January 20, 2010.

The filing fee of $39 is enclosed.  Please return to our office a conformed copy, with the miscellaneous case number assigned for our records, in the also enclosed self addressed stamped envelope.

SUSSMAN SHANK LLP

January 22, 2010
Page 2

Thank you for your assistance with this matter. Please contact our office with any questions.

Very truly yours,

SUSSMAN SHANK LLP

Martin P. Meyers

MPM:mpg
Enclosure
C:      Edward Hostmann
        Barry Caplan
F:\CLIENTS\20692\002\RECEIVER SERVICE INFORMATION §754\L-MPM RECEIVER LETTER.DOC



Certified to be a true and correct
copy of original filed in this District.
Dated _____
Mary L. Moran, Clerk of Court
US District Court of Oregon
By Deputy Clerk _____ Through ____
Pages ____

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

WELLS FARGO CAPITAL FINANCE,
INC., formerly known as Wells Fargo
Foothill, Inc., a California corporation, as
Administrative Lender and Agent on behalf
of itself, Bank of America, N.A., and The
CIT Group/Business Credit, Inc.,

Plaintiff,

v.

NORTH PACIFIC GROUP, INC., an
Oregon corporation; NOR PAC
ENTERPRISES, INC., an Oregon
corporation; RTH LUMBER CO., an
Oregon corporation; and BURNS
HOLDINGS, INC., a dissolved Oregon
corporation,

Defendants.

CV '10-65- ̄ ... ST

ORDER APPOINTING RECEIVER

This matter came before the Court on plaintiff's stipulated motion for the

appointment of a receiver. A hearing was held on January 20, 2010. Plaintiff Wells Fargo

Page 1 - Order Appointing Receiver

PDXDOCS:1877503.4

Capital Finance, Inc., formerly known as Wells Fargo Foothill, Inc. ("Wells Fargo") was represented by Teresa H. Pearson and Bruce L. Rubin of Miller Nash LLP. Defendants North Pacific Group, Inc. ("NPG"), NOR PAC Enterprises, Inc. ("Nor Pac"), RTH Lumber Co. ("RTH"), and Burns Holdings, Inc. ("Burns") were represented by George K. Fogg. The proposed receiver, Edward Hostmann, Inc., was represented by Barry Caplan.

The Court having been fully advised in the premises hereby finds as follows:

A.     Notice of this matter has been given to defendants as required by law, and defendants have waived all notice requirements;

B.     Plaintiff is the Administrative Lender to the defendants pursuant to a Credit Agreement dated December 22, 2006, as amended (collectively with all amendments, the "Credit Agreement"). As Administrative Lender, Wells Fargo has the authority to enforce the Credit Agreement on behalf of itself, Bank of America, N.A., ("Bank of America"), and The CIT Group/Business Credit, Inc. ("CIT"). Defendants have defaulted on the loans due to Plaintiffs. The present amount outstanding is approximately $42 million.

C.     To secure their obligations under the Credit Agreement, NPG, Nor Pac, RTH, and Burns granted a security interest in all of their personal property and rights in personal property, including, without limitation, their accounts, rights to payment, general intangibles, records, goods, fixtures, inventory, equipment, money, letter of credit rights, supporting obligations, instruments, chattel paper, deposit accounts, documents, investment property, commercial tort claims, products and proceeds (collectively, the "Collateral"), to Wells Fargo, for the benefit and on behalf of Wells Fargo, Bank of America, and CIT. Wells Fargo has perfected its security interest in the Collateral.

D.     Wells Fargo's right to its Collateral is probable, and such Collateral and the profits and proceeds from such Collateral are in danger of being lost or materially injured or impaired;

Page 2 -     Order Appointing Receiver

E.     Wells Fargo is entitled to the appointment of a receiver who has the exclusive and broad power and authority to manage and control the businesses and properties of NPG, Nor Pac, RTH, and Burns in order to preserve the value of the Collateral;

F.     Edward Hostmann, Inc. ("EHI"), is a responsible, competent, and qualified entity to be appointed as receiver for the businesses and properties of NPG, Nor Pac, RTH, and Burns;

G.     The receiver's bond should be set in the amount of $2 million.

Therefore, it is hereby

ORDERED as follows:

1.     EHI is hereby appointed receiver exclusively to take possession of, control, manage, and operate the businesses and properties of NPG, Nor Pac, RTH, and Burns for the purpose of preserving and protecting the Collateral and for the purpose of liquidating the Collateral and using the proceeds thereof to pay the obligations of NPG, Nor Pac, RTH, and Burns to Wells Fargo, Bank of America, and CIT in accordance with the terms of this order.

2.     Without limiting the foregoing, EHI shall have legal custody and control of the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral, and shall have the following powers and duties with respect thereto:

a.     To take exclusive charge, control, custody, and possession of the businesses and properties of NPG, Nor Pac, RTH, and Burns, tangible and intangible, including but not limited to the Collateral;

b.     To manage, operate, maintain and preserve the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral, and dispose of any of the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral, in accordance with the terms of this order;

Page 3 -    Order Appointing Receiver

c.     To collect all profits and proceeds from the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to accounts, and give receipts therefor;

d.     To make such payments and disbursements as EHI deems necessary or appropriate to ensure continued operation of the businesses and properties of NPG, Nor Pac, RTH, and Burns during the liquidation process, as EHI shall determine to be appropriate, to protect and maintain the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral, and to carry out the receiver's duties as set forth herein in accordance with the terms of this order;

e.     To sell the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral, which has not been reduced to proceeds as the receiver deems appropriate. Notwithstanding the foregoing, the receiver shall not sell any assets of a value in excess of $3,500,000 outside of the ordinary course of business without obtaining approval of the Court following notice to parties as provided herein. Any order approving such sale shall provide that the assets are sold free and clear of all liens and claims and that the proceeds of such sale shall be impressed with any liens encumbering such assets to the same extent, validity and priority as such liens attached to the assets sold;

f.     To give such notices as EHI may deem necessary;

g.     To contract with or hire, pay, direct, discipline, suspend, or discharge all persons deemed necessary by EHI for the management, collection, or disposition of the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral;

Page 4 -     Order Appointing Receiver

h.      To select, employ, and pay legal counsel, accountants, and other professionals, as may be necessary, to assist EHI in performing its functions hereunder;

i.      To the extent necessary and prudent, to obtain and maintain adequate public liability insurance, to the extent adequate insurance does not already exist;

j.      To the extent necessary and prudent, to obtain and maintain property insurance, with an endorsement for extended coverage, in the full amount of the insurable value of the Collateral;

k.      To continue in effect any contracts presently existing that relate to the businesses and properties of NPG, Nor Pac, RTH, and Burns, to the extent necessary to preserve the value of the Collateral;

l.      To enter into, modify, or terminate any contracts that relate to the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral, as EHI deems necessary or appropriate to properly ensure the continued operation of the businesses and properties of NPG, Nor Pac, RTH, and Burns (to the extent reasonably prudent to do so), to preserve, protect, and maintain the Collateral, or to carry out EHI's duties as set forth herein;

m.      To institute, prosecute and defend, compromise, adjust, intervene in, or become a party, by substitution or otherwise, to such actions in proceedings in state or federal courts as may in its opinion be necessary or proper for the benefit of the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral, or the carrying out of the terms of this Order;

n.      To review the books and records of NPG, Nor Pac, RTH, and Burns to determine if any improper transfers or conveyances were made, and

Page 5 -   Order Appointing Receiver

to pursue any necessary actions to recover any funds that were improperly transferred or conveyed; and

o.     To generally do other things that are necessary or incidental to the foregoing specific powers, directions, and general authorities and to take actions relating to the businesses and properties of NPG, Nor Pac, RTH, and Burns that are provided in the loan documents and provided by law.

p.     As a court appointed receiver, EHI will exercise its duties under this order with due regard to the interests of all parties, including but not limited to Wells Fargo, Bank of America, CIT, NPG, Nor Pac, RTH, and Burns.

3.     NPG, Nor Pac, RTH, and Burns, and their officers, directors, agents, representatives, shareholders, and employees shall:

a.     Turn over to the receiver the possession, custody, and control over the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral, and the proceeds thereof, and the records, books of account, ledgers and all business records of NPG, Nor Pac, RTH, and Burns, wherever located and in whatever mode maintained (including, without limitation, information contained on computers and any and all software relating thereto as well as all banking records, statements and cancelled checks), including but not limited to the rights of NPG, Nor Pac, RTH, and Burns to use telephone numbers, email addressees, websites, and marketing materials;

b.     Turn over to the receiver all documents which constitute or pertain to the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to all licenses, permits or governmental approvals relating to the businesses and properties of NPG, Nor Pac, RTH, and Burns;

c.     Turn over to the receiver all documents which constitute or pertain to insurance policies, whether currently in effect or lapsed, which relate to

Page 6 -    Order Appointing Receiver

the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral;

        d.    Turn over to the receiver all contracts, leases and subleases, management agreements, franchise agreements, royalty agreements, employment agreements, licenses, assignments or other agreements of any kind whatsoever, whether currently in effect or lapsed, which relate to or are related to any part or all of the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral; and

        e.    Fully cooperate with the receiver.

    4.    NPG, Nor Pac, RTH, and Burns, and their officers, directors, agents, representatives, shareholders, and employees, and all other persons and entities that have notice of this order, are hereby prohibited from:

        a.    Interfering with the receiver, directly or indirectly, in the management and operation of the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral, or otherwise directly or indirectly taking any actions or causing any such action to be taken which would dissipate the assets or negatively affect the operations of the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral;

        b.    Expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, or otherwise disposing of the whole or any part of the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral without the prior written consent of the receiver and Wells Fargo; provided, however, that nothing contained in the Order shall prohibit or restrain the Wells Fargo from initiating and/or completing a sale by judicial or nonjudicial

Page 7 -    Order Appointing Receiver

foreclosure of the Collateral, or any portion thereof, and thereafter taking title and possession thereto; and

        c.      Doing any act which will, or which will tend to, directly or indirectly, impair, defeat, prevent, or prejudice the preservation of the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral, or Wells Fargo's interest in such assets and operations of the businesses and properties of NPG, Nor Pac, RTH, and Burns.

        5.      EHI shall maintain a segregated account or accounts for each of NPG, Nor Pac, RTH, and Burns (the "Account") in its name as receiver at a federally insured banking institution. Upon receipt, all proceeds, profits and moneys derived from the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral, shall be deposited by EHI in the Account, and EHI shall maintain separate accounting records for the revenues and expenses of the businesses and properties of NPG, Nor Pac, RTH, and Burns. Until further order of the Court, EHI shall apply the proceeds in the Account as follows:

        a.      First: to the reasonable costs and expenses of taking charge of, possessing, operating, managing, controlling, the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral in accordance with the terms of this order, including but not limited to costs and expenses incurred by EHI in exercising its powers and duties as set forth herein, and to payment of EHI's compensation as described herein. To the extent it is possible to do so, EHI should pay these expenses from funds unencumbered by any liens;

        b.      Second: to Wells Fargo, for application against the indebtedness owing to Wells Fargo, Bank of America, and CIT that is secured by the Collateral; provided, however, if there is an interest in the Collateral that has priority over the interest of Wells Fargo, Bank of America, and CIT, then EHI

Page 8 -    Order Appointing Receiver

shall apply the proceeds to payment of that indebtedness; and further provided

that, if the property sold is subject to the lien of a creditor other than Wells Fargo,

then EHI shall apply the proceeds to payment of that indebtedness; and further

provided that, to the extent there is a dispute between EHI, Wells Fargo, and any

other holder of a security interest as to the priority or amount of a lien, EHI may

file a motion with this Court to determine the propriety of the proposed

distribution; and

              c.       Third:  the balance to be retained by EHI in the Account

pending further order of the Court.

Notwithstanding the foregoing, EHI may continue to receive payments on behalf of the

receivership estate in the existing lockbox accounts for NPG, Nor Pac, RTH, and Burns.  In

addition, until EHI can practicably set up separate accounts, EHI shall have the authority to

operate the businesses and properties of NPG, Nor Pac, RTH, and Burns using the existing bank

accounts and all existing cash management systems.

              6.       EHI shall file with the Court a monthly statement showing all receipts and

disbursements, in reasonable detail.  EHI shall make copies of supporting invoices available to

interested parties for review upon reasonable notice.  Each statement shall cover the applicable

calendar month and shall be delivered not later than the 15th day of the month next following the

reported month.  EHI shall send by first class mail a copy of the monthly statement, without

copies of the supporting receipts and disbursements, to each of the persons named below, at the

addresses designated, not later than the 15th day of the month next following the stated month:

////

////

////

////

////

Page 9 -    Order Appointing Receiver

For Plaintiff:

Ms. Amy L. Newman
Vice President
Wells Fargo Capital Finance, Inc.
2450 Colorado Ave., Suite 3000 West
Santa Monica, CA 90404
Phone: 310-453-7365
Fax: 866-350-9537
Email: amy.newman@wellsfargo.com

Teresa H. Pearson
Miller Nash LLP
111 S.W. Fifth Avenue, Suite 3400
Portland, Oregon 97204
Phone: (503) 205-2646
Fax:   (503) 224-0155
Email: teresa.pearson@millernash.com

For Defendants:

Jay A. Ross
North Pacific Group, Inc.
10200 S.W. Greenburg Road
Portland, Oregon 97223
Phone: (503) 872-3717
Fax: (503) 238-2641
Email: jross@northpacific.com

George K. Fogg
Perkins Coie LLP
1120 NW Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: (503) 727-2022
Fax: (503) 346-2022
Email: gfogg@perkinscoie.com

Any notices given to EHI pursuant to this order shall be provided to:

Edward Hostmann
Edward Hostmann, Inc.
4500 S.W. Kruse Way, Suite 100
Lake Oswego, Oregon 97035
Phone: (503) 968-6542
Fax: (503) 968-6544
Email: EHostmann@hostmann.com

Barry Caplan
Sussman Shank, LLP
1000 S.W. Broadway, Suite 1400
Portland, Oregon 97205
Phone: (503) 227-1111
Fax: (503) 248-0130
Email: Barry@sussmanshank.com

   7. As compensation for its services, EHI shall be entitled to compensation for
its services performed as a receiver at its normal hourly rates. The current standard rate for
Edward Hostmann is $435 per hour. The current standard rate for other employees of EHI range
from $235 to $295. The billing rates for the receiver are subject to periodic review and
adjustment. In addition, EHI shall be entitled to reimbursement for all reasonable costs and
expenses (including but not limited to professional fees) incurred in performing services in this
matter. Such reimbursable fees, costs and expenses shall include any incurred by EHI in

Page 10 -   Order Appointing Receiver

defending litigation brought by any interested party to adjudicate the propriety of any actions the receiver takes pursuant to this order (except that EHI shall not be entitled to such reimbursement if the Court determines that liability arose from EHI's bad faith, gross negligence, willful malfeasance, or reckless disregard of duty).

8.     EHI shall give notice to interested parties of the fees to be paid to EHI and its professionals on a monthly basis, and shall be authorized to make such payments unless EHI receives a written objection within ten days of such notice. If an objection is received, EHI may pay any fees not subject to objection, and may promptly file a motion with the Court to have such objection heard and ruled upon.

9.     Within 60 days from the date of this order, EHI shall file a report with the Court setting forth (a) a reasonably detailed description of the businesses and properties of NPG, Nor Pac, RTH, and Burns, (b) the interests in and claims against the businesses and properties of NPG, Nor Pac, RTH, and Burns, including but not limited to the Collateral, (c) the income-producing capacity of the businesses and properties of NPG, Nor Pac, RTH, and Burns, and any recommendations by EHI as to the best method of realizing its value for the benefit of those entitled.

10.     EHI may apply to the Court, after notice to all parties, for further instructions or powers, as may be necessary, to enable it to properly fulfill its duties under this receivership.

11.     Upon reasonable notice to EHI, NPG, Nor Pac, RTH, and Burns (and any authorized agent or representative of them) shall be entitled to reasonable access to review EHI's operation of the businesses and properties of NPG, Nor Pac, RTH, and Burns, and otherwise receive information regarding the status of the businesses and properties of NPG, Nor Pac, RTH, and Burns. Notwithstanding the foregoing, EHI will have complete and final authority regarding the operation of the businesses and properties of NPG, Nor Pac, RTH, and Burns, and the disposition of the Collateral, subject only to the direction and control of this Court.

Page 11 -    Order Appointing Receiver

12.     EHI will not be liable for any act or omission relating to the businesses

and properties of NPG, Nor Pac, RTH, and Burns, nor any of their officers, directors, agents,

representatives, shareholders, and employees, or be held to any personal liability whatsoever in

tort, contract, or otherwise in connection with the discharge of its duties under this Order, except

for liabilities arising from EHI's bad faith, gross negligence, willful malfeasance, or reckless

disregard of duty. Without limiting the foregoing, EHI shall not be liable to any other party in

any way for any damages or liability resulting from the existence or use, discharge, or storage by

any person other than EHI of any hazardous substance, or for liability for any product produced,

sold, or delivered prior to EHI's appointment as receiver. In addition, Wells Fargo, Bank of

America, and CIT will not be liable for any act or omission of EHI.

13.     If the businesses and properties of NPG, Nor Pac, RTH, and Burns do not

generate sufficient revenue following the appointment of the receiver to pay the operating and

liquidating expenses and approved charges of the receiver (including, but not limited to, those

described in paragraph 8) and the fees and expenses of any attorneys, accountants, or other

professionals employed by the receiver, the receiver shall borrow money from Wells Fargo,

Bank of America, and CIT to enable the receiver to pay such expenses and Wells Fargo, Bank of

America, and CIT shall lend the amount in question to the receivership estate on the basis

described in paragraph 15 of this order.

14.     Within 30 days of the receiver's appointment hereunder, the receiver shall

present to Wells Fargo a report identifying any capital expenditures the receiver believes need to

be made immediately in order to preserve and protect the value of the businesses and properties

of NPG, Nor Pac, RTH, and Burns. If Wells Fargo agrees regarding the necessity and cost of the

proposed capital expenditures identified by the receiver, the receiver may make such

expenditures from cash of the businesses and properties of NPG, Nor Pac, RTH, and Burns

available to the receiver. If there is not sufficient cash of the businesses and properties of NPG,

Nor Pac, RTH, and Burns available to the receiver to make capital expenditures approved by

Wells Fargo, the receiver may request Wells Fargo, Bank of America, and CIT to make an advance to the receivership estate (in accordance with paragraph 15 of this order) in an amount sufficient to pay for the capital expenditures in question. If Wells Fargo, Bank of America, and CIT, in their sole and absolute discretion agree to advance funds to the receivership estate to enable the Receiver to make protective capital expenditures, and the aggregate amount of such advances by Wells Fargo, Bank of America, and CIT (determined by aggregating all such advances made by them on or after the date of entry of this Order) is less than or equal to $500,000, then Wells Fargo, Bank of America, and CIT can advance such amounts to the receiver on behalf of the estate without notice or a hearing by the Court. If the aggregate amount Wells Fargo, Bank of America, and CIT agree to advance to the receiver in respect of protective capital expenditures is greater than $500,000, the receiver shall file a motion seeking authority to have Wells Fargo, Bank of America, and CIT advance the funds in question (with such advance to be secured in accordance with paragraph 15 of this order). All parties to this action shall be provided at least five (5) business days notice of the hearing on such a motion. In limitation of the preceding sentence, if the receiver, in the receiver's reasonable discretion, determines that: (a) there is a material and immediate risk of impairment to the health or safety of any person, or of immediate, serious, material and irreparable harm to the Collateral; and (b) a reasonably prudent response to such risk requires that the receiver obtain funds in less than five (5) days, then the receiver shall be authorized to apply to Wells Fargo, Bank of America, and CIT for such amount of funds as the receiver reasonably determines to be appropriate and Wells Fargo, Bank of America, and CIT shall be authorized to advance such amount without regard to the $500,000 limitation set forth above, and without notice or a hearing by the Court.

15.     All funds borrowed by the receiver from Wells Fargo, Bank of America, and CIT shall be deemed to be borrowings by NPG, Nor Pac, RTH, and Burns. The receiver may execute and issue in favor of Wells Fargo, Bank of America, and CIT promissory notes or other instruments evidencing the indebtedness with respect to all sums borrowed by the receiver

Page 13 -   Order Appointing Receiver

from them on behalf of NPG, Nor Pac, RTH, and Burns. All sums advanced by Wells Fargo, Bank of America, and CIT to the receiver pursuant to paragraphs 13 and 14 of this order, together with interest thereon at the default contract rate, shall be secured by Wells Fargo's existing lien and security interest in the Collateral, and otherwise shall constitute a first lien against such assets.

16.     EHI may at any time apply to this Court, after notice to all parties, for further or other instructions and powers necessary to enable EHI to properly perform its duties.

17.     The appointment of the receiver provided for herein is subject to EHI *no later than 5P.M. PST on Wednesday January 27, 2010.* posting security in the amount of $2 million∧ The costs of such security shall be paid out of the assets of the receivership estate. EHI is authorized to file a fax or electronic copy of the security *Notwithstanding The foregoing, The receivership* so long as the original security is filed in due course. *will be effective upon entry of this Order, but The receivership will lapse if the bond is not timely*

18.     Upon payment in full to Wells Fargo of the amounts due, EHI shall file an *filed.* application to terminate the receivership together with a final accounting. In the event any interested party objects to the termination of the receivership and desires that the receivership continue, then as a condition to continuing the receivership, such interested party shall fund the receiver's costs and fees until the receivership is terminated. The receivership shall not be terminated, and the rights and obligations of the parties subject to this Order shall remain in full force, until this Court approves the receiver's final report or until the Court enters an order terminating the receivership. If such interested party fails to cover such costs and fees of the continuing receivership, EHI shall be permitted to resign as receiver upon thirty (30) days notice.

19.     During the receivership, and after termination of the receivership, no party may initiate litigation against EHI as receiver without first seeking authority from this Court. To the extent the Court allows any such litigation to proceed, Plaintiff shall indemnify receiver for and hold receiver harmless from any and all actions, causes of action, claims, costs, damages, liabilities or expenses, including reasonable attorney fees (collectively "Claims") incurred by receiver by reason of, during, and/or arising from its appointment and service as receiver, except

Page 14 -   Order Appointing Receiver

to the extent that they arise from receiver's bad faith, gross negligence, willful malfeasance, reckless disregard of duty, or fraud, excluding any Claims to the extent same are covered and satisfied by insurance.

DATED this _20th_ day of January, 2010.

_anna J Brmm_

United States District Court Judge

Submitted by:

MILLER NASH LLP

_Teresa H. Pearson_

Teresa H. Pearson, P.C., OSB No. 953750
teresa.pearson@millernash.com
Bruce A. Rubin, P.C., OSB No. 763185
bruce.rubin@millernash.com
Clifton Molatore, P.C., OSB No. 044699
clifton.molatore@millernash.com
Phone: (503) 224-5858
Fax: (503) 224-0155

Attorneys for Plaintiff Wells Fargo Capital
Finance, Inc., formerly known as Wells
Fargo Foothill, Inc.

Page 15 -    Order Appointing Receiver

**Teresa H. Pearson, P.C., OSB No. 953750**
teresa.pearson@millernash.com
**Bruce A. Rubin, P.C., OSB No. 763185**
bruce.rubin@millernash.com
**Clifton Molatore, P.C., OSB No. 044699**
clifton.molatore@millernash.com
MILLER NASH LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204-3699
Telephone: (503) 224-5858
Facsimile: (503) 224-0155

      Attorneys for Plaintiff
      Wells Fargo Capital Finance, Inc., formerly
      known as Wells Fargo Foothill, Inc.

## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | |
|---|---|
| WELLS FARGO CAPITAL FINANCE, INC., formerly known as Wells Fargo Foothill, Inc., a California corporation, as Administrative Lender and Agent on behalf of itself, Bank of America, N.A., and The CIT Group/Business Credit, Inc., <br><br> Plaintiff, <br><br> v. <br><br> NORTH PACIFIC GROUP, INC., an Oregon corporation; NOR PAC ENTERPRISES, INC., an Oregon corporation; RTH LUMBER CO., an Oregon corporation, and BURNS HOLDINGS, INC., a dissolved Oregon corporation, <br><br> Defendants. | CV No. _____ <br><br> COMPLAINT <br><br> (Breach of Contract; Appointment of Receiver; Injunction in Aid of Receiver) |

Page 1 -    Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204-3699

Plaintiff, for its complaint against defendants, alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff is the Administrative Lender to the defendants pursuant to a

Credit Agreement dated December 22, 2006, as amended (collectively with all amendments, the

"Credit Agreement"). Defendants have defaulted on the loans due to Lenders (defined below).

Plaintiff seeks enforcement of the Credit Agreement and to recover the amounts due. Plaintiff

further seeks the appointment of a receiver and an injunction in aid of the receiver.

## PARTIES

2.      Wells Fargo Capital Finance, Inc. ("Wells Fargo"), formerly known as

Wells Fargo Foothill, Inc., is now and at all relevant times has been a corporation organized and

existing under the laws of California, with a principal place of business in California. Wells

Fargo is a Lender, and the Administrative Lender and Swingline Lender, under the Credit

Agreement.

3.      As Administrative Lender, Wells Fargo is authorized to act on behalf of

Bank of America, N.A. ("Bank of America"), under the Credit Agreement. Bank of America is

now and at all relevant times has been a national banking association with its principal place of

business in Charlotte, North Carolina. Bank of America is a Lender, and the Documentation

Agent, under the Credit Agreement.

4.      As Administrative Lender, Wells Fargo is also authorized to act on behalf

of The CIT Group/Business Credit, Inc. ("CIT"), under the Credit Agreement. CIT is now and at

all relevant times has been a corporation organized and existing under the laws of New York,

with a principal place of business in New York. CIT is a Lender, and the Syndication Agent,

Page 2 -    Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204-3699

under the Credit Agreement. Collectively, Wells Fargo, Bank of America, and CIT are the "Lenders."

5.     North Pacific Group, Inc. ("NPG"), is now and at all relevant times has been a corporation organized and existing under the laws of Oregon, with a principal place of business in Oregon. NPG is a Borrower under the Credit Agreement.

6.     NOR PAC Enterprises, Inc. ("Nor Pac"), is now and at all relevant times has been a corporation organized and existing under the laws of Oregon with a principal place of business in Oregon. Nor Pac is a Borrower under the Credit Agreement and is a subsidiary of NPG.

7.     RTH Lumber Co. ("RTH") is now and at all relevant times has been a corporation organized and existing under the laws of Oregon, with a principal place of business in Oregon. RTH is a Borrower under the Credit Agreement and is a subsidiary of NPG.

8.     Burns Holdings, Inc. ("Burns") is a corporation organized and existing under the laws of Oregon, with a principal place of business in Oregon. Burns has been dissolved but continues its corporate existence under ORS 60.637. Burns is a Borrower under the Credit Agreement and was a subsidiary of NPG.

## JURISDICTION AND VENUE

9.     Jurisdiction exists under 28 U.S.C. § 1332 as this is an action between citizens of different states and the amount in controversy exceeds the sum of $75,000 exclusive of interests and costs.

Page 3 -     Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204-3699

    10.     Venue is proper under 28 U.S.C. § 1391 as all of the defendants reside in Oregon, and a substantial part of the events or omissions giving rise to the claim occurred in Oregon.

## BACKGROUND FACTS

    11.     On or about December 22, 2006, NPG, Nor Pac, RTH, and Burns executed and delivered the Credit Agreement to Wells Fargo, Bank of America, and CIT. The original Credit Agreement was for a total commitment to loan $160,000,000, subject to the terms and conditions set forth therein. A true copy of the Credit Agreement is attached hereto as Exhibit A.

    12.     On or about December 28, 2007, NPG, Nor Pac, RTH, and Burns executed and delivered a Letter Agreement (the "First Amendment") to Wells Fargo as Administrative Lender, Bank of America and CIT. A true copy of the First Amendment is attached hereto as Exhibit B. The First Amendment, among other things, changed the pricing for loans under the Credit Agreement.

    13.     On or about March 31, 2008, NPG, Nor Pac, RTH, and Burns executed and delivered an Amendment Number One and Waiver to Credit Agreement (the "Second Amendment") to Wells Fargo as Administrative Lender, Bank of America and CIT. A true copy of the Second Amendment is attached hereto as Exhibit C. The Second Amendment, among other things, revised the borrowing base and changed the financial covenants that Borrowers were required to meet.

    14.     On or about June 2, 2009, NPG, Nor Pac, RTH, and Burns executed and delivered an Amendment Number Two to Credit Agreement (the "Third Amendment") to Wells

Page 4 -    Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204-3699

Fargo as Administrative Lender, Bank of America, and CIT. A true copy of the Third
Amendment is attached hereto as Exhibit D. The Third Amendment, among other things,
reduced the total loan commitments to $100,000,000.

15.     On or about September 15, 2009, NPG, Nor Pac, RTH, and Burns
executed and delivered a Letter Agreement with Respect to Certain Terms in the Credit
Agreement (the "Fourth Amendment") to Wells Fargo as Administrative Lender, Bank of
America, and CIT. A true copy of the Fourth Amendment is attached hereto as Exhibit E. The
Fourth Amendment, among other things, reduced the total loan commitments to $75,000,000
before November 1, 2009, and $70,000,000 on and after November 1, 2009.

16.     On or about October 6, 2009, NPG, Nor Pac, RTH, and Burns executed
and delivered an Extension and Letter Agreement with Respect to Certain Terms in the Credit
Agreement (the "Fifth Amendment") to Wells Fargo as Administrative Lender, Bank of
America, and CIT. A true copy of the Fifth Amendment is attached hereto as Exhibit F. The
Fifth Amendment, among other things, reduced the total loan commitments to $70,000,000.

17.     As Administrative Lender, Wells Fargo has the authority to enforce the
Loan Agreement on behalf of itself, Bank of America, and CIT.

18.     The Defendants are in default of the Credit Agreement. On or about
January 7, 2009, Wells Fargo notified NPG by written letter of a default resulting from the
borrowers' violation of the EBITDA covenant set forth in Section 10.1 of the Credit Agreement
for the period ending November 30, 2008 (the "January 2009 Default Letter"). Wells Fargo
provided notice that it would invoke the default interest rate under the Credit Agreement
effective January 1, 2009, and specifically reserved any and all of the lenders' rights and

Page 5 -    Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204-3699

remedies under the Credit Agreement. A true copy of the January 2009 Default Letter is attached hereto as Exhibit G.

19.     On or about September 18, 2009, Wells Fargo notified NPG by written letter of a default resulting from the borrowers' violation of the Fixed Charge Coverage Ratio covenant, the minimum Available Credit covenant, and the breach of certain representations and warranties made by NPG, Nor Pac, RTH, and Burns, including those relating to the correctness of financial statements and the solvency of the Borrowers (the "September 2009 Default Letter"). Wells Fargo provided notice that it would continue to charge the default interest rate, that it was under no obligation to make further loans under the Credit Agreement, that any future loans would be made on a day to day basis solely at the discretion of Wells Fargo, Bank of America, and CIT. Wells Fargo also specifically reserved any and all of the lenders' rights and remedies under the Credit Agreement. A true copy of the September 2009 Default Letter is attached hereto as Exhibit H.

20.     On or about January 12, 2010, Wells Fargo notified NPG by written letter that it would reduce the total loan commitments to $55,000,000 and increase the Borrowing Base Reserves (the "January 2010 Notice Letter"). Wells Fargo further notified NPG that in the event a final asset purchase agreement satisfactory to the Lenders had not been received by 3:00 p.m. on January 15, 2010, that the Lenders would cease funding all loans. A true copy of the January 2010 Notice Letter is attached hereto as Exhibit I.

21.     NPG failed to provide a final asset purchase agreement to the Lenders by the deadline specified in the January 2010 Notice Letter.

Page 6 -     Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204-3699

22.    As of January 19, 2010, there was and now is due, owing, and immediately payable to Wells Fargo, Bank of America, and CIT from the Defendants under the Credit Agreement the principal amount of $39,971,820.99, together with accrued interest in the amount of $172,331.92, plus interest accruing thereafter on the principal amount at the rate set forth in the Credit Agreement from January 20, 2010, until fully paid.

23.    Wells Fargo, Bank of America, and CIT have performed all conditions precedent on their part to be performed under the Credit Agreement.

24.    Pursuant to the terms of the Credit Agreement, Wells Fargo, Bank of America, and CIT are entitled to recover their reasonable attorney fees and costs incurred in connection with collection of obligations due and the enforcement of the Credit Agreement.

25.    Wells Fargo, Bank of America, and CIT have incurred, and anticipate that they will continue to incur, attorney fees and costs in connection with collection of obligations due and the enforcement of the Credit Agreement.

26.    To secure their obligations under the Credit Agreement, NPG, Nor Pac, RTH, and Burns granted a security interest in all of their personal property and rights in personal property, including, without limitation, their accounts, rights to payment, general intangibles, records, goods, fixtures, inventory, equipment, money, letter of credit rights, supporting obligations, instruments, chattel paper, deposit accounts, documents, investment property, commercial tort claims, products and proceeds (collectively, the "Collateral"), to Wells Fargo, for the benefit and on behalf of Wells Fargo, Bank of America, and CIT.

27.    In order to perfect its security interest in the Collateral, Wells Fargo filed UCC-1 Financing Statements with the Oregon Secretary of State. The financing statements

Page 7 -    Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204-3699

identify NPG, Nor Pac, RTH, and Burns as the debtors and Wells Fargo as the secured party, and describe as collateral all personal property in which NPG, Nor Pac, RTH, and Burns granted Wells Fargo a security interest. True copies of the UCC-1 Financing Statements are attached hereto as Exhibit J.

## FIRST CLAIM

### (Breach of Contract)

28.     Wells Fargo realleges and incorporates by reference the allegations of paragraphs 1 through 27 above.

29.     Because of their continuing and uncured defaults under the Credit Agreement, NPG, Nor Pac, RTH, and Burns have breached the Credit Agreement.

30.     As a result of the breach of the Credit Agreement by NPG, Nor Pac, RTH, and Burns, Wells Fargo, Bank of America, and CIT have suffered and will continue to suffer damages, in at least the amount due under the Credit Agreement, in such exact amount as will be proven at trial.

## SECOND CLAIM

### (Appointment of Receiver)

31.     Wells Fargo realleges and incorporates by reference the allegations of paragraphs 1 through 27 above.

32.     The Credit Agreement provides that upon the occurrence of an event of default, the Administrative Lender shall have all of the rights and remedies of a secured party under the UCC and all other applicable law.

Page 8 -     Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204-3699

33.     Because of the continuing and uncured defaults under the Credit

Agreement of NPG, Nor Pac, RTH, and Burns, Wells Fargo is entitled to the appointment of a

receiver as one of its remedies under the law.

34.     It is impractical and impossible for Wells Fargo, Bank of America, and

CIT to enjoy the rights granted to it under the Credit Agreement without the appointment of a

receiver who has the exclusive and broad power and authority to take possession of, control,

manage and operate the properties and businesses of NPG, Nor Pac, RTH, and Burns.

35.     Additional funds may be required to maintain and preserve the value of

the property and businesses of NPG, Nor Pac, RTH, and Burns.  NPG, Nor Pac, RTH, and Burns

are unwilling or unable to provide such additional funding.

36.     There is immediate danger that the value of the property and businesses of

NPG, Nor Pac, RTH, and Burns will be lost or materially injured or impaired, unless and until a

receiver is appointed.

37.     Accordingly, an order appointing a general receiver for the property and

businesses of NPG, Nor Pac, RTH, and Burn should be granted, providing the receiver with all

appropriate powers and duties.

38.     Wells Fargo has nominated or will nominate a qualified receiver to take

possession of the businesses and properties of NPG, Nor Pac, RTH, and Burns, to operate and

manage those businesses and properties, and to comply with all applicable state, federal,

administrative, or otherwise applicable laws and/or regulations.

Page 9 -    Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE

39.     Unless a receiver with broad powers is appointed, there is imminent danger that the value of the businesses and properties of NPG, Nor Pac, RTH, and Burns will be dissipated, to the detriment of Wells Fargo, Bank of America, and CIT.

40.     Wells Fargo has no plain, speedy, or adequate remedy at law, and will suffer irreparable damage, injury, and harm to its collateral unless the equitable relief requested herein is granted.

### THIRD CLAIM

### (Injunction in Aid of Receiver)

41.     Wells Fargo realleges and incorporates by reference the allegations of paragraphs 1 through 27 and 32 through 40 above.

42.     Wells Fargo is entitled to the appointment of a receiver who has the exclusive and broad power and authority to manage and control the businesses and properties of NPG, Nor Pac, RTH, and Burns. In aid of such receiver, Wells Fargo requests that the Court issue an injunction, restraining and enjoining NPG, Nor Pac, RTH, and Burns, and their respective agents, servants, employees, and representatives, and all other persons or entities with notice of the injunction, from:

    a.     engaging in, or performing any act which is properly performed by the receiver, and transferring or altering any books or records of NPG, Nor Pac, RTH, and Burns;

    b.     interfering with the receiver, directly or indirectly, in the management and operation of the businesses and properties of NPG, Nor Pac, RTH, and Burns, or otherwise directly or indirectly taking any actions or causing

Page 10 -    Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE

any such action to be taken which would dissipate the assets or negatively affect the operations of NPG, Nor Pac, RTH, and Burns;

        c.     expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, or otherwise disposing of the whole or any part of the businesses and properties of NPG, Nor Pac, RTH, and Burns without the prior written consent of Wells Fargo; provided, however, that nothing contained in the Court's order should prohibit or restrain Wells Fargo from initiating and/or completing a sale by judicial or nonjudicial foreclosure of its collateral, or any portion thereof, and thereafter taking title and possession thereto; and

        d.     doing any act which will, or which will tend to, directly or indirectly, impair, defeat, prevent, or prejudice the preservation of the businesses and properties of NPG, Nor Pac, RTH, and Burns, or Wells Fargo's interest in such assets and properties.

        WHEREFORE, plaintiff requests:

        (1)     On its first claim for relief, for judgment in an amount to be proven at trial;

        (2)     On its second claim for relief, that a receiver be appointed who has the exclusive and broad power and authority to take possession of, control, manage and operate the properties and businesses of NPG, Nor Pac, RTH, and Burns;

Page 11 -    Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204-3699

(3)     On its third claim for relief, for an injunction, restraining and enjoining NPG, Nor Pac, RTH, and Burns, and their respective agents, servants, employees, and representatives, and all other persons or entities with notice of the injunction, from:

a.     engaging in, or performing any act which is properly performed by the receiver, and transferring or altering any books or records of NPG, Nor Pac, RTH, and Burns;

b.     interfering with the receiver, directly or indirectly, in the management and operation of the businesses and properties of NPG, Nor Pac, RTH, and Burns, or otherwise directly or indirectly taking any actions or causing any such action to be taken which would dissipate the assets or negatively affect the operations of NPG, Nor Pac, RTH, and Burns;

c.     expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, or otherwise disposing of the whole or any part of the businesses and properties of NPG, Nor Pac, RTH, and Burns without the prior written consent of Wells Fargo; provided, however, that nothing contained in the Court's order should prohibit or restrain Wells Fargo from initiating and/or completing a sale by judicial or nonjudicial foreclosure of its collateral, or any portion thereof, and thereafter taking title and possession thereto; and

d.     doing any act which will, or which will tend to, directly or indirectly, impair, defeat, prevent, or prejudice the preservation of the businesses

Page 12 -   Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE

and properties of NPG, Nor Pac, RTH, and Burns, or Wells Fargo's interest in

such assets and properties.

    (4)    Judgment for its attorney fees and costs incurred herein; and

    (5)    Such other relief as this court deems just and proper.

DATED this 20th day of January, 2010.

MILLER NASH LLP

Teresa H. Pearson, OSB No. 953750
teresa.pearson@millernash.com
Bruce A. Rubin, P.C., OSB No. 763185
bruce.rubin@millernash.com
Clifton Molatore, P.C., OSB No. 044699
clifton.molatore@millernash.com
Phone: (503) 224-5858
Fax: (503) 224-0155

    Attorneys for Plaintiff Wells Fargo
    Capital Finance, Inc., formerly known
    as Wells Fargo Foothill, Inc.

Page 13 -   Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE

**CREDIT AGREEMENT**

**among**

**NORTH PACIFIC GROUP, INC.
AND ITS SUBSIDIARIES SIGNATORY HERETO
as Borrowers**

**LENDERS NAMED HEREIN,
as Lenders**

**WELLS FARGO FOOTHILL, INC.,
as Administrative Lender and Swingline Lender**

**BANK OF AMERICA, N.A.,
as Documentation Agent**

**THE CIT GROUP/BUSINESS CREDIT, INC.,
as Syndication Agent**

**TOTAL COMMITMENT -- $160,000,000**

**December 22, 2006**

BN 1042967v14

## TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS ................................................................................1

    1.1        DEFINED TERMS .................................................................1
    1.2        ACCOUNTING AND FINANCIAL DETERMINATIONS .........24
    1.3        HEADINGS ..........................................................................24
    1.4        GENERAL DEFINITIONAL PROVISIONS ............................24

ARTICLE II       APPOINTMENT OF BORROWERS' AGENT; JOINT AND
                 SEVERAL LIABILITY ..........................................................25

    2.1        APPOINTMENT OF AGENT................................................25
    2.2        JOINT AND SEVERAL LIABILITY; RIGHTS OF
               CONTRIBUTION..................................................................25

ARTICLE III      THE CREDITS ....................................................................30

    3.1        REVOLVING LOANS ...........................................................30
    3.2        SWING LOANS; PROTECTIVE LOANS; OPTIONAL
               OVERADVANCES ................................................................31
    3.3        LETTER OF CREDIT FACILITY ...........................................33
    3.4        INTEREST/FEES ................................................................37
    3.5        INTEREST OPTIONS ..........................................................37
    3.6        OTHER PAYMENT TERMS..................................................38
    3.7        FUNDING AND SETTLEMENT ............................................40
    3.8        PRO RATA TREATMENT.....................................................44
    3.9        CHANGE OF CIRCUMSTANCES; YIELD PROTECTION; NO
               REQUIREMENT OF MATCH FUNDING ................................45
    3.10       TAXES ON PAYMENTS .......................................................47
    3.11       MITIGATION OBLIGATIONS; REPLACEMENT OF LENDERS .............49
    3.12       FUNDING LOSS INDEMNIFICATION....................................50
    3.13       AUTHORIZED REPRESENTATIVES.....................................50

ARTICLE IV       COLLECTION; ADMINISTRATION AND TERM....................50

    4.1        CASH MANAGEMENT .........................................................50
    4.2        LOAN ACCOUNT AND STATEMENTS ..................................52
    4.3        PAYMENTS ........................................................................52
    4.4        TERM .................................................................................53
    4.5        EFFECT OF TERMINATION ................................................53
    4.6        EARLY TERMINATION BY BORROWERS. ..............................54

ARTICLE V        SECURITY .........................................................................54

    5.1        GRANT OF SECURITY INTEREST .......................................54
    5.2        PERFECTION; DUTY OF CARE ...........................................54

ARTICLE VI       REPRESENTATIONS AND WARRANTIES............................55

    6.1        LEGAL STATUS; SUBSIDIARIES .........................................56
    6.2        DUE AUTHORIZATION; NO VIOLATION................................56

**TABLE OF CONTENTS**
(continued)

Page

6.3     GOVERNMENT APPROVAL, REGULATION...........................................56
6.4     VALIDITY; ENFORCEABILITY .................................................................56
6.5     CORRECTNESS OF FINANCIAL STATEMENTS.....................................56
6.6     TAXES..........................................................................................................57
6.7     LITIGATION, LABOR CONTROVERSIES ..................................................57
6.8     TITLE TO PROPERTY, LIENS ....................................................................57
6.9     ERISA MATTERS .......................................................................................57
6.10    OTHER OBLIGATIONS ..............................................................................58
6.11    ENVIRONMENTAL MATTERS ..................................................................58
6.12    NO BURDENSOME RESTRICTIONS; NO DEFAULTS............................58
6.13    NO OTHER VENTURES..............................................................................59
6.14    INSURANCE.................................................................................................59
6.15    FORCE MAJEURE .......................................................................................59
6.16    INTELLECTUAL PROPERTY ....................................................................59
6.17    CERTAIN INDEBTEDNESS .......................................................................59
6.18    SOLVENCY .................................................................................................60
6.19    CHIEF EXECUTIVE OFFICE AND OTHER LOCATIONS ........................60
6.20    ELIGIBLE ACCOUNTS...............................................................................60
6.21    FISCAL YEAR..............................................................................................60
6.22    COMPLIANCE WITH LAW.........................................................................60
6.23    NO SUBORDINATION................................................................................60
6.24    TRUTH, ACCURACY OF INFORMATION................................................60
6.25    NON-OPERATING SUBSIDIARIES............................................................61

ARTICLE VII     CONDITIONS .................................................................................61

7.1     CONDITIONS OF INITIAL EXTENSION OF CREDIT .............................61
7.2     CONDITIONS OF EACH EXTENSION OF CREDIT ..................................64

ARTICLE VIII    AFFIRMATIVE COVENANTS ......................................................64

8.1     PAYMENTS ................................................................................................64
8.2     ACCOUNTING RECORDS.........................................................................64
8.3     FINANCIAL INFORMATION AND REPORTS...........................................65
8.4     COMPLIANCE.............................................................................................65
8.5     INSURANCE................................................................................................65
8.6     FACILITIES .................................................................................................66
8.7     TAXES AND OTHER LIABILITIES ............................................................66
8.8     LITIGATION................................................................................................66
8.9     NOTICE TO ADMINISTRATIVE LENDER................................................67
8.10    CONDUCT OF BUSINESS .........................................................................67
8.11    PRESERVATION OF EXISTENCE, ETC ....................................................67
8.12    ACCESS ......................................................................................................67
8.13    PERFORMANCE AND COMPLIANCE WITH CONTRACTUAL
        OBLIGATIONS............................................................................................68
8.14    INTENTIONALLY OMITTED ....................................................................68

**TABLE OF CONTENTS**
(continued)

|  |  | Page |
|---|---|---|
| 8.15 | ENVIRONMENTAL | 68 |
| 8.16 | LIENS | 69 |
| 8.17 | USE OF PROCEEDS | 69 |
| 8.18 | COMPLIANCE WITH ERISA | 69 |
| 8.19 | JOINDER OF SUBSIDIARIES | 69 |
| 8.20 | COLLATERAL LOCATIONS | 69 |
| 8.21 | FURTHER ASSURANCES | 70 |
| 8.22 | ESOP QUALIFICATION | 70 |
| 8.23 | POST-CLOSING COVENANTS | 70 |
| ARTICLE IX | NEGATIVE COVENANTS | 70 |
| 9.1 | LIENS | 70 |
| 9.2 | INDEBTEDNESS | 70 |
| 9.3 | RESTRICTED PAYMENTS, REDEMPTIONS | 72 |
| 9.4 | MERGERS, STOCK ISSUANCES, SALE OF ASSETS, ETC. | 73 |
| 9.5 | INVESTMENTS IN OTHER PERSONS | 74 |
| 9.6 | CHANGE IN NATURE OF BUSINESS | 75 |
| 9.7 | GUARANTIES | 75 |
| 9.8 | ERISA | 75 |
| 9.9 | CANCELLATION OF INDEBTEDNESS OWED TO IT | 75 |
| 9.10 | MARGIN REGULATIONS | 75 |
| 9.11 | ENVIRONMENTAL | 75 |
| 9.12 | TRANSACTIONS WITH AFFILIATES | 76 |
| 9.13 | NAME CHANGE; JURISDICTION CHANGE | 76 |
| 9.14 | NO SPECULATIVE TRANSACTIONS | 76 |
| 9.15 | TRANSACTIONS WITH SUBSIDIARIES | 76 |
| 9.16 | CONSIGNMENTS | 76 |
| 9.17 | INVENTORY AND EQUIPMENT WITH BAILEES | 77 |
| 9.18 | FISCAL YEAR; ACCOUNTING METHODS | 77 |
| 9.19 | CHARLESTOWN LOCATION | 77 |
| ARTICLE X | FINANCIAL COVENANTS | 77 |
| 10.1 | MINIMUM EBITDA | 77 |
| 10.2 | INTEREST COVERAGE RATIO | 79 |
| 10.3 | CAPITAL EXPENDITURES | 79 |
| ARTICLE XI | EVENTS OF DEFAULT | 80 |
| 11.1 | EVENTS OF DEFAULT | 80 |
| 11.2 | REMEDIES | 82 |
| 11.3 | POWER OF ATTORNEY | 84 |
| ARTICLE XII | ADMINISTRATIVE LENDER | 85 |
| 12.1 | APPOINTMENT AND AUTHORITY | 85 |
| 12.2 | RIGHTS AS A LENDER | 85 |
| 12.3 | EXCULPATORY PROVISIONS | 85 |

 

**TABLE OF CONTENTS**
(continued)

Page

12.4      RELIANCE BY ADMINISTRATIVE LENDER .............................................86
12.5      DELEGATION OF DUTIES.........................................................................87
12.6      RESIGNATION OF ADMINISTRATIVE LENDER ....................................87
12.7      INTENTIONALLY OMITTED .....................................................................87
12.8      NON- RELIANCE ON ADMINISTRATIVE LENDER AND OTHER
          LENDERS....................................................................................................88

ARTICLE XIII    MISCELLANEOUS .......................................................................88
13.1      NOTICES.....................................................................................................88
13.2      EXPENSES; INDEMNITY; DAMAGE WAIVER ........................................89
13.3      WAIVERS, AMENDMENTS .......................................................................91
13.4      SUCCESSORS AND ASSIGNS .................................................................92
13.5      SETOFF .......................................................................................................94
13.6      NO WAIVER; CUMULATIVE REMEDIES .................................................95
13.7      CONFIDENTIALITY....................................................................................95
13.8      AMENDMENT; COUNTERPARTS; INTEGRATION;
          EFFECTIVENESS.......................................................................................96
13.9      NO THIRD PARTY BENEFICIARIES .........................................................96
13.10     TIME............................................................................................................96
13.11     SEVERABILITY OF PROVISIONS .............................................................96
13.12     BANK PRODUCT PROVIDERS .................................................................97
13.13     GOVERNING LAW......................................................................................97
13.14     SUBMISSION TO JURISDICTION.............................................................97
13.15     WAIVER OF JURY TRIAL...........................................................................98
13.16     COUNTERPARTS .....................................................................................101
13.17     USA PATRIOT ACT...................................................................................101

## CREDIT AGREEMENT

THIS CREDIT AGREEMENT is entered into as of December 22, 2006 by and among NORTH PACIFIC GROUP, INC., an Oregon corporation ("Parent"), and each of the direct and indirect subsidiaries of Parent from time to time signatory hereto, each of the financial institutions from time to time listed on Schedule I attached hereto, as amended from time to time, WELLS FARGO FOOTHILL, INC. ("WFF"), as the Swingline Lender and administrative agent for Lenders (in such capacity, "Administrative Lender").

The parties agree as follows:

### ARTICLE I

### DEFINITIONS

#### 1.1 DEFINED TERMS

All terms defined above shall have the meanings set forth above. The following terms shall have the meanings set forth below:

"**Accounts**" means (i) all "accounts" as defined in the UCC and (ii) all presently existing and hereafter arising rights to payment of a monetary obligation, whether or not earned by performance.

"**Administrative Lender's Office**" means (i) initially, Administrative Lender's office designated as such in Schedule I hereto, and (ii) subsequently, such other office designated as such, from time to time, in writing by Administrative Lender to Lenders and Parent.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by Administrative Lender.

"**Adjusted EBITDA**" means, as of the end of a fiscal quarter, Parent's consolidated net income after taxes for the twelve months ending with such quarter (determined in a manner consistent with the standards described in Section 1.2) plus (A) the sum of the amounts for such twelve month period included in determining such net income of (i) interest expense, (ii) income tax expense, (iii) depreciation expense, (iv) amortization expense, (v) other non-recurring non-cash losses and charges and (vi) non-cash ESOP contribution expense; less (B) extraordinary gains and other non-recurring non-cash gains for such twelve month period, in each case determined in accordance with GAAP.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided that a Subsidiary shall not be considered an Affiliate of Borrower.

"**Agreement**" means this Credit Agreement as amended, modified or supplemented from time to time.

"**Applicable Percentage**" means with respect to any Lender, the percentage of the Total Commitments represented by such Lender's Revolving Loan Commitments. If the Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Commitments most recently in effect, giving effect to any assignments.

"**Applicable Margin**" means the Base Rate Margin or the LIBOR Margin, as the context requires.

"**Applicable Rate**" means, at any date, the lesser of (a) the Highest Lawful Rate or (b) the following: (i) with respect to each Base Rate Loan, a per annum rate equal to the sum of the Base Rate in effect on such date and the applicable Base Rate Margin; and (ii) with respect to each LIBOR Loan, a per annum rate equal to the sum of LIBOR plus the applicable LIBOR Margin, both as determined on the second Business Day before the first day of the applicable Interest Period.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Acquisition**" means the purchase or other acquisition by any Borrower of all or substantially all of the assets of any other Person.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 13.4), and accepted by Administrative Lender, in substantially the form of Exhibit G or any other form approved by Administrative Lender.

"**Authorized Representative**" means a person designated as such by Parent in a Notice of Authorized Representatives delivered to Administrative Lender.

"**Available Credit**" means, at any time, the amount by which (a) the lesser of (i) the total of the Revolving Loan Commitments or (ii) the Borrowing Base is greater than (b) the total of the outstanding principal amount of the Revolving Loans (including Protective Loan and intentional Overadvances), the Letter of Credit Obligations and Swing Loans.

"**Bank Product**" means any financial accommodation extended to Parent or its Subsidiaries by a Bank Product Provider (other than pursuant to the Agreement) including: (a) credit cards, (b) credit card processing services, (c) debit cards, (d) purchase cards, (e) ACH transactions, (f) cash management, including controlled disbursement, accounts or services, or (g) transactions under Hedge Agreements.

"**Bank Product Agreements**" means those agreements entered into from time to time by Parent or its Subsidiaries with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"**Bank Product Collateralization**" means providing cash collateral (pursuant to documentation reasonably satisfactory to Administrative Lender) to be held by Administrative Lender for the benefit of the Bank Product Providers in an amount determined by Administrative

Lender as sufficient to satisfy the reasonably estimated credit exposure with respect to the then existing Bank Products.

"**Bank Product Obligations**" means all obligations, liabilities, contingent reimbursement obligations, fees, and expenses owing by Parent or its Subsidiaries to any Bank Product Provider pursuant to or evidenced by the Bank Product Agreements and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all such amounts that Parent or its Subsidiaries are obligated to reimburse to Administrative Lender or any Lender as a result of Administrative Lender or such Lender purchasing participations from, or executing indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Bank Products provided by such Bank Product Provider to Parent or its Subsidiaries.

"**Bank Product Provider**" means Wells Fargo or any of its Affiliates.

"**Bank Product Reserve**" means, as of any date of determination, the lesser of (a) $3,000,000, and (b) the amount of reserves that Administrative Lender has established (based upon the Bank Product Providers' reasonable determination of the credit exposure of Parent and its Subsidiaries in respect of Bank Products) in respect of Bank Products then provided or outstanding, provided that in order to qualify as Bank Product Reserves, such reserves must be established on or substantially contemporaneous to the date that the Bank Product Provider provides the applicable Bank Products, except for the Bank Product Reserve that may be established with respect to purchase cards issued by the Bank Product Provider on or before the Closing Date. The Bank Product Reserve as of the Closing Date is $500,000.

"**Bankruptcy Code**" means the Bankruptcy Reform Act, Title 11 of the United States Code, as amended or recodified from time to time, including (unless the context otherwise requires) any rules or regulations promulgated thereunder.

"**Base Rate**" means, for any day, an interest rate per annum equal to the rate of interest most recently announced within Wells Fargo at its principal office as its prime rate, with any change in the prime rate to be effective as of the day such change is announced within Wells Fargo and with the understanding that the prime rate is one of Wells Fargo's base rates used to price some loans and may not be the lowest rate at which Wells Fargo makes any loan, and is evidenced by the recording thereof in such internal publication or publications as Wells Fargo may designate.

"**Base Rate Loan**" means any Loan that bears interest with reference to the Base Rate.

"**Base Rate Margin**" means the number of basis points determined in accordance with Schedule III.

"**Borrowers**" means, collectively, Parent and each of Parent's subsidiaries from time to time signatory hereto, and "**Borrower**" means any one of the Borrowers.

"**Borrowing Base**" means, as of any date of determination, an amount equal to the following amount:

BN 1042967v14                                    3

(a)     85% of the outstanding Eligible Accounts other than Eligible Accounts described in item (vii)(B) of the definition of Eligible Accounts ("Foreign Insured Receivables") *less* the amount, if any, of the Dilution Reserve with respect to all Accounts other than Foreign Insured Receivables; plus

(b)     with respect to each Foreign Insured Receivable that is an Eligible Account, 75% of the lesser of the amount of credit insurance on such Foreign Insured Receivable or the outstanding balance thereof *less* the amount, if any, of the Dilution Reserve with respect to Foreign Insured Receivables, provided that the total amount included in the Borrowing Base with respect to all Foreign Insured Receivables shall not exceed $7,000,000; plus

(c)     the lesser of:

(i)     the sum of:

(1)     60% of the value of the difference of: (y) Category A Inventory minus (z) the amount of the LCM Reserve, plus

(2)     the lesser of: (i) 55% of the value of Domestic In-Transit Inventory and (ii) $10,000,000, plus

(3)     the lesser of: (i) 55% of the value of Foreign In-Transit Inventory and (ii) $5,000,000, and

(ii)     150% of the amount of credit availability created by the sum of clauses (a) and (b) above, minus

(d)     all Borrowing Base Reserves.

"**Borrowing Base Certificate**" means a certificate substantially in the form of Exhibit A attached hereto.

"**Borrowing Base Reserves**" means, as of any date of determination, such amounts (expressed as a specified amount or as a percentage of a specified category or item) as Administrative Lender, in its reasonable discretion, may from time to time establish in determining the Borrowing Base to reflect contingencies or risks affecting the Collateral or reflecting the business, business prospects or financial condition of Borrowers, or the security of the loans made hereunder; provided, however, that the Borrowing Base Reserves shall include the Availability Reserve, the Bonus Reserve, the Bank Product Reserve, the TB Account Reserve, and the ESOP Reserve. "Availability Reserve" means a reserve of $5,000,000. "Bonus Reserve" means a reserve equal to a percentage of the projected amount of the annual bonuses expected to be paid by Borrowers to their employees in cash, net of deferred compensation, on the next bonus payment date (expected to be March 15 of each year), which reserve shall be established by January 31 of each year in an amount equal to 30% of the projected amount of such annual bonuses and which amount shall be increased on or before February 28 of each year to an aggregate amount equal to 60% of the projected amount of such annual bonuses, which reserve may be adjusted by the Administrative Lender in their reasonable discretion, provided, however that to the extent Borrowers modify the bonus structure in existence as of the Closing

Date to one where monthly commission payments are expensed and paid instead of annual bonuses, then effective on the first day of the year immediately after the year on which such change was made, the Bonus Reserve will be eliminated. "ESOP Reserve" means an amount equal to the projected cash payments required by the ESOP for such period as Administrative Lender deems appropriate.

"**Business Day**" means (a) for all purposes other than as covered by clause (b) below, any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required to be closed in Los Angeles, California or New York, New York and (b) with respect to all notices, determinations, fundings and payments in connection with any LIBOR interest selection or LIBOR Loan, any day that is a Business Day described in clause (a) above and that also is a day for trading by and between banks in U.S. dollar deposits in the London interbank market.

"**Capital Expenditures**" means, with respect to any Person for any period, the aggregate of all expenditures by such Person and its Subsidiaries during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"**Capital Lease**" means, as to any Person, any lease of property by such Person as lessee that would be capitalized on a balance sheet of such Person prepared in accordance with GAAP.

"**Capital Lease Obligations**" means, as to any Person, the capitalized amount of all obligations of such Person and its subsidiaries under Capital Leases, as determined on a consolidated basis in accordance with GAAP.

"**Cash Equivalents**" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) deposit accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the amount maintained with any such other bank is less than or equal to $100,000 and is insured by the Federal Deposit Insurance Corporation, and (f) investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (e) above.



"**Cash Management Account**" has the meaning specified therefor in Section 4.1(a).

"**Cash Management Agreements**" means those certain cash management agreements, in form and substance satisfactory to Administrative Lender, each of which is among Parent or one of its Subsidiaries, Administrative Lender, and one of the Cash Management Banks.

"**Cash Management Bank**" has the meaning set forth in Section 4.1(a).

"**Category A Inventory**" means Eligible Inventory that (i) is not In-Transit Inventory and (ii) fulfills one of the following requirements: (x) is located in premises owned by a Borrower which are either not encumbered by a mortgage or deed of trust or are so encumbered and mortgagee waivers acceptable to Administrative Lender (in its sole discretion) regarding such encumbrances have been delivered to Administrative Lender, (y) is located in premises leased by a Borrower for which landlord waivers acceptable to Administrative Lender (in its sole discretion) have been delivered to Administrative Lender, or (z) is located in public warehouses for which warehouseman's waivers acceptable to Administrative Lender (in its sole discretion) have been delivered to Administrative Lender. In addition, if at least 65% of the Eligible Inventory that is not In-Transit Inventory is included within items (x), (y) and (z) above, then all of the remaining Eligible Inventory that is not In-Transit Inventory shall be Category A Inventory.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Governmental Rule, (b) any change in any Governmental Rule or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Closing Date**" means the date of this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means (a) all of Borrowers' personal property and rights in and to personal property, including, without limitation, all Accounts, Rights to Payment, General Intangibles, Records, goods, fixtures, inventory, equipment, money, letter of credit rights, supporting obligations, instruments, chattel paper, deposit accounts, documents, investment property and commercial tort claims; (b) all products, proceeds, rents and profits of the foregoing; and (c) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which any Borrower now has or hereafter acquires any rights.

"**Collateral Location**" means a location at which Borrowers keep Collateral having of value of $500,000 or more.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.



"**Commitment**" means a Lender's obligation to advance credit hereunder.

"**Commodity Contracts**" means commodity options, futures, swaps, and other similar agreements and arrangements designed to provide protection against fluctuations in commodity prices.

"**Contaminant**" means any pollutant, hazardous substance, toxic substance, hazardous waste or other substance regulated or forming the basis of liability under any Environmental Law.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of such Person with respect to any Indebtedness or contractual obligation of another Person, if the purpose or intent of such Person in incurring the Contingent Obligation is to provide assurance to the obligee of such Indebtedness or contractual obligation that such Indebtedness or contractual obligation will be paid or discharged, or that any agreement entered into by such other Person relating to such Indebtedness or Contingent Obligation will be complied with, or that any holder of such Indebtedness or contractual obligation will be protected against loss in respect thereof. Contingent Obligations of a Person include, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of an obligation of another Person, and (b) any liability of such Person for an obligation of another Person through any agreement (contingent or otherwise) (i) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of a loan, advance, stock purchase, capital contribution or otherwise), (ii) to maintain the solvency or any balance sheet item, level of income or financial condition of another Person, (iii) to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (iv) to purchase, sell or lease (as lessor or lessee) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such obligation or to assure the holder of such obligation against loss, or (v) to supply funds to or in any other manner invest in such other Person (including, without limitation, to pay for property or services irrespective of whether such property is received or such services are rendered), if in the case of any agreement or liability described under subclauses (i) through (v) of this sentence the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the lesser of (A) the amount payable under such Contingent Obligation (if quantifiable) or (B) the portion of the obligation so guaranteed or otherwise supported.

"**Debt**" of any Person means, without duplication, (i) all Indebtedness of such Person referred to in clauses (a), (b), (c), (d), (e) and (g) of the definition of "Indebtedness" and (ii) all Contingent Obligations of such Person in respect of Indebtedness of any Person of the type described in such clauses of the definition of "Indebtedness." For purposes of determining the amount of Debt in a circumstance when the creditor has recourse only to specified assets, the amount shall be the lesser of (i) the amount of such obligation or (ii) the fair market value of such assets.



"**Default**" means (i) an Event of Default, (ii) an event or condition that with the giving of notice or the passage of time, or both, would constitute an Event of Default, or (iii) the filing against any Borrower of a petition commencing an involuntary case under the Bankruptcy Code.

"**Defaulting Lender**" means any Lender that fails to make any Revolving Loan (or other extension of credit) that it is required to make hereunder on the date that it is required to do so hereunder.

"**Defaulting Lender Rate**" means (a) for the first 3 days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Revolving Loans that are Base Rate Loans (inclusive of the Base Rate Margin applicable thereto).

"**Dilution**" means, as of any date of determination, a percentage, based upon the experience of the immediately prior 90 consecutive days, that is the result of dividing the dollar amount of (a) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to Borrowers' Accounts during such period, by (b) Borrowers' billings with respect to Accounts during such period.

"**Dilution Reserve**" means, as of any date of determination, an amount sufficient to reduce the advance rate against Eligible Accounts by 1 percentage point for each percentage point by which Dilution is in excess of 5%.

"**Disclosure Schedule**" means Schedule II attached hereto.

"**Domestic In-Transit Inventory**" means Eligible Inventory which is in transit within the territory of the United States.

"**Eligible Accounts**" means those Accounts that Administrative Lender determines in its reasonable discretion to be eligible for inclusion in the Borrowing Base based on such credit and collateral value considerations as it determines to be relevant to a decision to lend against such assets. General criteria for Eligible Accounts may be established and revised from time to time by Administrative Lender in its reasonable discretion. Without limiting such discretion as to other Accounts, the following Accounts shall not be Eligible Accounts:

(i) Accounts that do not consist of ordinary trade accounts receivable owned by a Borrower, payable in cash in United States Dollars and arising out of the final sale of inventory or provision of services in the ordinary course of Borrowers' business as presently conducted by them;

(ii) Accounts with respect to which a Borrower failed to issue an original invoice at the agreed-upon purchase price to the account debtor promptly after rendering the services or delivering the goods that are the subject of such Account;

(iii) Accounts that are not due and payable, absolutely and unconditionally, within 90 days from the date of the original invoice applicable thereto;

(iv)     Accounts with respect to which more than 90 days have elapsed since the date of the original invoice applicable thereto or that are more than 60 days past due;

(v)     Accounts with respect to which the account debtor is a Related Party of any Borrower or a Subsidiary;

(vi)     Accounts with respect to which the account debtor is the United States of America or any state, or any department, agency or instrumentality thereof, except for those Accounts as to which the relevant Borrower has assigned its right to payment thereof to Administrative Lender, and the assignment has been acknowledged, pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727);

(vii)     the chief executive office of the account debtor with respect to such Account is not located in the United States of America, unless (A) the account debtor has delivered to the relevant Borrower an irrevocable letter of credit issued or confirmed by a bank satisfactory to Administrative Lender, sufficient to cover such Account, in form and substance satisfactory to Administrative Lender, and, if required by Administrative Lender, the original of such letter of credit has been delivered to Administrative Lender or Administrative Lender's agent and the issuer thereof notified of the assignment of the proceeds of such letter of credit to Administrative Lender, (B) such Account is subject to credit insurance payable to Administrative Lender issued by an insurer and on terms and in an amount acceptable to Administrative Lender, (C) the account debtor resides in a province of Canada, or (D) such Account is otherwise acceptable in all respects to Administrative Lender;

(viii)     Accounts for which, in Administrative Lender's discretion, the prospect of payment or performance by the account debtor is or will be impaired;

(ix)     Accounts with respect to which Administrative Lender does not have a valid and prior, fully perfected Lien or which are not free of all Liens or other claims (including, without limitation, claims for rebates, credits, allowances or adjustments) of all other Persons;

(x)     Accounts with respect to which the account debtor is the subject of bankruptcy or a similar insolvency proceeding, or has made an assignment for the benefit of creditors, or whose assets have been conveyed to a receiver or trustee, or who has failed or suspended or gone out of business;

(xi)     Accounts with respect to which the account debtor's obligation to pay the Accounts is conditional upon the account debtor's approval, or which relate to the sale of inventory on sale or return, sale on consignment, or other conditional sale;

(xii)     Accounts with respect to an account debtor whose total obligations owing to Borrowers (whether evidenced by such Accounts or otherwise) exceed 25% of the face amount (less maximum discounts, credits and allowances which may be taken by or granted to account debtors in connection therewith) of all then outstanding Eligible Accounts, to the extent of the obligations owing by such account debtor in excess of such percentage;



(xiii)   Accounts owed by a particular account debtor if 50% or more of the aggregate Accounts then owed to Borrowers by that account debtor and its Affiliates are not Eligible Accounts;

(xiv)   Accounts that represent a prepayment or progress payment or a partial payment under an installment contract;

(xv)   Accounts that are evidenced by chattel paper, a promissory note or other instrument;

(xvi)   Accounts with respect to which the account debtor is also a creditor of a Borrower, but only to the extent of the amount owed by Borrowers to such account debtor if such amount is less than the amount of all Accounts with respect to such account debtor that otherwise would be Eligible Accounts; provided, however, until such time as Borrowers have implemented a computer reporting system that facilitates comparison of account debtors with account payees: (A) this item (xvi) shall apply only to Borrowers' 100 largest customers; and (B) Administrative Lender shall establish a contra exposure Borrowing Base Reserve of not less than $1,000,000; and

(xvii)   Accounts sold to Wells Fargo HSBC Trade Bank, NA as more specifically described in Section 9.4.

Administrative Lender has the right, but not the duty, to declare particular accounts ineligible. The fact that Administrative Lender has not declared a particular account ineligible shall not be deemed to be a determination or representation by Administrative Lender or any Lender as to the creditworthiness or financial condition of any account debtor. Because of banking relationships between account debtors of Borrowers and Administrative Lender or a Lender, Administrative Lender or a Lender may have information about the creditworthiness of such account debtors; however, none of Administrative Lender or any Lender shall have any duty to Borrowers to disclose information it may have about any of Borrowers' account debtors and Borrowers shall have no right to rely upon any action or inaction of Administrative Lender or any Lender concerning the creditworthiness or financial condition of Borrowers' account debtors. **BORROWERS HEREBY COVENANT NOT TO SUE AND TO HOLD HARMLESS LENDERS AND ADMINISTRATIVE LENDER AND THEIR OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS FOR AND FROM ANY AND ALL DAMAGES, LIABILITY, OR CLAIMS OF LIABILITY, WHETHER KNOWN OR UNKNOWN, OF ANY NATURE ARISING OUT OF OR BASED IN WHOLE OR IN PART UPON ADMINISTRATIVE LENDER'S OR ANY LENDER'S FAILURE TO DISCLOSE UNFAVORABLE INFORMATION ABOUT AN ACCOUNT DEBTOR OF ANY BORROWER TO BORROWERS, OR ADMINISTRATIVE LENDER'S FAILURE TO TREAT AS INELIGIBLE THE ACCOUNT OF AN ACCOUNT DEBTOR OF ANY BORROWER ABOUT WHOM ADMINISTRATIVE LENDER OR ANY LENDER HAS UNFAVORABLE INFORMATION.**

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person) approved by



(i) Administrative Lender, (ii) in the case of any assignment of a Revolving Loan Commitment, Issuing Lender, and (iii) unless a Default has occurred and is continuing, Parent (each such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include any Borrower or any of Borrowers' Affiliates or Subsidiaries.

"**Eligible Inventory**" means inventory that Administrative Lender determines in its reasonable discretion to be eligible for inclusion in the Borrowing Base based on such credit and collateral value considerations as they determine to be relevant to a decision to lend against such assets. General criteria for Eligible Inventory may be established and revised from time to time by Administrative Lender, in its reasonable discretion. Without limiting such discretion as to other inventory, the following inventory shall in any event not constitute Eligible Inventory:

(i) finished goods that are not held by Borrowers for sale as inventory in the ordinary course of Borrowers' business as presently conducted by it or that are obsolete, not in good condition, not of merchantable quality or not salable in the ordinary course of Borrowers' business or that are subject to defects that would affect their market value;

(ii) inventory that Administrative Lender, in their discretion, determines to be unacceptable due to age, type, category or quantity;

(iii) work in process, bill and hold goods, and Inventory acquired on consignment, or sold on consignment;

(iv) inventory in transit, except In-Transit Inventory that meets the following conditions: (A) it is insured in a manner, amount and by insurers acceptable to Administrative Lender; and (B) if it is in transit outside of the United States, it is subject to such bills of lading and other documents of title and instruments as are acceptable to Administrative Lender and, to the extent required by them, are in the possession of Administrative Lender; and

(v) inventory with respect to which Administrative Lender does not have a valid and prior, fully perfected Lien and that is not free of all other Liens, other than (A) Permitted Liens (except Permitted Liens described in item (g) of the definition of "Permitted Liens"), (B) statutory Lien rights of landlords and warehousemen and (C) rights of a mortgagee of Borrower.

"**Environmental Law**" means all Governmental Rules, and agreements with Governmental Authorities, relating to environmental, health, safety and/or land use matters.

"**Environmental Liabilities and Costs**" means, as to any Person, all liabilities, obligations, responsibilities, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including, without limitation, all fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any other Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, including, without limitation, any thereof arising under any Environmental Law, Permit, order or agreement with any Governmental Authority or other

Person, and which relate to any violation or alleged violation of an Environmental Law or a Permit, or a Release or threatened Release.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended or recodified from time to time, including (unless the context otherwise requires) any rules or regulations promulgated thereunder.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with Borrowers within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any ERISA Affiliate.

"**ESOP**" means the North Pacific Group, Inc. Employee Stock Ownership Plan, as amended from time to time.

"**Event of Default**" has the meaning set forth in Section 11.1 hereof.

"**Excluded Taxes**" means, with respect to Administrative Lender, any Lender, Issuing Lender or any other recipient of any payment to be made by or on account of any obligation of any Borrower hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which any Borrower is located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by Parent under Section 3.11), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new lending office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 3.10(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or

assignment), to receive additional amounts from Borrowers with respect to such withholding tax pursuant to Section 3.10(a).

"**Federal Funds Rate**" means, for any day, the weighted average of the per annum rates on overnight Federal funds transactions with member banks of the Federal Reserve System arranged by Federal funds brokers as published by the Federal Reserve Bank of New York for such day (or, if such rate is not so published for any day, the average rate quoted to Administrative Lender on such day by three Federal funds brokers of recognized standing selected by Administrative Lender).

"**Fee Letter**" means that certain fee letter between Borrowers and Administrative Lender, in form and substance satisfactory to Administrative Lender.

"**Foreign In-Transit Inventory**" means Eligible Inventory that is in transit outside the territory of the United States.

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction outside of the United States of America.

"**Foreign Subsidiary**" means any Subsidiary that is organized under the laws of a jurisdiction outside of the United States of America.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" means generally accepted accounting principles as in effect in the United States from time to time, consistently applied.

"**General Intangibles**" means (i) all "general intangibles" as defined in the UCC and (ii) all tax and duty refunds, registered and unregistered patents, trademarks, service marks, copyrights, trade names, applications for the foregoing, trade secrets, goodwill, processes, drawings, blueprints, customer lists, licenses, whether as licensor or licensee, choses in action, causes of action and other claims, judgments in favor of a Borrower, leasehold interests in equipment, software and payment intangibles.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Rule**" means any applicable law, rule, regulation, treaty ordinance, order, code interpretation, judgment, decree, directive, guideline, policy or similar form of decision of any Governmental Authority.



"**Hedge Agreement**" means any and all agreements, or documents now existing or hereafter entered into by Parent or any of its Subsidiaries that provide for an interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging Parent's or any of its Subsidiaries' exposure to fluctuations in interest or exchange rates, loan, credit exchange, security, or currency valuations or commodity prices.

"**Highest Lawful Rate**" means, at the particular time in question, the maximum rate of interest which, under applicable law, Lenders are then permitted to charge Borrowers on the applicable Loan, and if the maximum rate changes at any time, the Highest Lawful Rate shall increase or decrease, as the case may be, as of the effective time of each such change, without notice to Borrowers.

"**Indebtedness**" of any Person means, without duplication,

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, bills or other similar instruments;

(b)     all obligations, contingent or otherwise, relative to the face amount of all letters of credit, whether or not drawn, and banker's acceptances issued for such Person's account;

(c)     all Capital Lease Obligations and the principal component or equivalent of obligations under Other Leases of such Person;

(d)     all obligations of such person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business);

(e)     all obligations of any Person secured by a Lien on property owned or being purchased by such Person  all obligations secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property owned by such Person, even though such Person has not assumed or become liable for the payment of such obligations or such obligations are limited in recourse limited in recourse;

(f)     all liabilities of such Person as determined in accordance with GAAP;

(g)     all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property);

(h)     all Contingent Obligations of such Person;

(i)     all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any Stock or Stock Equivalents of such Person with a mandatory repurchase or redemption date of less than ten years from the date of issuance thereof; and



(j)     all liabilities of such Person in connection with the failure to make when due any contribution or payment pursuant to or under any Plan.

For purposes of determining the amount of Indebtedness in a circumstance when the creditor has recourse only to specified assets, the amount shall be the lesser of (i) the amount of such obligation or (ii) the fair market value of such assets.

"**Indemnitee**" has the meaning set forth in Section 13.2(b) hereof.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes.

"**Interest Period**" means a period of one, two, three, or six months, as designated by Parent, during which a Loan bears interest determined in relation to LIBOR; provided, however, that no Interest Period for a Revolving Loan may extend beyond the Maturity Date, and if the last day of an Interest Period is not a Business Day, such term shall be extended to the next succeeding Business Day, or if the next succeeding Business Day falls in another calendar month, such term shall end on the next preceding Business Day.

"**Interest Rate Contracts**" means interest rate swap agreements, interest rate cap agreements, interest rate collar agreements, interest rate insurance, and other agreements or arrangements designed to provide protection against fluctuations in interest rates.

"**In-Transit Inventory**" means Domestic In-Transit Inventory and Foreign In-Transit Inventory.

"**Issuing Lender**" means WFF, in its capacity as an issuer of a Letter of Credit hereunder.

"**L/C**" has the meaning specified therefor in Section 3.3(a).

"**L/C Disbursement**" means a payment made by the Issuing Lender pursuant to a Letter of Credit.

"**L/C Undertaking**" has the meaning specified therefor in Section 3.3(a).

"**LCM Reserve**" means a Borrowing Base Reserve established by Administrative Lender based on the calculation provided by Borrowers to reflect any reduction in the value of the Inventory as a result of lower of cost or market adjustments.

"**Lender Group Expenses**" means all (a) costs or expenses (including taxes, and insurance premiums) required to be paid by a Borrower or its Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by the Administrative Lender or any Lender, (b) fees or charges paid or incurred by Administrative Lender in connection with its and the Lenders' transactions with Borrowers or their Subsidiaries, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent



of the fees and charges (and up to the amount of any limitation) contained in this Agreement or the Fee Letter), real estate surveys, real estate title policies and endorsements, and environmental audits, (c) costs and expenses incurred by Administrative Lender in the disbursement of funds to Borrowers or the Lenders (by wire transfer or otherwise), (d) charges paid or incurred by Administrative Lender resulting from the dishonor of checks, (e) reasonable costs and expenses paid or incurred by the Administrative Lender and the Lenders to correct any default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) audit fees and expenses of Administrative Lender related to any inspections or audits to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement or the Fee Letter, (g) reasonable costs and expenses of third party claims or any other suit paid or incurred by the Administrative Lender and the Lenders in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or the Administrative Lender and the Lenders' relationship with any Borrower or any Subsidiary of a Borrower, (h) Administrative Lender's and each Lender's reasonable costs and expenses (including attorneys fees) incurred in advising, structuring, drafting, reviewing, administering, syndicating, or amending the Loan Documents, and (i) Administrative Lender's and each Lender's reasonable costs and expenses (including attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or a bankruptcy or other type of insolvency proceeding concerning any Borrower or any Subsidiary of a Borrower or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in exercising any of their remedies with respect to the Collateral.

"**Lenders**" means, collectively, each of the financial institutions from time to time listed on Schedule I, Issuing Lender and Swingline Lender, and "**Lender**" means any one of the Lenders.

"**Letter of Credit**" means an L/C or an L/C Undertaking, as the context requires.

"**Letter of Credit Agreement**" means Issuing Lender's or Underlying Issuer, as applicable, standard letter of credit application and documentation modified to such extent, if any, as Issuing Lender Underlying Issuer, as applicable, deems necessary.

"**Letter of Credit Collateralization**" means either (a) providing cash collateral (pursuant to documentation reasonably satisfactory to Administrative Lender, including provisions that specify that the Letter of Credit fee set forth in this Agreement will continue to accrue while the Letters of Credit are outstanding) to be held by Administrative Lender for the benefit of those Lenders with a Revolving Loan Commitment in an amount equal to 105% of the then existing Letter of Credit Obligations, (ii) causing the Letters of Credit to be returned to the Issuing Lender, or (iii) providing Administrative Lender with a standby letter of credit, in form and substance reasonably satisfactory to Administrative Lender, from a commercial bank acceptable to Administrative Lender (in its sole discretion) in an equal to 105% of the then existing Letter of Credit Obligations (it being understood that the Letter of Credit fee set forth in this Agreement will continue to accrue while the Letters of Credit are outstanding and that any



such fee that accrues must be an amount that can be drawn under any such standby letter of credit).

"**Letter of Credit Obligations**" means, at any time, all liabilities at such time of Borrowers to Issuing Lender with respect to Letters of Credit, whether or not any such liability is contingent.

"**Letter of Credit Request**" has the meaning set forth in Section 3.3(d) hereof.

"**LIBOR**" means, for each Interest Period, the rate per annum and determined pursuant to the following formula:

$$\text{LIBOR} = \frac{\text{Base LIBOR}}{100\% - \text{LIBOR Reserve Percentage}}$$

As used herein, (a) "Base LIBOR" means the rate per annum, determined by Administrative Lender in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate, to be the rate at which U.S. Dollar deposits (for delivery on the first day of the requested Interest Period) are offered to major banks in the London interbank market 2 Business Days prior to the commencement of the requested Interest Period, for a term and in an amount comparable to the Interest Period and the amount of the LIBOR Loan requested (whether as an initial LIBOR Loan or as a continuation of a LIBOR Loan or as a conversion of a Base Rate Loan to a LIBOR Loan) by Parent in accordance with this Agreement, which determination shall be conclusive in the absence of manifest error, and (b) "LIBOR Reserve Percentage" on any day, for any Lender, the maximum percentage prescribed by the Board of Governors of the Federal Reserve System (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to eurocurrency funding (currently referred to as "eurocurrency liabilities" in Regulation D of the Federal Reserve Board) of that Lender, but so long as such Lender is not required or directed under applicable regulations to maintain such reserves, the LIBOR Reserve Percentage shall be zero.

"**LIBOR Loan**" means any Loan that bears interest with reference to LIBOR.

"**LIBOR Margin**" means the number of basis points determined in accordance with Schedule III.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), security interest, priority or other security agreement or preferential arrangement of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement or the interest of a lessor under a Capital Lease or an Other Lease.

"**Loan**" means an advance made by a Lender to Borrowers pursuant to Section 3.1 or 3.2.

"**Loan Account**" has the meaning set forth in Section 4.2.

BN 1042967v14                                17



"**Loan Documents**" means this Agreement, the Fee Letter, the Letter of Credit Agreement, the Bank Product Agreements, and each other agreement, note, notice, document, contract or instrument to which any Borrower now or hereafter is a party and that is required by Lender in connection with this Agreement, or any of the obligations arising under any of such agreements.

"**Material Adverse Effect**" means a material adverse effect on (a) the condition (financial or otherwise), business, performance, operations or properties of Borrowers, (b) the ability of any Borrower to perform its obligations under any of the Loan Documents, or (c) the rights and remedies of any Lender or Administrative Lender under any of the Loan Documents.

"**Maturity Date**" means the earlier of the fifth anniversary of the Closing Date or the due date determined pursuant to Section 11.2.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding three calendar years, has made or been obligated to make contributions.

"**Non-Operating Subsidiary**" means each of the following: (i) Cascade Imperial Mills, Ltd., a corporation organized under the laws of the Canadian province of British Columbia, (ii) Norte Pacifico de Durango, S.A. de C.V., a corporation organized under the laws of Mexico, and (iii) Nor Pac Services S de R.L. de C.V., a company organized under the laws of Mexico.

"**Notice of Authorized Representatives**" has the meaning set forth in Section 3.13 hereof.

"**Notice of Borrowing**" has the meaning set forth in Section 3.1(c) hereof.

"**Notice of Conversion or Continuation**" has the meaning set forth in Section 3.5(c) hereof.

"**Obligations**" means all of Borrowers' obligations under the Loan Documents, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including, without limitation, Lender Group Expenses and all interest that accrues after the commencement of any case or proceeding by or against a Borrower under the Bankruptcy Code, whether or not allowed in such case or proceeding.

"**Organic Documents**" means, relative to any Borrower, as applicable, its certificate or articles of incorporation, its by-laws, its partnership agreement, its certificate of partnership, certificate of organization, operating agreement and other limited liability company organizational documents and all shareholder agreements, voting trusts and similar arrangements applicable to any of its Stock or Stock Equivalents.

"**Other Lease**" means any synthetic lease, tax retention operating lease, financing lease or any lease having substantially the same economic effect as a conditional sale, title retention agreement or similar arrangement.



"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"**Overadvance**" has the meaning set forth in Section 3.2(c).

"**Parent**" means, North Pacific Group, Inc., an Oregon corporation.

"**Participant**" has the meaning set forth in Section 13.4(d).

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Title IV of ERISA.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and (a) is sponsored or maintained by a Borrower or any ERISA Affiliate or (b) to which a Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer plan (as described in Section 4064(a) of ERISA) has made contributions at any time during the immediately preceding five plan years.

"**Permit**" means any permit, approval, authorization, license, variance or permission required from a Governmental Authority under a Governmental Rule.

"**Permitted Acquisition**" means any Asset Acquisition so long as:

(a) no Default or Event of Default shall have occurred and be continuing or would result from the consummation of the proposed Asset Acquisition,

(b) no Indebtedness will be incurred, assumed, or would exist with respect to Parent or its Subsidiaries as a result of such Asset Acquisition, other than Indebtedness permitted under clauses (d), (k), or (l) of Section 9.2 and no Liens will be incurred, assumed, or would exist with respect to the assets of Parent or its Subsidiaries as a result or such Asset Acquisition other than Liens permitted under clause (g) of the definition of Permitted Liens;

(c) Parent has provided Administrative Lender with written notice of the proposed Asset Acquisition at least 10 Business Days prior to the anticipated closing date of the proposed Asset Acquisition and, not later than 5 Business Days prior to the anticipated closing date of the proposed Asset Acquisition, copies of the acquisition agreement and other material documents relative to the proposed Asset Acquisition, which agreement and documents must be reasonably acceptable to Administrative Lender,

(d) the assets being acquired (other than a de minimis amount of assets in relation to Parent and its Subsidiaries' total assets) are located within the United States and are useful in the business of Parent and its Subsidiaries or a business reasonably related thereto,

(e) the subject assets are being acquired directly by Borrowers and Borrowers shall have executed and delivered or authorized, as applicable, any and all documentation



reasonably requested by the Administrative Lender in order to include the newly acquired assets within the collateral hypothecated under the Loan Documents,

(f)     Parent shall have Availability plus Qualified Cash in an amount of no less than $10,000,000 immediately after giving effect to the consummation of the proposed Asset Acquisition,

(g)     Inventory and Accounts shall constitute no less than 60% of the net book value of all assets being acquired in a Permitted Acquisition; and

(h)     the purchase consideration (including assumption of liabilities) payable in respect of all Permitted Acquisitions, in the aggregate (including the proposed Asset Acquisition and including deferred payment obligations) shall not exceed $12,500,000 in the aggregate in any one fiscal year of Parent.

"**Permitted Liens**" means (a) Liens arising by operation of law for taxes, assessments or governmental charges not yet due; (b) statutory Liens of mechanics, materialmen, shippers, warehousemen, carriers, and other similar persons for services or materials arising in the ordinary course of business for which payment is not past due; (c) nonconsensual Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security; (d) Liens for taxes or statutory Liens of mechanics, materialmen, shippers, warehousemen, carriers and other similar persons for services or materials that are due but are being contested in good faith and by appropriate and lawful proceedings promptly initiated and diligently conducted and for which reserves satisfactory to Administrative Lender have been established; (e) Liens listed on Section 6.17 of the Disclosure Schedule and any replacement Liens thereof resulting from debt refinancing permitted by Section 9.2(c); (f) Liens granted in the Loan Documents; (g) purchase money Liens upon or in any property of any Borrower and used by such Borrower in the ordinary course of business and Liens to secure Capital Leases and Other Leases and any related payment and performance obligations if, in each case, the incurrence of such Indebtedness is permitted by Section 9.2; provided, however, that: (X) any such Lien is created solely for the purpose of securing Indebtedness representing, or incurred to finance, refinance or refund, the cost of the property subject thereto, (Y) the principal amount of the Indebtedness secured by such Lien does not exceed such cost, and (Z) such Lien does not extend to or cover any other property other than such item of property, any improvements on such item, and the proceeds from the disposition of such items; (h) zoning restrictions, easements, rights of way, survey exceptions, encroachments, covenants, licenses, reservations, leasehold interests, restrictions on the use of real property or minor irregularities incident thereto which do not in the aggregate materially detract from the value or use of the property or assets of Borrowers or impair, in any material manner, the use of such property for the purposes for which such property is held by Borrowers; (i) the interests of lessors or lessees of property leased pursuant to leases permitted hereunder; (j) Liens of a depository institution arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of setoff, or similar rights and remedies as to deposit accounts or other funds maintained with such institution, provided that (X) such deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by Borrowers in excess of those set forth by regulations promulgated by any Government Authority, and (Y) such deposit account is not intended by a Borrower to provide collateral to the



depository institution; and (k) judgment Liens to the extent the existence of such Liens is not an Event of Default under Section 11.1(g).

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Plan**" means the ESOP and any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established, maintained or contributed to by a Borrower or any ERISA Affiliate (or which a Borrower or any ERISA Affiliate is obligated to establish, maintain or contribute to).

"**Proceeds**" has the meaning set forth in Section 4.1(a).

"**Qualified Cash**" means, as of any date of determination, the amount of unrestricted cash and Cash Equivalents of Borrowers and their Subsidiaries that is in deposit accounts or in securities accounts, or any combination thereof, and which such deposit account or securities account is the subject of a control agreement, satisfactory to Administrative Lender, and is maintained by a branch office of the bank or securities intermediary located within the United States.

"**Records**" means all of Borrowers' present and future records and books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files, electronically stored data and other data, together with the tapes, disks, diskettes, drives and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of a Borrower with respect to the foregoing maintained with or by any other Person).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"**Release**" means, as to any Person, any unpermitted spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration of a Contaminant into the environment and any "release" as defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.).

"**Remedial Action**" means all actions required to clean up, remove, prevent or minimize a Release or threat of Release or to perform pre-remedial studies and investigations and post-remedial monitoring and care.

"**Required Lenders**" means, Lenders whose aggregate Applicable Percentages equal or exceed 50.1%; provided, that at any time there are 3 or fewer Lenders, "Required Lenders" must include all Lenders.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty day notice period has been waived.

"**Responsible Officer**" means any one of Parent's Chief Executive Officer, President, Chief Financial Officer and Treasurer, Assistant Treasurer, Corporate Secretary and Tax Manager or Corporate Controller.

"**Revolving Loan**" means a Loan made by a Lender to Borrowers pursuant to Section 3.1.

"**Revolving Loan Commitment**" means, as to any Lender, the obligation of such Lender to advance credit under Sections 3.1 and 3.3 in an aggregate principal amount and/or amount of Letter of Credit Obligations at any one time outstanding not to exceed the Revolving Loan Commitment amount set opposite such Lender's name on Schedule I, as such amount may be reduced from time to time pursuant to this Agreement or as such amount may be adjusted pursuant to Section 13.4.

"**Revolver Usage**" has the meaning set forth in Section 3.2(c).

"**Rights to Payment**" means all Accounts, General Intangibles, contract rights, chattel paper, documents, instruments, letters of credit, bankers acceptances and guaranties, and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Accounts and other Collateral, and shall include without limitation, (a) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (b) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (c) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Accounts or other Collateral, including without limitation, returned, repossessed and reclaimed goods, and (d) deposits by and property of account debtors or other persons securing the obligations of account debtors, moneys, securities, credit balances, deposits, deposit accounts and other property of any Borrower now or hereafter held or received by or in transit to Administrative Lender or any of its Affiliates or at any other depository or other institution from or for the account of any Borrower, whether for safekeeping, pledge, custody, transmission, collection or otherwise.

"**Settlement**" has the meaning set forth in Section 3.7(e)(i).

"**Settlement Date**" has the meaning set forth in Section 3.7(e)(i).

"**Sold TB Account**" has the meaning set forth in Section 9.4(c)(v).

"**Stock**" means all shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"**Stock Equivalents**" means all securities convertible into or exchangeable for Stock and all warrants, options or other rights to purchase or subscribe for any Stock, whether or not presently convertible, exchangeable or exercisable.



"**Subsidiary**" means any Person required by GAAP to be included in the consolidated financial reporting of Parent, provided that the term shall not include Roberts Pacific, LLC or any other Person not Controlled by Parent.

"**Subordinated Debt**" means the Debt identified as "Subordinated Debt" in Section 6.17 of the Disclosure Schedule and all other Debt subordinated in writing to the Obligations on terms acceptable to Administrative Lender in favor of the prior payment in full in cash of the Obligations.

"**Swing Loan**" means a Loan made by the Swingline Lender to Borrowers pursuant to Section 3.2.

"**Swing Loan Available Credit**" means, at any time, the amount by which the outstanding balance of the Swing Loans is less than the lesser of (i) $15,000,000 or (ii) the Available Credit.

"**Swingline Lender**" means WFF or any other Lender that, at the request of Parent and with the consent of Administrative Lender agrees, in such Lender's sole discretion, to become the Swingline Lender under Section 3.2

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**TB Account Reserve**" means a Borrowing Base Reserve, established by Administrative Lender within one Business Day of its receipt of the notice set forth in Section 9.4(c)(v)(1) in an amount equal to the face amount of all Sold TB Accounts sold within the week of determination. The TB Account Reserve shall: (i) be increased every time Administrative Lender receives the above referenced notice, (ii) be reduced to zero as of the date Administrative Lender receives a Borrowing Base Certificate that does not include any Sold TB Accounts sold at any time prior to the effective date of such Borrowing Base Certificate, and (iii) re-established every week to the extent that any Sold TB Accounts are sold during such week.

"**Total Commitments**" means the total of all Revolving Loan Commitments, which as of the Closing Date equal $160,000,000.

"**Type A Subordinated Notes**" are the promissory notes described on Schedule IV attached hereto.

"**Type B Subordinated Notes**" are the promissory notes described on Schedule V attached hereto.

"**UCC**" means the California Uniform Commercial Code, as in effect from time to time.

"**Underlying Issuer**" means a third Person which is the beneficiary of an L/C Undertaking and which has issued a letter of credit at the request of the Issuing Lender for the benefit of Borrowers.

"**Underlying Letter of Credit**" means a letter of credit that has been issued by an Underlying Issuer.

"**Unfunded Pension Liability**" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"**Unused Line Fee Percentage**" means the percentage determined in accordance with Schedule III and identified therein as the "Unused Line Fee Percentage."

"**Wells Fargo**" means Wells Fargo Bank, National Association, a national banking association.

## 1.2    ACCOUNTING AND FINANCIAL DETERMINATIONS

Any accounting term used in this Agreement that is not specifically defined herein shall have the meaning customarily given to it under GAAP, and all accounting determinations and computations under any Loan Document shall be made, and all financial statements required to be delivered under any Loan Document shall be prepared, in accordance with GAAP applied in the preparation of the financial statements referred to in Section 6.5; provided that for all purposes hereunder, inventory shall be valued at the lower of cost (determined on a FIFO basis) or market value on a basis consistent with Borrowers' historical accounting practices. Interim financial statements will be prepared without footnotes and the absence of footnotes on such statements shall not cause such statements to be considered as not conforming to GAAP, for purposes of the Loan Documents.

## 1.3    HEADINGS

Headings in this Agreement and each of the other Loan Documents are for convenience of reference only and are not part of the substance hereof or thereof.

## 1.4    GENERAL DEFINITIONAL PROVISIONS

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation

herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Any reference herein or in any other Loan Document to the satisfaction or repayment in full of the Obligations shall mean the repayment in full in cash (or, in the case of Letters of Credit or Bank Products, the cash collateralization or support by a standby letter of credit in accordance with the terms hereof) of all Obligations other than unasserted contingent indemnification Obligations and other than any Bank Product Obligations that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding and that are not required by the provisions of this Agreement to be repaid or cash collateralized.

## ARTICLE II

### APPOINTMENT OF BORROWERS' AGENT; JOINT AND SEVERAL LIABILITY

#### 2.1    APPOINTMENT OF AGENT

In order to facilitate and insure prompt and accurate communication among Borrowers and Lenders and to insure the efficient and effective distribution of proceeds of the Loans, each Borrower hereby appoints Parent as its agent under the Loan Documents to take such actions and make such elections on such Borrower's behalf as are delegated to Parent in the Loan Documents and for the following purposes: (i) communicating to and receiving communications from Administrative Lender and Lenders; (ii) receiving all proceeds of the Loans and making all decisions regarding the distribution of such proceeds among the Borrowers as it, in its discretion, deems fair and appropriate; and (iii) making all decisions and elections with respect to requests for advances of credit, issuance of Letters of Credit and election of interest options.

#### 2.2    JOINT AND SEVERAL LIABILITY; RIGHTS OF CONTRIBUTION

(a)    Each Borrower states and acknowledges that:    (i) pursuant to this Agreement, Borrowers desire to utilize their borrowing potential on a consolidated basis to the same extent possible if they were merged into a single corporate entity; (ii) it has determined that it will benefit specifically and materially from the advances of credit contemplated by this Agreement; (iii) it is both a condition precedent to the obligations of Lenders hereunder and a desire of Borrowers that each Borrower execute and deliver to Lenders this Agreement; and (iv) Borrowers have requested and bargained for the structure and terms of the credit contemplated by this Agreement.

(b)    Each Borrower hereby irrevocably and unconditionally: (i) agrees that it is jointly and severally liable to Lenders for the full and prompt payment of the Obligations and the performance by each Borrower of its obligations hereunder in accordance with the terms of the Loan Documents; (ii) agrees to fully and promptly perform all of its obligations under the Loan Documents with respect to each advance of credit hereunder as if such advance had been made directly to it; and (iii) agrees as a primary obligation to indemnify Lenders on demand for and against any loss incurred by Lenders (other than a loss arising any Lender's willful

misconduct or gross negligence) as a result of any of the obligations of any one or more of Borrowers under the Loan Documents being or becoming void, voidable, unenforceable or ineffective for any reason whatsoever, whether or not known to Lenders or any other Person, the amount of such loss being the amount which Lenders would otherwise have been entitled to recover from any one or more of Borrowers.   Each Borrower hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with each other Borrower with respect to the payment and performance of all of the Obligations. If and to the extent that any Borrower fails to make any payment with respect to the Obligations as and when due or to perform any of its obligations in accordance with the terms of the Loan Documents, then in each such event the other Borrowers will make such payment with respect to, or perform, such obligations.

(c)      The joint and several liability of each Borrower for the Obligations shall be absolute and unconditional irrespective of and shall not be subject to any reduction, limitation, impairment or termination for any reason, including, without limitation, any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations. Without limiting the generality of the foregoing, the obligations of each Borrower shall not be discharged or impaired or otherwise affected by:

(i)      any change in the manner, place or terms of payment or performance and/or any change or extension of the time of payment or performance of, renewal or alteration of, any Obligation, any security therefor, or any liability incurred directly or indirectly in respect thereof, or any rescission of, or amendment, waiver or other modification of, or any consent to departure from any Loan Document, including any increase in the Obligations resulting from the extension of additional credit to any Borrower;

(ii)      any sale, exchange, release, surrender, realization upon any property at any time pledged or mortgaged to secure any of the Obligations, and/or any offset against, or failure to recover, or continue the perfection of, any lien in any such property, or delay in the perfection of any such lien, or any amendment or waiver of or consent to departure from any other guaranty for any of the Obligations;

(iii)      the failure of Lenders to assert any claim or demand or to enforce any right or remedy against any Borrower or other Person under the provisions of any Loan Document;

(iv)      any settlement or compromise of any Obligation, any security therefor or any liability incurred directly or indirectly in respect thereof, and any subordination of the payment of any part thereof to the payment of any obligation (whether due or not) of any other Borrower to creditors of such other Borrower other than any other Borrower;

(v)      any manner of application of any collateral for the Obligations or proceeds thereof, to any of the Obligations, or any manner of sale or other disposition of any such collateral for all or any of the Obligations or any other assets of any Borrower;



(vi)     any change, restructuring or termination of the existence of any Borrower; or

(vii)    any other agreement or circumstance of any nature whatsoever that might in any manner or to any extent vary the risk of any Borrower, or that might otherwise at law or in equity constitute a defense available to, or a discharge of, the obligations of any Borrower, or a defense to, or discharge of, any Borrower or other Person relating to any of the Obligations.

(d)     The joint and several liability of Borrowers shall continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, membership, constitution or place of formation of any Borrower.

(e)     It is the intent of each Borrower that the indebtedness, obligations and liability hereunder of no one of them be subject to challenge on any basis. Accordingly, as of the date hereof, the liability of each Borrower under the Loan Documents, together with all of its other liabilities to all Persons as of the date hereof and as of any other date on which a transfer is deemed to occur by virtue of this Agreement, calculated in an amount sufficient to pay its probable net liabilities (including Contingent Obligations) as the same become absolute and matured ("Dated Liabilities") is, and is to be, less than the amount of the aggregate of a fair valuation of its property as of such corresponding date ("Dated Assets"). To this end each Borrower hereby (i) grants to and recognizes in each other Borrower, ratably, rights of subrogation and contribution in the amount, if any, by which the Dated Assets of such Borrower, but for the aggregate of subrogation and contribution in its favor recognized herein, would exceed the Dated Liabilities of such Borrower or, as the case may be (ii) acknowledges receipt of and recognizes its right to subrogation and contribution ratably from each of the other Borrowers in the amount, if any, by which the Dated Liabilities of such Borrower, but for the aggregate of subrogation and contribution in its favor recognized herein, would exceed the Dated Assets of such Borrower. In recognizing the value of the Dated Assets and the Dated Liabilities, it is understood that Borrowers will recognize, to at least the same extent of their aggregate recognition of liabilities hereunder, their rights to subrogation and contribution hereunder. It is a material objective of this Section that each Borrower recognizes rights to subrogation and contribution rather than be deemed to be insolvent (or in contemplation thereof) by reason of its joint and several obligations hereunder.

(f)     Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Loans or Letters of Credit issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Administrative Lender or Lenders under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement). Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Administrative Lender or Lenders at any time or times in respect of any default

BN 1042967v14                                   27

Exhibit A

by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Administrative Lender or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of any Administrative Lender or Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.2 afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 2.2, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this Section 2.2 shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this Section 2.2 shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or any Administrative Lender or Lender.

(g)     Each Borrower represents and warrants to Administrative Lender and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations.     Each Borrower further represents and warrants to Administrative Lender and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(h)     Each Borrower waives all rights and defenses arising out of an election of remedies by Administrative Lender or any Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Administrative Lender's or such Lender's rights of subrogation and reimbursement against such Borrower by the operation of Section 580(d) of the California Code of Civil Procedure or otherwise.

(i)     Each Borrower waives all rights and defenses that such Borrower may have because the Obligations are secured by real property. This means, among other things:

(i)     Administrative Lender and Lenders may collect from such Borrower without first foreclosing on any real or personal property Collateral pledged by Borrowers.

(ii)     If Administrative Lender or any Lender forecloses on any real property Collateral pledged by Borrowers:



(1) The amount of the Obligations may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price.

(2) Administrative Lender and Lenders may collect from such Borrower even if Administrative Lender or Lenders, by foreclosing on the real property Collateral, has destroyed any right such Borrower may have to collect from the other Borrowers.

This is an unconditional and irrevocable waiver of any rights and defenses such Borrower may have because the Obligations are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure.

(j) The provisions of this Section 2.2 are made for the benefit of Administrative Lender, Lenders and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of Administrative Lender, Lender, successor or assign first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 2.2 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect 'of any of the Obligations, is rescinded or must otherwise be restored or returned by Administrative Lender or any Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this Section 2.2 will forthwith be reinstated in effect, as though such payment had not been made.

(k) Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Administrative Lender or Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to any Administrative Lender or Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(l) Each Borrower hereby agrees that, after the occurrence and during the continuance of any Default or Event of Default, the payment of any amounts due with respect to the indebtedness owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations. Each Borrower hereby agrees that after the

29



occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash.    If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Agent, and such Borrower shall deliver any such amounts to Agent for application to the Obligations in accordance with Section 3.6(d).

## ARTICLE III

### THE CREDITS

### 3.1    REVOLVING LOANS

(a)    On the terms and subject to the conditions contained in this Agreement, each Lender severally agrees to make loans (each a "Revolving Loan") to Borrowers from time to time until the Maturity Date in an aggregate amount not to exceed at any time outstanding such Lender's Revolving Loan Commitment; provided, however, that at no time shall any Lender be obligated to make a Revolving Loan in excess of such Lender's Applicable Percentage of the Available Credit.  Borrowers may from time to time borrow, partially or wholly repay outstanding borrowings, and reborrow, subject to all the limitations, terms and conditions contained herein.

(b)    If at any time the Available Credit is negative, Borrowers, without demand or notice, shall immediately repay that portion of the Revolving Loans necessary to cause the Available Credit to be zero.  Borrowers shall repay the outstanding principal balance of the Revolving Loans, together with all accrued and unpaid interest and related fees on the Maturity Date.

(c)    Parent, through an Authorized Representative, shall request each advance of a Revolving Loan by giving Administrative Lender irrevocable written notice or telephonic notice (confirmed promptly in writing), in the form of Exhibit B attached hereto (each, a "Notice of Borrowing"), which specifies, among other things:

(i)    the aggregate principal amount of the requested advances (which amounts must be a minimum of $1,000,000 and in integral multiples of $100,000 if such advances are to be Base Rate Loans and a minimum of $5,000,000 and in integral multiples of $500,000 if such advances are to be LIBOR Loans);

(ii)    the proposed date of borrowing, which shall be a Business Day;

(iii)    whether such advance is to be a Base Rate Loan or a LIBOR Loan; and

(iv)    if such advance is to be a LIBOR Loan, the length of the Interest Period applicable thereto.

(d)      Each such Notice of Borrowing must be received by Administrative Lender not later than (x) 11:00 a.m. (California time) at least one Business Day prior to the date of borrowing if a Base Rate Loan or (y) at least three Business Days prior to the date of borrowing if a LIBOR Loan. Administrative Lender shall promptly notify each Lender of the contents of each Notice of Borrowing and of the amount of the advance to be made by such Lender no later than 1:00 p.m. (California time) on the Business Day of receipt for Base Rate Loans and 1:00 p.m. (California time) the Business Day after receipt with respect to LIBOR Loans.

(e)      From time to time on any Business Day, Borrowers may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of any Revolving Loans; provided, however, that with respect to the prepayment of LIBOR Loans (i) Parent gives Administrative Lender notice of such prepayment before 2:00 PM (California time) on the third Business Day before the date of prepayment (which notice shall be irrevocable), (ii) each voluntary partial prepayment must be in a minimum of $5,000,000 and in integral multiples of $500,000, or, if less, the entire principal amount of a LIBOR Loan and (iii) any prepayment is subject to the provisions of Section 3.12 hereof.

(f)      From time to time on any Business Day, Borrowers may permanently reduce the Total Commitments by Parent giving at least five Business Days prior notice to Administrative Lender of the amount of such aggregate reduction; provided that any partial aggregate reduction shall be in a minimum amount of $5,000,000 and in an integral multiple of $500,000. Any reduction shall be applied pro-rata to each Lender's Revolving Loan Commitment based on its Applicable Percentage as of the date of such reduction.

### 3.2    SWING LOANS; PROTECTIVE LOANS; OPTIONAL OVERADVANCES

(a)      In lieu of making Revolving Loans, the Swingline Lender, in its sole discretion, on the terms and subject to the conditions contained in this Agreement, may make loans (each a "Swing Loan") to Borrowers from time to time until the Maturity Date as provided herein in an aggregate amount not to exceed at any time outstanding the Swing Loan Available Credit. Each Swing Loan shall be made and prepaid upon such notice as the Swingline Lender and Parent shall agree, except that Swing Loans may be made automatically (A) pursuant to certain cash management arrangements made from time to time by Parent with Administrative Lender and/or (B) for the purposes described in item (e) below. All Swing Loans shall be Base Rate Loans. Borrowers shall repay the outstanding principal balance of the Swing Loans, together with all accrued and unpaid interest and related fees on the Maturity Date. All interest due on the Swing Loans shall be payable to the Swingline Lender

(b)      Administrative Lender hereby is authorized by Borrowers and the Lenders, from time to time in Administrative Lender's sole discretion, (A) after the occurrence and during the continuance of a Default or an Event of Default, or (B) at any time that any of the other applicable conditions precedent set forth in Section 7 are not satisfied, to make Revolving Loans to Borrowers on behalf of the Lenders that Administrative Lender, in its reasonable discretion deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, (2) to enhance the likelihood of repayment of the Obligations (other than the Bank Product Obligations), or (3) to pay any other amount chargeable to Borrowers pursuant to the

terms of this Agreement, including Lender Group Expenses and the costs, fees, and expenses described in Section 13.2 (any of the loans described in this Section 3.2(b) shall be referred to as "Protective Loan"). Notwithstanding anything to the contrary contained in this Agreement, the aggregate amount of Protective Loans outstanding under this Agreement shall not exceed, at any one time, $15,000,000.

(c)     Any contrary provision of this Agreement notwithstanding, the Lenders hereby authorize Administrative Lender or Swingline Lender, as applicable, and either Administrative Lender or Swingline Lender, as applicable, may, but is not obligated to, knowingly and intentionally, continue to make loans (including Swing Loans) to Borrowers notwithstanding the fact that the Available Credit is negative (an "Overadvance") or thereby an Overadvance would be created, so long as (A) after giving effect to such Revolving Loans, the sum of outstanding Revolving Loans, Letter of Credit Obligations, and Swing Loans (such sum, the "Revolver Usage") does not exceed the Borrowing Base by more than $10,000,000, and (B) after giving effect to such Revolving Loans, the Revolver Usage (except for and excluding . amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) does not exceed the Total Commitments. In the event Administrative Lender obtains actual knowledge that the Revolver Usage exceeds the amounts permitted by the immediately foregoing sentence, regardless of the amount of, or reason for, such excess, Administrative Lender shall notify the Lenders as soon as practicable (and prior to making any (or any additional) intentional Overadvances (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) unless Administrative Lender determines that prior notice would result in imminent harm to the Collateral or its value), and the Lenders with Revolving Loan Commitments thereupon shall, together with Administrative Lender, jointly determine the terms of arrangements that shall be implemented with Borrowers intended to reduce, within a reasonable time, the outstanding principal amount of the Revolving Loans to Borrowers to an amount permitted by the preceding sentence. In such circumstances, if any Lender with a Revolving Loan Commitment objects to the proposed terms of reduction or repayment of any Overadvance, the terms of reduction or repayment thereof shall be implemented according to the determination of the Required Lenders. Each Lender with a Revolving Loan Commitment shall be obligated to settle with Administrative Lender as provided in Section 3.7(e) for the amount of such Lender's Applicable Percentage of any unintentional Overadvances by Administrative Lender reported to such Lender, any intentional Overadvances made as permitted under this Section 3.2(c), and any Overadvances resulting from the charging to the Loan Account of interest, fees, or Lender Group Expenses. Notwithstanding anything to the contrary contained in this Agreement, the aggregate amount of intentional Overadvances outstanding under this Agreement shall not exceed, at any one time, $10,000,000.

(d)     Each Protective Loan and each Overadvance shall be deemed to be a Revolving Loan hereunder, except that no Protective Loan or Overadvance shall be eligible to be a LIBOR Loan and all payments on the Protective Loans shall be payable to Administrative Lender solely for its own account, until settled among the Lenders pursuant to Section 3.7(e). The Protective Loans and Overadvances shall be repayable on demand, secured by the Liens granted to Administrative Lender to secure the Obligations, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Revolving Loans that are Base Rate Loans. The provisions of this Section 3.2(d) are for the exclusive benefit of Administrative



Lender, Swingline Lender, and the Lenders and are not intended to benefit any Borrower in any way.

(e)     Borrowers hereby authorize Administrative Lender, from time to time, without prior notice to Borrowers, to charge all interest and fees (when due and payable), all Lender Group Expenses (as and when incurred), all charges, commissions, fees, and costs provided for in under this Agreement (as and when accrued or incurred), and all other payments as and when due and payable under any Loan Document (including the amounts due and payable with respect to the Bank Product Providers in respect of Bank Products up to the amount of the Bank Product Reserve) to Borrowers' Loan Account, which amounts thereafter shall constitute Revolving Loans hereunder and shall accrue interest at the rate then applicable to Revolving Loans that are Base Rate Loans. Any interest not paid when due shall be compounded by being charged to the Loan Account and shall thereafter constitute Revolving Loans hereunder and shall accrue interest at the rate then applicable to Revolving Loans that are Base Rate Loans.

### 3.3    LETTER OF CREDIT FACILITY

(a)     On the terms and subject to the conditions contained in this Agreement, at the request of Parent the Issuing Lender so requested agrees promptly to issue one or more letters of credit for the account of Borrowers (an "L/C") or to purchase participations or execute indemnities or reimbursement obligations (each such undertaking, an "L/C Undertaking") with respect to letters of credit issued by an Underlying Issuer (as of the Closing Date, the prospective Underlying Issuer is to be Wells Fargo) for the account of Parent, from time to time; provided, however, that Issuing Lender shall not issue any Letter of Credit if:

(i)     any order, judgment or decree of any Governmental Authority or arbitrator of which either Issuing Lender or the Underlying Issuer is aware purports by its terms to enjoin or restrain Issuing Lender or Underlying Issuer from issuing such Letter of Credit or Underlying Letter of Credit, as applicable, or any Governmental Rule applicable to Issuing Lender or Underlying Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over Issuing Lender or Underlying Issuer prohibits, or requests that Issuing Lender or Underlying Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit or Underlying Letter of Credit, as applicable, in particular or shall impose upon Issuing Lender or Underlying Issuer with respect to such Letter of Credit or Underlying Letter of Credit any restriction or reserve or capital requirement (for which Issuing Lender or Underlying Issuer, as applicable, is not otherwise compensated) not in effect on the date hereof or result in any loss, cost or expense which (A) was not applicable, in effect or known to Issuing Lender or Underlying Issuer on the Closing Date and which Issuing Lender or Underlying Issuer deems material to it, and (B) the reimbursement of which is not provided for hereunder;

(ii)     Issuing Lender shall have received notice from Administrative Lender or Parent, on or before the Business Day prior to the requested date of issuance of such Letter of Credit, that one or more of the applicable conditions contained in Article VII is not then satisfied;



(iii)    after giving effect to the issuance of such Letter of Credit, the Letter of Credit Obligations exceed $5,000,000;

(iv)    the amount of the Letter of Credit requested exceeds the Available Credit; or

(v)    fees due in connection with a requested issuance have not been paid.

None of Lenders (other than an Issuing Lender so requested by Parent) shall have any obligation to issue any Letters of Credit.

(b)    In no event shall the expiry date of any Letter of Credit be more than one year for a standby Letter of Credit, more than 180 days for a commercial Letter of Credit, or fall after the Maturity Date.

(c)    Prior to the issuance of each Letter of Credit, Borrowers shall have delivered to the Underlying Issuer, if requested by Issuing Lender, a Letter of Credit Agreement, signed by Borrowers, and such other agreements as Issuing Lender or Underlying Issuer may require pursuant to the terms thereof.

(d)    In connection with the issuance of each Letter of Credit, Parent shall give Administrative Lender at least one Business Day prior notice (a "Letter of Credit Request"), in substantially the form of Exhibit C, of the requested issuance of such Letter of Credit. Such notice shall be irrevocable and binding on Borrowers and shall specify (i) whether the Letter of Credit is to be a standby or commercial Letter of Credit, (ii) the stated amount of the Letter of Credit requested, (iii) the date of issuance of such requested Letter of Credit (which day shall be a Business Day), (iv) the date on which such Letter of Credit is to expire (which date shall be a Business Day), (v) the Person for whose benefit the requested Letter of Credit is to be issued, and (vii) such other terms and conditions of the proposed Letter of Credit as are requested by Parent and acceptable to Issuing Lender and Underlying Issuer. Such notice, to be effective, must be received by Issuing Lender and Administrative Lender not later than 10:00 a.m. (California time) on the last Business Day on which notice can be given under the immediately preceding sentence. If requested by the Issuing Lender, Borrowers also shall be an applicant under the application with respect to any Underlying Letter of Credit that is to be the subject of an L/C Undertaking.

(e)    Subject to the terms and conditions of this Section 3.3 and provided that the applicable conditions set forth in Article VII have been satisfied, Issuing Lender or the Underlying Issuer, as applicable, shall, on the requested date, issue a Letter of Credit on behalf of Borrowers in accordance with the applicable Letter of Credit Request and Issuing Lender's or Underlying Issuer's, as applicable, usual and customary business practices and in a final form reasonably satisfactory to Parent.

(f)    Immediately upon the issuance by Issuing Lender of a Letter of Credit, Issuing Lender shall be deemed to have sold and transferred to each Lender, and each Lender shall be deemed irrevocably and unconditionally to have purchased and received from Issuing Lender, without recourse or warranty, an undivided interest and participation, to the extent of



such Lender's Applicable Percentage, in such Letter of Credit and the obligations of Borrowers with respect thereto (including, without limitation, all Letter of Credit Obligations with respect thereto) and any security therefor and guaranty pertaining thereto and each Lender's Revolving Loan Commitment shall be deemed used to the extent of such Lender's Applicable Percentage of such Letter of Credit Obligations.

(g)     In determining whether to pay under any Letter of Credit, Issuing Lender shall not have any obligation relative to Lenders other than to obtain from Underlying Issuer a representation that the necessary conditions for drawing under the Underlying Letter of Credit have been met. Any action taken or omitted to be taken by Issuing Lender or Underlying Issuer under or in connection with any Letter of Credit, if taken or omitted in the absence of gross negligence or willful misconduct, shall not put Issuing Lender or Underlying Issuer under any resulting liability to any other Lender.

(h)     If Issuing Lender makes any payment under any Letter of Credit, Issuing Lender shall promptly notify Administrative Lender, who shall promptly notify each Lender, and each Lender shall promptly and unconditionally pay to Administrative Lender for the account of Issuing Lender the amount of such Lender's Applicable Percentage of such payment in same day funds (and upon receipt, Administrative Lender shall promptly pay the same to Issuing Lender), which payment shall be deemed to be and shall constitute a Revolving Loan that is a Base Rate Loan made by such Lender to Borrowers; provided, however, that if the Swingline Lender so elects, and if a Swing Loan can be made in such amount, Administrative Lender shall promptly notify the Swingline Lender of such payment by Issuing Lender, and the Swingline Lender shall, and Borrowers hereby authorize the Swingline Lender to, pay to Administrative Lender for the account of Issuing Lender the amount of such payment in same day funds, which payment shall be deemed to be and shall constitute a Swing Loan made by the Swingline Lender to Borrowers. The Revolving Loans shall be made, or the Swing Loan may be made, as contemplated in the preceding sentence notwithstanding Borrowers' failure to satisfy the conditions set forth in Section 7.2. If Administrative Lender so notifies such Lender prior to 10:00 a.m. (California time) on any Business Day, such Lender shall make available to Administrative Lender for the account of Issuing Lender its Applicable Percentage of the amount of such payment by 1:00 p.m. (California time) on such Business Day in same day funds. If and to the extent such Lender shall not have so made such Lender's Applicable Percentage of the amount of such payment available to Administrative Lender for the account of Issuing Lender, such Lender shall be deemed a Defaulting Lender, and it agrees to repay to Administrative Lender for the account of such Issuing Lender forthwith on demand such amount together with interest thereon at the Defaulting Lender Rate, for each day from such date until the date such amount is repaid to Administrative Lender for the account of Issuing Lender. The failure of any Lender to make available to Administrative Lender for the account of Issuing Lender its Applicable Percentage of any such payment shall not relieve any other Lender of its obligation hereunder to make available to Administrative Lender for the account of Issuing Lender its Applicable Percentage of any payment on the date such payment is to be made, but no Lender shall be responsible for the failure of any other Lender to make available to Administrative Lender for the account of Issuing Lender such other Lender's Applicable Percentage of any such payment.

(i)     The obligations of Lenders to make payments to Administrative Lender for the account of Issuing Lender with respect to Letters of Credit shall be irrevocable and not

Exhibit A
Page 40 of 160

subject to any qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances (except as expressly provided in Section 3.3(g)), including, without limitation, any of the following circumstances:

(i)     any lack of validity or enforceability of any of the other Loan Documents;

(ii)     the existence of any claim, setoff, defense or other right which a Borrower may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), Administrative Lender, any Lender or any other Person, whether in connection with this Agreement, any Letter of Credit, the transactions contemplated herein or any unrelated transactions (including, without limitation, any underlying transaction between a Borrower and the beneficiary named in any Letter of Credit);

(iii)     any draft, certificate or any other document presented under the Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or

(iv)     the occurrence of any Default.

(j)     Each Borrower hereby agrees to indemnify, save, defend, and hold Administrative Lender, Issuing Lender, and the Lenders harmless from any loss, cost, expense, or liability, and reasonable attorneys fees incurred by the any of them arising out of or in connection with any Letter of Credit; provided, however, that no Borrower shall be obligated hereunder to indemnify for any loss, cost, expense, or liability to the extent that it is caused by the gross negligence or willful misconduct of the Issuing Lender or any Lender. Each Borrower agrees to be bound by the Underlying Issuer's regulations and interpretations of any Underlying Letter of Credit or by Issuing Lender's interpretations of any L/C issued by Issuing Lender to or for such Borrower's account, even though this interpretation may be different from such Borrower's own, and each Borrower understands and agrees that none of the Lenders or Administrative Lender shall be liable for any error, negligence, or mistake, whether of omission or commission, in following Borrowers' instructions or those contained in the Letter of Credit or any modifications, amendments, or supplements thereto. Each Borrower understands that the L/C Undertakings may require Issuing Lender to indemnify the Underlying Issuer for certain costs or liabilities arising out of claims by Borrowers against such Underlying Issuer. Each Borrower hereby agrees to indemnify, save, defend, and hold Administrative Lender and the Lenders harmless with respect to any loss, cost, expense (including reasonable attorneys fees), or liability incurred by any of them under any L/C Undertaking as a result of the Issuing Lender's, Administrative Lender', or Lenders' indemnification of any Underlying Issuer; provided, however, that no Borrower shall be obligated hereunder to indemnify for any loss, cost, expense, or liability to the extent that it is caused by the gross negligence or willful misconduct of the Issuing Lender or any other Lender. Each Borrower hereby acknowledges and agrees that none of the Administrative Lender, the Lenders, or the Issuing Lender shall be responsible for delays, errors, or omissions resulting from the malfunction of equipment in connection with any Letter of Credit.

(k)     Each Borrower hereby authorizes and directs any Underlying Issuer to deliver to the Issuing Lender all instruments, documents, and other writings and property received by such Underlying Issuer pursuant to such Underlying Letter of Credit and to accept and rely upon the Issuing Lender's instructions with respect to all matters arising in connection with such Underlying Letter of Credit and the related application.

(l)     Any and all issuance charges, commissions, fees, and costs incurred by the Issuing Lender relating to Underlying Letters of Credit shall be Lender Group Expenses for purposes of this Agreement and immediately shall be reimbursable by Borrowers to Administrative Lender for the account of the Issuing Lender; it being acknowledged and agreed by each Borrower that, as of the Closing Date, the issuance charge imposed by the prospective Underlying Issuer is .825% per annum times the undrawn amount of each Underlying Letter of Credit, that such issuance charge may be changed from time to time, and that the Underlying Issuer also imposes a schedule of charges for amendments, extensions, drawings, and renewals.

### 3.4    INTEREST/FEES

(a)     **Interest**.  The outstanding principal balance of each Loan shall bear interest at the Applicable Rate.  The foregoing notwithstanding, the rate of interest applicable at all times during the continuation of an Event of Default shall be a fluctuating rate per annum equal to the Applicable Rate (calculated based upon a Level III Applicable Margin) plus 200 basis points. All fees, expenses and other amounts not paid when due shall bear interest (from the date due until paid) at the rate set forth in the preceding sentence.

(b)     **Letter of Credit Fees**.  With respect to each Letter of Credit, Borrowers shall pay Administrative Lender, for the ratable benefit of the Lenders and the Issuing Lender, a Letter of Credit fee (in addition to the charges, commissions, fees, and costs set forth in Section 3.3(l)) which shall accrue at a rate equal to the LIBOR Margin times the daily balance of Letter of Credit Obligations and shall be payable in arrears on the first day of each month.  The foregoing notwithstanding, the Letter of Credit fee at all times during the continuation of an Event of Default shall be 200 basis points above the Level III LIBOR Margin.

(c)     **Fee Letter Fees**.  Borrowers shall pay to Administrative Lender, as and when due and payable under the terms of the Fee Letter, the fees set forth in the Fee Letter.

(d)     **Unused Line Fee**.  Borrowers shall pay to Administrative Lender, for the ratable benefit of Lenders, a fee equal to (i) the amount by which the Revolving Loan Commitments are greater than the average daily outstanding balance of the Revolving Loans, Letter of Credit Obligations and Swing Loans multiplied by (ii) a percentage per annum equal to the Unused Line Fee Percentage.  Borrowers shall pay this fee monthly, in arrears, on the first day of each month.

(e)     **Computation and Payment**.  All interest and per annum fees shall be computed on the basis of a 360-day year, actual days elapsed.  Interest on Base Rate Loans and the Letter of Credit fees shall be payable monthly, in arrears, on the first day of each month and on the Maturity Date.  Interest on LIBOR Loans shall be paid on the last day of each Interest



Period, at the end of the third month with respect to each Interest Period greater than 3 months (and at 3 month intervals thereafter), and on the Maturity Date.

### 3.5   INTEREST OPTIONS

(a)   **Election**.   Subject to the requirement that each LIBOR Loan be in a minimum amount of $5,000,000 and in integral multiples of $500,000 and the limitation in Section 3.5(b) regarding the number of LIBOR Loans outstanding at any time, (i) except as otherwise provided herein, at any time when a Default is not continuing Borrowers may convert all or any portion of a Base Rate Loan to a LIBOR Loan for an Interest Period designated by Parent, and (ii) at any time Borrowers may convert all or a portion of a LIBOR Loan at the end of the Interest Period applicable thereto to a Base Rate Loan or, if no Default is continuing, to a LIBOR Loan for a new Interest Period designated by Parent. If Parent has not made the required interest rate conversion or continuation election prior to the last day of any Interest Period, Borrowers shall be deemed to have elected to convert such LIBOR Loan to a Base Rate Loan.

(b)   **Maximum Number of LIBOR Loans**.   At no time shall there be more than five LIBOR Loans outstanding.

(c)   **Notice to Administrative Lender**.   Parent shall request each interest rate conversion or continuation by giving Administrative Lender irrevocable written notice or telephonic notice (confirmed promptly in writing), in the form of Exhibit D attached hereto (a "Notice of Conversion or Continuation"), that specifies, among other things: (i) the Loan to which such Notice of Conversion or Continuation applies; (ii) the principal amount that is the subject of such conversion or continuation; (iii) the proposed date of such conversion or continuation, which shall be a Business Day; and (iv) if such Notice pertains to a LIBOR Loan, the length of the applicable Interest Period. Any such Notice of Conversion or Continuation must be received by Administrative Lender not later than (i) 11:00 a.m. (California time) at least one Business Day prior to the effective date of any Base Rate interest selection, and (ii) at least three Business Days prior to the effective date of any LIBOR interest selection. Administrative Lender shall promptly notify each Lender of the contents of each such Notice of Conversion or Continuation, or if timely notice is not received from Parent prior to the last day of any Interest Period, of the automatic conversion of such LIBOR Loan to a Base Rate Loan.

### 3.6   OTHER PAYMENT TERMS

(a)   **Intentionally Omitted**.

(b)   **Place and Manner**.   Borrowers shall make all payments due to each Lender under the Loan Documents by payment to Administrative Lender at Administrative Lender's Office, for the account of such Lender, in lawful money of the United States and in same day or immediately available funds not later than 11:00 a.m. (California time) on the date due. Administrative Lender shall promptly disburse to each Lender at such Lender's lending office each such payment received by Administrative Lender for such Lender no later than 2:00 p.m. (California time) on the Business Day received if received before 11:00 a.m. (California time), or if received later, by 2:00 p.m. (California time) on the next Business Day.



(c)    **Date**. Whenever any payment due hereunder shall fall due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall be included in the computation of interest or fees, as the case may be.

(d)    **Apportionment and Application**.

(i)    So long as no Event of Default has occurred and is continuing and except as otherwise provided with respect to Defaulting Lenders, all principal and interest payments shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses (other than fees or expenses that are for Administrative Lender's separate account) shall be apportioned ratably among the Lenders having an Applicable Percentage of the type of Commitment or Obligation to which a particular fee or expense relates. All payments to be made hereunder by Borrowers shall be remitted to Administrative Lender and all (subject to Section 3.6(d)(iv) hereof) such payments, and all proceeds of Collateral received by Administrative Lender, shall be applied, so long as no Event of Default has occurred and is continuing, to reduce the balance of the Revolving Loans outstanding and, thereafter, to Borrowers or such other Person entitled thereto under applicable law.

(ii)    At any time that an Event of Default has occurred and is continuing and except as otherwise provided with respect to Defaulting Lenders, all payments remitted to Administrative Lender and all proceeds of Collateral received by Administrative Lender shall be applied as follows:

(1)    first, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Administrative Lender under the Loan Documents, until paid in full,

(2)    second, to pay any fees or premiums then due to the Administrative Lender under the Loan Documents until paid in full,

(3)    third, to pay interest due in respect of all Protective Loans until paid in full,

(4)    fourth, to pay the principal of all Protective Loans until paid in full,

(5)    fifth, ratably to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the Loan Documents, until paid in full,

(6)    sixth, ratably to pay any fees or premiums then due to any of the Lenders under the Loan Documents until paid in full,

(7)    seventh, ratably to pay interest due in respect of the Revolving Loans (other than Protective Loans) and the Swing Loans until paid in full,

(8)     eighth, ratably (i) to pay the principal of all Swing Loans until paid in full, (ii) to pay the principal of all Revolving Loans until paid in full, (iii) to Administrative Lender, to be held by Administrative Lender, for the ratable benefit of Issuing Lender and those Lenders having a Revolving Loan Commitment, as cash collateral in an amount up to 105% of the Letter of Credit Obligations, and (iv) to Administrative Lender, to be held by Administrative Lender, for the benefit of the Bank Product Providers, as cash collateral in an amount up to the amount of the Bank Product Reserve established prior to the occurrence of, and not in contemplation of, the subject Event of Default,

(9)     ninth, to pay any other Obligations (including the provision of amounts to Administrative Lender, to be held by Administrative Lender, for the benefit of the Bank Product Providers, as cash collateral in an amount up to the amount determined by Administrative Lender in its reasonable discretion as the amount necessary to secure Borrowers' and their Subsidiaries' obligations in respect of Bank Products), and

(10)     tenth, to Borrowers or such other Person entitled thereto under applicable law.

(iii)     Administrative Lender promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in Section 3.7(e).

(iv)     In each instance, so long as no Event of Default has occurred and is continuing, Section 3.6(d)(i) shall not apply to any payment made by Borrowers to Administrative Lender and specified by Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement.

(v)     For purposes of Section 3.6(d)(ii), "paid in full" means payment of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any proceeding under the Bankruptcy Code or other insolvency proceeding), default interest, interest on interest, and expense reimbursements, whether or not any of the foregoing would be or is allowed or disallowed in whole or in part in any bankruptcy or other insolvency proceeding.

(vi)     In the event of a direct conflict between the priority provisions of this Section 3.6(d) and any other provision contained in any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 3.6(d) shall control and govern.

(e)     **Failure to Pay Administrative Lender**. Unless Administrative Lender shall have received notice from Parent prior to the date on which any payment is due to Administrative Lender for the account of Lenders or Issuing Lender hereunder that Borrowers will not make such payment, Administrative Lender may assume that Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption,



distribute to Lenders or Issuing Lender, as the case may be, the amount due. In such event, if Borrowers have not in fact made such payment, then each of Lenders or Issuing Lender, as the case may be, severally agrees to repay to Administrative Lender forthwith on demand the amount so distributed to such Lender or Issuing Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to Administrative Lender, at the greater of the Federal Funds Rate and a rate determined by Administrative Lender in accordance with banking industry rules on interbank compensation. A certificate of Administrative Lender submitted to any Lender with respect to any amounts owing by such Lender under this Section 3.6(e) shall be presumptive evidence of such amounts.

### 3.7    FUNDING AND SETTLEMENT

(a)    **Lender Funding and Disbursement**.    Each Lender shall, before 10:00 a.m. (California time) on the date of each borrowing under Section 3.1, make available to Administrative Lender at Administrative Lender's Office, in same day or immediately available funds, such Lender's Applicable Percentage thereof. After Administrative Lender's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article VII hereof, Administrative Lender will promptly disburse such funds in same day or immediately available funds to Borrowers. Unless otherwise directed by Parent in writing, Administrative Lender shall disburse the proceeds of each borrowing to Parent by deposit to any demand deposit account maintained by Parent with Wells Fargo or one designated by Parent in a notice to Administrative Lender.

(b)    **Funding by Lenders; Presumption by Administrative Lender**.    Unless Administrative Lender shall have received notice from a Lender prior to the proposed date of any borrowing that such Lender will not make available to Administrative Lender such Lender's share of such borrowing, Administrative Lender may assume that such Lender has made such share available on such date in accordance with Section 3.7(a) and may, in reliance upon such assumption, make available to Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable borrowing available to Administrative Lender, then the applicable Lender and Borrowers severally agree to pay to Administrative Lender forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to Borrowers to but excluding the date of payment to Administrative Lender, at (i) in the case of a payment to be made by such Lender, at the Defaulting Lender Rate and (ii) in the case of a payment to be made by Borrowers, the interest rate applicable to Revolving Loans that are Base Rate Loans. If Borrowers and such Lender shall pay such interest to Administrative Lender for the same or an overlapping period, Administrative Lender shall promptly remit to Borrowers the amount of such interest paid by Borrowers for such period. If such Lender pays its share of the applicable borrowing to Administrative Lender, then the amount so paid shall constitute such Lender's Loan included in such borrowing. Any payment by Borrowers shall be without prejudice to any claim Borrowers may have against a Lender that shall have failed to make such payment to Administrative Lender.

(c)    **Lenders' Obligations Several**.    The obligation of each Lender hereunder is several. The failure of any Lender to make available its Applicable Percentage of any borrowing shall not relieve any other Lender of its obligation hereunder to do so on the date



requested, but no Lender shall be responsible for the failure of any other Lender to make available the Applicable Percentage to be funded by such other Lender.

(d)     **Defaulting Lender.**   Administrative Lender shall not be obligated to transfer to a Defaulting Lender any payments made by Borrowers to Administrative Lender for the Defaulting Lender's benefit, and, in the absence of such transfer to the Defaulting Lender, Administrative Lender shall transfer any such payments to each other non-Defaulting Lender ratably in accordance with their Applicable Percentage (but only to the extent that such Defaulting Lender's Revolving Loan was funded by the other Lenders) or, if so directed by Parent and if no Default or Event of Default had occurred and is continuing (and to the extent such Defaulting Lender's Revolving Loan was not funded by the Lenders), retain same to be re-advanced to Borrowers as if such Defaulting Lender had made Revolving Loans to Borrowers. . Subject to the foregoing, Administrative Lender may hold and, in its reasonable discretion, re-lend to Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by Administrative Lender for the account of such Defaulting Lender. . Solely for the purposes of voting or consenting to matters with respect to the Loan Documents, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Revolving Loan Commitment shall be deemed to be zero. This Section shall remain effective with respect to such Lender until (x) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable, (y) the non-Defaulting Lenders, Administrative Lender, and Parent shall have waived such Defaulting Lender's default in writing, or (z) the Defaulting Lender makes its Applicable Percentage of the applicable Revolving Loan and pays to Administrative Lender all amounts owing by Defaulting Lender in respect thereof.   The operation of this Section shall not be construed to increase or otherwise affect the Revolving Loan Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrowers of their duties and obligations hereunder to Administrative Lender or to the Lenders other than such Defaulting Lender. Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Parent at its option, upon written notice to Administrative Lender, to arrange for a substitute Lender to assume the Revolving Loan Commitment of such Defaulting Lender, such substitute Lender to be acceptable to Administrative Lender. In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Assumption in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being repaid its share of the outstanding Obligations (other than Bank Product Obligations, but including an assumption of its Applicable Percentage of the Letter of Credit Obligations) without any premium or penalty of any kind whatsoever; provided however, that any such assumption of the Revolving Loan Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Administrative Lender's, Lenders' or Borrowers' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.

(e)     **Settlement.**   It is agreed that each Lender's funded portion of the Revolving Loans is intended by the Lenders to equal, at all times, such Lender's Applicable Percentage of the outstanding Revolving Loans.   Such agreement notwithstanding, Administrative Lender, Swingline Lender, and the other Lenders agree (which agreement shall

not be for the benefit of any Borrower) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Lenders as to the Revolving Loans, the Swing Loans, and the Protective Loans shall take place on a periodic basis in accordance with the following provisions:

(i)     Administrative Lender shall request settlement ("Settlement") with the Lenders on a weekly basis, or on a more frequent basis if so determined by Administrative Lender (1) on behalf of Swingline Lender, with respect to the outstanding Swing Loans, (2) for itself, with respect to the outstanding Protective Loans, and (3) with respect to Borrowers' or their subsidiaries' collections received, as to each by notifying the Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than 2:00 p.m. (California time) on the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "Settlement Date"). Such notice of a Settlement Date shall include a summary statement of the amount of outstanding Revolving Loans, Swing Loans, and Protective Loans for the period since the prior Settlement Date. Subject to the terms and conditions contained herein (including Section 3.2(c)): (y) if a Lender's balance of the Revolving Loans (including Swing Loans and Protective Loans) exceeds such Lender's Applicable Percentage of the Revolving Loans (including Swing Loans and Protective Loans) as of a Settlement Date, then Administrative Lender shall, by no later than 12:00 p.m. (California time) on the Settlement Date, transfer in immediately available funds to a deposit account of such Lender (as such Lender may designate), an amount such that each such Lender shall, upon receipt of such amount, have as of the Settlement Date, its Applicable Percentage of the Revolving Loans (including Swing Loans and Protective Loans), and (z) if a Lender's balance of the Revolving Loans (including Swing Loans and Protective Loans) is less than such Lender's Applicable Percentage of the Revolving Loans (including Swing Loans and Protective Loans) as of a Settlement Date, such Lender shall no later than 12:00 p.m. (California time) on the Settlement Date transfer in immediately available funds to the Administrative Lender, an amount such that each such Lender shall, upon transfer of such amount, have as of the Settlement Date, its Applicable Percentage of the Revolving Loans (including Swing Loans and Protective Loans). Such amounts made available to Administrative Lender under clause (z) of the immediately preceding sentence shall be applied against the amounts of the applicable Swing Loans or Protective Loans and, together with the portion of such Swing Loans or Protective Loans representing Swingline Lender's Applicable Percentage thereof, shall constitute Revolving Loans of such Lenders. If any such amount is not made available to Administrative Lender by any Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Administrative Lender shall be entitled to recover for its account such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate.

(ii)     In determining whether a Lender's balance of the Revolving Loans, Swing Loans, and Protective Loans is less than, equal to, or greater than such Lender's Applicable Percentage of the Revolving Loans, Swing Loans, and Protective Loans as of a Settlement Date, Administrative Lender shall, as part of the relevant Settlement, apply to such balance the portion of payments actually received in good funds by Administrative Lender with respect to principal, interest, fees payable by Borrowers and allocable to the Lenders hereunder, and proceeds of Collateral. To the extent that a net amount is owed to any such Lender after such application, such net amount shall be distributed by Administrative Lender to that Lender as part of such next Settlement.

(iii)    Between Settlement Dates, Administrative Lender, to the extent no Protective Loans or Swing Loans are outstanding, may pay over to Swingline Lender any payments received by Administrative Lender, that in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans, for application to Swingline Lender's Applicable Percentage of the Revolving Loans. If, as of any Settlement Date, collections of Borrowers or their Subsidiaries received since the then immediately preceding Settlement Date have been applied to Swingline Lender's Applicable Percentage of the Revolving Loans other than to Swing Loans, as provided for in the previous sentence, Swingline Lender shall pay to Administrative Lender for the accounts of the Lenders, and Administrative Lender shall pay to the Lenders, to be applied to the outstanding Revolving Loans of such Lenders, an amount such that each Lender shall, upon receipt of such amount, have, as of such Settlement Date, its Applicable Percentage of the Revolving Loans. During the period between Settlement Dates, Swingline Lender with respect to Swing Loans, Administrative Lender with respect to Protective Loans, and each Lender (subject to the effect of agreements between Administrative Lender and individual Lenders) with respect to the Revolving Loans other than Swing Loans and Protective Loans, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by Swingline Lender, Administrative Lender, or the Lenders, as applicable.

(f)    **Revolving Loans Records**. Administrative Lender shall record on its books the principal amount of the Revolving Loans owing to each Lender, including the Swing Loans owing to Swingline Lender, and Protective Loans owing to Administrative Lender and the interests therein of each Lender, from time to time and such records shall, absent manifest error, conclusively be presumed to be correct and accurate.

### 3.8   PRO RATA TREATMENT

(a)    **Borrowings**. Except as otherwise provided herein, each Loan, except a Swing Loan, shall be made by or shared by each Lender in accordance with its Applicable Percentage.

(b)    **Sharing of Payments, Etc.** Except as otherwise provided herein, each payment of principal, interest or fees shall be made by or shared by each Lender in accordance with its Applicable Percentage. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its pro rata share thereof as provided herein, then Lender receiving such greater proportion shall (a) notify Administrative Lender of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them, provided that:

(i)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this paragraph shall not be construed to apply to (x) any payment made by Borrowers pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in Letter of Credit Obligations to any assignee or Participant, other than to Borrowers or any Subsidiary (as to which the provisions of this paragraph shall apply).

Borrowers consent to the foregoing and agree, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against Borrowers rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of Borrowers in the amount of such participation.

### 3.9   CHANGE   OF   CIRCUMSTANCES;   YIELD   PROTECTION;   NO REQUIREMENT OF MATCH FUNDING

(a)     **Inability to Determine Rate**.   If Administrative Lender at any time determines that adequate and reasonable means do not exist for ascertaining LIBOR; or the Required Lenders determine at any time that LIBOR does not accurately reflect the cost to Lenders of making or maintaining LIBOR interest rates hereunder, then Administrative Lender shall give telephonic notice (promptly confirmed in writing) to Parent and each Lender of such determination.   If such notice is given and until such notice has been withdrawn in writing by Administrative Lender, no LIBOR interest option may be selected by Parent and each LIBOR Loan, subsequent to the end of the Interest Period applicable thereto, shall bear interest determined in relation to the Base Rate pursuant to the terms and conditions of this Agreement.

(b)     **Illegality:   Termination of Commitment**.   Notwithstanding any other provisions herein, if any Change in Law shall make it unlawful for any Lender (i) to make a LIBOR interest rate available, or (ii) to maintain LIBOR interest rates hereunder, then, in the former event, any obligation of such Lender to make available such unlawful LIBOR interest rate shall be suspended until such time as it is once again lawful to make such rate available, and in the latter event, any such unlawful LIBOR interest rate then outstanding shall be converted so that interest is determined in relation to the Base Rate pursuant to the terms of this Agreement; provided, however, if any such Change in Law shall permit a LIBOR interest rate until the expiration of the Interest Period relating thereto, then such permitted LIBOR interest rate shall continue as such until the end of such Interest Period.   If as a result of this Section 3.9(b) a LIBOR interest rate is converted to a lower interest rate, Borrowers shall pay to each Lender immediately upon demand such amount or amounts as may be necessary to compensate such Lender for any loss in connection therewith.

(c)     **Charges:   Illegality**.   Upon the occurrence of any event described in Section 3.9(b) hereof, Borrowers shall pay to each Lender, immediately upon demand, such amount or amounts as may be necessary to compensate such Lender for any fines, fees, charges, penalties or other amounts payable by such Lender as a result thereof and that are attributable to LIBOR interest rates made available to Borrowers hereunder.   In determining which amounts payable by any Lender and/or losses incurred by any Lender are attributable to LIBOR interest rates made available to Borrowers hereunder, any reasonable allocation made by any Lender



among its operations shall, in the absence of manifest error, be conclusive and binding upon Borrowers.

        (d)    **Increased Costs Generally**. If any Change in Law shall:

        (i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the definition of "LIBOR") or Issuing Lender;

        (ii)    subject any Lender or Issuing Lender to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any Eurodollar Loan made by it, or change the basis of taxation of payments to such Lender or Issuing Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.10 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender or Issuing Lender); or

        (iii)    impose on any Lender or Issuing Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or Issuing Lender of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or Issuing Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or Issuing Lender, Borrowers will pay to such Lender or Issuing Lender, as the case may be, such additional amount or amounts as will compensate such Lender or Issuing Lender, as the case may be, for such additional costs incurred or reduction suffered.

        (e)    **Capital Requirements**. If any Lender or Issuing Lender determines that any Change in Law affecting such Lender or Issuing Lender or any lending office of such Lender or such Lender's or Issuing Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or Issuing Lender's capital or on the capital of such Lender's or Issuing Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by Issuing Lender, to a level below that which such Lender or Issuing Lender or such Lender's or Issuing Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or Issuing Lender's policies and the policies of such Lender's or Issuing Lender's holding company with respect to capital adequacy), then from time to time Borrowers will pay to such Lender or Issuing Lender, as the case may be, such additional amount or amounts as will compensate such Lender or Issuing Lender or such Lender's or Issuing Lender's holding company for any such reduction suffered.

(f) **Certificates for Reimbursement.** A certificate of a Lender or Issuing Lender setting forth the amount or amounts necessary to compensate such Lender or Issuing Lender or its holding company, as the case may be, as specified in Section 3.9(d) or (e) and delivered to Parent shall be conclusive absent manifest error. Borrowers shall pay such Lender or Issuing Lender, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(g) **Delay in Requests.** Failure or delay on the part of any Lender or Issuing Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or Issuing Lender's right to demand such compensation, provided that Borrowers shall not be required to compensate a Lender or Issuing Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or Issuing Lender, as the case may be, notifies Parent of the Change in Law giving rise to such increased costs or reductions and of such Lender's or Issuing Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(h) **No Requirement of Matched Funding.** Anything to the contrary contained herein notwithstanding, neither Administrative Lender, nor any Lender, nor any of their Participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any LIBOR Loans. The provisions herein with respect to LIBOR and LIBOR Loans shall apply as if each Lender or its Participants had match funded LIBOR Loan by acquiring eurodollar deposits for each Interest Period in the amount of such LIBOR Loan.

### 3.10 TAXES ON PAYMENTS

(a) **Payments Free of Taxes.** Any and all payments by or on account of any obligation of Borrowers under any Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if any Borrower shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) Administrative Lender, Lender or Issuing Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Borrower shall make such deductions and (iii) Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b) **Payment of Other Taxes by Borrowers.** Without limiting the provisions of Section 3.10(a), Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c) **Indemnification by Borrowers.** Borrowers shall indemnify Administrative Lender, each Lender and Issuing Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by Administrative Lender, such Lender or Issuing Lender, as the case may be, and any penalties,



interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Parent by a Lender or Issuing Lender (with a copy to Administrative Lender), or by Administrative Lender on its own behalf or on behalf of a Lender or Issuing Lender, shall be conclusive absent manifest error.

(d) **Evidence of Payments.** As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Borrower to a Governmental Authority, Parent shall deliver to Administrative Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Administrative Lender.

(e) **Status of Lenders.** Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments under any Loan Document shall deliver to Parent (with a copy to Administrative Lender), at the time or times prescribed by applicable law or reasonably requested by Parent or Administrative Lender, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if requested by Parent or Administrative Lender, shall deliver such other documentation prescribed by applicable law or reasonably requested by Parent or Administrative Lender as will enable Parent or Administrative Lender to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Without limiting the generality of the foregoing, if any Borrower is resident for tax purposes in the United States of America, any Foreign Lender shall deliver to Parent and Administrative Lender (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of Parent or Administrative Lender, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i) duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(ii) duly completed copies of Internal Revenue Service Form W-8ECI,

(iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of a Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, or

(iv) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together



with such supplementary documentation as may be prescribed by applicable law to permit Parent to determine the withholding or deduction required to be made.

(f)     **Treatment of Certain Refunds**. If Administrative Lender, a Lender or Issuing Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by Borrowers or with respect to which Borrowers have paid additional amounts pursuant to this Section, it shall pay to Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrowers under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of Administrative Lender, such Lender or Issuing Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that Borrowers, upon the request of Administrative Lender, such Lender or Issuing Lender, agree to repay the amount paid over to Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Administrative Lender, such Lender or Issuing Lender in the event . Administrative Lender, such Lender or Issuing Lender is required to repay such refund to such Governmental Authority. This Section 3.10(f) shall not be construed to require Administrative Lender, any Lender or Issuing Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to Borrowers or any other Person.

## 3.11    MITIGATION OBLIGATIONS; REPLACEMENT OF LENDERS

(a)     **Designation of Different Lending Office**. If any Lender requests compensation under Section 3.9, or requires Borrowers to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.10, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.9 or Section 3.10, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     **Replacement of Lenders**. If any Lender requests compensation under Section 3.9, or if Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.10, or if any Lender defaults in its obligation to fund Loans hereunder, then Borrowers may, at their sole expense and effort, upon notice to such Lender and Administrative Lender, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 13.4), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(i)     Borrowers shall have paid to Administrative Lender the assignment fee specified in Section 13.4;

Exhibit A

 

(ii)　such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in Letter of Credit Obligations, accrued interest thereon, accrued fees and all other amounts payable to it under the Loan Documents (including any amounts under Section 3.12) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrowers (in the case of all other amounts);

(iii)　in the case of any such assignment resulting from a claim for compensation under Section 3.9 or payments required to be made pursuant to Section 3.10, such assignment will result in a reduction in such compensation or payments thereafter; and

(iv)　such assignment does not conflict with applicable law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrowers to require such assignment and delegation cease to apply.

### 3.12　FUNDING LOSS INDEMNIFICATION

Borrowers will indemnify Lenders upon demand from Administrative Lender against any loss or expense which Lenders sustain or incur as a consequence of (a) any payment of any portion of the principal of a LIBOR Loan before the last day of the Interest Period applicable thereto (whether through voluntary prepayment, acceleration, exercise by Borrowers of their rights under Section 3.11 or otherwise), or (b) any failure to borrow the full amount of a requested LIBOR Loan set forth in any Notice of Borrowing or to convert or continue at the LIBOR interest option any portion of a Loan in accordance with a Notice of Conversion or Continuation (in either event, whether as a result of the failure to satisfy any applicable conditions or otherwise). Administrative Lender's determination of the amount payable under this Section shall, in the absence of manifest error, be conclusive and binding on Borrowers for all purposes. In determining such amount, Administrative Lender may use any reasonable averaging and attribution methods and Lenders shall be deemed to have actually funded and maintained all LIBOR Loans during the applicable Interest Period through the purchase of deposits having a term corresponding to such Interest Period and bearing interest at a rate equal to LIBOR for such Interest Period. This Section shall survive the payment in full and performance of all of Borrowers' other Obligations.

### 3.13　AUTHORIZED REPRESENTATIVES

On the Closing Date, and from time to time subsequent thereto at Parent's option, Parent shall deliver to Administrative Lender a notice in the form of Exhibit E attached hereto, which designates by name each of Parent's Authorized Representatives and includes each of their respective specimen signatures (each, a "Notice of Authorized Representatives"). Administrative Lender shall be entitled to rely conclusively on the authority of each officer or employee designated as an Authorized Representative in the most current Notice of Authorized Representatives delivered by Parent to Administrative Lender, to request borrowings, to select interest rate options hereunder, and to give to Administrative Lender such other notices as are specified herein as being made through one of Parent's Authorized Representatives, until such time as Parent has delivered to Administrative Lender, and Administrative Lender has actual



receipt of, a new Notice of Authorized Representatives. Administrative Lender shall have no duty or obligation to Parent to verify the authenticity of any signature appearing on any Notice of Borrowing, Notice of Conversion or Continuation or any other notice from an Authorized Representative or to verify the authenticity of any person purporting to be an Authorized Representative giving any telephonic notice permitted hereby.

## ARTICLE IV

## COLLECTION; ADMINISTRATION AND TERM

### 4.1 CASH MANAGEMENT

(a) **Establishment of Cash Management Accounts**. Borrowers shall and shall cause each of their domestic Subsidiaries to (i) establish and maintain cash management services of a type and on terms satisfactory to Administrative Lender at one or more of the banks set forth on Schedule 4.1(a) (each a "Cash Management Bank"), and shall request in writing and otherwise take such reasonable steps to ensure that all of their and their Subsidiaries' account debtors forward payment of the amounts owed by them directly to such Cash Management Bank, and (ii) deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all payments, remittances, and all other collections and proceeds of Collateral ("Proceeds") (including those sent directly by their account debtors to Borrowers or their Subsidiaries) into a bank account in Administrative Lender's name (a "Cash Management Account") at one of the Cash Management Banks, provided, however, that: (i) Borrowers may maintain in a segregated deposit account collections with respect to Accounts sold to Trade Bank in accordance with the terms set forth in Section 9.4. Each Cash Management Account shall be a cash collateral account subject to a control agreement, in form and substance satisfactory to Administrative Lender.

(b) **Cash Management Agreements**. Each Cash Management Bank shall establish and maintain Cash Management Agreements with Administrative Lender and Borrowers. Each such Cash Management Agreement shall provide, among other things, that (i) the Cash Management Bank will comply with any instructions originated by Administrative Lender directing the disposition of the funds in such Cash Management Account without further consent by Borrowers or their Subsidiaries, as applicable, (ii) the Cash Management Bank has no rights of setoff or recoupment or any other claim against the applicable Cash Management Account, other than for payment of its service fees and other charges directly related to the administration of such Cash Management Account and for returned checks or other items of payment, and (iii) the Cash Management Bank will forward, by daily sweep, all amounts in the applicable Cash Management Account to a deposit account designated by the Administrative Lender (the "Administrative Lender Account"), provided, however, that Borrowers may maintain the following deposit accounts which shall be subject to a control agreement in form and substance satisfactory to Administrative Lender, but the balances of which shall not be swept to the Administrative Lender Account: (i) a deposit account with a balance not to exceed $75,000 at any one time for the purpose of paying product purchase invoices denominated in Canadian Dollars and (ii) a deposit account with a balance not to exceed $50,000 at any one time for the purpose of making cash purchases of certain Inventory within the State of Missouri.

51

(c)     **Amendments to Schedule 4.1(a)**.  So long as no Default or Event of Default has occurred and is continuing, Parent may amend Schedule 4.1(a) to add or replace a Cash Management Bank or Cash Management Account; provided, however, that (i) such prospective Cash Management Bank shall be reasonably satisfactory to Administrative Lender, and (ii) prior to the time of the opening of such Cash Management Account, a Borrower (or its Subsidiary, as applicable) and such prospective Cash Management Bank shall have executed and delivered to Administrative Lender a Cash Management Agreement.  Borrowers (or their Subsidiaries, as applicable) shall close any of their Cash Management Accounts (and establish replacement cash management accounts in accordance with the foregoing sentence) promptly and in any event within 30 days of notice from Administrative Lender that the creditworthiness of any Cash Management Bank is no longer acceptable in Administrative Lender's reasonable judgment, or as promptly as practicable and in any event within 60 days of notice from Administrative Lender that the operating performance, funds transfer, or availability procedures or performance of the Cash Management Bank with respect to Cash Management Accounts or Administrative Lender's liability under any Cash Management Agreement with such Cash Management Bank is no longer acceptable in Administrative Lender's reasonable judgment.

(d)     **Crediting Payments**.  The receipt of any payment item by Administrative Lender (whether from transfers to Administrative Lender by the Cash Management Banks pursuant to the Cash Management Agreements or otherwise) shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Administrative Lender Account or unless and until such payment item is honored when presented for payment.  Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly.  Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Administrative Lender only if it is received into the Administrative Lender's Account on a Business Day on or before 11:00 a.m. (California time). If any payment item is received into the Administrative Lender's Account on a non-Business Day or after 11:00 a.m. (California time) on a Business Day, it shall be deemed to have been received by Administrative Lender's as of the opening of business on the immediately following Business Day.

### 4.2     LOAN ACCOUNT AND STATEMENTS

Administrative Lender shall maintain an account on its books in the name of Borrowers (the "Loan Account") on which Borrowers will be charged with all Revolving Loans (including Protective Loans and Swing Loans) made by Administrative Lender, Swingline Lender, or the Lenders to Borrowers or for Borrowers' account, the Letters of Credit issued by Issuing Lender for Borrowers' account, and with all other payment Obligations hereunder or under the other Loan Documents (except for Bank Product Obligations), including, accrued interest, fees and expenses, and Lender Group Expenses.  In accordance with Section 4.1(d), the Loan Account will be credited with all payments received by Administrative Lender from Borrowers or for Borrowers' account, including all amounts received in the Administrative Lender's Account from any Cash Management Bank.  From time to time Administrative Lender may render to Parent a statement setting forth the balance in the Loan Account, including principal, interest, fees, costs and expenses. Each such statement shall be subject to subsequent adjustment by Administrative Lender, but shall, absent manifest errors or omissions, be



considered correct and deemed accepted by Borrowers and conclusively binding upon Borrowers as an account stated except to the extent that Administrative Lender receives a notice from Parent of any specific exceptions thereto within thirty days after the date such statement has been mailed by Administrative Lender. Until such time as Administrative Lender shall have rendered to Parent a written statement as provided above, the balance in the loan account(s) shall be presumptive evidence of the amounts due and owing to Lenders by Borrowers.

### 4.3 PAYMENTS

Borrowers shall make all payments due hereunder free and clear of, and without deduction or withholding for or on account of, any setoff, counterclaim, defense, duties, taxes, levies, imposts, fees, deductions, withholding, restrictions or conditions of any kind. If after receipt of any Proceeds or payment applied to the payment of any of the Obligations any Lender is required to surrender or return such payment or Proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or Proceeds shall be reinstated and continue and this Agreement shall continue in full force and effect as if such payment or Proceeds had not been received by such Lender. Borrowers hereby indemnify and hold Lenders harmless for the amount of any payments or Proceeds surrendered or returned. Borrowers hereby authorize Administrative Lender, from time to time, without prior notice to Borrowers, to charge all interest and fees (when due and payable), all Lender Group Expenses (as and when incurred), all charges, commissions, fees, and costs provided for in Section 3.3(l) (as and when accrued or incurred), all fees and costs provided for in Section 3.4 (as and when accrued or incurred), and all other payments as and when due and payable under any Loan Document (including the amounts due and payable with respect to the Bank Product Providers in respect of Bank Products up to the amount of the Bank Product Reserve) to the Loan Account, which amounts thereafter shall constitute Revolving Loans hereunder and shall accrue interest at the rate then applicable to Revolving Loans that are Base Rate Loans. Any interest not paid when due shall be compounded by being charged to the Loan Account and shall thereafter constitute Revolving Loans hereunder and shall accrue interest at the rate then applicable to Revolving Loans that are Base Rate Loans. This Section shall remain effective notwithstanding any contrary action which may be taken by any Lender in reliance upon such payment or Proceeds. This Section 4.3 shall survive the payment in full and performance of all of Borrowers' other Obligations.

### 4.4 TERM

This Agreement shall continue in full force and effect for a term ending on the Maturity Date. The foregoing notwithstanding, the Administrative Lender and the Lenders, upon the election of the Required Lenders, shall have the right to terminate their obligations under this Agreement immediately and without notice upon the occurrence and during the continuation of an Event of Default.

### 4.5 EFFECT OF TERMINATION

On the date of termination of this Agreement, all Obligations (including contingent reimbursement obligations of Borrowers with respect to outstanding Letters of Credit and including all Bank Product Obligations) immediately shall become due and payable without

53



notice or demand (including the requirement that Borrowers provide (a) Letter of Credit Collateralization, and (b) Bank Product Collateralization). No termination of this Agreement, however, shall relieve or discharge Borrowers or their Subsidiaries of their duties, Obligations, or covenants hereunder or under any other Loan Document and the Liens in the Collateral granted to Administrative Lender, for the ratable benefit of the Lenders, to secure the Obligations shall remain in effect until all Obligations have been paid in full and Lenders' obligations to provide additional credit hereunder have been terminated. When this Agreement has been terminated and all of the Obligations have been paid in full and the Lenders' obligations to provide additional credit under the Loan Documents have been terminated irrevocably, Administrative Lender will, at Borrowers' sole expense, execute and deliver any termination statements, lien releases, mortgage releases, re-assignments of trademarks, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, the Liens granted to Administrative Lender, for the ratable benefit of the Lenders, to secure the Obligations, and all notices of security interests and liens previously filed by Administrative Lender with respect to the Obligations.

### 4.6   EARLY TERMINATION BY BORROWERS.

Borrowers have the option, at any time upon 30 days prior written notice to Administrative Lender, to terminate this Agreement and terminate the Commitments hereunder by paying to Administrative Lender, in cash, the Obligations (including (a) providing Letter of Credit Collateralization with respect to the then existing Letter of Credit Obligations, and (b) providing Bank Product Collateralization with respect to the then existing Bank Products), in full. If Borrowers have sent a notice of termination pursuant to the provisions of this Section, then the Commitments shall terminate and Borrowers shall be obligated to repay the Obligations (including (a) providing Letter of Credit Collateralization with respect to the then existing Letter of Credit Obligations, and (b) providing Bank Product Collateralization with respect to the then existing Bank Products), in full, on the date set forth as the date of termination of this Agreement in such notice.

### ARTICLE V

### SECURITY

### 5.1   GRANT OF SECURITY INTEREST

Borrowers hereby grant to Administrative Lender, for the benefit of and on behalf of Lenders, a security interest in all of the Collateral as security for the full and prompt payment in cash and performance of the Obligations; provided, however, if any Borrower acquires equipment financed with debt permitted by Section 9.2(d) and the holder of such debt requests in a written notice to Administrative Lender that the Lien granted hereby on such equipment be released, Administrative Lender, at Borrowers' expense, shall promptly release its Lien in such equipment if no Default exists.

## 5.2    PERFECTION; DUTY OF CARE

(a)    Until all the Obligations have been indefeasibly satisfied and paid in cash and Lenders' obligations to advance credit to Borrowers terminated, Borrowers shall perform all steps requested by Administrative Lender to perfect, maintain and protect Administrative Lender's security interest in the Collateral, including, without limitation, delivering all Collateral in which Administrative Lender's security interest may be perfected by possession together with such indorsements as Administrative Lender may request.

(b)    Administrative Lender shall have the right at all times, and from time to time, to contact Borrowers' account debtors to verify Rights to Payment.

(c)    Borrowers shall pay or cause to be paid all taxes, assessments and governmental charges levied or assessed or imposed upon or with respect to the Collateral or any part thereof; provided, however, Borrowers shall not be required to pay any tax if the validity and/or amount thereof is being contested in good faith and by appropriate and lawful proceedings promptly initiated and diligently conducted and for which appropriate reserves have been established and so long as levy and execution have been and continue to be stayed. If Borrowers fail to pay or so contest and reserve for such taxes, assessments and governmental charges, Administrative Lender may (but shall not be required to) pay the same and add the amount of such payment to the principal of the Revolving Loans.

(d)    In order to protect or perfect the security interest granted under the Loan Documents, Administrative Lender may discharge any Lien that is not a Permitted Lien or bond the same, pay for any insurance that Borrowers fail to maintain as required by this Agreement, maintain guards, pay any service bureau, or obtain any record and add the same to the principal of the Revolving Loans.

(e)    Administrative Lender shall have no duty of care with respect to the Collateral, except to exercise reasonable care with respect to the Collateral in its custody, but shall be deemed to have exercised reasonable care if such property is accorded treatment either (i) substantially equal to that which it accords its own property or (ii) as Parent requests in writing, provided that no failure to comply with any such request nor any omission to do any such act requested by Parent shall be deemed a failure to exercise reasonable care. Administrative Lender's failure to take steps to preserve rights against any parties or property shall not be deemed to be a failure to exercise reasonable care with respect to the Collateral in its custody

(f)    Borrowers agree that they will not, and will not permit their Subsidiaries to, transfer assets out of any of their deposit accounts or securities accounts; provided, however, that so long as no Event of Default has occurred and is continuing or would result therefrom, Borrowers and their Subsidiaries may use such assets (and the proceeds thereof) to the extent not prohibited by this Agreement or the other Loan Documents and, if the transfer is to another bank or securities intermediary, so long as the applicable Borrower or Subsidiary, Administrative Lender, and the substitute bank or securities intermediary have entered into a control agreement, in form and substance satisfactory to Administrative Lender. Borrowers agree that they will and will cause their Subsidiaries to take any or all reasonable steps that Administrative Lender

requests in order for Administrative Lender to obtain control in accordance with Sections 9-104, 9-105, 9-106, and 9-107 of the UCC with respect to any of its or their securities accounts, deposit accounts, electronic chattel paper, investment property, and letter-of-credit rights. No arrangement contemplated hereby or by any such control agreement in respect of any securities accounts or other investment property shall be modified by Borrowers without the prior written consent of Administrative Lender. Upon the occurrence and during the continuance of a Default or Event of Default, Administrative Lender may notify any bank or securities intermediary to liquidate the applicable deposit account or securities account or any related investment property maintained or held thereby and remit the proceeds thereof to the Administrative Lender.

## ARTICLE VI

### REPRESENTATIONS AND WARRANTIES

Each Borrower makes the following representations and warranties to Administrative Lender and Lenders, subject to the exceptions set forth on the Disclosure Schedule, which representations and warranties shall survive the execution of this Agreement and shall continue in full force and effect until the performance and indefeasible payment in full, in cash, of all Obligations:

### 6.1 LEGAL STATUS; SUBSIDIARIES

Each Borrower and each Subsidiary is a corporation or other entity duly organized and validly existing in good standing under the laws of the jurisdiction of its incorporation, organization or other formation set forth in Section 6.1 of the Disclosure Schedule, is duly qualified to do business and is in good standing as a foreign corporation or other entity in each jurisdiction where the nature of its business requires such qualification, and has full power and authority and holds all Permits and other approvals necessary to enter into and perform the Obligations and to own and hold under lease its property and to conduct its business substantially as currently conducted by it, except where the failure to have so qualified or have such power and authority could not have a Material Adverse Effect. Except as otherwise disclosed in Section 6.1 of the Disclosure Schedule, no Borrower has any Subsidiaries other than those that it hereafter acquires in accordance with Section 9.5 and does not otherwise own or hold, directly or indirectly, any Stock or Stock Equivalents.

### 6.2 DUE AUTHORIZATION; NO VIOLATION

The execution, delivery and performance by Borrowers of the Loan Documents executed or to be executed by them are within Borrowers' powers, have been duly authorized by all necessary action, and do not (a) contravene its Organic Documents; (b) contravene any contractual restriction or Governmental Rule binding on or affecting any Borrower; or (c) result in, or require the creation or imposition of, any Lien on any Borrowers' or any Subsidiary's property, except Liens for the benefit of Lenders.

### 6.3 GOVERNMENT APPROVAL, REGULATION

No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other Person is required for the due execution, delivery or

performance by any Borrower of the Loan Documents to which it is a party. No Borrower nor any Subsidiary is an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended. No Borrower nor any Subsidiary is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Loans will be used for a purpose which violates, or would be inconsistent with, Regulation U or X of the Board of Governors of the Federal Reserve System.

### 6.4   VALIDITY; ENFORCEABILITY

The Loan Documents executed by each Borrower constitute, the legal, valid and binding obligations of such Borrower enforceable against such Borrower in accordance with their respective terms.

### 6.5   CORRECTNESS OF FINANCIAL STATEMENTS

The consolidated financial statements of Parent dated as of December 31, 2005 heretofore delivered by Parent to Administrative Lender, (a) present fairly in all material respects the financial condition and results of operations of Borrowers and the Subsidiaries; (b) disclose all liabilities that are required to be reflected or reserved against under GAAP, whether liquidated or unliquidated, fixed or contingent; and (c) have been prepared in accordance with GAAP consistently applied. Except as disclosed to Administrative Lender pursuant to Section 6.5 of the Disclosure Schedule, since the date of such financial statements there has been no change or changes which have resulted in, or could reasonably be expected to result in, a Material Adverse Effect. All of Borrowers' Contingent Obligations existing as of the Closing Date are listed in Section 6.5 of the Disclosure Schedule.

### 6.6   TAXES

Each Borrower and each Subsidiary has filed, or caused to be filed, all federal, state, local and foreign tax returns required to be filed by it, and has paid, or caused to be paid, all taxes as are shown on such returns, or on any assessment received by it, to the extent that such taxes have become due, except as otherwise contested in good faith. Each Borrower has set aside proper amounts on its books, determined in accordance with GAAP, for the payment of all taxes for the years that have not been audited by the respective tax authorities and for taxes being contested by it.

### 6.7   LITIGATION, LABOR CONTROVERSIES

Other than as listed Section 6.7 of the Disclosure Schedule, there is no pending or, to the knowledge of any Borrower, threatened litigation, action, proceeding, or labor controversy affecting any Borrower or Subsidiary, or any of their respective properties, businesses, assets or revenues, which could reasonably be expected to have a Material Adverse Effect. As of the Closing Date, no Borrower nor any Subsidiary is a party to, or has any obligations under, any collective bargaining agreement.

## 6.8   TITLE TO PROPERTY, LIENS

Each Borrower has good, indefeasible and merchantable title to and ownership of its property and assets free and clear of all Liens, except Permitted Liens.

## 6.9   ERISA MATTERS

(a)   No Borrower nor any Subsidiary has a Pension Plan.

(b)   The ESOP is an employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code. At all times after the Effective Date, the ESOP will be Parent's sole shareholder.

(c)   Each Plan (i) was properly and legally established, and (ii) at all times since inception has been maintained, administered, operated and funded in all material respects in accordance with its terms and in compliance with all applicable Governmental Rules, including, without limitation, ERISA and the Code. Each Borrower, each Subsidiary and all other Persons (including, without limitation, all fiduciaries) have, at all times and in all material respects, properly performed all of their duties and obligations (whether arising by operation of law or by contract) under or with respect to each Plan. No Borrower, Subsidiary or other Person has violated any provision of any Plan in a manner that could result in a Material Adverse Effect. No Borrower, Subsidiary or other fiduciary of any Plan has engaged in any transaction or acted or failed to act in a manner that violates the fiduciary requirements of ERISA or any other applicable Governmental Rule. No transaction or event has occurred or is threatened or about to occur (including any of the transactions contemplated in or by this Agreement) that constitutes or could constitute a prohibited transaction under Section 406 or 407 of ERISA or under Section 4975 of the Code for which an exemption is not available. No Reportable Event has occurred and is continuing with respect to any Plan.

(d)   Each Plan that is intended to be qualified under Section 401(a) of the Code, including, without limitation, the ESOP, is the subject of an unrevoked favorable determination letter with respect to such Plan's qualified status under the Code, as amended by that legislation commonly referred to as "GUST" and "EGTRRA" (and all subsequent legislation), or has remaining a period of time under the Code or applicable Treasury regulations or IRS pronouncements in which to request, and make any amendments necessary to obtain, such a letter from the IRS. Nothing has occurred, or is reasonably expected by any Borrower or any Subsidiary to occur, that (i) could cause the disqualification of the tax qualified status of the ESOP or (ii) could adversely affect the qualification or exemption of any other Plan or its related trust or group annuity contract in a manner that could have a Material Adverse Effect.

## 6.10   OTHER OBLIGATIONS

No Borrower nor any Subsidiary is in default with respect to (i) any of its Contractual Obligations default of which could reasonably be expected to result in a Material Adverse Effect or (ii) any Debt in excess of $500,000.



### 6.11 ENVIRONMENTAL MATTERS

Each Borrower and each Subsidiary is in compliance in all material respects with all Environmental Laws applicable to it, other than such noncompliance as in the aggregate could not reasonably be expected to have a Material Adverse Effect. No Borrower nor any Subsidiary has received notice that it is the subject of any federal or state investigation evaluating whether any Remedial Action is needed, except for such notices received that in the aggregate do not refer to Remedial Actions that could reasonably be expected to result in a Material Adverse Effect. There have been no Releases by any Borrower or a Subsidiary that could reasonably be expected to result in a Material Adverse Effect.

### 6.12 NO BURDENSOME RESTRICTIONS; NO DEFAULTS

(a) No Borrower nor any Subsidiary is a party to any Contractual Obligation the compliance with which could reasonably be expected to have a Material Adverse Effect or the performance of which, either unconditionally or upon the happening of an event, will result in the creation of a Lien (other than Permitted Liens) on its property or assets.

(b) No facts or circumstances exist that would constitute a breach of any obligation, representation or warranty of any Borrower hereunder if this Agreement were in effect immediately prior to Borrowers' execution hereof.

(c) There is no Governmental Rule the compliance with which by any Borrower or any Subsidiary could reasonably be expected to have a Material Adverse Effect.

### 6.13 NO OTHER VENTURES

No Borrower nor any Subsidiary is engaged in any joint purchasing arrangement, joint venture, partnership or other joint enterprise with any other Person.

### 6.14 INSURANCE

All current policies of insurance of any kind or nature owned by or issued to the Borrowers and the Subsidiaries, including, without limitation, policies of fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation and employee health and welfare insurance, are in full force and effect and are of a nature and provide such coverage as is sufficient and as is customarily carried by companies of its size and character. No Borrower nor any Subsidiary has any reason to believe that it will be unable to comply with Section 8.5.

### 6.15 FORCE MAJEURE

No Borrower's nor any Subsidiary's business or properties is suffering from the effects of any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance), other than those the consequences of which in the aggregate could not reasonably be expected to have a Material Adverse Effect.

Exhibit A

### 6.16 INTELLECTUAL PROPERTY

Each Borrower and each Subsidiary owns or licenses or otherwise has the right to use all material licenses, Permits, patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, copyright applications, franchises, authorizations and other intellectual property rights and General Intangibles that are necessary for the operation of its businesses, without infringement upon or conflict with the rights of any other Person with respect thereto, including, without limitation, all trade names, which infringement or conflict could reasonably be expected to have a Material Adverse Effect. No slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Borrower or any Subsidiary infringes upon or conflicts with any rights owned by any other Person, which infringement or conflict could reasonably be expected to have a Material Adverse Effect, and no claim or litigation regarding any of the foregoing is pending or, to its knowledge, threatened, the existence of which could reasonably be expected to have a Material Adverse Effect.

### 6.17 CERTAIN INDEBTEDNESS

The Disclosure Schedule identifies as of the Closing Date all Indebtedness of Borrowers and the Subsidiaries that is either (i) Debt or (ii) material to the condition (financial or otherwise), business, performance, operations or properties of Borrowers and was incurred outside of the ordinary course of the business.

### 6.18 SOLVENCY

Each Borrower has received consideration that is the reasonably equivalent value of the obligations and liabilities that it has incurred to Lenders. No Borrower is insolvent as defined in any Governmental Rule, nor will any Borrower be rendered insolvent by the execution and delivery of the Loan Documents. No Borrower intends to, nor does any Borrower believe that it will, incur debts beyond such Borrower's ability to pay them as they mature. Each Borrower has capital sufficient to carry on its business and transactions and all business and transactions in which it is about to engage.

### 6.19 CHIEF EXECUTIVE OFFICE AND OTHER LOCATIONS

**Parent's chief executive office and principal place of business and all other offices of Borrowers are set forth in Section 6.19 of the Disclosure Schedule. Each Collateral Location as of the Closing Date is set forth in Section 6.19 of the Disclosure Schedule.**

### 6.20 ELIGIBLE ACCOUNTS

Each Eligible Account of Borrowers reported by Parent to Administrative Lender is and will be free and clear of Liens in favor of any Person other than for the benefit of Lenders, will cover a bona fide right to payment earned by performance in the ordinary course of Borrowers' business, and will be for a liquidated amount from a customer competent to contract therefor and maturing as stated by it.

BN 1042967v14                    60

Exhibit A



### 6.21   FISCAL YEAR

Parent's fiscal year ends on December 31.

### 6.22   COMPLIANCE WITH LAW

Each Borrower and each Subsidiary is in compliance with all Governmental Rules, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

### 6.23   NO SUBORDINATION

There is no agreement, indenture, contract or instrument to which any Borrower or any Subsidiary is a party or by which it may be bound that requires the subordination in right of payment of any of the Obligations to any other obligation of it.

### 6.24   TRUTH, ACCURACY OF INFORMATION

All factual information furnished by each Borrower and each Subsidiary to any Lender in connection with the Loan Documents is accurate in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the information furnished, in light of the circumstances under which furnished, not misleading (it being recognized that projections and forecasts provided by Borrowers are not to be viewed as facts and that actual results during the period covered by any such projections and forecasts may differ from the projected or forecasted results).

**6.25   Non-Operating Subsidiaries.** None of the Non-Operating Subsidiaries have or maintain (a) any employees or operations, (b) any assets in excess of $150,000 for any one Non-Operating Subsidiary or $250,000 in the aggregate for all Non-Operating Subsidiaries, or (c) any liabilities not otherwise permitted by this Agreement.

**6.26   Comerica Bank Indebtedness.** As of the Closing Date, no Borrower has any outstanding Indebtedness owing to Comerica Bank.

## ARTICLE VII

## CONDITIONS

### 7.1   CONDITIONS OF INITIAL EXTENSION OF CREDIT

Lenders' obligation to extend any credit contemplated by this Agreement is subject to the fulfillment to Administrative Lender's satisfaction of all of the following conditions:

(a)   **Documentation.** Administrative Lender shall have received, in form and substance satisfactory to it, each of the following duly executed:

61



(i)     a letter duly executed by each Borrower authorizing Administrative Lender to file appropriate financing statements in such office or offices as may be necessary or, in the opinion of Administrative Lender, desirable to perfect the security interests to be created by the Loan Documents;

(ii)     Administrative Lender shall have received the results of lien searches against Parent and each of its Subsidiaries from all applicable jurisdictions which shall be reasonably satisfactory to Administrative Lender and its counsel;

(iii)     evidence that appropriate financing statements have been duly filed in such office or offices as may be necessary or, in the opinion of Administrative Lender, desirable to perfect the Administrative Lender's Liens in and to the Collateral, for the ratable benefit of the Lenders, and Administrative Lender shall have received searches reflecting the filing of all such financing statements;

(iv)     the control agreement with respect to each of Borrowers' deposit accounts and investment accounts and agreements with respect to the Cash Management Accounts,

(v)     a copyright security agreement,

(vi)     a disbursement letter executed and delivered by Borrowers to Administrative Lender regarding the extensions of credit to be made on the Closing Date, the form and substance of which is satisfactory to Administrative Lender,

(vii)     the Fee Letter,

(viii)     a guaranty for each guarantor hereunder,

(ix)     an intercompany subordination agreement, executed by Parent and each of its subsidiaries

(x)     a patent security agreement,

(xi)     a letter, in form and substance satisfactory to Administrative Lender, from Wells Fargo as agent for certain lenders under that certain Amended and Restated Credit Agreement, dated as of August 31, 2004, ("Existing Lender") to Administrative Lender respecting the amount necessary to repay in full all of the obligations of Borrowers and their Subsidiaries owing to Existing Lender and obtain a release of all of the Liens existing in favor of Existing Lender in and to the assets of Borrowers and their Subsidiaries, together with termination statements and other documentation evidencing the termination by Existing Lender of its Liens in and to the properties and assets of Borrowers and their Subsidiaries,

(xii)     from each Borrower, a certificate of its secretary or assistant secretary dated as of the Closing Date as to: (A) resolutions of its board of directors or other governing body then in full force and effect authorizing the execution, delivery and performance of each Loan Document to be executed by it; (B) its Organic Documents (other than those described in (iii)(A) below), a copy of each of which is attached; and (C) the incumbency and

BN 1042967v14                                62



signatures of those of its officers authorized to act with respect to the Loan Documents to be executed by it;

(xiii)   with respect to each Borrower: (A) from the Secretary of State (or other appropriate governmental official) of its jurisdiction of incorporation or organization, a good standing certificate and certified copy of its filed Organic Documents; and (B) a certificate of good standing as a foreign corporation from the Secretary of State of each jurisdiction, if any, described in Section 6.1, in each case dated within fifteen Business Days of the Closing Date, provided, however that with respect to Parent, certificates of good standing as a foreign corporation from the Secretary of State shall be required only with respect to the 20 jurisdictions representing Parent's largest amount of sales (on a per jurisdiction basis) as well as Minnesota, New Jersey, and West Virginia;

(xiv)   a Notice of Authorized Representatives, the initial Notice of Borrowing, a Borrowing Base Certificate and disbursement direction letter;

(xv)   an opinion of Dunn Carney Allen Higgins & Tongue LLP, counsel to Borrowers, as to such matters as Administrative Lender and each Lender shall reasonably require; and

(xvi)   such other documents as Administrative Lender may require.

(b)   **Financial Condition.**   There is no event or circumstance that can reasonably be expected to have a Material Adverse Effect.

(c)   **Lender Group Expenses.**  Borrowers shall have paid all Lender Group Expenses incurred in connection with the transactions evidenced by this Agreement and the other Loan Documents;

(d)   **Fees.**  Borrowers shall have paid all fees which are due and payable on the Closing Date pursuant to the terms of this Agreement or any other Loan Document;

(e)   **Insurance.**   Borrowers shall have delivered to Administrative Lender evidence of the insurance coverage, including loss payable endorsements, required pursuant to Section 8.5.

(f)   **Availability.**   Borrowers, on a pro forma basis, shall have, immediately after the initial funding of the Loans and payment of all transaction expenses, Available Credit plus Qualified Cash of at least $10,000,000.

(g)   **Collateral Access Agreements.**   Administrative Lender shall have received Collateral Access Agreements with respect to:  (i) all locations covered by Collateral Access Agreements in connection with the Amended and Restated Credit Agreement, dated as of August 31, 2004, between Borrowers and the Existing Lender and (ii) all other Collateral Locations;

(h)   **Due Diligence.**  Administrative Lender shall have completed its business, legal, and collateral due diligence, including a collateral audit and review of Borrowers' and their



Subsidiaries' books and records and verification of Borrowers' representations and warranties, the results of which shall be satisfactory to Administrative Lender;

(i)  **Reference Checks.** Administrative Lender shall have received completed reference checks with respect to Borrowers' senior management, the results of which are satisfactory to Administrative Lender in its sole discretion;

(j)  **Projections and Business Plan.** Administrative Lender shall have received: (y) a set of financial projections of the Parent for the 3 year period following the Closing Date (on a year by year basis, and for the 1 year period following the Closing Date, on a month by month basis) and (z) Borrowers' business plan, each in form and substance (including as to scope and underlying assumptions) satisfactory to Administrative Lender;

(k)  **Licenses and Approvals.** Borrowers and each of their Subsidiaries shall have received all licenses, approvals or evidence of other actions required by any Governmental Authority in connection with the execution and delivery by Borrowers or their Subsidiaries of the Loan Documents or with the consummation of the transactions contemplated thereby;

(l)  **Closing Date.** The Closing Date shall be on or before December 30, 2006.

(m)  **Other Conditions.** all other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to Administrative Lender.

### 7.2   CONDITIONS OF EACH EXTENSION OF CREDIT

The obligation of each Lender to make any credit available under the Loan Documents (including any Loan being made by Lenders on the Closing Date) shall be subject to the further conditions precedent that:

(a)  the following statements shall be true on the date such credit is advanced, both before and after giving effect thereto and to the application of the proceeds therefrom, and the acceptance by Borrowers of the proceeds of such credit shall constitute a representation and warranty by Borrowers that on the date such credit is advanced such statements are true:

(i)  the representations and warranties of Borrowers contained in the Loan Documents are correct in all material respects on and as of such date as though made on and as of such date or, as to those representations and warranties limited by their terms to a specified date, were correct in all material respects on and as of such date; and

(ii)  no Default is continuing or would result from the credit being advanced;

(b)  advancing the requested credit on such date does not violate any Governmental Rule and is not enjoined, temporarily, preliminarily or permanently;

(c)     Administrative Lender shall have received such additional documents, information and materials as any Lender, through Administrative Lender, may reasonably request; and

(d)     no event or circumstance exists that can reasonably be expected to have a Material Adverse Effect.

## ARTICLE VIII

### AFFIRMATIVE COVENANTS

Each Borrower covenants that until performance and indefeasible payment in full, in cash of all Obligations and termination of Lenders' obligations to advance credit to Borrowers, each Borrower shall:

### 8.1   PAYMENTS

Pay all principal, interest, fees and other liabilities due under any of the Loan Documents at the times and place and in the manner specified therein.

### 8.2   ACCOUNTING RECORDS

Keep, and cause each Subsidiary to keep, accurate books and records of the financial affairs of it and its Subsidiaries sufficient to permit the preparation of financial statements therefrom in accordance with GAAP.

### 8.3   FINANCIAL INFORMATION AND REPORTS

(a)     **Collateral Reporting**.   Provide Administrative Lender (and if so requested by Administrative Lender, with copies for each Lender) with each of the reports set forth on Schedule 8.3(a) at the times specified therein.  In addition, each Borrower agrees to cooperate fully with Administrative Lender to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth above.

(b)     **Financial Statements, Reports, Certificates**.  Deliver to Administrative Lender, with copies to each Lender, each of the financial statements, reports, or other items set forth on Schedule 8.3(b) at the times specified therein.  In addition, Parent agrees that no Subsidiary of Parent will have a fiscal year different from that of Parent.

### 8.4   COMPLIANCE

Preserve and maintain, and cause each Subsidiary to preserve and maintain, all licenses, Permits, governmental approvals, rights, privileges, franchises and General Intangibles necessary for the conduct of its business and comply in all material respects, and cause each Subsidiary to comply in all material respects, with all Governmental Rules, other than such failure to do so the consequences of which in the aggregate could not reasonably be expected to have a Material Adverse Effect.

Exhibit A
Page 70 of 160

## 8.5   INSURANCE

(a)   Maintain, and cause each Subsidiary to maintain, insurance with insurance companies reasonably acceptable to Administrative Lender with respect to its properties and business against such casualties and contingencies and of such types, with such deductibles and in such amounts as is customary in the case of similar businesses. Such insurance covering any Collateral shall contain a lender's loss payable endorsement acceptable to Administrative Lender and shall name Administrative Lender as an additional insured. The policies or a certificate thereof signed by the insurer shall be delivered to Administrative Lender within five Business Days after the issuance or renewal of the policies to Borrower. Each such policy shall provide that such policy may not be materially amended (except to increase coverage) or canceled without thirty days prior notice to Administrative Lender. Promptly upon receipt, Parent shall deliver to Administrative Lender a binder (or other evidence reasonably acceptable to Administrative Lender) indicating that such policy has been renewed or that a substitute for such policy will be issued effective upon the expiration of such policy. If Borrowers or Parent fail to comply with the foregoing, Administrative Lender may (but shall not be required to) procure such insurance and add the cost thereof to the Revolving Loans.

(b)   Maintain, and cause each Subsidiary to maintain, such liability and other insurance with insurance companies reasonably acceptable to Administrative Lender with respect to its activities as is customary in the case of similar businesses or as may be reasonably required by Administrative Lender.

(c)   The following is inserted pursuant to ORS 746.201:

### WARNING

**Unless Borrowers provide Administrative Lender with evidence of the insurance coverage as required by this Agreement, Administrative Lender may purchase insurance at Borrowers' expense to protect Administrative Lender's interest. This insurance may, but need not, also protect Borrowers' interest. If the collateral becomes damaged, the coverage Administrative Lender purchases may not pay any claim Borrowers make or any claim made against Borrowers. Borrowers may later cancel this coverage by providing evidence that Borrowers has obtained property coverage elsewhere.**

**Borrowers are responsible for the cost of any insurance purchased by Administrative Lender. The cost of this insurance may be added to Borrowers' contract or loan balance. If the cost is added to Borrowers' contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date Borrowers' prior coverage lapsed or the date Borrowers failed to provide proof of coverage.**

**The coverage Administrative Lender purchases may be considerably more expensive than insurance Borrowers can obtain on**

its own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by applicable law.

### 8.6   FACILITIES

Keep, and cause each Subsidiary to keep, all properties useful or necessary to its business in good repair and condition, ordinary wear and tear excepted, and from time to time make necessary repairs, renewals and replacements thereto so that such property shall be fully and efficiently preserved and maintained, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

### 8.7   TAXES AND OTHER LIABILITIES

Pay and discharge, and cause each Subsidiary to pay and discharge, when due any and all indebtedness, obligations, assessments and taxes, both real or personal, including without limitation Federal and state income taxes and state and local property taxes and assessments, except such as Borrowers may in good faith contest or as to which a bona fide dispute may arise, and for which Borrowers have made provision for adequate reserves in accordance with GAAP, expect where the failure to do so cannot reasonably be expected to have a Material Adverse Effect.

### 8.8   LITIGATION

Parent shall promptly give notice in writing to Administrative Lender of any litigation pending or threatened against any Borrower or any Subsidiary with a claim in excess of $1,000,000 in the aggregate for Borrowers and all Subsidiaries.

### 8.9   NOTICE TO ADMINISTRATIVE LENDER

Promptly (but in no event more than five Business Days after any Borrower has knowledge of the occurrence of each such event or matter) Parent shall give notice to Administrative Lender in reasonable detail of:   (i) the occurrence of any Default; (ii) any termination or cancellation of any insurance policy which any Borrower or Subsidiary is required to maintain, unless such policy is replaced without any break in coverage with an equivalent or better policy; (iii) any uninsured or partially uninsured loss or losses through liability or property damage, or through fire, theft or any other cause affecting the property of Borrowers or Subsidiary in excess of an aggregate of $500,000 during any twelve month period for Borrowers and all Subsidiaries; (iv) any change in its Organic Documents affecting voting rights, control or the authority to incur Debt and/or grant Liens in its property; (v) the occurrence of any material adverse development with respect to any litigation, action, proceeding, or labor controversy described in Section 6.7 or the commencement of any labor controversy, litigation, action, proceeding of the type described in Section 6.7 together with copies of all documentation relating thereto; (vi) any ERISA Event; (vii) the filing of one or more tax liens against Borrowers or any of its property in an aggregate amount greater than $250,000 or (viii) the occurrence of any event that could have a Material Adverse Effect.

### 8.10   CONDUCT OF BUSINESS

Except as otherwise permitted by this Agreement, (a) conduct, and cause each Subsidiary to conduct, its business in the ordinary course and (b) use, and cause each Subsidiary to use, its reasonable efforts in the ordinary course and consistent with past practice to (i) preserve its business and the goodwill and business of the customers, advertisers, suppliers and others with whom it has business relations and (ii) keep available the services and goodwill of its present employees.

### 8.11   PRESERVATION OF EXISTENCE, ETC.

Except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, preserve and maintain, and cause each Subsidiary to preserve and maintain, all licenses, Permits, governmental approvals, rights, privileges, franchises and General Intangibles necessary for the conduct of its business and its corporate or other entity existence and rights (charter and statutory).

### 8.12   ACCESS

(a)   From time to time, upon reasonable prior notice (unless a Default or Event of Default shall have occurred and be continuing, in which case no prior notice is necessary), permit Administrative Lender and/or any of their agents or representatives to (i) examine and make copies of and abstracts from each Borrower's and each Subsidiary's records and books of account, (ii) communicate directly with each Borrower's and each Subsidiary's independent certified public accountants, (iii) arrange for verification of Borrowers' Rights to Payment under reasonable procedures directly with the obligors thereon or by other methods, and (iv) examine and inspect each Borrower's and each Subsidiary's assets. At any reasonable time and from time to time, any Lender may discuss each Borrower's and each Subsidiary's affairs, finances and accounts with any of Borrowers' officers or directors who may then be reasonably available. Borrowers shall authorize their independent certified public accountants to disclose to Administrative Lender any and all financial statements and other information of any kind, including, without limitation, copies of any management letter, work papers or the substance of any oral information that such accountants may have with respect to the business, financial condition, results of operations or other affairs of each Borrower and each Subsidiary.

(b)   Each Borrower shall execute and deliver at the request of any Lender such instruments as may be necessary for such Lender to obtain such information concerning the business of Borrower and each Subsidiary as such Lender may reasonably require from accountants, service bureaus or others having custody of or maintaining records or assets of any Borrower or any Subsidiary, provided that the foregoing shall not (and is not intended to) require any Borrower or any Subsidiary to take any action that would constitute a waiver of Borrowers' or any Subsidiary's attorneys.

### 8.13   PERFORMANCE AND COMPLIANCE WITH CONTRACTUAL OBLIGATIONS

Perform and observe, and cause each Subsidiary to perform and observe, all the terms, covenants and conditions required to be performed and observed by it under its

Exhibit A



Contractual Obligations, and do all things necessary to preserve and to keep unimpaired its rights under such Contractual Obligations, other than such failures the consequences of which in the aggregate could not reasonably be expected to have a Material Adverse Effect; provided, however, that nothing in this Section shall limit or prevent any Borrower from contesting any of its Contractual Obligations in good faith and by appropriate and lawful proceedings diligently conducted.

### 8.14   INTENTIONALLY OMITTED

### 8.15   ENVIRONMENTAL

(a)     Promptly give notice to Administrative Lender upon obtaining knowledge of (i) any claim, injury, proceeding, investigation or other action, including a request for information or a notice of potential environmental liability, by or from any Governmental Authority or any third-party claimant that could result in Borrowers or their Subsidiaries incurring Environmental Liabilities and Costs that could reasonably be expected to have a Material Adverse Effect or (ii) the discovery of any Release at, on, under or from any real property, facility or equipment owned or leased by any Borrower or any Subsidiary in excess of reportable or allowable standards or levels under any applicable Environmental Law, or in any manner or amount that could result in any Borrower or any Subsidiary incurring Environmental Liabilities and Costs that could reasonably be expected to have a Material Adverse Effect.

(b)     Upon discovery of the presence on any property owned or leased by any Borrower or any Subsidiary of any Contaminant that reasonably could be expected to result in Environmental Liabilities and Costs that could reasonably be expected to have a Material Adverse Effect, take all Remedial Action required by applicable Environmental Law.

(c)     Borrowers shall protect, defend, indemnify and hold Lenders harmless from and against all Environmental Liabilities and Costs arising with respect to Borrowers, any Subsidiary or any of Borrowers' and Subsidiaries' property, except for those arising from Lenders' gross negligence or willful misconduct. This indemnity obligation shall survive the payment in full and performance of all of Borrowers' other Obligations.

### 8.16   LIENS

Keep its property and assets, and cause each Subsidiary to keep its property and assets, free and clear of all Liens, except Permitted Liens.

### 8.17   USE OF PROCEEDS

Use the proceeds of the Loans: (a) on the Closing Date, (i) to repay, in full, the outstanding principal, accrued interest, and accrued fees and expenses owing to Existing Lender, and (ii) to pay transactional fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, and the transactions contemplated hereby and thereby and (b) otherwise solely for Borrowers' general working capital and other general business purposes, including, without limitation, stock redemptions and distributions otherwise permitted hereunder.

### 8.18   COMPLIANCE WITH ERISA

Do, and cause each of its ERISA Affiliates to do, each of the following: (a) maintain each Plan in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state law; (b) cause each Plan that is qualified under Section 401(a) of the Code to maintain such qualification; and (c) make all required contributions to any Plan subject to Section 412 of the Code.

### 8.19   JOINDER OF SUBSIDIARIES

Parent shall cause each Person that hereafter becomes a Subsidiary to become a "Borrower" by executing and delivering to Administrative Lender a Joinder Agreement in the form of Exhibit H attached hereto, provided that if such Subsidiary is a Foreign Subsidiary, it shall only become a Borrower if Administrative Lender, in its discretion, agrees that it should become a Borrower.

### 8.20   COLLATERAL LOCATIONS

Keep Borrowers' and their Subsidiaries' Inventory and equipment (other than vehicles and equipment out for repair, In-Transit Inventory and Category A Inventory maintained in public warehouses) only at the locations identified on Section 6.19 of the Disclosure Schedule and their chief executive offices only at the location identified as such entity's the chief executive office on Section 6.19 of the Disclosure Schedule; provided, however, that Parent may amend Section 6.19 of the Disclosure Schedule so long as such amendment occurs by written notice to Administrative Lender not less than 30 days prior to the date on which such Inventory or equipment is moved to such new location or such chief executive office is relocated, so long as such new location is within the continental United States. As noted in Schedule 8.3(a), Borrowers will provide monthly reporting of waiver status for inventory locations, which includes Collateral Locations.

### 8.21   FURTHER ASSURANCES

At Administrative Lender's request at any time and from time to time, duly execute and deliver, and cause each Subsidiary to execute and deliver, such further agreements, documents and instruments, and do or cause to be done such further acts as may reasonably be necessary or proper to evidence, perfect, maintain and enforce the security interests and the priority thereof in the Collateral and to otherwise effectuate the provisions or purposes of the Loan Documents, at Borrowers' expense. Administrative Lender may at any time and from time to time request a certificate from Parent representing that all conditions precedent to the advancement of credit contained herein are satisfied, and cease to make any further advancements of credit until it has received such certificate and determined that such conditions are satisfied.

### 8.22   ESOP QUALIFICATION

Maintain the tax qualified status of the ESOP.

**8.23   POST-CLOSING COVENANTS**.

The obligation of the Lenders to make any Revolving Loans hereunder at any time (or to extend any other credit hereunder) shall be subject to the fulfillment, to the satisfaction of Administrative Lender (or waiver), of each of the post-closing covenants set forth on Schedule 8.23 within the prescribed time periods set forth on such schedule. The failure by Borrowers to satisfy the post-closing covenants set forth on Schedule 8.23 within the prescribed time periods (except extended by Administrative Lender in its sole discretion) shall constitute an Event of Default.

**8.24   CONTRA ACCOUNTS REPORTING.**

On or before December 31, 2007, Borrower shall use their best efforts to implement a computer reporting system that facilitates comparison of account debtors with account payees for the purpose of calculating "contra accounts" in connection with the determination of ineligible Accounts.

**8.25   LOCATIONS REPORT.**

Upon reasonable request of Administrative Lender, shall provide promptly, but in any event within 2 Business Days, a list of addresses for each location where Inventory with value in excess of $100,000 is located.

## ARTICLE IX

## NEGATIVE COVENANTS

Each Borrower covenants that until performance and indefeasible payment in full, in cash, of all Obligations and termination of Lenders' obligations to advance credit to Borrowers, no Borrower shall:

**9.1   LIENS**

Create or suffer to exist, or permit any Subsidiary to create or suffer to exist, any Lien upon or with respect to any of its property and assets, whether now owned or hereafter acquired, or assign any right to receive income, except Permitted Liens.

**9.2   INDEBTEDNESS**

Create or suffer to exist, or permit any Subsidiary to create or suffer to exist, any Indebtedness except:

(a)   the Obligations, together with Indebtedness owed to the Underlying Issuer with respect to the Underlying Letters of Credit;

(b)   current liabilities in respect of taxes, assessments and governmental charges or levies incurred, or liabilities for labor, materials, inventory, services, supplies and



rentals incurred, or for goods or services purchased, in the ordinary course of business consistent with past practice and industry practice in respect of arm's length transactions;

(c)      All Debt outstanding on the Closing Date and referenced on Section 6.17 of the Disclosure Schedule and all renewals, extensions, refinancing or refunding of such Debt in a principal amount which does not exceed the principal amount outstanding immediately before such refinancing, together with all prepayment fees, penalties and expenses in respect of the Indebtedness being renewed, extended, refinanced or refunded, provided: (i) each such renewal, extension, refinancing or refunding does not result in a shortening of the average weighted maturity, (ii) each such renewal, extension, refinancing or refunding is not on terms and conditions less favorable to the applicable Borrower than the Debt being renewed, extended, refinanced or refunded, (iii) if the Debt that is refinanced, renewed, refunded, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, refunding, or extension Debt must include subordination terms and conditions that are at least as favorable to the Lenders as those that were applicable to the refinanced, renewed, or extended Debt, and (iv) the Debt that is refinanced, renewed, refunded, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended;

(d)      purchase money Debt incurred after the Closing Date (and all refinancings of such Debt so long as the principal amount of the obligations refinanced is not increased) to finance the purchase of fixed assets (including equipment); provided that (i) the total of such Debt incurred in any year shall not exceed $2,000,000, provided that any portion not used in a year may be used in the immediately following year only (and any amount so carried over shall be deemed to be the last amount used in the year to which it was carried over); (ii) such Debt when incurred shall not exceed the purchase price of the assets financed; and (iii) no Default exists at the time such Debt is incurred;

(e)      intercompany loans between and among Borrowers made in connection with the cash management system maintained by Parent and its Subsidiaries substantially as in effect on the Closing Date;

(f)      guarantees by a Borrower of Indebtedness of another Borrower;

(g)      Subordinated Debt;

(h)      Indebtedness under Interest Rate Contracts, Commodity Contracts and foreign exchange agreements permitted under Section 9.14;

(i)      Indebtedness in connection with bonds of the type listed in Section 9.7 of the Disclosure Schedule incurred in the ordinary course of business consistent with past practices;

(j)      Indebtedness permitted under Section 9.3;

(k)      Indebtedness secured by mortgages assumed or obtained with respect to real estate acquired as part of a Permitted Acquisition so long as: (i) the aggregate total of such

Debt incurred in any one calendar year shall not exceed $1,500,000 (it being understood that in the event Borrowers do not utilize the full amount permitted by this clause (k)(i) in any year, Borrowers shall not be permitted to add any such unused amounts to the amount permitted in any subsequent year) , (ii) any such Indebtedness is secured solely by a mortgage on the real property acquired in a Permitted Acquisition, (ii) the value of any such Indebtedness does not exceed 100% of the appraised value of the real property acquired in such Permitted Acquisition at the time of the closing of the Permitted Acquisition, (iii) the terms of such Indebtedness allow Administrative Lender, for the ratable benefit of the Lenders, to mortgage such property as additional collateral for the Obligations; and

(l)     Indebtedness in addition to Indebtedness provided for in subsections (a) – (k) above in an aggregate principal amount at any time outstanding not in excess of the lesser of $1,500,000 or an amount which, after giving pro forma effect to the incurrence thereof and the application of the proceeds thereof, would not cause a breach of the covenants in Article X; provided that (i) such Indebtedness is unsecured and (ii) a Default hereunder does not constitute an event of default of Borrowers' obligations under such Indebtedness unless Lenders accelerate Borrowers' obligations hereunder.

## 9.3    RESTRICTED PAYMENTS, REDEMPTIONS

(a)     Declare or make, or permit any Subsidiary to declare or make, any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account or in respect of any of its Stock or Stock Equivalents except (i) dividends and distributions paid to any Borrower or (ii) dividends paid by a Borrower solely in Stock or Stock Equivalents of such Borrower; or

(b)     Purchase, redeem or otherwise acquire for value any of Borrowers' Stock or Stock Equivalents;

(c)     prepay or redeem any Subordinated Debt or make any payment in respect of Subordinated Debt not permitted under the terms of such subordination; or

(d)     directly or indirectly, amend, modify, alter, increase, or change any of the terms or conditions of any agreement, instrument, document, indenture, or other writing evidencing or concerning Indebtedness permitted under Section 9.2(c), (d), (g), or (k).

In addition to any other remedies available to Administrative Lender or the Lenders hereunder, or otherwise available by contract, at law, or in equity, at any time after the earlier to occur of: (i) the occurrence of a Default or (ii) Borrowers' failure to maintain Available Credit plus Qualified Cash of more than $5,000,000, Administrative Lender may instruct Borrowers to: (a) cease making payments of principal on or with respect to the Type A Subordinated Notes; (b) cease making payments of principal or interest on and any other distributions on or with respect to the Type B Subordinated Notes; and (c) cease making any payments under any other Subordinated Debt to the extent such payments would be prohibited by the terms of such Subordinated Debt or any subordination agreement respecting such Subordinated Debt. Borrowers shall immediately comply with each such instruction.

### 9.4    MERGERS, STOCK ISSUANCES, SALE OF ASSETS, ETC.

Except as permitted in Section 9.5(g):

(a)     Merge or consolidate with, or permit any Subsidiary to merge or consolidate with, any Person or acquire all or substantially all of the Stock or Stock Equivalents of any Person; provided any Subsidiary may liquidate or dissolve voluntarily into, and may merge with and into, or have its stock otherwise acquired by any Borrower that is not a Foreign Subsidiary or by any other Subsidiary having its principal place of business in the same country as such Subsidiary;

(b)     Acquire all or substantially all, or permit any Subsidiary to acquire all or substantially all of (i) the assets of any Person or (ii) the assets constituting the business of a division, branch or other unit operation of any Person; provided any Borrower may acquire all or substantially all of the assets of (or the assets constituting the business of a division, branch or other unit operation of) any Subsidiary that is not a Foreign Subsidiary or of any Subsidiary having its principal place of business in the same country as such Borrower; or

(c)     Sell, convey, transfer, lease or otherwise dispose of, or permit any Subsidiary to sell, convey, transfer, lease or otherwise dispose of, any of its assets or any interest therein to any Person, or permit or suffer any other Person to acquire any interest in any of its assets, except (i) Permitted Liens, (ii) as otherwise permitted under item (a) or (b) above, (iii) the sale or disposition of inventory in the ordinary course of business and/or assets which have become obsolete, unneeded or are replaced in the ordinary course of business, (iv) the sale or other disposition of equipment that any Borrower determines is no longer useful in its business, or (v) the sale to Wells Fargo HSBC Trade Bank, NA ("Trade Bank") of foreign Accounts (the "Sold TB Accounts"), so long as: (1) on the date a Sold TB Account is sold, Borrowers send to Administrative Lender by electronic mail or fax a detailed list, in form and substance satisfactory to Administrative Lender, of all such Sold TB Accounts sold on that date, (2) the TB Account Reserve is equal to the face amount of all Sold TB Accounts sold within the week of determination, (3) the face value of the uncollected Sold TB Accounts held by Trade Bank shall not exceed $10,000,000 at any one time; (4) Trade Bank has paid to Borrowers no less than 100% of the face value of the Sold TB Accounts within 1 Business Day of the sale and the fee paid by Borrowers to Trade Bank in connection with the sale of the Sold TB Accounts does not exceed an amount per annum equal to the product of: (x) the face amount of all uncollected Sold TB Accounts multiplied by (y) the interest rate applicable to Base Rate Loans plus 2%, and (z) Trade Bank, Borrowers, and Administrative Lender shall have entered into an agreement, in form and substance satisfactory to Administrative Lender, setting forth, among other things, the parties' priorities with respect to the Sold TB Accounts, stating that Trade Bank shall have no interest in any portion of the Collateral other than the Sold TB Accounts, and directing Trade Bank to deposit into a Cash Management Account all amounts paid by Trade Bank to Borrowers in connection with Trade Bank's purchase of the Sold TB Accounts.

### 9.5    INVESTMENTS IN OTHER PERSONS

Directly or indirectly, make or maintain any loan or advance to any other Person or own, purchase or otherwise acquire any Stock, Stock Equivalents, other equity interest,

 

obligations or other securities of, or otherwise invest in, any other Person (any such transaction being an "Investment"), except:

      (a)     Intentionally Omitted;

      (b)     so long as no Default or Event of Default exists, incidental advances to employees of Borrowers in the ordinary course of business consistent with past practice, in an aggregate amount not to exceed $500,000 at any one time outstanding;

      (c)     Investments consisting of Cash Equivalents;

      (d)     Investments referenced on Section 9.5 of the Disclosure Schedule;

      (e)     Investments permitted under Section 9.4;

      (f)     Investments in Roberts Pacific, LLC not in excess of $300,000;

      (g)     loans to the trustee of the ESOP to the extent necessary to enable the ESOP to pay any participant benefits, the payment of which is required to enable the ESOP to maintain its tax qualified status;

      (h)     Investments consisting of deposit accounts or securities accounts but only so long as Parent or its Subsidiary, as applicable, and the applicable securities intermediary or bank have entered into a control agreements, in form and substance satisfactory to Administrative Lender, in order to perfect (and further establish) the Administrative Lender's Liens, for the ratable benefit of the Lenders, in such deposit account or securities account, as applicable, provided, however, that (a) Parent and its domestic Subsidiaries shall not have Investments (other than in the Cash Management Accounts) in deposit accounts or securities accounts in an aggregate amount in excess of $10,000 outstanding at any one time unless Parent or such Subsidiary, as applicable, and the applicable securities intermediary or bank have entered into control agreements or similar arrangements governing such Investments in order to perfect (and further establish) the Administrative Lender's Liens, for the ratable benefit of the Lenders, in such Investments; and (b) Foreign Subsidiaries shall not have Investments in deposit accounts or securities accounts in an aggregate amount in excess of $1,250,000 outstanding at any one time. Subject to the foregoing proviso, Borrowers shall not, and shall not permit their Subsidiaries to, establish or maintain any deposit account or securities account unless Administrative Lender shall have received a control agreement, in form and substance satisfactory to Administrative Lender, in respect of such deposit account or securities account;

      (i)     Investments in the form of loans made in the ordinary course of business and consistent with past practice, in an amount not to exceed $1,500,000 in the aggregate at any one time outstanding  to Comercial Norte Pacifico de Chile Limitada and North Pacific de Mexico, S. de R.L. de C.V. for the purpose of sustaining such Subsidiaries operations; and

      (j)     Investments consisting of Permitted Acquisitions, provided, however, that no assets acquired pursuant to a Permitted Acquisition shall be included in the Borrowing Base calculation until such time as Administrative Lender has completed an audit with respect to such assets or Person and the results of such audit are satisfactory to Administrative Lender.

Exhibit A

### 9.6 CHANGE IN NATURE OF BUSINESS

Directly or indirectly engage in, or permit any Subsidiary to directly or indirectly engage, in any business activity other than its current business activity.

### 9.7 GUARANTIES

Guarantee or become liable in any way as surety, endorser (other than as endorser of negotiable instruments for deposit or collection in the ordinary course of business), accommodation endorser or otherwise for, nor pledge or hypothecate any of its assets as security for, any liabilities or obligations of any other Person, or permit any Subsidiary to do so.

### 9.8 ERISA

At any time engage in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, or permit any Plan to (a) engage in any non-exempt "prohibited transaction" (as defined in Section 4975 of the Code); (b) fail to comply with ERISA or any other applicable Laws; or (c) incur any material "accumulated funding deficiency" (as defined in Section 302 of ERISA), that, with respect to each event listed above, could be reasonably expected to have a Material Adverse Effect.

### 9.9 CANCELLATION OF INDEBTEDNESS OWED TO IT

Cancel, or permit any Subsidiary to cancel, any claim or Debt owed to it except for legitimate business purposes in the reasonable judgment of Borrowers and in the ordinary course of business.

### 9.10 MARGIN REGULATIONS

Use, or permit any Subsidiary to use, the proceeds of any Loan to purchase or carry any margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System).

### 9.11 ENVIRONMENTAL

Permit any lessee or any other Person to dispose of any Contaminant by placing it in or on the ground or waters of any property owned or leased by any Borrower or any Subsidiary, except in material compliance with Environmental Law or the terms of any Permit or other than those that in the aggregate could not reasonably be expected to have a Material Adverse Effect.

### 9.12 TRANSACTIONS WITH AFFILIATES

Enter, or permit any Subsidiary to enter, into any transaction directly or indirectly with or for any Affiliate of any Borrower except (a) in the ordinary course of business on a basis no less favorable to such Affiliate than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of any Borrower, or (b) any transaction involving assets that are not material to the business and operations of any Borrower or the Subsidiaries;

BN 1042967v14                                    76



provided, however, that the foregoing restriction shall not apply to (i) any transaction between a Borrower and another Borrower that is not a Foreign Subsidiary or (ii) indemnification payments to officers or directors of Borrowers or the Subsidiaries.

### 9.13   NAME CHANGE; JURISDICTION CHANGE

Change its name or change its jurisdiction of organization, or permit any Subsidiary to do so, unless (a) Parent gives Administrative Lender 30 days prior notice of the intended name change or change of jurisdiction of organization and (b) Borrowers executes and delivers to Administrative Lender such agreements, documents and instruments as Administrative Lender deems reasonably necessary or desirable to protect its interests in the Collateral.

### 9.14   NO SPECULATIVE TRANSACTIONS

Engage in, or permit any Subsidiary to engage in, any Commodity Contract, Interest Rate Contract or foreign exchange agreement, except (i) for hedging purposes with respect to transactions engaged in by Borrowers, (ii) one or more Interest Rate Contracts or foreign exchange agreements on terms reasonably acceptable to Administrative Lender, and (iii) not more than 250 Commodity Contracts outstanding at any time with an aggregate notional amount not exceeding $10,000,000, in each case in the ordinary course of business consistent with Parent's existing practice as of the Closing Date and not for speculative purposes.

### 9.15   TRANSACTIONS WITH SUBSIDIARIES

Notwithstanding any other provision of this Agreement to the contrary, engage in, or permit any Subsidiary to engage in, any transaction with, or provide any funding, financial support or funds to or for the benefit of, any Subsidiary at any time, unless: (i) such Subsidiary is a "Borrower" or (ii) such transaction is permitted under Section 9.5(i).

### 9.16   CONSIGNMENTS

Consign any of their Inventory or sell any of their Inventory on bill and hold, sale or return, sale on approval, or other conditional terms of sale, provided, however that notwithstanding the foregoing, Borrowers may consign and sell on bill and hold basis Inventory in an amount not to exceed $3,000,000 in the aggregate at any one time outstanding.

### 9.17   INVENTORY AND EQUIPMENT WITH BAILEES.

Store the Inventory or equipment of Borrowers or their Subsidiaries at any time now or hereafter with a bailee, warehouseman, or similar party, other than in the ordinary course of business, consistent with past practice.

### 9.18   FISCAL YEAR; ACCOUNTING METHODS.

Modify or change their fiscal year or their method of accounting (other than as may be required to conform to GAAP).



### 9.19   CHARLESTOWN LOCATION.

Maintain, at any time, at the premises located in Charlestown, County of Sullivan, New Hampshire any personal property assets with aggregate value in excess of: (i) $150,000 during the period commencing on the Closing Date through and including June 30, 2007 and (ii) $50,000, after June 30, 2007.

### ARTICLE X

### FINANCIAL COVENANTS

In the event that, at any time, the Borrowers' Available Credit plus Qualified Cash as of such date (after giving effect to the funding of all Revolving Loans, Swing Loans, and the issuance of all Letters of Credit to be funded or issued as of such date) is not equal to at least $10,000,000, then the Borrowers shall be required to maintain the following financial covenants:

### 10.1   MINIMUM EBITDA

Achieve Adjusted EBITDA, measured on a quarter-end basis for the four fiscal quarters of Parent most recently completed, of at least the required amount set forth in the following table for the applicable period set forth opposite thereto:

 

| Applicable Amount | Applicable Period<br><br>(Applicable Period means the four fiscal quarters of Parent ending on the date set forth below) |
|---|---|
| $6,600,000 | December 31, 2006 |
| $5,200,000 | March 31, 2007 |
| $6,800,000 | June 30, 2007 |
| $13,600,000 | September 30, 2007 |
| $17,300,000 | December 31, 2007 |
| $17,600,000 | March 31, 2008 |
| $18,300,000 | June 30, 2008 |
| $18,900,000 | September 30, 2008 |
| $19,500,000 | December 31, 2008 |
| $19,900,000 | March 31, 2009 |
| $20,600,000 | June 30, 2009 |
| $21,300,000 | September 30, 2009 |
| $21,900,000 | December 31, 2009 |
| $22,000,000 | March 31, 2010 and each fiscal quarter-end thereafter |



## 10.2   INTEREST COVERAGE RATIO

The ratio of Adjusted EBITDA to Parent's consolidated interest expense, measured on a quarter-end basis for the four fiscal quarters of Parent most recently completed, of at least the applicable ratio set forth in the following table for the applicable period set forth opposite thereto:

| Applicable Ratio | Applicable Period<br>(Applicable Period means the four fiscal quarters of Parent ending on the date set forth below) |
|:---:|:---:|
| 0.20:1.00 | December 31, 2006 |
| 0.20:1.00 | March 31, 2007 |
| 0.20:1.00 | June 30, 2007 |
| 0.75:1.00 | September 30, 2007 |
| 1.10:1.00 | December 31, 2007 |
| 1.10:1.00 | March 31, 2008 |
| 1.10:1.00 | June 30, 2008 |
| 1.20:1.00 | September 30, 2008 |
| 1.25:1.00 | December 31, 2008 |
| 1.25:1.00 | March 31, 2009 |
| 1.30:1.00 | June 30, 2009 |
| 1.30:1.00 | September 30, 2009 |
| 1.40:1.00 | December 31, 2009 |
| 1.50:1.00 | March 31, 2010 and each fiscal quarter-end thereafter |

## 10.3   CAPITAL EXPENDITURES

Make Capital Expenditures in any fiscal year in excess of the amount set forth in the following table for the applicable period:

BN 1042967v14                                      80

| Fiscal Year 2007 | Fiscal Year 2008 | Fiscal Year 2009 and for each Fiscal Year thereafter |
|---|---|---|
| $3,625,000 | $3,900,000 | $4,000,000 |

## ARTICLE XI

## EVENTS OF DEFAULT

### 11.1   EVENTS OF DEFAULT

The occurrence of any of the following shall constitute an "Event of Default" under this Agreement:

(a)   Borrowers fail, to pay when due any amount payable under any of the Loan Documents;

(b)   any financial statement or certificate furnished to Administrative Lender or any Lender in connection with, or any representation or warranty made by Borrowers under any of the Loan Documents is false or misleading in any material respect when furnished or made;

(c)   Parent fails to provide any certificate, report or other information which it is required to provide pursuant to Section 8.3 or Section 8.9 on the date specified in Section 8.3 or Section 8.9; provided that unless Parent has previously failed to provide any required certificate, report or other information by the required date on two prior occasions within the preceding twelve months such failure shall be considered an Event of Default only if Parent fails to provide such certificate, report or other information within five Business Days (two Business Days with respect to items (i) through (v) of Section 8.9) or the earlier of (i) the date Parent has knowledge of its failure to so provide such certificate, report or other information, or (ii) the date Administrative Lender, at the request of a Lender, notifies Parent of such failure;

(d)   any default by Borrowers in the performance of or compliance with any obligation, agreement or other provision contained in Sections 4.1, 8.5, 8.11, 8.12, 8.14, 8.15, 8.16, 9.1, 9.2, 9.3, 9.4, 9.5, 9.6, 9.7, 9.13, 9.15 and Article X;

(e)   any default by Borrowers in the performance of or compliance with any obligation, agreement or other provision contained in any Loan Document (other than those referred to in subsections (a) through (d) above) for fifteen days after notice thereof has been given to Parent by Administrative Lender at the request of any Lender;

(f)   any breach(es) by any Borrower in the payment or performance of any obligation under the terms of any contract(s) or instrument(s) (other than any of the Loan Documents) evidencing Indebtedness in excess of $1,000,000 in the aggregate if such breach(es) has/have not been cured to the satisfaction of the affected creditor(s) or waived by such

81



creditor(s) within any applicable cure period provided under such contract(s) and/or instrument(s);

(g)     any judgment(s) or order(s) for the payment of money in excess of $1,000,000 in the aggregate is rendered against one or more of Borrowers and Subsidiaries and either (i) enforcement proceedings have been commenced upon any such judgment or order; or (ii) there is any period of 10 consecutive days during which a stay of enforcement of any such judgment or order, by reason of a pending appeal or otherwise, is not in effect;

(h)     any Borrower becomes insolvent, or suffers or consents to or applies for the appointment of a receiver, trustee, custodian or liquidator of itself or any of its property, or is generally unable to or fails to pay its debts as they become due, or makes a general assignment for the benefit of creditors; any Borrower files a voluntary petition in bankruptcy, or seeks to effect a plan or other arrangement with creditors or any other relief under the Bankruptcy Code, or under any state or other Federal law granting relief to debtors, whether now or hereafter in effect; or any involuntary petition or proceeding pursuant to the Bankruptcy Code or any other applicable state or other Federal law relating to bankruptcy, reorganization or other relief for debtors is filed or commenced against any Borrower and is not dismissed, stayed or vacated within sixty days thereafter; any Borrower files an answer admitting the jurisdiction of the court and the material allegations of any involuntary petition; or any Borrower is adjudicated a bankrupt, or an order for relief is entered by any court of competent jurisdiction under the Bankruptcy Code or any other applicable state or Federal law relating to bankruptcy, reorganization or other relief for debtors; or any Borrower takes any corporate action authorizing or in furtherance of any of the foregoing;

(i)     tax lien(s) (other than a Permitted Lien) greater than $1,000,000 in the aggregate shall have been filed against any Borrower or any of its property by any federal, state, or municipal authority;

(j)     an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or could reasonably be expected to result in liability of any Borrower under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $1,000,000, or (ii) any Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $1,000,000;

(k)     the dissolution or liquidation of Parent, or Parent or its directors or stockholders shall take action seeking to effect such dissolution or liquidation of Parent;

(l)     any change in Control of any Borrower, excluding any change in Control resulting from an Employee Stock Transaction;

(m)     any Loan Document shall (except in accordance with its terms), in whole or in any material part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of each Borrower; any Borrower, directly or indirectly, contests in any manner such effectiveness, validity, binding nature or enforceability; or any Lien securing

any Obligation, in whole or in any material part, ceases to be a perfected first priority Lien, subject only to those exceptions expressly permitted by such Loan Document;

(n)     If any material portion of any Borrowers' or any Subsidiaries' assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any third Person and the same is not discharged before the earlier of 30 days after the date it first arises or 5 days prior to the date on which such property or asset is subject to forfeiture by such Borrower or the applicable Subsidiary; or

(o)     If any Borrower or any Subsidiary of a Borrower is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs

### 11.2   REMEDIES

(a)     During the continuance of any Event of Default (other than an Event of Default referred to in Section 11.1(h)), Administrative Lender may, with the consent of the Required Lenders, or shall, upon instructions from the Required Lenders, by notice to Parent, (i) terminate the obligations of Lenders to extend any further credit under any of the Loan Documents, and (ii) declare all or any part of the Obligations to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Borrowers, and/or take such enforcement action as is permitted under any Loan Document.  Upon the occurrence or existence of any Event of Default described in Section 11.1(h), immediately and without notice, (A) the obligations, if any, of Lenders to extend any further credit under any of the Loan Documents shall automatically cease and terminate, and (B) all indebtedness of Borrowers under the Loan Documents shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Borrowers.  Immediately after taking any action under this Section 11.2, Administrative Lender shall notify each Lender of such action.

(b)     During the continuance of an Event of Default, Administrative Lender, in addition to any other rights and remedies contained in the Loan Documents, shall have all of the rights and remedies of a secured party under the UCC and all other applicable law, all of which rights and remedies shall be cumulative and nonexclusive to the extent permitted by law. Administrative Lender may cause the Collateral to remain on Borrowers' premises, at Borrowers' expense, pending sale or other disposition thereof.  Administrative Lender shall have the right to conduct such sales on Borrowers' premises or elsewhere, at Borrowers' expense, on such occasion(s) as Administrative Lender may see fit, and Borrowers, at Administrative Lender's request, will, at Borrowers' expense, assemble the Collateral and make it available to Administrative Lender at such place(s) as Administrative Lender may reasonably designate from time to time.  Any sale, lease or other disposition by Administrative Lender of the Collateral, or any part thereof, may be for cash or other value.  Each Borrower shall execute and deliver, or cause to be executed and delivered, such instruments, documents, assignments, deeds, waivers, certificates and affidavits and take such further action as Administrative Lender shall reasonably require in connection with such sale, and each Borrower hereby constitutes Administrative Lender as its attorney-in-fact to execute any such instrument, document, assignment, deed, waiver, certificate or affidavit on behalf of such Borrower and in its name.  At any sale of the

Collateral, the Collateral to be sold may be sold in one lot as an entirety or in separate lots as Administrative Lender may determine. Administrative Lender shall not be obligated to make any sale of any Collateral if it determines not to do so, regardless of the fact that notice of sale was given. Administrative Lender may, without notice or publication, adjourn any public or private sale or cause the sale to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which it was so adjourned. In case any sale of Collateral is made on credit or for future delivery, the Collateral so sold may be retained by Administrative Lender until the sale price is paid, but Administrative Lender shall not incur any liability if any purchaser fails to pay for any Collateral so sold and, in case of any such failure, such Collateral may be sold again. At any public sale, any Lender (i) may bid for or purchase the Collateral offered for sale, free (to the extent permitted by law) from any rights of redemption, stay or appraisal on the part of any Borrower with respect to the Collateral, (ii) make payment on account thereof by using any claim then due and payable to such Lender from any Borrower as a credit against the purchase price, and (iii) upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to Borrowers therefor. Each Borrower acknowledges that portions of the Collateral may be difficult to preserve and dispose of and may be subject to complex maintenance and management; accordingly, Administrative Lender shall have the widest possible latitude in the exercise of its rights and remedies hereunder.

(c) Administrative Lender is hereby granted a license and right to use, without charge upon the occurrence and during the continuance of an Event of Default and until the Obligations are fully and indefeasibly paid in cash and Lenders' obligations to advance credit to Borrowers terminated, Borrowers' labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, advertising material, General Intangibles or any property of a similar nature in completing the production, advertising for sale and sale of any Collateral.

(d) Any notice required to be given by Administrative Lender with respect to any of the Collateral which notice is given pursuant to Section 13.1 and deemed received pursuant to Section 13.1 at least five Business Days before a sale, lease, disposition or other intended action by Administrative Lender with respect to any of the Collateral shall constitute fair and reasonable notice to Borrowers of any such action. A public sale in the following fashion shall be conclusively presumed to be reasonable: (i) the sale is held in a county where any part of the Collateral is located or in which any Borrower has a place of business; (ii) the sale is conducted by auction, but it need not be by a professional auctioneer; (iii) any Collateral is sold as is and without any preparation for sale; and (iv) any Borrower is given notice of such public sale pursuant to the preceding sentence.

(e) Upon the occurrence and during the continuance of an Event of Default, Administrative Lender shall have, with respect to Rights to Payment, all rights and powers to: (i) direct any and all account debtors to make all payments in respect of the Rights to Payment directly to Administrative Lender or otherwise demand payment of any or all of the Rights to Payment; (ii) enforce payment of any or all of the Rights to Payment by legal proceedings or otherwise; (iii) exercise Borrowers' rights and remedies with respect to any actions or proceedings brought to collect any Right to Payment; (iv) sell or assign any Right to Payment upon such terms, for such amount and at such time or times as Administrative Lender deems

advisable; (v) settle, adjust, compromise, extend or renew a Right to Payment; (vi) discharge or release any Right to Payment; and (vii) prepare, file and sign Borrowers' name on any proof of claim in bankruptcy or any similar document against an account debtor, and to otherwise exercise the rights granted herein.

(f)     Administrative Lender shall have no obligation (i) to preserve any rights to the Collateral against any Person, (ii) to make any demand upon or pursue or exhaust any rights or remedies against any Borrower or others with respect to payment of the Obligations, (iii) to pursue or exhaust any rights or remedies with respect to any of the Collateral or any other security for the Obligations, or (iv) to marshal any assets in favor of any Borrower or any other Person against or in payment of any or all of the Obligations.

(g)     Borrowers recognize that federal and/or state securities and other laws may limit the flexibility desired to achieve an otherwise commercially reasonable disposition of Collateral, and in the event of potential conflict between such laws and what in other circumstances might constitute commercial reasonableness, it is intended that consideration of such laws will prevail over attempts to achieve such commercial reasonableness. In connection with any sale or other disposition of Collateral, compliance by Administrative Lender with the written advice of its counsel concerning the potential effect of any such law will not be cause for any Borrower, or any other Person, to claim that such sale or other disposition was not commercially reasonable.

(h)     Borrowers shall pay to Administrative Lender (for distribution to Lenders, as appropriate), on demand and as part of the Obligations, all costs and expenses, including court costs and costs of sale, incurred by Administrative Lender or any Lender in exercising any of its rights or remedies hereunder, and all costs and expenses incurred in connection with any review of any part of the Collateral.

### 11.3    POWER OF ATTORNEY

Each Borrower hereby appoints Administrative Lender or any other Person whom Administrative Lender may designate, as such Borrower's attorney, with power: (i) to indorse such Borrower's name on any checks, notes, acceptances, money orders, drafts or other forms of payment or security that may come into Administrative Lender's possession; (ii) to send requests for verification of Borrowers' or their Subsidiaries' Accounts; (iii) at any time an Event of Default exists, to sign such Borrower's name on any invoice or bill of lading relating to any Right to Payment, on drafts against customers, on schedules and assignments of Rights to Payment, on notices of assignment and other public records, and on notices to customers; (iv) at any time an Event of Default exists, to notify the post office authorities to change the address for delivery of such Borrower's mail to an address designated by Administrative Lender; (v) at any time an Event of Default exists, to receive, open and process all mail addressed to any Borrower; (vi) at any time an Event of Default exists, to ask for, demand, sue for, collect, receive, receipt and give aquittance for any and all moneys due or to become due with respect to any Collateral; (vii) at any time an Event of Default exists, to settle, compromise, prosecute or defend any action, claim or proceeding with respect to Collateral; (viii) at any time an Event of Default exists, to sell, assign, pledge, transfer and make any agreement with respect to or otherwise deal with the Collateral; and (ix) to do all things necessary to perfect Administrative Lender's security

interest in the Collateral, to preserve and protect the Collateral and to otherwise carry out this Agreement; provided, however, that nothing contained in this Section 11.3 will be construed as requiring or obligating Administrative Lender to take any action. Provided Administrative Lender acts in a reasonable manner, each Borrower ratifies and approves all acts of such attorney, and neither Administrative Lender nor the attorney will be liable for any acts or omissions nor for any error of judgment or mistake of fact or law. This power being coupled with an interest is irrevocable until the Obligations have been fully satisfied and indefeasibly paid in cash or Lenders' obligations to advance credit to Borrowers terminated, whichever shall later occur.

## ARTICLE XII

### ADMINISTRATIVE LENDER

#### 12.1   APPOINTMENT AND AUTHORITY

Each of Lenders and Issuing Lender hereby irrevocably appoints WFF to act on its behalf as Administrative Lender under the Loan Documents and authorizes WFF as Administrative Lender to take such actions on its behalf and to exercise such powers as are delegated to Administrative Lender respectively by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article XII are solely for the benefit of Administrative Lender, Lenders and Issuing Lender, and Borrowers shall not have rights as a third party beneficiary of any of such provisions.

#### 12.2   RIGHTS AS A LENDER

The Person serving as Administrative Lender hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not Administrative Lender and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as Administrative Lender hereunder in their individual capacity. Administrative Lender and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Borrower or any Subsidiary or other Affiliate thereof as if Administrative Lender was not Administrative Lender hereunder and without any duty to account therefor to Lenders.

#### 12.3   EXCULPATORY PROVISIONS

The Administrative Lender shall not have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, Administrative Lender:

(i)   shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)   shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that either is required to exercise as directed in writing by the Required

Exhibit A

Lenders (or such other number or percentage of Lenders as shall be expressly provided for in the Loan Documents), provided that Administrative Lender shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable law; and

(iii) except as expressly set forth in the Loan Documents, shall not have any duty to disclose, or shall not be liable for the failure to disclose, any information relating to any Borrower or any of its Affiliates or Subsidiaries that is communicated to or obtained by it or any of its Affiliates in any capacity.

Administrative Lender shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of Lenders as shall be necessary, or as it shall believe in good faith shall be necessary, under the circumstances as provided in Sections 11.2 and 13.3) or (ii) in the absence of its own gross negligence or willful misconduct. Administrative Lender shall not be deemed to have knowledge of any Default unless and until notice describing such Default is given to it by Parent, a Lender or Issuing Lender.

Administrative Lender shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article VII or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to it in its capacity as Administrative Lender.

## 12.4 RELIANCE BY ADMINISTRATIVE LENDER

Administrative Lender shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Administrative Lender also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or Issuing Lender, Administrative Lender may presume that such condition is satisfactory to such Lender or Issuing Lender unless Administrative Lender shall have received notice to the contrary from such Lender or Issuing Lender prior to the making of such Loan or the issuance of such Letter of Credit. Administrative Lender may consult with legal counsel (who may be counsel for Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

87

## 12.5   DELEGATION OF DUTIES

Administrative Lender may perform any and all of its duties and exercise its rights and powers under any Loan Document by or through any one or more sub-agents appointed by it. Administrative Lender and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article XII shall apply to any such sub-agent and to the Related Parties of Administrative Lender and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as their respective activities as Administrative Lender.

## 12.6   RESIGNATION OF ADMINISTRATIVE LENDER

Administrative Lender may at any time give notice of its resignation to Lenders, Issuing Lender and Parent. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with Parent, to appoint a successor, which shall be a Lender. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Lender gives notice of its resignation, then the retiring Administrative Lender may on behalf of Lenders and Issuing Lender, appoint a successor Administrative Lender meeting the qualifications set forth above provided that if Administrative Lender shall notify Parent and Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Lender shall be discharged from its duties and obligations under the Loan Documents (except that in the case of any Collateral held by Administrative Lender on behalf of Lenders or Issuing Lender under any of the Loan Documents, the retiring Administrative Lender shall continue to hold such Collateral until such time as a successor Administrative Lender is appointed) and (2) all payments, communications and determinations provided to be made by, to or through Administrative Lender shall instead be made by or to each Lender and Issuing Lender directly, until such time as the Required Lenders appoint a successor Administrative Lender as provided for in this Section. Upon the acceptance of a successor's appointment as Administrative Lender hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Lender, and the retiring Administrative Lender shall be discharged from all of its duties and obligations under the Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by Borrowers to a successor Administrative Lender shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor. After the retiring Administrative Lender's resignation under the Loan Documents, the provisions of this Article and Section 13.2 shall continue in effect for the benefit of such retiring Administrative Lender, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Lender was acting as Administrative Lender.

## 12.7   INTENTIONALLY OMITTED



**12.8 NON- RELIANCE ON ADMINISTRATIVE LENDER AND OTHER LENDERS**

Each Lender and Issuing Lender acknowledges that it has, independently and without reliance upon Administrative Lender or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and Issuing Lender also acknowledges that it will, independently and without reliance upon Administrative Lender or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon any Loan Document or any related agreement or any document furnished thereunder.

## ARTICLE XIII

### MISCELLANEOUS

### 13.1 NOTICES

(a) **Notices Generally**. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 13.1(b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

To Administrative Lender, Issuing Lender or any Lender:
at their respective addresses set forth in Schedule I hereto

To Parent or Borrower:    North Pacific Group, Inc.
10200 SW Greenburg Rd.
Portland, Oregon 97223
Attn: Chief Financial Officer
Fax: (503) 238-2641

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in Section 13.1(b) below, shall be effective as provided in Section 13.1(b).

(b) **Electronic Communications**. Notices and other communications to Lenders and Issuing Lender hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by Administrative Lender, provided that the foregoing shall not apply to notices to any Lender or Issuing Lender pursuant to Article III if such Lender or Issuing Lender, as applicable, has notified Administrative Lender that it is incapable of receiving notices under such Article by electronic communication. Administrative Lender or Parent may, in its discretion, agree to

Exhibit A

accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless Administrative Lender otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     **Change of Address etc**.  Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

### 13.2    EXPENSES; INDEMNITY; DAMAGE WAIVER

(a)     **Costs and Expenses**.  Borrowers shall pay all Lender Group Expenses, including:  (i) all reasonable out-of-pocket expenses incurred by Issuing Lender in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (ii) all out-of-pocket expenses incurred by Administrative Lender, any Lender or Issuing Lender (including the fees, charges and disbursements of any counsel for Administrative Lender, any Lender or Issuing Lender), and shall pay all fees and time charges for attorneys who may be employees of Administrative Lender, any Lender or Issuing Lender, in connection with the enforcement or protection of its rights (A) in connection with the Loan Documents, including its rights under this Section, or (B) in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b)     **Indemnification by Borrowers**.     Borrowers    shall    indemnify Administrative Lender (and any sub-agent thereof), each Lender and Issuing Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee) and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the transactions contemplated thereby, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by Issuing Lender to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of

BN 1042967v14                                              90



such Letter of Credit), (iii) any actual or alleged presence or Release of Contaminants on or from any property owned or operated by any Borrower or any of its Subsidiaries, or any Environmental Liabilities and Costs related in any way to any Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower, and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by any Borrower against an Indemnitee for breach in bad faith of such Indemnitee's obligations under any Loan Document, if such Borrower has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)     **Reimbursement by Lenders**.    To the extent that Borrowers for any reason fails to indefeasibly pay any amount required under Section 13.2(a) or (b) to be paid by it to Administrative Lender (or any sub-agent thereof), Issuing Lender or any Related Party of any of the foregoing, each Lender severally agrees to pay to Administrative Lender (or any such sub-agent), Issuing Lender or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against Administrative Lender (or any such sub-agent) or Issuing Lender in its capacity as such, or against any Related Party of any of the foregoing acting for Administrative Lender (or any such sub-agent) or Issuing Lender in connection with such capacity.    The obligations of Lenders under this Section 13.2(c) are several.

(d)     **Waiver of Consequential Damages, Etc**.    To the fullest extent permitted by applicable law, Borrowers shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, the Loan Document or any agreement or instrument contemplated thereby, the transactions contemplated thereby, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with any Loan Document or the transactions contemplated thereby.

(e)     **Payments**.    All amounts due under this Section shall be payable promptly upon demand therefor.

(f)     **Attorneys' Fees**.    References in the Loan Documents to fees and expenses of attorneys shall include all such fees and expenses, whether incurred at the trial or appellate level, in an arbitration or administrative proceeding, in bankruptcy (including, without limitation, any adversary proceeding, contested matter or motion) or otherwise incurred.

 

(g)    **Survival**.    This Section 13.2 shall survive the payment in full and performance of all of Borrowers' other Obligations.

### 13.3   WAIVERS, AMENDMENTS

Any term, covenant, agreement or condition of any Loan Document may be amended or waived if such amendment or waiver is in writing and is signed by the Required Lenders (or by Administrative Lender with written consent of the Required Lenders), Borrowers and any other party thereto; provided, however, that any amendment, waiver or consent which affects the rights or duties of Administrative Lender, Issuing Lender or Swingline Lender must be in writing and be signed also by the affected Administrative Lender, Issuing Lender or Swingline Lender; and provided further, that any amendment, waiver or consent which effects any of the following changes must be in writing and signed by all Lenders (or by Administrative Lender with the written consent of all Lenders):

(i)    increases the maximum amount of credit available hereunder;

(ii)    extends the maturity date of any Loan;

(iii)    reduces the principal of, or interest (including default rate interest) on, any Loan or any fees or other amounts payable for the account of Lenders hereunder;

(iv)    postpones or conditions any date fixed for any payment of the principal of, or interest on, any Loan or any fees or other amounts payable for the account of Lenders hereunder;

(v)    waives or amends this Section 13.3;

(vi)    amends the definition of Required Lenders or any provision of this Agreement requiring approval of the Required Lenders or some other specified amount of Lenders;

(vii)    increases or decreases the Commitment or the Applicable Percentage of any Lender (other than through an assignment under Section 13.4 hereof);

(viii)    waives any of the conditions set forth in Article VII;

(ix)    Changes the definition of Borrowing Base or the definitions of Eligible Accounts, Eligible Inventory, or Borrowing Base Reserves, or any change to the trigger language in the first paragraph of Article X;

(x)    releases any material Collateral (except as required by Section 5.1(a)).

Unless otherwise specified in such waiver or consent, a waiver or consent given hereunder shall be effective only in the specific instance and for the specific purpose for which given. Any fee paid by Borrowers in connection with a waiver or amendment requiring the consent of Required Lenders or all Lenders shall be shared ratably by the Lenders.

Exhibit A

### 13.4   SUCCESSORS AND ASSIGNS

(a)   **Successors and Assigns Generally**.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Administrative Lender and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 13.4(b), (ii) by way of participation in accordance with the provisions of Section 13.4(d) or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 13.4(f) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 13.4(d) and, to the extent expressly contemplated hereby, the Related Parties of each of Administrative Lender and Lenders) any · legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)   **Assignments by Lenders**.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that

(i)   except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to Administrative Lender or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $5,000,000, unless each of Administrative Lender and, so long as no Default is continuing, Parent otherwise consent (each such consent not to be unreasonably withheld or delayed);

(ii)   each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate LIBOR Loans on a non-*pro rata* basis;

(iii)   any assignment of a Revolving Loan Commitment must be approved by Administrative Lender and Issuing Lender (which approval shall not be unreasonably withheld or delayed) unless the Person that is the proposed assignee is itself a Lender with a Revolving Loan Commitment (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee); and



(iv)    the parties to each assignment shall execute and deliver to Administrative Lender an Assignment and Assumption, together with a processing and recordation fee of $3500 and the Eligible Assignee, if it shall not be a Lender, shall deliver to Administrative Lender an Administrative Questionnaire.

Subject to acceptance and recording thereof by Administrative Lender pursuant to Section 13.4(c) from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.9, 3.10 and 13.2 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.4(b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 13.4(d).

(c)    **Register**.  Administrative Lender, acting solely for this purpose as an agent of Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and Borrowers, Administrative Lender and Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    **Participations**.  Any Lender may at any time, without the consent of, or notice to, Borrowers or Administrative Lender, sell participations to any Person (other than a natural person or any Borrower or any of Borrowers' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) Borrowers, Administrative Lender and Lenders and Issuing Lender shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any  provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to matters described in Section 13.3(i) – (ix) that affects such Participant.    Subject to

Section 13.4(e), Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.9 and 3.10 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 13.4(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 13.5 as though it were a Lender, provided such Participant agrees to be subject to Section 3.8(b).

(e) **Limitations upon Participation Rights.** A Participant shall not be entitled to receive any greater payment under Sections 3.9 and 3.10 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with Parent's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.10 unless Parent is notified of the participation sold to such Participant and such Participant agrees, for the benefit of Borrowers, to comply with Section 3.10(e) as though it were a Lender.

(f) **Certain Pledges.** Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g) **Electronic Execution of Assignments.** The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

### 13.5   SETOFF

If an Event of Default is continuing, each Lender, Issuing Lender, and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, Issuing Lender or any such Affiliate to or for the credit or the account of Borrowers against any and all of the obligations of Borrowers now or hereafter existing under any Loan Document to such Lender or Issuing Lender, irrespective of whether or not such Lender or Issuing Lender shall have made any demand under any Loan Document and although such obligations of Borrowers may be contingent or unmatured or are owed to a branch or office of such Lender or Issuing Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender, Issuing Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, Issuing Lender or their respective Affiliates may have. Each Lender and Issuing Lender agrees to notify

Parent and Administrative Lender promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

### 13.6   NO WAIVER; CUMULATIVE REMEDIES

No failure on the part of Administrative Lender or any Lender to exercise, and no delay in exercising, any right, power, privilege or remedy under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy. The rights and remedies under the Loan Documents are cumulative and not exclusive of any rights, powers, privileges and remedies that may otherwise be available to Administrative Lender or any Lender.

### 13.7   CONFIDENTIALITY

Each of Administrative Lender, Lenders and Issuing Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto (including the Bank Product Providers), (e) in connection with the exercise of any remedies under any Loan Document or any action or proceeding relating to any Loan Document or the enforcement of rights thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Borrower and its obligations, (g) with the consent of Parent or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to Administrative Lender, any Lender, Issuing Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Borrower.

For purposes of this Section, "Information" means all information received from any Borrower or any Subsidiary relating to any Borrower or any Subsidiary or any of their respective businesses, other than any such information that is available to Administrative Lender, any Lender or Issuing Lender on a nonconfidential basis prior to disclosure by Borrowers or any of Subsidiary, provided that, in the case of information received from Borrowers or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.



Notwithstanding anything herein to the contrary, "Information" shall not include, and Borrowers, Administrative Lender, each Lender and the respective Affiliates of each of the foregoing (and the respective partners, directors, officers, employees, agents, advisors and other representatives of each of the foregoing and their Affiliates), and any other party, may disclose to any and all Persons, without limitation of any kind, (a) any information with respect to the U.S. federal and state income tax treatment of the transactions contemplated hereby and any facts that may be relevant to understanding such tax treatment, which facts shall not include for this purpose the names of the parties or any other Person named herein, or information that would permit identification of the parties or such other Persons, or any pricing terms or other nonpublic business or financial information that is unrelated to such tax treatment or facts, and (b) all materials of any kind (including opinions or other tax analyses) that are provided to any of the Persons referred to above relating to such tax treatment or facts.

### 13.8 AMENDMENT; COUNTERPARTS; INTEGRATION; EFFECTIVENESS

The Loan Documents may be amended or modified only by a written document executed by the parties hereto. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. The Loan Documents, and any separate letter agreements with respect to fees payable to Administrative Lender, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Article VII, this Agreement shall become effective when it shall have been executed by Administrative Lender and when Administrative Lender shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

### 13.9 NO THIRD PARTY BENEFICIARIES

This Agreement is made and entered into for the sole protection and benefit of the parties hereto and their respective permitted successors and assigns, and no other person or entity shall be a third party beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any other of the Loan Documents to which it is not a party.

### 13.10 TIME

Time is of the essence of each and every provision of this Agreement and each other of the Loan Documents.

### 13.11 SEVERABILITY OF PROVISIONS

If any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or any remaining provisions of this Agreement.

**13.12 BANK PRODUCT PROVIDERS.** Each Bank Product Provider shall be deemed a party hereto for purposes of any reference in a Loan Document to the parties for whom Administrative Lender is acting; it being understood and agreed that the rights and benefits of such Bank Product Provider under the Loan Documents consist exclusively of such Bank Product Provider's right to share in payments and collections out of the Collateral as more fully set forth herein. In connection with any such distribution of payments and collections, Administrative Lender shall be entitled to assume no amounts are due to any Bank Product Provider unless such Bank Product Provider has notified Administrative Lender in writing of the amount of any such liability owed to it prior to such distribution.

### 13.13 GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflict of laws provisions thereof, and any applicable laws of the United States.

### 13.14 SUBMISSION TO JURISDICTION

(a) **Submission to Jurisdiction.** EACH BORROWER IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA AND THE FEDERAL COURTS OF THE UNITED STATES FOR LOCATED IN THE CITY OF LOS ANGELES, STATE OF CALIFORNIA AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH CALIFORNIA STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN ANY LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ADMINISTRATIVE LENDER, ANY LENDER OR ISSUING LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO ANY LOAN DOCUMENT AGAINST ANY BORROWER OR SUCH BORROWER'S PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(b) **Waiver of Venue.** Each Borrower irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to any Loan Document in any court referred to in Section 13.13(a). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.



(c)    **Service of Process**.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 13.1.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

### 13.15  WAIVER OF JURY TRIAL

(a)    TO THE EXTENT PERMITTED BY LAW, EACH OF BORROWER, ADMINISTRATIVE LENDER AND LENDERS, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, COUNTERCLAIM OR OTHER LITIGATION IN ANY WAY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS OR EVENTS REFERENCED THEREIN OR CONTEMPLATED THEREBY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND/OR ANY OTHER OF THE LOAN DOCUMENTS. A COPY OF THIS SECTION MAY BE FILED WITH ANY COURT AS WRITTEN EVIDENCE OF THE WAIVER OF THE RIGHT TO TRIAL BY JURY AND THE CONSENT TO TRIAL BY COURT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(b)    REFERENCE PROVISION.

(i)    THE PARTIES PREFER THAT ANY DISPUTE BETWEEN THEM BE RESOLVED IN LITIGATION SUBJECT TO A JURY TRIAL WAIVER AS SET FORTH IN THE LOAN DOCUMENTS, BUT THE CALIFORNIA SUPREME COURT HAS HELD THAT PRE-DISPUTE JURY TRIAL WAIVERS ARE UNENFORCEABLE. THIS REFERENCE PROVISION WILL BE APPLICABLE UNTIL: (I) THE CALIFORNIA SUPREME COURT HOLDS THAT A PRE-DISPUTE JURY TRIAL WAIVER PROVISION SIMILAR TO THAT CONTAINED IN THE LOAN DOCUMENTS IS VALID OR ENFORCEABLE; OR (II) THE CALIFORNIA LEGISLATURE PASSES LEGISLATION AND THE GOVERNOR OF THE STATE OF CALIFORNIA SIGNS INTO LAW A STATUTE AUTHORIZING PRE-DISPUTE JURY TRIAL WAIVERS AND AS A RESULT SUCH WAIVERS BECOME ENFORCEABLE. IN ADDITION, THIS REFERENCE PROVISION, IF NOT ALREADY APPLICABLE AS OTHERWISE PROVIDED HEREIN, WILL BECOME APPLICABLE, IF A COURT, CONTRARY TO A CHOICE OF LAW PROVISION CONTAINED IN THE LOAN DOCUMENTS, HOLDS THAT THE LAWS OF THE STATE OF CALIFORNIA APPLY TO THE LOAN DOCUMENTS.

(ii)    OTHER THAN (I) NONJUDICIAL FORECLOSURE OF SECURITY INTERESTS IN REAL OR PERSONAL PROPERTY,   (II) THE APPOINTMENT OF A RECEIVER OR (III) THE EXERCISE OF OTHER PROVISIONAL REMEDIES (ANY OF WHICH MAY BE INITIATED PURSUANT TO APPLICABLE LAW), ANY CONTROVERSY, DISPUTE OR CLAIM (EACH, A "CLAIM") BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, WILL BE RESOLVED BY A REFERENCE PROCEEDING IN CALIFORNIA IN ACCORDANCE WITH THE PROVISIONS OF SECTION 638 ET SEQ. OF THE CALIFORNIA CODE OF CIVIL PROCEDURE ("CCP"), OR THEIR SUCCESSOR SECTIONS, WHICH SHALL CONSTITUTE THE EXCLUSIVE REMEDY FOR THE RESOLUTION OF ANY CLAIM, INCLUDING WHETHER THE CLAIM IS SUBJECT TO THE REFERENCE PROCEEDING.    EXCEPT AS OTHERWISE PROVIDED IN THE LOAN DOCUMENTS, VENUE FOR THE REFERENCE PROCEEDING WILL BE IN THE SUPERIOR COURT OR FEDERAL DISTRICT COURT LOCATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA (THE "COURT").

(iii)    THE REFEREE SHALL BE A RETIRED JUDGE OR JUSTICE SELECTED BY MUTUAL WRITTEN AGREEMENT OF THE PARTIES. IF THE PARTIES DO NOT AGREE, THE REFEREE SHALL BE SELECTED BY THE PRESIDING JUDGE OF THE COURT (OR HIS OR HER REPRESENTATIVE).   A REQUEST FOR APPOINTMENT OF A REFEREE MAY BE HEARD ON AN EX PARTE OR EXPEDITED BASIS, AND THE PARTIES AGREE THAT IRREPARABLE HARM WOULD RESULT IF EX PARTE RELIEF IS NOT GRANTED. THE REFEREE SHALL BE APPOINTED TO SIT WITH ALL THE POWERS PROVIDED BY LAW. PENDING APPOINTMENT OF THE REFEREE, THE COURT HAS POWER TO ISSUE TEMPORARY OR PROVISIONAL REMEDIES.

(iv)    THE PARTIES AGREE THAT TIME IS OF THE ESSENCE IN CONDUCTING THE REFERENCE PROCEEDINGS.   ACCORDINGLY, THE REFEREE SHALL BE REQUESTED, SUBJECT TO CHANGE IN THE TIME PERIODS SPECIFIED HEREIN FOR GOOD CAUSE SHOWN, TO (A) SET THE MATTER FOR A STATUS AND TRIAL-SETTING CONFERENCE WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF SELECTION OF THE REFEREE, (B) IF PRACTICABLE, TRY ALL ISSUES OF LAW OR FACT WITHIN NINETY (90) DAYS AFTER THE DATE OF THE CONFERENCE AND (C) REPORT A STATEMENT OF DECISION WITHIN TWENTY (20) DAYS AFTER THE MATTER HAS BEEN SUBMITTED FOR DECISION.

(v)    THE REFEREE WILL HAVE POWER TO EXPAND OR LIMIT THE AMOUNT AND DURATION OF DISCOVERY. THE REFEREE MAY SET OR EXTEND DISCOVERY DEADLINES OR CUTOFFS FOR GOOD CAUSE, INCLUDING A PARTY'S FAILURE TO PROVIDE REQUESTED DISCOVERY FOR ANY REASON WHATSOEVER.  UNLESS OTHERWISE ORDERED BASED UPON GOOD CAUSE SHOWN, NO PARTY SHALL BE ENTITLED TO "PRIORITY" IN CONDUCTING DISCOVERY, DEPOSITIONS MAY BE TAKEN BY EITHER PARTY UPON SEVEN (7) DAYS WRITTEN NOTICE, AND ALL OTHER DISCOVERY SHALL

BE RESPONDED TO WITHIN FIFTEEN (15) DAYS AFTER SERVICE. ALL DISPUTES RELATING TO DISCOVERY WHICH CANNOT BE RESOLVED BY THE PARTIES SHALL BE SUBMITTED TO THE REFEREE WHOSE DECISION SHALL BE FINAL AND BINDING.

(vi)    EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE REFEREE SHALL DETERMINE THE MANNER IN WHICH THE REFERENCE PROCEEDING IS CONDUCTED INCLUDING THE TIME AND PLACE OF HEARINGS, THE ORDER OF PRESENTATION OF EVIDENCE, AND ALL OTHER QUESTIONS THAT ARISE WITH RESPECT TO THE COURSE OF THE REFERENCE PROCEEDING. ALL PROCEEDINGS AND HEARINGS CONDUCTED BEFORE THE REFEREE, EXCEPT FOR TRIAL, SHALL BE CONDUCTED WITHOUT A COURT REPORTER, EXCEPT THAT WHEN ANY PARTY SO REQUESTS, A COURT REPORTER WILL BE USED AT ANY HEARING CONDUCTED BEFORE THE REFEREE, AND THE REFEREE WILL BE PROVIDED A COURTESY COPY OF THE TRANSCRIPT. THE PARTY MAKING SUCH A REQUEST SHALL HAVE THE OBLIGATION TO ARRANGE FOR AND PAY THE COURT REPORTER. SUBJECT TO THE REFEREE'S POWER TO AWARD COSTS TO THE PREVAILING PARTY, THE PARTIES WILL EQUALLY SHARE THE COST OF THE REFEREE AND THE COURT REPORTER AT TRIAL.

(vii)    THE REFEREE SHALL BE REQUIRED TO DETERMINE ALL ISSUES IN ACCORDANCE WITH EXISTING CASE LAW AND THE STATUTORY LAWS OF THE STATE OF CALIFORNIA. THE RULES OF EVIDENCE APPLICABLE TO PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA WILL BE APPLICABLE TO THE REFERENCE PROCEEDING. THE REFEREE SHALL BE EMPOWERED TO ENTER EQUITABLE AS WELL AS LEGAL RELIEF, PROVIDE ALL TEMPORARY OR PROVISIONAL REMEDIES, ENTER EQUITABLE ORDERS THAT WILL BE BINDING ON THE PARTIES AND RULE ON ANY MOTION WHICH WOULD BE AUTHORIZED IN A TRIAL, INCLUDING WITHOUT LIMITATION MOTIONS FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION . THE REFEREE SHALL ISSUE A DECISION AND PURSUANT TO CCP §644 THE REFEREE'S DECISION SHALL BE ENTERED BY THE COURT AS A JUDGMENT OR AN ORDER IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT. THE FINAL JUDGMENT OR ORDER OR FROM ANY APPEALABLE DECISION OR ORDER ENTERED BY THE REFEREE SHALL BE FULLY APPEALABLE AS PROVIDED BY LAW. THE PARTIES RESERVE THE RIGHT TO FINDINGS OF FACT, CONCLUSIONS OF LAWS, A WRITTEN STATEMENT OF DECISION, AND THE RIGHT TO MOVE FOR A NEW TRIAL OR A DIFFERENT JUDGMENT, WHICH NEW TRIAL, IF GRANTED, IS ALSO TO BE A REFERENCE PROCEEDING UNDER THIS PROVISION.

(viii)    IF THE ENABLING LEGISLATION WHICH PROVIDES FOR APPOINTMENT OF A REFEREE IS REPEALED (AND NO SUCCESSOR STATUTE IS ENACTED), ANY DISPUTE BETWEEN THE PARTIES THAT WOULD OTHERWISE BE DETERMINED BY REFERENCE PROCEDURE WILL BE RESOLVED AND DETERMINED BY ARBITRATION. THE ARBITRATION WILL BE

CONDUCTED BY A RETIRED JUDGE OR JUSTICE, IN ACCORDANCE WITH THE CALIFORNIA ARBITRATION ACT §1280 THROUGH §1294.2 OF THE CCP AS AMENDED FROM TIME TO TIME. THE LIMITATIONS WITH RESPECT TO DISCOVERY SET FORTH ABOVE SHALL APPLY TO ANY SUCH ARBITRATION PROCEEDING.

(ix)    THE PARTIES RECOGNIZE AND AGREE THAT ALL DISPUTES RESOLVED UNDER THIS REFERENCE PROVISION WILL BE DECIDED BY A REFEREE AND NOT BY A JURY. AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR OWN CHOICE, EACH PARTY KNOWINGLY AND VOLUNTARILY AND FOR THEIR MUTUAL BENEFIT AGREES THAT THIS REFERENCE PROVISION WILL APPLY TO ANY DISPUTE BETWEEN THEM WHICH ARISES OUT OF OR IS RELATED TO THIS AGREEMENT OR THE LOAN DOCUMENTS.

### 13.16  COUNTERPARTS

This Agreement may be executed in any number of identical counterparts, any set of which signed by all the parties hereto shall be deemed to constitute a complete, executed original for all purposes. Delivery of an executed signature page of this Agreement by fax shall be effective as delivery of a manually executed counterpart hereof.

### 13.17  USA PATRIOT ACT

Each Lender that is subject to the requirements of the USA Patriot Act (Title 111 of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") hereby notifies Borrowers that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies Borrowers, which information includes the name and address of Borrowers and other information that will allow such Lender to identify Borrowers in accordance with the Act.

### 13.18  CO-AGENTS.

None of the Lenders identified on the facing page or signature pages of this Agreement as a "co-agent", "syndication agent", or "documentation agent" shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such. Without limiting the foregoing, none of the Lenders so identified as a "co-agent" , "syndication agent", or "documentation agent" shall have or be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

IN WITNESS WHEREOF, this Credit Agreement has been duly executed as of the date first written above.

**NORTH PACIFIC GROUP, INC.**

By: _____

Christopher D. Cassard
Chief Financial Officer

**BURNS HOLDINGS, INC.**
**NOR PAC ENTERPRISES, INC.**
**RTH LUMBER CO.**

By: _____

Christopher D. Cassard
Treasurer

**WELLS FARGO FOOTHILL, INC.,**
as Administrative Lender and a Lender

By: _____
Name: Carey Do
Title:   Vice President

**BANK OF AMERICA, N.A.,**
as Documentation Agent and as a Lender

By: _M. R. Williamson_
Name: _Michael R. Williamson_
Title: _SVP_

S-3
Credit Agreement

Exhibit A

**THE CIT GROUP/BUSINESS CREDIT, INC.,**
as Syndication Agent and as a Lender

By: _____
Name: __Kirk Wolverton_____
Title: __Vice President_____

S-4
Credit Agreement

**LASALLE BUSINESS CREDIT, LLC**
as a Lender

By: _____

Name: _____

Title: _____



## SCHEDULE I

**1.** **Revolving Loan Commitments:**

| | | | |
|---|---|---|---|
| Wells Fargo Foothill, Inc. | - | $45,000,000 - | (28.125%) |
| Bank of America, N.A. | - | $45,000,000 - | (28.125%) |
| The CIT Group/Business Credit, Inc. | $45,000,000 | (28.125%) | |
| LaSalle Business Credit, LLC | - | $25,000,000 - | (15.625%) |

Total Commitments      -   $160,000,000

**2.** **Maximum Exposure for Letter of Credit Obligations:**

| | | | |
|---|---|---|---|
| Wells Fargo Foothill, Inc. | - | $1,406,250 - | (28.125%) |
| Bank of America, N.A. | - | $1,406,250 - | (28.125%) |
| The CIT Group/Business Credit, Inc. | $1,406,250 - | (28.125%) | |
| LaSalle Business Credit, LLC | - | $781,250 - | (15.625%) |

Total Exposure -      $5,000,000

**3.** **Applicable Lending Office and Address for Notices for each Lender:**

Wells Fargo Foothill, Inc.
2450 Colorado Avenue
Suite 3000 West
Santa Monica, California 90404
Attn: Business Finance Division Manager
Fax No.: (310) 453-7413

LaSalle Business Credit, LLC
135 South LaSalle
Chicago, IL 60603
Attn: Gregory Jones, Senior Vice
President and Regional Portfolio
Manager or Andrew Moulton, Vice
President
Fax No.: (503) 684-4665

Bank of America, N.A.
55 South Lake Avenue, Suite 900
Pasadena, CA 91101
Attn: Steven Sharp
Fax No.: (626) 584-4602

The CIT Group/Business Credit, Inc.
5420 LBJ Freeway, Suite 200
Dallas, TX 75240
Attn: Regional Credit Manager
Fax No.: (972) 455-1690

BN 1042967v14

## SCHEDULE II

**Disclosure Schedule**

**SEE ATTACHED**

**Schedule II**
**Disclosure Schedule**
**Section 1.1**

**"PERMITTED LIENS"**

| Borrower Company | Lien Holder Bank/Creditor | Debt Type | Collateral Description |
|---|---|---|---|
| Roberts Pacific, LLC | Rick Roberts | Equipment promissory note | Equipment-Mountain View, MO |
| North Pacific Group, Inc. | WebBank | Promissory Note | Equipment- Gunnison, UT |
| North Pacific Group, Inc. | Gunnison Valley Bank | Promissory Note | Equipment- Gunnison, UT |
| North Pacific Group, Inc. | West Plains Bank | Mortgage | Real property, kilns & related equipment-West Plains, MO |
| North Pacific Group, Inc. | First State Bank | Mortgage | Real property-Waynesboro, MS |
| Saxonville USA | GE Capital | Mortgage | Real property-Charlestown, NH |
| Saxonville USA | Citizens Bank | Mortgage | Real property-Springfield, MA |
| Saxonville USA | Citizens Bank | Mortgage | Real property-Auburn, ME |
| Saxonville USA | Citizens Bank | Mortgage | Real property-Phoenix, NY |
| North Pacific Group, Inc. | Yale Financial Services | Forklift lease | Equipment-Napa, CA |
| North Pacific Group, Inc. | US Bancorp Equipment Finance | Forklift/truck lease | Equipment-Missouri yards |
| North Pacific Group, Inc. | US Bancorp Equipment Finance | Forklift/truck lease | Equipment-Missouri and Arkansas yards |
| North Pacific Group, Inc. | US Bancorp Equipment Finance | Equipment lease | Equipment-Van Buren, MO |
| Saxonville USA | GE Capital | Forklift lease | Equipment |
| Saxonville USA | GE Capital | Forklift lease | Equipment |
| North Pacific Group, Inc. | West Plains Bank | Mortgage | Real property, kilns & equipment- MO & AR |
| North Pacific Group, Inc. | West Plains Bank | Mortgage | Real property, kilns & equipment- MO & AR |
| North Pacific Group, Inc. | Wells Fargo Bank | Mortgage | Real property- Michigan properties |

SCHEDULE II – DISCLOSURE SCHEDULE

### Schedule II
### Disclosure Schedule
### Section 6.1

## LEGAL STATUS; SUBSIDIARIES

*North Pacific Group, Inc. ("NPG")* – Oregon corporation. Parent company and conducts most of the business of the Hardwoods, Softwoods, Southern and Specialty Products Business Units. Headquartered in Portland, Oregon with other primary locations in Michigan, Indiana, Mississippi, Missouri, Arkansas, California, Virginia, and several northeastern states.

*Burns Holdings, Inc.* – Oregon corporation owned 100% by NPG. Currently not engaged in any active business activities.

*RTH Lumber Co .–* Oregon corporation owned 100% by NPG. Member/partner in Chilean & Mexican subsidiaries.

*NOR PAC Enterprises, Inc.* – Oregon corporation owned 100% by NPG. Owns real property in New Hampshire that is leased to NPG and an unrelated third party.

### Active Foreign Subsidiaries that are not Borrowers:

*North Pacific de Mexico, S. de R.L. de C.V.* – Mexican limited liability company owned 99% by NPG and 1% by RTH Lumber Co. Distributes hardwood lumber and panels in Mexico.

*Commercial Norte Pacifico de Chile Limitada* – Chilean limited partnership owned 99.9% by RTH Lumber Co. and .1% by an individual. Buying office in Chile to source radiata pine products imported to the US.

### Active Company in which NPG has Less than Majority Ownership who is not a Borrower:

*Roberts Pacific, LLC* - Limited liability company owned 50% by NPG and 50% by an unrelated company. Manufactures hardwood flooring that is sold primarily to Century Flooring, LLC.

### Inactive Companies Who are Not Co-Borrowers:

*Cascade Imperial Mills Ltd.* – Canadian corporation owned 100% by NPG. Not currently conducting any significant business.

*Norte Pacifico de Durango S.A. de C.V.* – Mexican corporation owned 99% by NPG and 1% by RTH Lumber Co. Distributed hardwood lumber in Mexico. Currently inactive. Attempting to liquidate.



*NOR PAC Services S. de R.L. de C.V.* – Mexican limited liability company owned 99% by NPG and 1% by RTH Lumber Co.  Was formed as a payroll company in Mexico.  Currently inactive.  Attempting to liquidate.

**Schedule II**
**Disclosure Schedule**
**Section 6.5**

## CORRECTNESS OF FINANCIAL STATEMENTS

<u>Material Changes to Financial Statements</u>.  There are no material changes to the financial statements issued as of 12/31/05, OTHER THAN the $7,442,000 net loss reported to the Administrative Lender and Lenders in the November year to date interim financial statements for 2006.

<u>Contingent liabilities</u>.  NPG is negotiating the terms and conditions of a possible asset acquisition from North Santiam Lumber Co. of Ohio, an Ohio corporation:

North Santiam is a 35-year distribution company located in a single location in Columbus, Ohio. The company has a negative net worth, the result of a theft 2 years ago, and they are losing their commercial banking support.  The owner is over 70 years old and ready to retire.  North Pacific has offered to purchase: (a) all inventory for approximately $700,000 which reflects a substantial discount for marketability and settlements with ongoing vendors; (b) all accounts receivable for approximately $1,300,000 which reflects substantial discounts for potential collection issues; (c) all trade names, intangibles, office and distribution equipment for a net book value of $60,000; and (d) the real estate for $1.5 million, subject to the customary environmental and title work (the real estate closing will likely not occur before February 20, 2007).  NPG anticipates hiring substantially all of the employees, other than the president of North Santiam.  The asset acquisition, other than the acquisition of the real property is anticipated to close on or about December 29, 2006.

**Schedule II**
**Disclosure Schedule**
**Section 6.7**

**LEGAL CLAIMS**

The Borrowers are subject to various legal proceedings, claims and litigation arising in the ordinary course of business. All significant liabilities associated with such suits that are likely to be realized and can be reasonably estimated are accrued in the financial records of the company as they become known.

1. *Devon International Trading, Inc. v. North Pacific Group, Inc. (USDC Eastern District of Pennsylvania Case No. 06-CV5119PBT)*

   North Pacific has been sued in the Eastern District of Pennsylvania by Devon International Trading, Inc. The single claim is for breach of contract. The damages sought are "in excess of $4,000,000."

   The case arises from an agreement entered between the parties in February 2006 pursuant to which North Pacific agreed to purchase a shipment of Chinese manufactured drywall from Devon. The goods arrived out of contract very late and were severely damaged. As a result, North Pacific canceled its order. Devon alleges that North Pacific's actions were unjustified and constitute a breach.

   Please note: the only signed purchase order is for $1,658.880 worth of drywall (amount of drywall being purchased was approximate and depended on the size of the ship). The only invoice we currently have shows an amount owed of $1,949,594. The $4 million dollar figure above comes from two, unsigned purchase orders for approximately $4.1 million each.

2. *A/R Roofing, L.L.C., American Standard Roofing, L.L.C. and Roof Top Wholesale, L.L.C. v. CertainTeed Corporation and North Pacific Group, Inc. (USDC, District of Kansas, Case No. 05-1158-WEB).*

   North Pacific is named as a defendant in this lawsuit filed in federal court in Kansas. The lawsuit is over the sale of asphalt shingles by North Pacific to the plaintiff roofing companies. The shingles were manufactured by co-defendant CertainTeed. Plaintiffs allege that certain misrepresentations and other misstatements were made relating to their purchase of these shingles. The plaintiffs' initial prayer in their complaint sought to recover $2,000,000 in compensatory damages, and another $5,000,000 in punitive damages. As the case has progressed, the plaintiffs' compensatory damage claim now appears to have been reduced to a prayer of $365,000. While the plaintiffs' prayer for punitive damages has not been reduced, with the reduction in the claim of actual damages, we can expect that the claim for punitive damages will be substantially reduced as well.

Co-defendant CertainTeed has also asserted cross claims against North Pacific for breach of contract and defamation. As to the amount of damages which it seeks, CertainTeed alleged unspecified damages resulting from an alleged injury to its business reputation. However, in discovery, CertainTeed has not produced any evidence to support this claim, and this part of the claim will probably be dismissed. The other part of CertainTeed's cross claim is for breach of contract to recover all the amounts that it has spent in defense fees and costs in defending the plaintiffs' case, which apparently currently total approximately $700,000. In addition to this, CertainTeed seeks to recover from North Pacific any amount that it would pay the plaintiffs either in settlement or on any judgment which might be entered against it.

As to potential defenses, North Pacific has vigorously defended both the claims of the plaintiffs and the cross claims of co-defendant CertainTeed, and has defenses to both claims. While there is a possibility that North Pacific could be found liable to plaintiffs for compensatory damages, we estimate that the likely award will be significantly less than the amount that the plaintiffs are currently seeking, $365,000. As to the plaintiffs' claim for punitive damages, it appears very unlikely that there would be an award punitive damages. As to the cross claims of CertainTeed, there is a very strong chance that North Pacific will prevail on these claims and that they will be dismissed.

As to the status of the case, the discovery phase is almost complete. The parties are scheduling a mediation, which will be held in February 2007. North Pacific is also preparing summary judgment motions against CertainTeed's cross claims. A trial date has not been set, but if the case does not settle, a trial date will likely be set later in 2007.

3. *Beaverton School District, No. 48j v. JE Dunn Northwest, Inc. v. Texas Construction; North Pacific Lumber Co.; Deamor Associates, Inc.; Architectural Metal Works, Inc. and James Hardie Building Products, Inc.* (Washington County Circuit Court, Case No. C052864 CV).

North Pacific is named as a third-party defendant in this construction defect lawsuit filed by the Beaverton School District relating to alleged construction defects at one of its elementary schools. Although the bulk of the school district's claims against the general contractor allege faulty construction as opposed to the use of inferior or faulty materials, the general contractor included North Pacific as one of the third-party defendants, alleging that it supplied some of the Hardie Plank siding that was used on the exterior of the building. The manufacturer of the siding, James Hardie Building Products, Inc. was also included as a third-party defendant. James Hardie subsequently agreed to defend and indemnify North Pacific for any claims asserted against North Pacific in the lawsuit. Since that time, James Hardie's lawyers have taken over representing North Pacific. The parties to the lawsuit have reached an agreement to settle all of these claims, and the settlement agreements are in the process of being negotiated. Under this settlement, North Pacific will pay nothing, and will be dismissed from the case.

4. *Polygon Northwest Company; Polygon Northwest Company, LLC; Scholls Creek Townhomes LLC; v. Timothy P. Bogart, Inc., dba Bogart Construction Company; Nichols & Son, Inc.; G Cam Ltd; William Joe Rivera dba Rivera & Sons Construction; Paul M. Kehoe dba Paul Kehoe Construction; Tacy A Lind dba North Pacific Lumber Company; Shelter Productions, Inc.; Westurn Cedar, Inc.; West Coast Roofing & Gutter Supply, Inc.; Tri County Temp Control, Inc.; Protek Painting, Inc.; D. Wolfe, Inc. (Multnomah County Circuit Court, Case No. 0512-13359).*

North Pacific has been named as a defendant in this construction defect lawsuit relating to the construction of the Scholls Creek Condominiums in suburban Portland. The case was filed by the developers of the project and names as defendants the contractors and suppliers of the project. The developers were involved in a prior lawsuit with the condominium association, settled that lawsuit, and are seeking to recover the sums in the pending lawsuit from the contractors and suppliers.

It appears that the bulk of the claims allege faulty workmanship, as opposed to the use of faulty or inferior materials. North Pacific is alleged to be one of the suppliers of the project, and that is why it is named in the case. This project took place while a division of North Pacific was separating from North Pacific and was starting to do business as a separate corporation, Shelter Products, Inc. Shelter Products, Inc. is also named as a defendant in the lawsuit. Shelter Products, Inc. has agreed to defend and indemnify North Pacific in the case, and since this time, its attorneys have defended North Pacific. The case is still pending, and these attorneys are in the process of attempting to have North Pacific dismissed from the case. If this is not successful, we expect that the ultimate exposure of Shelter Products, Inc. and/or North Pacific will be relatively small, again with the bulk of the claims relating to alleged faulty workmanship for which they are not responsible.

**Schedule II
Disclosure Schedule
Section 6.13**

## NO OTHER VENTURES

*Roberts Pacific, LLC* - Limited liability company owned 50% by NPG and 50% by an
unrelated company.   It manufactures hardwood flooring.

Exhibit A
Page 122 of 160

SCHEDULE II – DISCLOSURE SCHEDULE

**Schedule II**
**Disclosure Schedule**
**Section 6.17**

## CERTAIN INDEBTEDNESS

NOTES PAYABLE AND OTHER OBLIGATIONS - (In Thousands)
November 30, 2006

| Bank/Creditor | Acct. Name | Description | Type | Beg. Bal. 01/01/06 | Proceeds | Payments | End. Bal. 11/30/2006 | Current | Long-Term |
|---|---|---|---|---|---|---|---|---|---|
| **Long Term Debt** | | | | | | | | | |
| **Non Subordinated Long Term Debt** | | | | | | | | | |
| Rick Roberts | | NP Rick Roberts | Equipment Loan | (358) | - | 80 | (278) | (88) | (190) |
| WebBank | | Web Bank - Wasatch NP purchase | Promissory Note | (79) | - | 62 | (17) | (17) | 0 |
| Gunnison Valley Bank | | Wasatch NP | Promissory Note | (55) | - | 39 | (15) | (15) | 0 |
| Utah Technical Finance Corp | | Wasatch NP | | (42) | - | 42 | 0 | - | 0 |
| West Plains Bank | | West Plains properties Missouri Yards | Mortgage | (1,743) | - | 172 | (1,571) | (228) | (1,343) |
| West Plains Bank 2 | | West Plains Land & Equipment | Mortgage | (1,779) | (132) | 83 | (1,828) | (142) | (1,687) |
| West Plains Bank 3 | | Bldg | Mortgage | (115) | (285) | 18 | (382) | (26) | (356) |
| First State Bank | | Southern building loan NPE - Charlestown, | Mortgage | (182) | - | 17 | (165) | (21) | |
| GE Capital | | NH Mortgage | Mortgage | (495) | - | 88 | (408) | (103) | (305) |
| Citicorp Dealer Fin. | Forklift Loan | CP Sac - Forklift Loan | | (3) | - | 3 | 0 | - | 0 |
| Citizens Bank | | Sax - NP Auburn Maine Mortgage | Mortgage | (512) | - | 28 | (484) | (33) | (451) |
| Citizens Bank | | Sax - NP Springfield Mortgage | Mortgage | (908) | - | 52 | (856) | (61) | (795) |
| Citizens Bank | | Sax - Phoenix NY Mortgage | Mortgage | (221) | - | 24 | (197) | (28) | (169) |
| Wells Fargo | | BME-MW - mortgage | Mortgage | (4,017) | - | 223 | (3,794) | (268) | (3,526) |
| Sub-Total Debt | | | | (10,510) | (417) | 33 | (9,994) | (1,029) | (8,965) |

**Capital Leases**

| Lender | Type | Description | Lease Type | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Citicorp Vendor Fin. | Forklift Loan | Valejo - Capital Lease Oblig | Equipment Lease | (7) | - | | 0 | - | 0 |
| Pac. Mat. Handling | Forklift Loan | Valejo - Capital Lease Oblig | Equipment Lease | (8) | - | 8 | 0 | - | 0 |
| Yale Financial Ser | Forklift Loan | Valejo - Capital Lease Oblig | Equipment Lease | (11) | - | 10 | (1) | (1) | 0 |
| NMHG Financial Svs | Forklift lease | Valejo/Yale forklift | Equipment Lease | (17) | - | 7 | (10) | (7) | (3) |
| De Lage Landen | Forklift lease | Valejo CAT Forklift | Equipment Lease | (28) | - | 5 | (23) | (5) | (18) |
| De Lage Landen | Forklift Lease | Western Grove | Equipment Lease | (3) | - | 3 | 0 | - | 0 |
| USBancorp | Forklift/Truck Lease | MO Yards Leases | Equipment Lease | (111) | - | 76 | (36) | (36) | 0 |
| USBancorp2 | Forklift/Truck Lease | MO Yards Leases | Equipment Lease | (176) | - | 101 | (75) | (75) | 0 |
| USBancorp3 | Planer Equip Lease | Van Buren Leases | Equipment Lease | (303) | - | 55 | (249) | (63) | (185) |
| GE Capital | Forklift Lease | Sax - Forklift Lease | Equipment Lease | (5) | - | 5 | 0 | - | 0 |
| GE Capital | NMGH - Hyster | Sax - Kearns Forklift Lease | Equipment Lease | (7) | - | 5 | (2) | (2) | 0 |
| GE Capital | Forklift Lease | Sax - Forklift Lease | Equipment Lease | (11) | - | 7 | (4) | (4) | 0 |
| **Sub-Total Capital Leases** | | | | **(687)** | **-** | **288** | **(400)** | **(194)** | **(206)** |
| **Total Non Subordinated Long Term Debt** | | | | **(11,197)** | **(417)** | **1,221** | **(10,394)** | **(1,222)** | **(9,...)** |

**Subordinated Long Term Debt**

| Lender | | Description | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Hallie Joe Hutto | Former Shareholder | Long-Term Debt - N/P - Hutto | (404) | - | - | (404) | (101) | (303) |
| Tamura Family Trust | Former Shareholder | Long-Term Debt - N/P - Tamura Fmly | (84) | - | 84 | (0) | - | (0) |
| Douglas P Webb Marital Trust A | Former Shareholder | Long-Term Debt - N/P - Webb Estate | (350) | - | 117 | (233) | (117) | (117) |
| Mary Webb Rollover IRA | Former Shareholder | Long-Term Debt - N/P - Webb Trust | (120) | - | 40 | (80) | (40) | (40) |
| Hustler Beard | Former Shareholder | Long-Term Debt - N/P - H. Beard | (82) | - | 82 | - | - | - |

SCHEDULE II – DISCLOSURE SCHEDULE

**Subordinated Long Term Debt**

| Name | Status | Description | | | | | |
|---|---|---|---|---|---|---|---|
| T.J. Tomjack | Former | Long-Term Debt - N/P - T.J. Tomjack | (436) | 70 | (366) | (96) | (271) |
| Tomjack Family Ltd Partnership | Shareholder | Long-Term Debt - N/P - Tomjack Family | (526) | 110 | (416) | (153) | (264) |
| Kenneth McCoun | Former | Long-Term Debt - N/P - Kenneth McCoun | (369) | 74 | (295) | (103) | (192) |
| Robert E. Martin | Shareholder | Long-Term Debt - N/P - Robert Martin | (467) | 79 | (389) | (108) | (280) |
| Martin CRUT | Former | Long-Term Debt - N/P - Martin Charitable Tr | (350) | 42 | (308) | (56) | (252) |
| George Thurston | Shareholder | Long-Term Debt - N/P - George Thurston | (603) | 117 | (487) | (162) | ● |
| Sheathelm Family LLC | Former | Long-Term Debt - N/P - Sheathelm Family LLC | (603) | 112 | (491) | (155) | (336) |
| Don Lester | Shareholder | Long-Term Debt - N/P - Donald Lester | (260) | 51 | (209) | (71) | (139) |
| Irwin Rogers | Former | Long-Term Debt - N/P - Irwin Rogers | (124) | 39 | (85) | (55) | (29) |
| Charles K. Smith | Shareholder | Long-Term Debt - N/P - Charles Smith | (194) | 17 | (176) | (117) | (59) |
| Charles Smith IRA | Former | Long-Term Debt - N/P - Charles Smith IRA | (70) | 70 | 0 | - | 0 |
| Richard Meyers | Shareholder | Long-Term Debt - N/P - Richard Meyers | (177) | 44 | (133) | (62) | (70) |
| Lyndel Jennings | Former | Long-Term Debt - N/P - Lyndel Jennings | (184) | 58 | (126) | (83) | (44) |
| Robert J. DeArmond | Shareholder | Long-Term Debt - N/P - Robert DeArmond | (196) | 62 | (134) | (88) | ● |
| John Percin | Former | Long-Term Debt - N/P - John Percin | (490) | 207 | (283) | (40) | (247) |
| Phil Myers | Shareholder | Long-Term Debt - N/P - Phil Myers | (97) | 49 | (49) | (49) | 0 |
| Irwin Rogers 2 | Former | Long-Term Debt - N/P - Irwin Rogers | (904) | 226 | (678) | (226) | (452) |
| George Thurston 2 | Shareholder | Long-Term Debt - N/P - George Thurston | (638) | 400 | (238) | (238) | - |
| TJ Tomjack 2 | Former | Long-Term Debt - N/P - T.J. Tomjack | (270) | 68 | (203) | (68) | (135) |
| Tomjack Family Lmtd 2 | Shareholder | Long-Term Debt - N/P - Tomjack Family | (495) | 124 | (371) | (124) | (248) |
| William Perkins | Former | Long-Term Debt - N/P - Perkins | (22) | 22 | - | - | - |

SCHEDULE II – DISCLOSURE SCHEDULE

Exhibit A

| Subordinated Long Term Debt | | | | | | | |
|---|---|---|---|---|---|---|---|
| William Wainwright | *Former Shareholder* | Long-Term Debt - N/P - Wainwright | (1,368) | - | 253 | (1,114) | (253) | (661) |
| Douglas W Kubosh | *Former Shareholder* | Long-Term Debt - N/P - Kubosh | (226) | - | 75 | (151) | (75) | (75) |
| Recap 2006 | *Former Shareholders* | Long-Term Debt - N/P | (8,846) | - | - | (8,846) | - | (8,846) |
| **Total Subordinated Long Term Debt** | | | (18,954) | - | 2,690 | (16,264) | (2,639) | (13,625) |
| **Deferred Compensation** | | | | | | | | |
| Employees - Principal | | | (8,276) | (511) | - | (8,787) | (1,336) | (7,452) ● |
| Employees - Interest | | | - | (120) | - | (120) | (18) | (102) |
| Non-Employees - Principal | | | (111) | (8) | - | (119) | (57) | (61) |
| Non-Employees - Interest | | | (1) | 1 | - | (1) | (0) | (0) |
| **Total Deferred Compensation** | | | (8,388) | (638) | - | (9,026) | (1,412) | (7,615) |
| **Total Long Term Debt** | | | (38,540) | (1,055) | 3,911 | (35,684) | (5,273) | (30,411) |
| **GRAND TOTALS** | | | (122,112) | (46,102) | 27,330 | (140,884) | (110,473) | (30,●) |

SCHEDULE II – DISCLOSURE SCHEDULE

Exhibit A

 

**Schedule II**
**Disclosure Schedule**
**Section 6.19**

## Chief Executive Office and Other Locations

North Pacific Group, Inc.
10200 SW Greenburg Road,
Portland, Oregon 97223

Burns Holdings, Inc.
10200 SW Greenburg Road,
Portland, Oregon 97223

RTH Lumber Co.
10200 SW Greenburg Road,
Portland, Oregon 97223

NOR PAC Enterprises, Inc.
10200 SW Greenburg Road,
Portland, Oregon 97223

See following supplemental **Schedule II.6.19** attached hereto for additional collateral locations.

402269-DISCLOSURE SCHEDULES (2).DOC

Exhibit A



## Schedule II
### Disclosure Schedule
### Section 6.19

### Chief Executive Office and Other Locations (continued)

**Schedule II.6.19**
Inventory Locations whereby the Inventory Value Exceeds $500,000
Does NOT Include In-Transit Inventory

| Branch | Description | Location | Location Type | Inventory Value at 12/19/2006 | Total by Location |
|---|---|---|---|---|---|
| 1049napa | Nor Cal Commodity | Napa, CA | Owned | 3,078,349 | |
| 1050napa | Nor Cal EWP | Napa, CA | Owned | 1,954,486 | |
| **Total by Location** | | **Napa, CA** | **Owned** | | **5,032,835** |
| | | | | | |
| 1072ind | So Cal Industrial | Mira Loma, CA | Owned | 3,793,232 | |
| 1075lam | Tri State Laminating | Mira Loma, CA | Owned | 765,943 | |
| 1076soca | So Cal Commodity | Mira Loma, CA | Owned | 543,796 | |
| **Total by Location** | | **Mira Loma, CA** | | - | **5,102,971** |
| | | | | | |
| 30161001 | Bobac, CFS Inc. | Alameda, CA | Reload | 547,050 | |
| 30161001 | American Warehouses | Houston, TX | Reload | 753,227 | |
| | | | | | |
| 3017tho | Thomasville Lumber | Thomasville, AL | Reload | 515,932 | |
| | | | | | |
| 20302100 | Tigard Food Warehouse | Tigard, OR | Owned | 919,219 | |
| | | | | | |
| 25402002 | McConnell Heavy Hauling | Nashville, AK | Reload | 580,940 | |
| 25402002 | Oklahoma Pole | Broken Bow, OK | Reload | 944,190 | |
| | | | | | |
| 25502002 | Silverleaf Interprises | Bluford, IL | Reload | 1,104,785 | |
| | | | | | |
| 25505001 | Coastal Tie & Timber Consolidated - So. IL | Taylortown, MS | Reload | 721,570 | |
| 25505001 | Railcar | Carterville, IL | Reload | 1,627,496 | |
| | | | | | |
| 25502005 | Nevada Wood Preserving | Silver Springs, NV | Reload | 1,076,023 | |
| 25502005 | Pacific Wood Preserving | Sheridan, OR | Reload | 1,231,029 | |
| 25502005 | Weyerhaeuser | Wilbur, OR | Reload | 512,309 | |
| | | | | | |
| 30051001 | Morgan 3 | Portland, OR | Reload | 982,216 | |
| | | | | | |
| 30071001 | Castle Pacific | Sacramento, CA | Owned | 1,717,942 | |
| | | | | | |
| 30451103 | Drayage Express | Compton, CA | Reload | 699,461 | |
| 30451104 | Better Boxing | New Orleans, LA | Reload | 1,269,148 | |

402269-DISCLOSURE SCHEDULES (2).DOC

 

| 30451105 | S. Jersey Port Reload | Camden, NJ | Reload | 1,378,841 | |
|---|---|---|---|---|---|
| 30621001 | Roberts Pacific | Mountain View, MO | Reload | 1,151,776 | |
| 30661001 | Van Buren | Van Buren, MO | Owned | 2,383,895 | |
| 30661001 | Raymondville, MO | Raymondville, MO | Owned | 2,923,682 | |
| 30661001 | Springfield, MO | Springfield, MO | Owned | 965,582 | |
| 30661001 | Western Grove | Western Grove, AK | Owned | 1,855,975 | |
| 30661001 | Mountain View | Mountain View, MO | Owned | 1,513,698 | |
| 30681001 | Vermillion | Springfield, MO | Reload | 1,798,264 | |
| 30911001 | Holley Distribution | Stoughton, WI | Reload | 3,168,240 | |
| 60751001 | BME - Edison | Edison, NJ | Owned | 1,422,756 | |
| 60771001 | BME - Landisville | Landisville, PA | Owned | 1,116,402 | |
| 60791006 | BME - Springfield EWP | Springfield, MA | Owned | 895,460 | |
| 60801001 | BME - Springfield | Springfield, MA | Owned | 1,954,817 | |
| **Total by Location** | | **Springfield, MA** | | | **2,850,277** |
| 60831001 | BME - Concord | Concord, NH | Owned | 1,779,662 | |
| 60851001 | BME - Providence | Providence, RI | Owned | 1,063,144 | |
| 65011001 | BMM - Mason | Mason, MI | Owned | 2,899,812 | |
| 65031001 | BMM - Traverse City | Williamsburg, MI | Owned | 2,714,219 | |
| 65041001 | BMM - Grand Rapids | Wyoming, MI | Owned | 2,485,392 | |
| 65091001 | BMM - Indianapolis | Indianapolis, IN | Owned | 2,963,679 | |
| **Total Inventory Valued over $500k by Location** | | | | 61,773,639 | |
| **Total Inventory Value as of 12/19/2006** | | | | 80,330,670 | |
| **Percent Inventory at Identified Locations** | | | | 76.90% | |

402269-DISCLOSURE SCHEDULES (2).DOC

Exhibit A

**Schedule II**
**Disclosure Schedule**
**Section 9.5**

### INVESTMENTS

**Existing Equity Investments:**
> 25,000 Shares of Woodlist, Inc. (fka E-Wood.Com, Inc.) Series A Convertible Preferred Stock (no immediate value)

> 25,000 shares of WoodPlanet, Inc. Series A Preferred Stock (no immediate value)

**Existing Loans or Advances:**
> Note Receivable from Vermillion, Inc. from liquidation of former joint venture – current balance $39,344 as of 12/15/06, being repaid in monthly installments through 2008.

**Expected Investment:**
> Purchase of substantially all of the assets of North Santiam Co. of Ohio, an Ohio corporation. This investment is anticipated to be within the Permitted Acquisition definition.

402269-DISCLOSURE SCHEDULES (2).DOC



**Schedule II
Disclosure Schedule
Section 9.7**

## BONDS

In the ordinary course of business, Borrower regularly issues bid bonds and performance bonds as required by major sales contracts, and issues customs bonds, tax bonds, dealers in commodities bonds, toll road bonds, highway bonds and various other similar bonds to support its domestic and international movement of goods. Such bonds are typically for notional amounts ranging from $1,000 to $100,000.

Borrower has outstanding a bond in Mexico for approximately $250,000 supporting its legal claim against a former Mexican customer.



## SCHEDULE III

### Pricing Schedule

With respect to Base Rate Loans, LIBOR Loans, and the Unused Line Fee, as the case may be, as of any date of determination, the LIBOR Margin, Base Rate Margin, and the Unused Line Fee Percentage, as applicable, shall be those that correspond to the most recent Average Pricing Availability calculation (determined as set forth in the following paragraph) for the most recently completed fiscal quarter of Parent, as set forth in the following table; provided, however, that for the period from the Closing Date through the date Administrative Lender receives the Borrowing Base Certificate for the last week ending during the fiscal quarter ending on December 31, 2006, the Applicable Margins and Unused Line Fee Percentage shall be those in the row styled "Level III" below

| Level | Average Pricing Availability | Margin above Base Rate | Margin above LIBOR Rate | Unused Line Fee Percentage |
|-------|------------------------------|------------------------|-------------------------|----------------------------|
| I | ≥ $25,000,000 | 0.00% | 1.50% | 0.25% |
| II | ≥ $15,000,000 but < $25,000,000 | 0.50% | 2.00% | 0.375% |
| III | < $15,000,000 | 0.75% | 2.25% | 0.50% |

The Applicable Margins and the Unused Line Fee Percentage shall be adjusted as of the first day of each fiscal quarter of Parent based upon the Average Pricing Availability for the most recently completed fiscal quarter of Parent; provided, however, that if Parent and Borrowers fail to provide a Borrowing Base Certificate when due, the Applicable Margins and the Unused Line Fee Percentage shall be the margin in the row styled "Level III" as of the first day of the fiscal quarter following the date on which such Borrowing Base Certificate was required to be delivered until the first day of the month following the date on which it was actually delivered (but not retroactively), without constituting a waiver of any Default or Event of Default caused by the failure to timely deliver the Borrowing Base Certificate. In the event that the information contained in any Borrowing Base Certificate delivered to Administrative Lender is shown to be inaccurate, and such inaccuracy, if corrected, would have led to a determination of a increased Applicable Margin and/or Unused Line Fee Percentage at the time such Borrowing Base Certificate was delivered, the Borrowers shall immediately (i) re-deliver a correct Borrowing Base Certificate for the applicable week to Administrative Lender and the Applicable Margin and Unused Line Fee Percentage shall be redetermined in accordance with the same and (ii) deliver to the Administrative Lender full payment in respect of the accrued additional interest on the Obligations from the date of delivery of the inaccurate Borrowing Base Certificate, which payment shall be promptly applied by the Administrative Lender in accordance with Section 3.6 (it being understood that nothing in this definition: (i) shall limit the rights of the Lenders under Sections 11.1 or 11.2 or (ii) require that Lenders reimburse any interest payments in the event

BN 1042967v14



that any Borrowing Base Certificate inaccuracy leads to a determination of a reduced Applicable Margin and/or Unused Line Fee Percentage).

"**Average Pricing Availability**" means, for any fiscal quarter of Parent, the amount, computed on the average weekly basis for the weeks ending during such quarter, by which the sum of (i) the Borrowing Base (calculated after giving effect to all Borrowing Base Reserves) plus (ii) Qualified Cash, exceeds the outstanding principal amount of the Revolving Loans, the Letter of Credit Obligations and Swing Loans. The Average Pricing Availability shall be based upon the Borrowing Base Certificates and cash balance reports delivered to Administrative Lender in accordance with the terms of this Agreement.

Schedule III

2

## SCHEDULE IV

### Type A Subordinated Notes

| Creditor | Relationship to Parent | Description | End. Bal. 10/31/2006 |
|---|---|---|---|
| T.J. Tomjack | *Former Shareholder* | Long-Term Debt – N/P – T. J. Tomjack | (366,040) |
| Tomjack Family Ltd Partnership | *Former Shareholder* | Long-Term Debt – N/P – Tomjack Family | (416,376) |
| Kenneth McCoun | *Former Shareholder* | Long-Term Debt – N/P – Kenneth McCoun | (294,670) |
| Robert E. Martin | *Former Shareholder* | Long-Term Debt – N/P – Robert Martin | (388,356) |
| Martin CRUT | *Former Shareholder* | Long-Term Debt – N/P – Martin Charitable | (308,316) |
| George Thurston | *Former Shareholder* | Long-Term Debt – N/P – George Thurston | (486,573) |
| Sheathelm Family LLC | *Former Shareholder* | Long-Term Debt – N/P – Sheathelm Family | (491,020) |
| Don Lester | *Former Shareholder* | Long-Term Debt – N/P – Donald Lester | (209,388) |
| Irwin Rogers | *Former Shareholder* | Long-Term Debt – N/P – Irwin Rogers | (84,713) |
| Charles K. Smith | *Former Shareholder* | Long-Term Debt – N/P – Charles Smith | (176,369) |
| Richard Meyers | *Former Shareholder* | Long-Term Debt – N/P – Richard Meyers | (132,610) |
| Lyndel Jennings | *Former Shareholder* | Long-Term Debt – N/P – Lyndel Jennings | (126,052) |
| Robert J. DeArmond | *Former Shareholder* | Long-Term Debt – N/P – Robert DeArmond | (134,137) |

BN 1042967v14

## SCHEDULE V

### Type B Subordinated Notes

| Creditor | Relationship to Parent | Description | End. Bal. 10/31/2006 |
|---|---|---|---|
| Irwin Rogers 2 | *Former Shareholder* | Long-Term Debt – N/P – Irwin Rogers | (677,725) |
| George Thurston 2 | *Former Shareholder* | Long-Term Debt – N/P – George Thurston | (237,857) |
| TJ Tomjack 2 | *Former Shareholder* | Long-Term Debt – N/P – T.J. Tomjack | (202,695) |
| Tomjack Family Lmtd 2 | *Former Shareholder* | Long-Term Debt – N/P – Tomjack Family | (371,250) |
| William Wainwright | *Former Shareholder* | Long-Term Debt – N/P – Wainwright | (1,114,284) |
| Douglas W Kubosh | *Former Shareholder* | Long-Term Debt – N/P – Kubosh | (150,981) |
| Recap 2006 | *Former Shareholder* | Long-Term Debt – N/P | (8,846,425) |

Schedule V
1



### Schedule 4.1(a)

### North Pacific Group, Inc.

### Cash Management Summary

U.S. Bank—Account No. 153600033994 currently receives lockbox and merchant remittances. This account has been set up with a blocked depository account agreement and will sweep to JPMorgan Chase from day one. Eventually, these lockboxes and the account will be phased out, as new lockboxes have been established at B of A.

Bank of America—Account Nos. 004581610904 receives remittances from three new lockboxes. Account No. 0990036985 receives remittances from an older Boston/Fleet lockbox. Although this box is being phased out, this account will remain open until no longer needed. Both accounts will be blocked from day one, with collected funds wired to JPMorgan Chase daily.

Wells Fargo Bank—We are taking ownership of Account No. 4121031074 (formerly titled Wells Fargo Bank as agent for NPG). This account receives desktop deposits from several small locations, as well as wires, ACH's or other electronic deposits. This account will be subject to our Collection Account Agreement. It will be set up with a sweep on day one to our JPMorgan Chase account.

The following accounts will be covered by our Restricted Account Agreement, which allows the company to use the accounts, and to perfect our security interest: No. 4159-596833 (general concentration/operating); No. 9600060265 (cash disbursements); No. 4159586965 (Missouri Tie—local checks); and No. 104102CAD (Canadian multi-currency). We have excluded the payroll account.

**Schedule 8.23**

The obligation of the Lenders to make any Revolving Loans hereunder at any time (or to extend any other credit hereunder) shall be subject to the fulfillment, to the satisfaction of Administrative Lender (or waiver thereby), of each of the post-closing covenants set forth below within the prescribed time periods. The failure by Borrowers to satisfy any of the post-closing covenants set forth below within the prescribed time periods (except extended by Administrative Lender in its sole discretion) shall constitute an Event of Default.

(a)     Within 10 Business Days after the Closing Date, Administrative Lender shall have received the Lender's Loss Payable Clause to Policy No. AH85880 issued by Marsh USA Inc.

(b)     Within 30 days after the Closing Date, Administrative Lender shall have received vehicle titles for the vehicles owned by Borrowers together with all documents deemed necessary by Administrative Lender to perfect its security interest in such vehicles, provided that, Borrowers shall not be required to deliver any such titles the whereabouts of which are neither actually nor constructively known to any Borrower.

(c)     Within 30 day of the Closing Date, Borrowers shall deliver or caused to be delivered to Administrative Lender the Stock certificates representing the Pledged Shares (as defined in the Parent's Stock Pledge Agreement) with respect to Cascade Imperial Mills Ltd., a British Columbia corporation, together with a Stock power for such Stock endorsed in blank (to the extent that such Stock power has not previously been delivered to Administrative Lender), in form and substance acceptable to Administrative Lender in its sole discretion.

(d)     Within 30 day of the Closing Date, Borrowers shall cause Burns Holdings, Inc., an Oregon corporation ("Burns"), to re-issue its Stock certificates with Burns' true and correct name and shall deliver or caused to be delivered to Administrative Lender such corrected Stock certificates representing the Pledged Shares (as defined in the Parent's Stock Pledge Agreement) with respect to Burns, together with a Stock power for such Stock endorsed in blank (to the extent that such Stock power has not previously been delivered to Administrative Lender), in form and substance acceptable to Administrative Lender in its sole discretion.

(e)     Within 2 Business Day of the Closing Date, Borrowers shall deliver or caused to be delivered to Administrative Lender the Stock certificates representing the Pledged Shares (as defined in the Parent's Stock Pledge Agreement) with respect to NOR PAC Enterprises, Inc., an Oregon corporation, and RTH Lumber Co., an Oregon corporation, together with Stock powers for such Stock endorsed in blank (to the extent that such Stock power has not previously been delivered to Administrative Lender), in form and substance acceptable to Administrative Lender in its sole discretion.

(f)     Within 60 days of the Closing Date, Borrowers shall have used their best efforts to deliver or caused to be delivered to Administrative Lender a reaffirmation and amendment or similar document, in form and substance acceptable to Administrative Lender in its sole discretion, with respect to each collateral access agreement being assigned to Administrative Lender by the Existing Lender.



## Schedule 8.3(a)

Provide Administrative Lender (and if so requested by Administrative Lender, with copies for each Lender) with each of the documents set forth below at the following times in form satisfactory to Administrative Lender:

| Weekly | (a) a Borrowing Base Certificate, provided, however, that information with respect to Accounts described in subsection (xvi) of the definition of Eligible Accounts will be required to be updated once per month on the Borrowing Base Certificate delivered on the first week of each month, |
|---|---|
| | (b) at all times after the Borrowers establish electronic reporting, an Account roll-forward with supporting details supplied from sales journals, collection journals, credit registers and any other records delivered electronically in an acceptable format (before electronic reporting is established the reports set forth in this clause (b) shall be monthly as set forth in clause (f) below), |
| | (c) notice of all extraordinary claims, offsets, or disputes asserted by Borrowers' account debtors with respect to Borrowers' and their Subsidiaries' Accounts, |
| | (d) Inventory system/perpetual reports specifying the cost of Borrowers' and their Subsidiaries' Inventory, by category (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting), |
| | (e) a detailed report regarding Borrowers' and their Subsidiaries' cash and Cash Equivalents including an indication of which amounts constitute Qualified Cash. |
| Monthly (no later than the 15th day of each month) | (f) prior to the establishment of electronic reporting, an Account roll-forward which reconciles to Borrowers' general ledger (after electronic reporting is established the reports set forth in this clause (f) shall be weekly as set forth in clause (b) above), |
| | (g) a detailed aging, by total, of Borrowers' Accounts, together with a reconciliation and supporting documentation for any reconciling items noted (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting), |
| | (h) a detailed calculation of those Accounts that are not eligible for the Borrowing Base as well a calculation of the LCM Reserve, if Borrowers have not implemented electronic reporting, |
| | (i) a detailed Inventory system/perpetual report together with a reconciliation to Borrowers' general ledger accounts (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting), |
| | (j) a detailed calculation of Inventory categories that are not eligible for the Borrowing Base, if Borrowers have not implemented electronic reporting, |
| | (k) a summary aging, by vendor, of Borrowers' and their Subsidiaries' accounts payable and the total amount of book overdrafts (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting) and an aging, by vendor, of any held checks, |
| | (l) a monthly Account roll-forward, in a format acceptable to Administrative Lender in its discretion, tied to the beginning and ending account receivable balances of Borrowers' general ledgers. |

Exhibit A

| Monthly (no later than the 30th day of each month) | (m) a reconciliation of Accounts, trade accounts payable, and Inventory of Borrowers' general ledger accounts to their monthly financial statements including any book reserves related to each category. |
|---|---|
| Quarterly | (n) a report regarding Borrowers' and their Subsidiaries' accrued, but unpaid, ad valorem taxes. |
| Upon request by Administrative Lender | (o) copies of invoices together with corresponding shipping and delivery documents, and credit memos together with corresponding supporting documentation, with respect to invoices and credit memos in excess of an amount determined in the sole discretion of Administrative Lender, from time to time, <br><br>(p) copies of purchase orders and invoices for Inventory and equipment acquired by Borrowers or their Subsidiaries, and <br><br>(q) a detailed list of Borrowers' and their Subsidiaries' customers, with address and contact information. <br><br>(r) such other reports as to the Collateral or the financial condition of Borrowers and their Subsidiaries, as Administrative Lender may reasonably request. |



### Schedule 8.3(b)

Deliver to Administrative Lender, with copies to each Lender, each of the financial statements, reports, or other items set forth set forth below at the following times in form satisfactory to Administrative Lender:

| | |
|---|---|
| as soon as available, but in any event within 30 days after the end of each month during each of Parent's fiscal years | (a) consolidated and consolidating balance sheets of Parent and the Subsidiaries as of the end of such month and consolidated and consolidating statements of earnings and cash flow of Parent and the Subsidiaries for such month prepared in accordance with GAAP together with a comparison of Parent's financial condition for such month and year-to-date with the corresponding month and year-to-date in the immediately preceding fiscal year, and<br><br>(b) a certificate in the form of Exhibit F to the Credit Agreement (the "Compliance Certificate"). |
| as soon as available, but in any event within 90 days after the end of each of Parent's fiscal years | (c) audited financial statements of Parent, prepared in accordance with GAAP and certified by an independent certified public accountant acceptable to Administrative Lender, without any qualifications (including any (A) "going concern" or like qualification or exception, (B) qualification or exception as to the scope of such audit, or (C) qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item, the effect of which would be to cause any noncompliance with the provisions of Article X), by such accountants to have been prepared in accordance with GAAP (such audited financial statements to include a balance sheet, income statement, and statement of cash flow and, if prepared, such accountants' letter to management), and<br><br>(d) a Compliance Certificate. |
| as soon as available, but in any event before March 31 of each of Parent's fiscal years, | (e) detailed projections for Parent's current fiscal year setting forth projected income, cash flow and borrowing availability under this Agreement for the current year and the forthcoming 2 years, year by year, and for the current year of reporting, month by month, and the projected balance sheet as of the end of each month, and<br><br>(f) a repurchase liability study of the ESOP, or such other form of projections as Administrative Lender may reasonably request, projecting the cash payments required by the ESOP from the first day of such year through Maturity Date. |
| promptly after the commencement thereof, but in any event within 5 days after the service of process with respect thereto on any Borrower or any Subsidiary of a Borrower, | (g) notice of all actions, suits, or proceedings brought by or against any Borrower or any Subsidiary of a Borrower before any Governmental Authority which reasonably could be expected to result in a Material Adverse Effect. |

Exhibit A
Page 140



| | |
|---|---|
| upon the request of Administrative Lender, | (h)  information that is provided by any Borrower to its shareholders generally, and<br><br>(i)  any other information reasonably requested relating to the financial condition of Borrowers or their Subsidiaries. |

**EXHIBIT A**
**TO**
**CREDIT AGREEMENT**

**Borrowing Base Certificate**



SOURCES & USES - FUNDING DATA
North Pacific Group, Inc.

BASED ON INVOICE DATE AR AGING (Invoice Date)

| SOURCES | 12/20/06 | | | | | | | Avail | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Collateral | Gross Amount | Non Prime | Prime | Advance Rate | Available | Reserves | Gross Avail | Suppressed by line | Line Limit | Net Avail | Availability Contribution |
| Domestic AR | 80,550 | 6,814 | 73,735 | 85% | 62,675 | 1,321 | 61,354 | | 160,000 | 61,354 | 53% |
| Foreign AR | 8,858 | 2,368 | 6,490 | 75% | 4,868 | | 4,868 | | 7,000 | 4,868 | 4% |
| Finished Goods | 80,586 | 7,035 | 73,551 | 60% | 44,131 | | 44,131 | | 96,000 | 44,131 | 38% |
| Domestic In-Transit Inventory | 6,333 | 1 | 6,332 | 55% | 3,483 | | 3,483 | | 10,000 | 3,483 | 3% |
| Foreign In-Transit Inventory | 3,874 | 222 | 3,651 | 55% | 2,008 | | 2,008 | | 5,000 | 2,008 | 2% |
| Totals | 180,201 | 16,441 | 163,760 | | 117,164 | 1,321 | 115,843 | | 160,000 | 115,843 | 100% |

Qualified Cash 11,307   0.097607277
TOTAL SOURCES 127,150

| USES | Estimate or Actual | | | A/O Date |
|---|---|---|---|---|
| Lender payout | Actual | Based Upon 11/30/06 CIT Borrowing Base Certificate | 105,000 | 11/30/06 |
| Lender early termination fee | N/A | | - | N/A |
| AP Requirements over 60 DPD | Actual | Based Upon 11/30/06 AP Aging | 46 | 11/30/06 |
| Outstanding LCs | Actual | Based Upon 11/30/06 CIT Borrowing Base Certificate | 535 | 11/30/06 |
| Costs and Expenses | Actual | | 800 | 11/30/06 |
| Permanent Availability Reserve | Actual | Based Upon CAS | 5,000 | 11/30/06 |

TOTAL USES 111,381

| | |
|---|---|
| EXCESS AVAILABILITY (SHORTFALL) | 15,769 |
| Minimum Excess Closing Availability per LOI | 10,000 |
| NET EXCESS AVAILABILITY (SHORTFALL) | 5,769 |

Comments:
Inventory availability is limited to 60% of total borrowing base calculation.

Wells Fargo Confidential
Not intended for use, reproduction, or further distribution outside of
Wells Fargo and Company, or to those without a business need-to-know.

# AR NON PRIME & RESERVE SUMMARY - BASED ON INVOICE DATE AGING
North Pacific Group, Inc.

| Source | | | Current Audit Consolidated 12/20/06 | | 1 Domestic | | 2 Foreign | |
|---|---|---|---|---|---|---|---|---|
| M | Gross AR | | 89,408 | 100% | 80,550 | | 8,858 | |
| | **Non Primes** | | | | | | | |
| M | Over 90 DOI | | 3,386 | 4% | 2,995 | 4% | 391 | 4% |
| M | Past Due Credits | | 849 | 1% | 807 | 1% | 42 | 0% |
| M | Cross Age | | 587 | 1% | 388 | 0% | 199 | 2% |
| M | Intercompany | | 1,550 | 2% | 1,550 | 2% | - | 0% |
| M | Foreign w/o Coverage | | 1,736 | 2% | - | 0% | 1,736 | 20% |
| M | Government | | 3 | 0% | 3 | 0% | - | 0% |
| M | Finance Charges | | 27 | 0% | 27 | 0% | - | 0% |
| M | Contras | | 1,044 | 1% | 1,044 | 1% | - | 0% |
| | Non Primes Sub-Total | | 9,182 | 10% | 6,814 | 8% | 2,368 | 27% |
| M | Concentration non prime | | - | 0% | - | 0% | - | 0% |
| | **Total Non Primes** | | 9,182 | 10% | 6,814 | 8% | 2,368 | 27% |
| | Prime AR | | 80,226 | 90% | 73,735 | 92% | 6,490 | 73% |
| | Advance Rate | | 85% | | 85% | | 75% | |
| | Available | | 68,192 | 76% | 62,675 | 78% | 4,868 | 55% |
| | Basis for dilution | | sales | | sales | | sales | |
| | Trailing 3 Month Dilution % | | 3.5% | | 3.5% | | 3.5% | |
| | Allowable Dilution % | | 5.0% | | 5.0% | | 5.0% | |
| | Dilution Reserve % | | none | | none | | none | |
| M | Dilution Reserve** | | - | 0% | - | 0% | - | 0% |
| M | Customer Rebate Reserve | | 821 | 1% | 821 | 1% | - | 0% |
| M | Bank Product Reserve | | 500 | 1% | 500 | 1% | - | 0% |
| | Total Availability | | 66,871 | 75% | 61,354 | 76% | 4,868 | 55% |

** - Please note that the dilution calculation is currently set to provide a value for a dollar to dollar reserve after the advance rate. If the formula will need to be adjusted to 'gross up' the result.

Wells Fargo Confidential

Not intended for use, reproduction, or further distribution outside of
Wells Fargo and Company, or to those without a business need-to-know.

Exhibit A
Page 144 of 160



INVENTORY NON-PRIME SUMMARY
PER CURRENT AUDIT
North Pacific Group, Inc.

| | as of 12/19/06 | Source | NPG |
|---|---|---|---|
| Finished Goods | | Inventory Recap | 80,586 |
| Per: Inventory Recap | | | |
| | | | |
| Less: Non Primes | | | |
| Market/Obsolescence Reserve @ 11/30/06 | | GL | 574 |
| Claims Reserve @11/30/06 | | GL | 267 |
| Inventory Mark-Up Reserve @ 11/30/06 | | GL | 296 |
| Inventory @ Chile 11/30/06 | | Inventory Recap | 363 |
| Inventory @ Mexico | | Inventory Recap | 419 |
| Inventory @ Roberts Pacific (Joint Venture) | | Inventory Recap | 1,152 |
| Vendor Managed Inventory @ 11/30/06 | | GL | 72 |
| Locations with <$100M @10/31/06 | | Inv. Valuation | 3,893 |
| Total FG Non-Primes | | | 7,035 |
| | | | |
| Total Eligible FG | | | 73,551 |
| | | | |
| Advance Rate | | | 60% |
| | | | |
| Gross Available FG | | | 44,131 |
| | | | |
| Reserves | | | |

| As Of: | 12/19/06 | Source | NPG |
|---|---|---|---|
| Domestic In-Transit Inventory | | Inventory Recap | 6,333 |
| Per: Inventory Recap | | | |
| | | | |
| Less: Non Primes | | | |
| Inventory @ Mexico | | | 1 |
| Other | | | |
| Total WIP Non-Primes | | | 1 |
| | | | |
| Total Eligible WIP | | | 6,332 |
| | | | |
| Advance Rate | | | 55% |
| | | | |
| Gross Available WIP | | | 3,483 |
| (capped @ $18MM) | | | |
| Reserves | | | |

| As Of: | 12/19/06 | Source | NPG |
|---|---|---|---|
| Foreign In-Transit Inventory | | Inventory Recap | 3,874 |
| Per: Inventory Recap | | | |
| | | | |
| Less: Non Primes | | | |
| Inventory @ Chile @ 11/30/06 | | Inventory Recap | 222 |
| Other | | | |
| Total Other Inventory Non-Primes | | | 222 |
| | | | |
| Total Eligible Other | | | 3,651 |
| | | | |
| Advance Rate | | | 55% |
| | | | |
| Gross Available Foreign In-Transit | | | 2,008 |
| (capped @ $5MM) | | | |
| Reserves | | | |

| | | | |
|---|---|---|---|
| Total Available | | | 49,621 |
| | | | |
| Reserves | | | - |
| | | | |
| Net Available | | | 49,621 |
| (capped @ $96MM or 60% of total availability) | | | |
| Effective Advance Rate | | | 55% |
| | | | |
| Total Inventory | | | 90,793 |
| Total Non-Primes | | | 7,259 |

Wells Fargo Confidential
Not intended for use, reproduction, or further distribution outside of
Wells Fargo and Company, or to those without a business need-to-know.

INV 4




**North Pacific Corporation, Inc.**
**Calculation of Qualified Cash as of December 20, 2006**

| Bank | Account Number | Ledger Balance |
|------|----------------|----------------|
| US Bank | 153600033994 | 1,361,060.30 |
| Wells Fargo Bank | 4121031074 | 0.00 |
| Wells Fargo Bank | 4159596833 | 89,653.00 |
| Wells Fargo Bank | 4159586965 | 17,722.95 |
| Investment Sweep | N/A | 10,901,619.43 |
| B of A / Fleet | 990036985 | 68,191.94 |
| Bank of America | 004851610904 | 1,115,907.09 |
| TOTAL QUALIFIED CASH | | |

Exhibit A
Page 146 of 160



| Collected Balance |
| --- |
| 270,483.02 |
| 0.00 |
| 0.00 |
| 17,722.95 |
| 10,901,619.43 |
| 2,675.94 |
| 114,629.09 |
| 11,307,130.43 |

This account will go away with the funding of the new credit facility

## EXHIBIT B
## TO
## CREDIT AGREEMENT

### Notice of Borrowing

Wells Fargo Foothill, Inc.
Attn: _____, Fax _____

Reference is made to that certain Credit Agreement among North Pacific Group, Inc., an Oregon corporation, and its subsidiaries signatory thereto as Borrowers, Wells Fargo Foothill, Inc., (as Administrative Lender), and Lenders named therein dated as of December __, 2006 (as amended, modified or supplemented from time to time, the "Credit Agreement"). Capitalized terms used herein shall have the respective meanings assigned to them in the Credit Agreement.

1.    Pursuant to Section 3.1 of the Credit Agreement, Borrowers hereby request the following changes to Revolving Loans:

| | | |
|---|---|---|
| (a) | Swingline loan advance request | $_____ |
| (b) | Swingline loan payment request | $_____ |
| (c) | Base Rate loan advance request | $_____ |
| (d) | Base Rate loan payment request | $_____ |
| (e) | LIBOR Rate loan request: | |
| | Interest Period (in months) | _____ |
| | Amount | $_____ |
| (f) | Date of Funding | _____ |

Loan advances and payment requests must be received by the Administrative Lender by 11:00 a.m. (California time) at least one Business Day prior to the date of borrowing if a Base Rate Loan and at least three Business Days prior to the date of borrowing if a LIBOR Loan.

2.    Borrowers, through Parent as their agent, hereby certify to Administrative Lender and Lenders that, on the date of this Notice of Borrowing and after giving effect to the requested disbursement (including the use of the proceeds thereof):

(a)    Borrowers' representations and warranties in the Loan Documents are correct in all material respects as if made on the date hereof;

(b)    no Default is continuing or would result from the requested Loans being made; and

(c)    no event or circumstance exists that can reasonably be expected to have a Material Adverse Effect.

The party signing below is an Authorized Representative and has caused this Notice of Borrowing to be duly executed on behalf of Borrowers.

Exhibit B

BN 1042967v14

**North Pacific Group, Inc.**

Date: _____

By: _____

Title: _____



## EXHIBIT C
## TO
## CREDIT AGREEMENT

### Letter of Credit Request

Wells Fargo Foothill, Inc.
2750 Colorado Avenue
Suite 3000 West
Santa Monica, California 90404
Attn: _____ Fax No.: 310-453-7413

Reference is made to that certain Credit Agreement among North Pacific Group, Inc., an Oregon corporation, and its subsidiaries signatory thereto as Borrowers, Wells Fargo Foothill, Inc., (as Administrative Lender), and Lenders named therein dated as of December __, 2006 (as amended, modified or supplemented from time to time, the "Credit Agreement"). Capitalized terms used herein shall have the respective meanings assigned to them in the Credit Agreement.

1. Pursuant to Section 3.3 of the Credit Agreement, Borrowers hereby request that Administrative Lender as Issuing Bank, issue or cause to be issued by the Underlying Issuer a [standby][commercial (documentary)] Letter of Credit on behalf of Borrowers pursuant to the attached letter of credit application and the following terms:

(a) The stated amount is $_____.

(b) The date of issuance is _____, and the expiry date is _____.

(c) The beneficiary is _____ _____.

2. Borrowers, through Parent as their agent, hereby certify to Issuing Bank, Administrative Lender and Lenders that, on the date of this Notice and after giving effect to the issuance of the requested Letter of Credit:

(a) Borrowers' representations and warranties in the Loan Documents are correct in all material respects as if made on the date hereof;

(b) no Default is continuing or would result from the requested Letter of Credit being issued; and

(c) no event or circumstance exists that can reasonably be expected to have a Material Adverse Effect.

The party signing below is an Authorized Representative and has caused this Notice to be duly executed on behalf of Borrowers.

**North Pacific Group, Inc.**

By: _____

Date:_____  Title:_____

Exhibit C
1

BN 1042967v14

 

## EXHIBIT D
## TO
## CREDIT AGREEMENT

### Notice of Conversion or Continuation

Wells Fargo Foothill, Inc.
Attn: _____, Phone _____,     Fax No.: _____

Reference is made to that certain Credit Agreement among North Pacific Group, Inc., an Oregon corporation, and its subsidiaries signatory thereto as Borrowers, Wells Fargo Foothill, Inc., (as Administrative Lender), and Lenders named therein dated as of December __, 2006 (as amended, modified or supplemented from time to time, the "Credit Agreement"). Capitalized terms used herein shall have the respective meanings assigned to them in the Credit Agreement.

1.     Pursuant to Section 3.5 of the Credit Agreement, Borrowers hereby request the continuation/conversion of LIBOR loans as follows:

(a)     LIBOR Loan continuation request:
        Date of funding/expiration of existing          _____

        Interest Period (in months)                     _____
        Amount                             $_____

(b)     LIBOR Loan conversion request to move **to** Base Rate Loan:
        Expiration date of existing LIBOR Loan          _____
        Amount                             $_____

2.     Borrowers, through Parent as their agent, hereby certify to Administrative Lender and Lenders that, on the date of this Notice of LIBOR Continuation or Conversion and after giving effect to the requested disbursement (including the use of the proceeds thereof):

(a)     Borrowers' representations and warranties in the Loan Documents are correct in all material respects as if made on the date hereof;

(b)     no Default is continuing or would result from the requested Loans being made; and

(c)     no event or circumstance exists that can reasonably be expected to have a Material Adverse Effect.

The party signing below is an Authorized Representative and has caused this Notice of LIBOR Continuation or Conversion to be duly executed on behalf of Borrowers.

**North Pacific Group, Inc.**

By: _____

Date:_____     Title:_____

Exhibit D
1



**EXHIBIT E**
**TO**
**CREDIT AGREEMENT**

**Notice of Authorized Representatives**

Wells Fargo Foothill, Inc.
2450 Colorado Avenue
Suite 3000 West
Santa Monica, California 90404
Attn: Business Finance Division Manager
Fax No.: (310) 453-7413

      Reference is made to that certain Credit Agreement among North Pacific Group, Inc., an Oregon corporation, and its subsidiaries signatory thereto as Borrowers, Wells Fargo Foothill, Inc. (as Administrative Lender and Swingline Lender) and the Lenders named therein dated as of December __, 2006 (as amended, modified or supplemented from time to time, the "Credit Agreement"). Capitalized terms used herein shall have the respective meanings assigned to them in the Credit Agreement.

      Parent hereby represents to Administrative Lender that the following persons are the Authorized Representatives, as defined in the Credit Agreement, and that the signatures opposite their names are their true signatures:

Name and Office           Signature

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

Exhibit E
1

BN 1042967v14



Administrative Lender is authorized to rely on this Notice of Authorized Representatives until such time, if any, as Parent has delivered to Administrative Lender, and Administrative Lender has received, a duly executed Notice of Authorized Representatives in substitution hereof. This Notice of Authorized Representatives cancels and supersedes any Notice of Authorized Representatives at any time prior to the date hereof delivered by Borrowers to Administrative Lender.

Dated: _____

                       NORTH PACIFIC GROUP, INC.

                       By: _____
                       Title: _____

Exhibit E

2



**EXHIBIT F
TO
CREDIT AGREEMENT**

### Certificate of Responsible Officer

Wells Fargo Foothill, Inc.
2450 Colorado Avenue
Suite 3000 West
Santa Monica, California 90404
Attn: Business Finance Division Manager
Fax No.: 310-453-7413

This certificate is furnished pursuant to Section 8.3 of that certain Credit Agreement among North Pacific Group, Inc., an Oregon corporation, and its subsidiaries signatory thereto as Borrowers, Wells Fargo Foothill, Inc. (as Administrative Lender and Swingline Lender) and the Lenders named therein dated as of December __, 2006 (as amended, modified or supplemented from time to time, the "Credit Agreement"). Capitalized terms used herein shall have the respective meanings assigned to them in the Credit Agreement.

The undersigned hereby certifies that:

(1)     the financial statements of Parent attached hereto for the [month] [year] ending _____, ____ were prepared in accordance with GAAP and fairly present in all material respects Parent's balance sheet as of the end of such [month] [year] and income and cash flow for such [month] [year] and year-to-date (subject to normal year end adjustments and without notes);

(2)     [no Default existed at any time during such [month] [year]] [no Default existed at any time during such [month] [year] except for the events described below and a detailed statement of the action which any Borrower [has taken] [proposes to take] with respect to each such event is set forth the description of such event below]; and

(3)     the calculation demonstrating compliance with the covenants set forth in Article X is attached hereto, if so required by Article X.

Dated: _____

> Name:_____
> Title:_____

Exhibit F

**EXHIBIT G**
**TO**
**CREDIT AGREEMENT**

**ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Lender as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any letters of credit, guarantees, and swingline loans included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.  Assignor: _____

2.  Assignee: _____

    [and is an Affiliate/Approved Fund of
    [*identify Lender*]]

3.  Borrower(s): _____

Exhibit H
1



4.     Administrative Lender: Wells Fargo Foothill, Inc., as the Administrative Lender under the Credit Agreement

5.     Credit Agreement: The $160,000,000 Credit Agreement dated as of December ___, 2006 among North Pacific Group, Inc. and its subsidiaries as Borrowers, the Lenders parties thereto, Wells Fargo Foothill, Inc., as Administrative Lender, and the other agents parties thereto

6.     Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/ Loans for all Lenders | Amount of Commitment/ Loans Assigned[1] | Percentage Assigned of Commitment/ Loans[2] |
|---|---|---|---|
| Revolving Loan Commitment | $160,000,000 | $ | % |
| | $ | $ | % |
| | $ | $ | % |

[7.     Trade Date: _____ ][3]

Effective  Date:     _____ ___, 20___  [TO  BE  INSERTED  BY ADMINISTRATIVE LENDER AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

## ASSIGNOR

## [NAME OF ASSIGNOR]

By: _____
Name: _____
Title: _____

---

[1]  Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[2]  Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[3]  To be completed if the Assignor and the Assignee intend that the minimum assignment amount is to be determined as of the Trade Date.

Exhibit G
2

**ASSIGNEE**

**[NAME OF ASSIGNEE]**

By: _____

Name: _____

Title: _____

[Consented to and][4] Accepted:

**[NAME OF ADMINISTRATIVE LENDER], as
Administrative Lender**

By: _____

Name: _____

Title: _____

[Consented to:][5]

**[NAME OF RELEVANT PARTY]**

By: _____

Name: _____

Title: _____

---

[4] To be added only if the consent of the Administrative Lender is required by the terms of the Credit Agreement.

[5] To be added only if the consent of the Borrower and/or other parties (e.g. Swingline Lender, L/C Issuer) is required by the terms of the Credit Agreement.

Exhibit G

3

BN 1042967v14

### ANNEX 1 to Assignment and Assumption

## STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1.    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of any Borrower, any Subsidiary or their Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement (subject to receipt of such consents as may be required under the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 8.3 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Lender or any other Lender, and (v) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Lender, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations that by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    Payments.  From and after the Effective Date, the Administrative Lender shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts that have accrued to but excluding the Effective Date and to the Assignee for amounts that have accrued from and after the Effective Date.

BN 1042967v14

3.     General Provisions. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.   This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.   This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of Oregon.

Annex 1
2

**EXHIBIT H**
**TO**
**CREDIT AGREEMENT**

**JOINDER AGREEMENT**

Reference is made to that certain Credit Agreement among North Pacific Group, Inc., an Oregon corporation, and its subsidiaries signatory thereto as Borrowers, Wells Fargo Foothill, Inc. (as Administrative Lender and Swingline Lender) and the Lenders named therein dated as of December __, 2006 (as amended, modified or supplemented from time to time, the "Credit Agreement"). Capitalized terms used herein shall have the respective meanings assigned to them in the Credit Agreement.

For good and valuable consideration (including, without limitation, avoidance of the consequences of Section 9.15 of the Credit Agreement), the receipt and sufficiency of which are hereby acknowledged, _____ ("New Sub"), a Subsidiary, hereby becomes a party to the Credit Agreement with the same force and effect as if New Sub had been an original signatory to the Credit Agreement. Administrative Lender, on behalf of the Lenders, and Parent, on behalf of the other Borrowers, hereby consent and agree to New Sub becoming a party to the Credit Agreement and acknowledge that New Sub is a "Borrower" under the Credit Agreement.

This Joinder Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflict of laws provisions thereof.

IN WITNESS WHEREOF, this Joinder Agreement has been duly executed as of _____.

NORTH PACIFIC GROUP, INC.          _____

By:_____       By:_____
Title:_____    Title:_____

                                   WELLS FARGO FOOTHILL, INC., as
                                   Administrative Lender

                                   By:_____
                                   Title:_____

Exhibit H
1



December 28, 2007

**Wells Fargo Foothill**
2450 Colorado Avenue
Suite 3000 West
Santa Monica, CA 90404
310 453-7300
www.wffoothill.com

North Pacific Group, Inc.
10200 SW Greenburg Road
Portland, Oregon 97223
Attn: Christopher Cassard, Chief Financial Officer

      Re:    Letter Agreement.

Ladies and Gentlemen:

      Reference is hereby made to that certain Credit Agreement, dated as of December 22, 2006 (as amended and modified from time to time, the "Agreement"), by and between North Pacific Group, Inc., an Oregon corporation ("Parent"), each of Parent's subsidiaries from time to time party thereto (along with Parent, each individually, a "Borrower" and collectively, the "Borrowers"), the lenders from time to time party thereto (each individually, a "Lender" and collectively, the "Lenders") and Wells Fargo Foothill, Inc., a California corporation ("WFF"), as administrative lender for the Lenders (in such capacity, the "Administrative Lender"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

      Administrative Lender, the Required Lenders and the Borrowers are considering an Amendment Number One and Waiver to the Agreement (the "Amendment Number One") however in order to induce the Lenders to continue making Revolving Loans and extending other financial accommodations to the Borrowers, in the Lenders' sole and absolute discretion, after the occurrence and during the continuation of the Events of Defaults that now exist and for other good and valuable consideration, the parties hereto hereby agree as follows:

      1.     Schedule III of the Agreement is hereby deleted in its entirety and replaced, effective as of November 1, 2007, with Schedule III attached hereto.

      2.     Borrowers shall deliver the following items to Administrative Lender, within the time periods set forth below:

            (a)     On or before December 31, 2007, an appraisal of the Borrowers' Inventory, the results of which are in form and substance acceptable to the Administrative Lender; and

            (b)     On or before January 7, 2008, evidence satisfactory to Administrative Lender that Parent has engaged a consultant, acceptable as to identity and scope of engagement to Administrative Lender, in order to assist the Borrowers in, among other things, evaluating, preparing and updating the Borrowers' 13 week cash flow budget and such consultant has started.

      3.     Borrowers hereby acknowledge, confirm and agree that the existing Events of Default (as specified in that certain Reservation of Rights Letter dated November 7, 2007 made

by Administrative Lender to and acknowledged by Parent) have occurred and are continuing, each of which constitutes an Event of Default and entitles the Lenders to exercise their rights and remedies under the Loan Documents, applicable law or otherwise, and that the Lenders have not waived such existing Events of Default and nothing in this letter agreement constitutes a waiver or otherwise. Borrowers hereby waive the right to contest the occurrence, existence, accuracy or materiality of such existing Events of Default.

This letter agreement shall constitute a Loan Document and shall be subject to the provisions regarding governing law, waiver of jury trial, jurisdiction and venue applicable to the Credit Agreement.

This letter agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Delivery of an executed counterpart of this letter agreement by telefacsimile shall be equally as effective as delivery of an original executed counterpart of this letter agreement. Any party delivering an executed counterpart of this letter by telefacsimile shall also deliver an original executed counterpart of this letter agreement, but the failure to do so shall not affect the validity, enforceability or binding effect of this letter agreement.

This letter agreement shall be binding upon our respective successors and assigns and any lenders for which we and you are acting as agent.

*[The remainder of this page is intentionally left blank.]*

Please signify your agreement to the above by signing a copy of this letter in the space provided below and returning it to the undersigned.

Very truly yours,

WELLS FARGO FOOTHILL, INC.,
as Administrative Lender and a Lender

By: _____
Name: _____Amy Lam_____
Title: _____Vice President_____

Acknowledged and agreed as of December 28, 2007

NORTH PACIFIC GROUP, INC.,
an Oregon corporation as a Borrower

By: _____
Name: _____
Title: _____

BURNS HOLDINGS, INC.,
an Oregon corporation as a Borrower

By: _____
Name: _____
Title: _____

NOR PAC ENTERPRISES, INC.,
an Oregon corporation as a Borrower

By: _____
Name: _____
Title: _____

Please signify your agreement to the above by signing a copy of this letter in the space provided below and returning it to the undersigned.

Very truly yours,

WELLS FARGO FOOTHILL, INC.,
as Administrative Lender and a Lender

By: _____
Name: _____
Title: _____

Acknowledged and agreed as of December 28, 2007

NORTH PACIFIC GROUP, INC.,
an Oregon corporation as a Borrower

By: _____
Name: Christopher D. Cassard
Title: CFO + Treasurer

BURNS HOLDINGS, INC.,
an Oregon corporation as a Borrower

By: _____
Name: Christopher D. Cassard
Title: Treasurer

NOR PAC ENTERPRISES, INC.,
an Oregon corporation as a Borrower

By: _____
Name: Christopher D. Cassard
Title: Treasurer

RTH LUMBER CO.,
an Oregon corporation as a Borrower

By: _____
Name: Christopher D. Cassard
Title: Treasurer

BANK OF AMERICA, N.A.,
as Documentation Agent and as a Lender

By: _____
Name: _____
Title: _____

LASALLE BUSINESS CREDIT, LLC,
as a Lender

By: _____
Name: _____
Title: _____

THE CIT GROUP/BUSINESS CREDIT, INC.,
as Syndication Agent and as a Lender

By: _____
Name: _____
Title: _____

RTH LUMBER CO.,
an Oregon corporation as a Borrower

By: _____
Name: _____
Title: _____

BANK OF AMERICA, N.A.,
as Documentation Agent and as a Lender

By: _____
Name: _____STEVEN W SHARP_____
Title: _____VICE PRESIDENT_____

LASALLE BUSINESS CREDIT, LLC,
as a Lender

By: _____
Name: _____
Title: _____

THE CIT GROUP/BUSINESS CREDIT, INC.,
as Syndication Agent and as a Lender

By: _____
Name: _____
Title: _____

RTH LUMBER CO.,
an Oregon corporation as a Borrower

By: _____
Name: _____
Title: _____

BANK OF AMERICA, N.A.,
as Documentation Agent and as a Lender

By: _____
Name: _____
Title: _____

LASALLE BUSINESS CREDIT, LLC,
as a Lender

By: _____
Name: _Andrew Moulton_____
Title: _AVP_____

THE CIT GROUP/BUSINESS CREDIT, INC.,
as Syndication Agent and as a Lender

By: _____
Name: _____
Title: _____

RTH LUMBER CO.,
an Oregon corporation as a Borrower

By: _____
Name: _____
Title: _____

BANK OF AMERICA, N.A.,
as Documentation Agent and as a Lender

By: _____
Name: _____
Title: _____

LASALLE BUSINESS CREDIT, LLC,
as a Lender

By: _____
Name: _____
Title: _____

THE CIT GROUP/BUSINESS CREDIT, INC.,
as Syndication Agent and as a Lender

By: _____
Name: __Kirk Wolverton_____
Title: __Vice President_____

S-2
Letter Agreement

## SCHEDULE III

### Pricing Schedule

With respect to Base Rate Loans, LIBOR Loans, and the Unused Line Fee, as the case may be, as of any date of determination, the LIBOR Margin, Base Rate Margin, and the Unused Line Fee Percentage, as applicable, shall be those that correspond to the most recent Average Pricing Availability calculation (determined as set forth in the following paragraph) for the most recently completed fiscal quarter of Parent, as set forth in the following table; provided, however, that for the period from November 1, 2007 through the date Administrative Lender receives the Borrowing Base Certificate for the last week ending during the fiscal quarter ending on December 31, 2007, the Applicable Margins and Unused Line Fee Percentage shall be those in the row styled "Level III" below

| Level | Average Pricing Availability | Margin above Base Rate | Margin above LIBOR Rate | Unused Line Fee Percentage |
|-------|------------------------------|------------------------|-------------------------|----------------------------|
| I | > $25,000,000 | 0.50% | 2.00% | 0.25% |
| II | > $15,000,000 but < $25,000,000 | 1.00% | 2.50% | 0.375% |
| III | < $15,000,000 | 1.25% | 2.75% | 0.50% |

The Applicable Margins and the Unused Line Fee Percentage shall be adjusted as of the first day of each fiscal quarter of Parent based upon the Average Pricing Availability for the most recently completed fiscal quarter of Parent; provided, however, that if Parent and Borrowers fail to provide a Borrowing Base Certificate when due, the Applicable Margins and the Unused Line Fee Percentage shall be the margin in the row styled "Level III" as of the first day of the fiscal quarter following the date on which such Borrowing Base Certificate was required to be delivered until the first day of the month following the date on which it was actually delivered (but not retroactively), without constituting a waiver of any Default or Event of Default caused by the failure to timely deliver the Borrowing Base Certificate. In the event that the information contained in any Borrowing Base Certificate delivered to Administrative Lender is shown to be inaccurate, and such inaccuracy, if corrected, would have led to a determination of a increased Applicable Margin and/or Unused Line Fee Percentage at the time such Borrowing Base Certificate was delivered, the Borrowers shall immediately (i) re-deliver a correct Borrowing Base Certificate for the applicable week to Administrative Lender and the Applicable Margin and Unused Line Fee Percentage shall be redetermined in accordance with the same and (ii) deliver to the Administrative Lender full payment in respect of the accrued additional interest on the Obligations from the date of delivery of the inaccurate Borrowing Base Certificate, which payment shall be promptly applied by the Administrative Lender in accordance with Section 3.6 (it being understood that nothing in this definition: (i) shall limit the rights of the Lenders under Sections 11.1 or 11.2 or (ii) require that Lenders reimburse any interest payments in the event that any Borrowing Base Certificate inaccuracy leads to a determination of a reduced Applicable Margin and/or Unused Line Fee Percentage).

"**Average Pricing Availability**" means, for any fiscal quarter of Parent, the amount, computed on the average weekly basis for the weeks ending during such quarter, by which the sum of (i) the Borrowing Base (calculated after giving effect to all Borrowing Base Reserves) plus (ii) Qualified Cash, exceeds the outstanding principal amount of the Revolving Loans, the Letter of Credit Obligations and Swing Loans. The Average Pricing Availability shall be based upon the Borrowing Base Certificates and cash balance reports delivered to Administrative Lender in accordance with the terms of this Agreement.

## AMENDMENT NUMBER ONE AND WAIVER TO CREDIT AGREEMENT

This Amendment Number One and Waiver to Credit Agreement ("Amendment") is entered into as of March 31, 2008 ("Amendment Effective Date"), by and among **WELLS FARGO FOOTHILL, INC.**, a California corporation, as Administrative Lender for the Lenders set forth in the signature pages of this Amendment and the Required Lenders, on the one hand, and **NORTH PACIFIC GROUP, INC.**, an Oregon corporation ("Parent"), and each of Parent's direct and indirect subsidiaries set forth in the signature pages of this Amendment (along with Parent, each individually a "Borrower" and collectively "Borrowers"), on the other hand, in light of the following:

A.    Administrative Lender, Lenders and Borrowers have previously entered into that certain Credit Agreement, dated as of December 22, 2006 (as amended, the "Agreement");

B.    Borrower violated <u>Section 10.1</u> of the Agreement by failing to achieve: (i) the minimum Adjusted EBITDA set forth therein for the measurement periods ending as of September 30, 2007 and December 31, 2007 and (ii) the Interest Coverage Ratio set forth in <u>Section 10.2</u> for the measurement period ending as of December 31, 2007 (collectively referred to as the "Specified Defaults");

C.    In connection with the Specified Defaults, the Borrowers have requested, and Administrative Lender and Required Lenders hereby agree, to (i) waive the Specified Defaults and (ii) amend the Agreement, all as provided for and on the conditions herein.

**NOW, THEREFORE**, Borrowers, Administrative Lender and Required Lenders hereby amend and supplement the Agreement as follows:

1.    **DEFINITIONS.** All initially capitalized terms used in this Amendment shall have the meanings given to them in the Agreement unless specifically defined herein.

2.    **AMENDMENTS.**

(a)    The following definitions set forth in Section 1.1 of the Agreement are hereby amended to read as follows:

"**Adjusted EBITDA**" means Parent's consolidated net income after taxes for the relevant Applicable Period (determined in a manner consistent with the standards described in Section 1.2) <u>plus</u> (A) the sum of the amounts for such period included in determining such net income of (i) Interest Expense, (ii) income tax expense, (iii) depreciation expense, (iv) amortization expense, (v) other non-recurring non-cash losses and charges, (vi) non-cash ESOP contribution expense and (vi) restructuring charges relating to leases, employee severance, disposal of equipment, and disposal of Inventory incurred after February 2008 in an aggregate amount not to exceed $1,000,000 in any one fiscal year, <u>provided</u> that Administrative Lender has received documentation, acceptable to it, that explains such restructuring charges, and depreciation and amortization for such period, <u>less</u> (B) extraordinary gains and other non-recurring non-cash gains for such period, in each case determined in accordance with GAAP.

"**Borrowing Base**" means, as of any date of determination, an amount equal to the following amount:

(a)    85% of the outstanding Eligible Accounts other than Eligible Accounts described in item (vii)(B) of the definition of Eligible Accounts ("Foreign Insured Receivables") *less* the amount, if any, of the

Exhibit C
Page 1 of 20

Dilution Reserve with respect to all Accounts other than Foreign Insured Receivables; plus

(b) with respect to each Foreign Insured Receivable that is an Eligible Account, 75% of the lesser of the amount of credit insurance on such Foreign Insured Receivable or the outstanding balance thereof *less* the amount, if any, of the Dilution Reserve with respect to Foreign Insured Receivables, provided that the total amount included in the Borrowing Base with respect to all Foreign Insured Receivables shall not exceed $7,000,000; plus

(c) the lesser of:

(i) the sum of:

(1) the lesser of: (A) 60% of the value of the difference of: (y) Category A Inventory minus (z) the amount of the LCM Reserve and (B) the difference of: (I) the product of: (x) 85% times (y) the most recently determined Net Liquidation Percentage times, (z) the book value of Category A Inventory, plus

(2) the least of: (A) 55% of the value of Domestic In-Transit Inventory, (B) the product of: (x) 85% times (y) the most recently determined Net Liquidation Percentage times, (z) the book value of Domestic In-Transit Inventory, and (C) $10,000,000, plus

(3) the least of: (A) 55% of the value of Foreign In-Transit Inventory, (B) the product of: (x) 85% times (y) the most recently determined Net Liquidation Percentage times, (z) the book value of Foreign In-Transit Inventory, and (C) $5,000,000, and

(ii) the lesser of: (A) $96,000,000 and (B) 150% of the amount of credit availability created by the sum of clauses (a) and (b) above, minus

(d) all Borrowing Base Reserves.

**"Borrowing Base Reserves"** means, as of any date of determination, such amounts (expressed as a specified amount or as a percentage of a specified category or item) as Administrative Lender, in its reasonable discretion, may from time to time establish in determining the Borrowing Base to reflect contingencies or risks affecting the Collateral or reflecting the business, business prospects or financial condition of Borrowers, or the security of the loans made hereunder; provided, however, that the Borrowing Base Reserves shall include the Availability Reserve, the Bonus Reserve, the Bank Product Reserve, the TB Account Reserve, the ESOP Reserve, the EBITDA Reserve, and the Subordinated Debt Payment Reserve. **"Availability Reserve"** means a reserve of $5,000,000. **"Bonus Reserve"** means a reserve equal to a percentage of the projected amount of the annual bonuses expected to be paid by Borrowers to their employees in cash, net of deferred compensation, on the next bonus payment date (expected to be March 15 of each year), which reserve shall be established by January 31 of each year in an amount equal to 30% of the projected amount of such annual bonuses and which amount shall be increased on or before February 28 of each year to an aggregate amount equal to 60% of the

projected amount of such annual bonuses, which reserve may be adjusted by the Administrative Lender in their reasonable discretion, provided, however that to the extent Borrowers modify the bonus structure in existence as of the Closing Date to one where monthly commission payments are expensed and paid instead of annual bonuses, then effective on the first day of the year immediately after the year on which such change was made, the Bonus Reserve will be eliminated. **"ESOP Reserve"** means a reserve created six weeks before a scheduled cash payment required by the ESOP, which reserve is initially in an amount equal to one-sixth of such scheduled payment and increases as of the last day of each of the five succeeding weeks thereafter by an amount equal to one-sixth of such scheduled ESOP payment and reduces by the amount of the applicable ESOP payment on the date such scheduled ESOP payment is made, with one such reserve to be created with respect to each scheduled ESOP payment. **"EBITDA Reserve"** means as of the last day of an Applicable Period, an amount equal to the lesser of (a) the aggregate amount of the difference (if a positive number) of (i) the minimum Adjusted EBITDA amount set forth in Exhibit H attached hereto for such Applicable Period minus (ii) Parent's actual Adjusted EBITDA for each Applicable Period and (b) the aggregate difference (if a positive number) of (y) the level of Adjusted EBITDA necessary to cause the Fixed Charge Coverage Ratio for the Applicable Period ending on such date to be at least 1:1 minus (z) the aggregate actual Adjusted EBITDA for such Applicable Period, provided, however, that if Borrower receives no less than $20,000,000 in aggregate net cash proceeds from issuance of Additional Capital, then the EBITDA Reserve shall be eliminated. **"Subordinated Debt Payment Reserve"** means an amount equal to the aggregate amount of all payments made (principal, interest and fees) on the Subordinated Debt with respect to scheduled payments for the months of March and April, 2008.

     (b)    Section 1.1 of the Agreement is hereby amended by adding the following definitions in the appropriate alphabetical order:

    **"Additional Capital"** means any form of the following issued by a Borrower: (i) debt subordinated on terms acceptable to Required Lenders; (ii) common or preferred stock; (iii) warrants to acquire any of the foregoing.

    **"Amendment One Date"** means March 31, 2008.

    **"Applicable Period"** means the shorter of (a) the period beginning March 1, 2008 and ending on the last day of the month of determination, or (b) the twelve month period ending on the last day of the month of determination.

    **"Fixed Charges"** means, with respect to any fiscal period and with respect to Parent and its Subsidiaries determined on a consolidated basis in accordance with GAAP, the sum, without duplication, of (a) Interest Expense accrued during such period minus the sum of (i) to the extent included in such Interest Expense for such period, non-cash amounts attributable to the amortization of financing costs paid in a previous period and (ii) to the extent included in such Interest Expense for such period, non-cash amounts attributable to amortization of debt discounts or accrued interest payable in kind for such period, (b) any principal payments in respect of Debt (other than up to $600,000 with respect to the March, 2008

Exhibit C
Page 3 of 20

and April, 2008 payments on Subordinated Debt) that are required to be paid during such period, (c) federal, state, and local income taxes payable during such period and (d) unfinanced Capital Expenditures.

"Fixed Charge Coverage Ratio" means, with respect to Parent and its Subsidiaries for any fiscal period, the ratio of (i) Adjusted EBITDA for such period to (ii) Fixed Charges for such period.

"Interest Expense" means, for any period, the aggregate of the interest expense of Parent and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"Inventory" means inventory (as that term is defined in the California Uniform Commercial Code, as in effect from time to time.

"Net Liquidation Percentage" means the percentage of the cost of Borrowers' Inventory that is estimated to be recoverable in an orderly liquidation of such Inventory net of all associated costs and expenses of such liquidation, such percentage to be as determined from time to time from the most recent appraisal report prepared by an appraisal company selected by Administrative Lender.

(c)     Section 6.7 of the Agreement is hereby amended in its entirety to read as follows:

### 6.7     LITIGATION, LABOR CONTROVERSIES

Section 6.7 of the Disclosure Schedule reflects, as of the Closing Date, all threatened litigation, actions, proceedings, or labor controversies affecting any Borrower or Subsidiary, or any of their respective properties, businesses, assets or revenues, which could reasonably be expected to have a Material Adverse effect. There is no pending or, to the knowledge of any Borrower, threatened litigation, action, proceeding, or labor controversy affecting any Borrower or Subsidiary, or any of their respective properties, businesses, assets or revenues, which could reasonably be expected to have a Material Adverse Effect. As of the Closing Date, no Borrower nor any subsidiary is a party to, or has any obligations under, any collective bargaining agreement.

(d)     Subsection (c) of Schedule 8.3(b) of the Agreement is hereby amended by extending the deadline for delivery solely with respect to the audited financial statements for Parent's fiscal year ending December 31, 2007 from March 31, 2008 to April 30, 2008.

(e)     The following new Section 8.26 is hereby added to immediately after Section 8.25 of the Agreement:

### 8.26     INVENTORY APPRAISALS

Upon Administrative Lender's request, Borrowers shall obtain, at their own expense, and deliver to Administrative Lender an appraisal of the value of their Inventory, performed by an appraiser chosen by Administrative Lender and otherwise in form and substance satisfactory to Administrative Lender, provided, however that so long as no Default has occurred and is continuing, Borrowers will not be required to deliver more than one such appraisal of Inventory in any one fiscal year.

(f)     The last paragraph of Section 9.3 is hereby amended in its entirety to read as follows:

Exhibit C
Page 4 of 20

Borrowers may make the payments with respect to Subordinated Debt scheduled to be paid in March and April of 2008 in an aggregate amount not to exceed $600,000. Thereafter, no payments may be made with respect to: (a) principal on or with respect to the Type A Subordinated Notes, (b) principal or interest on and any other distributions on or with respect to the Type B Subordinated Notes, and (c) any other Subordinated Debt (to the extent such payments would be prohibited by the terms of such Subordinated Debt or any subordination agreement respecting such Subordinated Debt) unless Required Lenders consent in writing to any such payment. Any future payments on Subordinated Debt will result in an increase in the Subordinated Debt Payment Reserve.

(g) Article X of the Agreement is hereby amended and restated in its entirety to read as follows:

## ARTICLE X

### FINANCIAL COVENANTS

(a) **10.1 FIXED CHARGE COVERAGE RATIO.** Borrowers shall achieve a Fixed Charge Coverage Ratio, measured on a monthly basis, of at least the required amount set forth in the following table for the Applicable Period set forth opposite thereto (provided, however, that if, at any time after Borrower receives no less than $20,000,000 in aggregate net cash proceeds from issuance of Additional Capital, such Fixed Charge Coverage Ratio shall be measured on a quarterly basis):

| Minimum Ratio | Applicable Period Ending |
|---|---|
| 0.25:1.00 | March 31, 2008 |
| 0.50:1.00 | April 30, 2008 |
| 0.72:1.00 | May 31, 2008 |
| 0.93:1.00 | June 30, 2008 |
| 1.08:1.00 | July 31, 2008 |
| 1.18:1.00 | August 31, 2008 |
| 1.24:1.00 | September 30, 2008 |
| 1.24:1.00 | October 31, 2008 |
| 1.22:1.00 | November 30, 2008 |
| 1.16:1.00 | December 31, 2008 |
| 1.07:1.00 | January 31, 2009 |
| 1.01:1.00 | February 28, 2009 |
| 1.04:1.00 | March 31, 2009 |
| 1.06:1.00 | April 30, 2009 |
| 1.06:1.00 | May 31, 2009 |
| 1.04:1.00 | June 30, 2009 |
| 1.05:1.00 | July 31, 2009 |
| 1.03:1.00 | August 31, 2009 |
| 1.02:1.00 | September 30, 2009 |

Exhibit C
Page 5 of 20

| 1.02:1.00 | October 31, 2009 |
| 1.01:1.00 | November 30, 2009 |
| 1.03:1.00 | December 31, 2009 |
| 1.03:1.00 | Last day of each month thereafter |

**10.2    Minimum Available Credit.** Borrowers shall maintain minimum Available Credit as determined in Administrative Lender's reporting system, at any time, of no less than $1,500,000; provided, however, that if, at any time after Borrower receives no less than $20,000,000 in aggregate net cash proceeds from issuance of Additional Capital, and Borrower meets on or after February 28, 2009 the adjusted EBITDA budgeted projections attached hereto as Exhibit H at a level of 90% or greater for the twelve month period immediately prior to the date of determination, then this minimum Available Credit covenant shall no longer be effective.

**10.3    CAPITAL EXPENDITURES**

Make Capital Expenditures in any fiscal year in excess of the amount set forth in the following table for the applicable period:

| Fiscal Year 2008 | Fiscal Year 2009 and for each Fiscal Year thereafter |
| --- | --- |
| $3,900,000 | $4,000,000 |

(h)    Schedule III of the Agreement is hereby deleted in its entirety and replaced, effective as of March 1, 2008, with Schedule III attached hereto.

(i)    A new Exhibit H is hereby added to the Agreement and is attached hereto as Exhibit H.

3.    **WAIVER.** Administrative Lender and Required Lenders hereby waive the Specified Defaults solely with respect to the measurement periods specified therein. The foregoing waiver is limited to these single instances, and is not a continuing waiver by the Administrative Lender or the Lenders of any future failure of the Borrowers to perform these or any other covenants to be performed by the Borrowers (or either of them) under the Agreement.

4.    **REPRESENTATIONS AND WARRANTIES.** Each Borrower hereby affirms to Administrative Lender and Lenders that all of such Borrower's representations and warranties set forth in the Agreement are true, complete and accurate in all respects as of the Amendment One Date, except: (i) to the extent that such representations and warranties relate solely to an earlier date and (ii) with respect to Section 6.10(ii), the mortgage loans made to Borrower by Citizens Bank regarding real property in Massachusetts and New York, which loans are in default due to violation of a financial covenant resulting from the same facts that caused the Specified Defaults.

5.    **NO DEFAULTS.** Each Borrower hereby affirms to Administrative Lender and the Lenders that no Defaults or Events of Default other than the Specified Defaults and the Mortgage Defaults have occurred and are continuing as of the Amendment One Date.

Exhibit C
Page 6 of 20

6.    **CONDITION PRECEDENT.**    The effectiveness of this Amendment is expressly conditioned upon receipt by Administrative Lender of the following:

(a)    An amendment fee in the amount of $160,000, to be distributed to the Lenders on a pro rata basis in proportion to each Lender's commitment; and

(b)    a fully executed copy of this Amendment executed by the Borrowers, Administrative Lender and the Required Lenders.

7.    **COSTS AND EXPENSES.**    Borrowers shall pay to Administrative Lender all of Administrative Lender's out-of-pocket costs and expenses (including, without limitation, the fees and expenses of its counsel, which counsel may include any local counsel deemed necessary, search fees, filing and recording fees, documentation fees, appraisal fees, travel expenses, and other fees) arising in connection with the preparation, execution, and delivery of this Amendment and all related documents.

8.    **LIMITED EFFECT.**    In the event of a conflict between the terms and provisions of this Amendment and the terms and provisions of the Agreement, the terms and provisions of this Amendment shall govern. In all other respects, the Agreement, as amended and supplemented hereby, shall remain in full force and effect.

9.    **COUNTERPARTS; EFFECTIVENESS.**    This Amendment may be executed in any number of counterparts and by different parties on separate counterparts, each of which when so executed and delivered shall be deemed to be an original. All such counterparts, taken together, shall constitute but one and the same Amendment. This Amendment shall become effective upon the execution of a counterpart of this Amendment by each of the parties hereto.

[Signatures on next page]

Exhibit C
Page 7 of 20

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first set forth above.

WELLS FARGO FOOTHILL, INC.,
a California corporation, as Administrative Lender and a Lender

By: _____

Name:  Lan Wong
Title:    Vice-President

Amendment Number One and Waiver to Credit Agreement

Exhibit C
Page 8 of 20

**BANK OF AMERICA, N.A.,**
as Documentation Agent and as a Lender

By: _____

Name:   STEVEN W. SHARP

Title:   VICE PRESIDENT

Amendment Number One and Waiver to Credit Agreement

Exhibit C
Page 9 of 20

LASALLE BUSINESS CREDIT, LLC,
as a Lender

By:
Name:  Andrew J Maulton
Title:  AVP

Amendment Number One and Waiver to Credit Agreement

Exhibit C
Page 10 of 20

THE CIT GROUP/BUSINESS CREDIT, INC.,
as Syndication Agent and as a Lender

By: _____
Name: __Kirk Wolverton_____
Title: ___Vice President_____

Amendment Number One and Waiver to Credit Agreement

Exhibit C
Page 11 of 20

**NORTH PACIFIC GROUP, INC.,**
an Oregon corporation as a Borrower

By:
Name: CHRISTOPHER D. CASSARD
Title: CFO & TREASURER

**BURNS HOLDINGS, INC.,**
an Oregon corporation as a Borrower

By:
Name: CHRISTOPHER D. CASSARD
Title: CFO & TREASURER

**NOR PAC ENTERPRISES, INC.,**
an Oregon corporation as a Borrower

By:
Name: CHRISTOPHER D. CASSARD
Title: CFO & TREASURER

**RTH LUMBER CO.,**
an Oregon corporation as a Borrower

By:
Name: CHRISTOPHER D. CASSARD
Title: CFO & TREASURER

Amendment Number One and Waiver to Credit Agreement

Exhibit C
Page 12 of 20

## SCHEDULE III

### Pricing Schedule

Effective as of March 1, 2008, with respect to Base Rate Loans, LIBOR Loans, and the Unused Line Fee, as the case may be, as of any date of determination, the LIBOR Margin, Base Rate Margin, and the Unused Line Fee Percentage, as applicable, shall be those that correspond to the most recent Average Pricing Availability calculation (determined as set forth in the following paragraph) for the most recently completed fiscal quarter of Parent, as set forth in the following table:

| Level | Average Pricing Availability | Margin above Base Rate | Margin above LIBOR Rate | Unused Line Fee Percentage |
|---|---|---|---|---|
| I | > $25,000,000 | 0.50% | 2.25% | 0.25% |
| II | > $15,000,000 but < $25,000,000 | 1.00% | 2.75% | 0.375% |
| III | < $15,000,000 | 1.25% | 3.00% | 0.50% |

The Applicable Margins and the Unused Line Fee Percentage shall be adjusted as of the first day of each fiscal quarter of Parent based upon the Average Pricing Availability for the most recently completed fiscal quarter of Parent; provided, however, that if Parent and Borrowers fail to provide a Borrowing Base Certificate when due, the Applicable Margins and the Unused Line Fee Percentage shall be the margin in the row styled "Level III" as of the first day of the fiscal quarter following the date on which such Borrowing Base Certificate was required to be delivered until the first day of the month following the date on which it was actually delivered (but not retroactively), without constituting a waiver of any Default or Event of Default caused by the failure to timely deliver the Borrowing Base Certificate. In the event that the information contained in any Borrowing Base Certificate delivered to Administrative Lender is shown to be inaccurate, and such inaccuracy, if corrected, would have led to a determination of a increased Applicable Margin and/or Unused Line Fee Percentage at the time such Borrowing Base Certificate was delivered, the Borrowers shall immediately (i) re-deliver a correct Borrowing Base Certificate for the applicable week to Administrative Lender and the Applicable Margin and Unused Line Fee Percentage shall be redetermined in accordance with the same and (ii) deliver to the Administrative Lender full payment in respect of the accrued additional interest on the Obligations from the date of delivery of the inaccurate Borrowing Base Certificate, which payment shall be promptly applied by the Administrative Lender in accordance with Section 3.6 (it being understood that nothing in this definition: (i) shall limit the rights of the Lenders under Sections 11.1 or 11.2 or (ii) require that Lenders reimburse any interest payments in the event that any Borrowing Base Certificate inaccuracy leads to a determination of a reduced Applicable Margin and/or Unused Line Fee Percentage).

"Average Pricing Availability" means, for any fiscal quarter of Parent, the amount, computed on the average weekly basis for the weeks ending during such quarter, by which the sum of (i) the Borrowing Base (calculated after giving effect to all Borrowing Base Reserves) plus (ii) Qualified Cash, exceeds the outstanding principal amount of the Revolving Loans, the Letter of Credit Obligations and Swing Loans. The Average Pricing Availability shall be based upon the Borrowing Base Certificates and cash balance reports delivered to Administrative Lender in accordance with the terms of this Agreement.

**EXHIBIT H**
**TO**
**CREDIT AGREEMENT**

**[SEE ATTACHED]**

Exhibit H

Exhibit C
Page 14 of 20

2008 Covenants & Collateral

**NORTH PACIFIC GROUP, INC.**
**EBITDA**
**TRAILING 18 SCHEDULE**
**(In Dollars)**

**MONTHLY EBITDA BUDGETED**

| Description | January 2008 | February 2008 | March 2008 | April 2008 | May 2008 | June 2008 | July 2008 | August 2008 | September 2008 | October 2008 | November 2008 | December 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Profit (Loss) | | | (186,381) | 580,914 | 954,693 | 1,494,964 | 1,428,028 | 1,332,145 | 957,555 | 215,436 | 169,814 | (392,827) |
| Interest Expense | | | 1,006,010 | 998,159 | 1,038,727 | 965,417 | 1,022,546 | 1,052,817 | 938,373 | 960,743 | 894,478 | 858,037 |
| Tax Expense (Benefit) | | | 842 | 842 | 842 | 842 | 842 | 842 | 842 | 842 | 842 | 843 |
| Depreciation Expense | | | 242,673 | 248,302 | 248,311 | 247,774 | 242,802 | 259,092 | 218,803 | 212,543 | 212,491 | 207,623 |
| Amortization Expense | | | 33,946 | 33,946 | 33,946 | 33,946 | 33,946 | 33,946 | 33,946 | 33,946 | 33,946 | 33,946 |
| Non-Recurring | | | | | | | | | | | | |
| Gain on Sale of Asset | | | | | | | | | | | | |
| Budgeted Monthly EBITDA | | | 1,096,610 | 1,862,233 | 2,256,659 | 2,742,943 | 2,728,185 | 2,616,642 | 2,163,801 | 1,423,510 | 1,311,571 | 717,833 |

**ROLLING EBITDA BUDGETED**

| Description | January 2008 | February 2008 | March 2008 | April 2008 | May 2008 | June 2008 | July 2008 | August 2008 | September 2008 | October 2008 | November 2008 | December 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Profit (Loss) | | | (184,811) | 394,033 | 1,328,726 | 2,823,710 | 4,251,738 | 5,576,883 | 6,532,718 | 6,748,154 | 6,917,968 | 6,525,141 |
| Interest Expense | | | 1,006,010 | 2,004,169 | 3,042,936 | 4,008,353 | 5,030,919 | 6,036,736 | 6,995,109 | 7,955,852 | 8,850,330 | 9,708,367 |
| Tax Expense (Benefit) | | | 842 | 1,684 | 2,526 | 3,368 | 4,210 | 5,052 | 5,894 | 6,736 | 7,578 | 8,421 |
| Depreciation Expense | | | 242,673 | 491,065 | 739,376 | 987,150 | 1,239,953 | 1,499,045 | 1,708,850 | 1,918,393 | 2,130,884 | 2,337,600 |
| Amortization Expense | | | 33,946 | 67,892 | 101,838 | 135,784 | 169,730 | 205,676 | 237,622 | 271,568 | 305,514 | 339,460 |
| Non-Recurring | | | | | | | | | | | | |
| Gain on Sale of Asset | | | | | | | | | | | | |
| Budgeted Rolling EBITDA | | | 1,096,610 | 2,958,843 | 5,215,402 | 7,958,365 | 10,694,550 | 13,313,392 | 15,477,193 | 16,906,703 | 18,212,274 | 18,919,397 |
| Cushion Reduction | | | (396,610) | (858,843) | (1,415,402) | (2,158,365) | (2,194,550) | (2,813,392) | (3,177,193) | (3,406,703) | (3,712,274) | (3,849,397) |
| Adjusted EBITDA Required | | | 700,000 | 2,100,000 | 3,800,000 | 5,800,000 | 8,500,000 | 10,500,000 | 12,300,000 | 13,500,000 | 14,500,000 | 15,100,000 |
| Interest Coverage based on Adjusted EBITDA | | | 0.70 | 1.05 | 1.23 | 1.45 | 1.69 | 1.74 | 1.76 | 1.70 | 1.64 | 1.55 |
| EBITDA Covenant as a % of plan | | | 64% | 71% | 73% | 73% | 79% | 79% | 79% | 80% | 80% | 80% |

Exhibit C
Page 15 of 20

2009 Covenants ; Collateral

NORTH PACIFIC GROUP, INC.
EBITDA
TRAILING 12 SCHEDULE
(in Dollars)

## MONTHLY EBITDA BUDGETED

| Description | January 2009 | February 2009 | March 2009 | April 2009 | May 2009 | June 2009 | July 2009 | August 2009 | September 2009 | October 2009 | November 2009 | December 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Profit (Loss) | (1,403,000) | (1,081,000) | 71,000 | 764,000 | 1,036,000 | 1,572,000 | 1,466,000 | 1,313,000 | 1,061,000 | 417,000 | 383,000 | (78,000) |
| Interest Expense | 929,000 | 853,000 | 1,021,000 | 1,009,000 | 1,003,000 | 987,000 | 1,013,000 | 1,071,000 | 974,000 | 978,000 | 912,000 | 900,000 |
| Tax Expense (Benefit) | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Depreciation Expense | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 |
| Amortization Expense | 33,944 | 33,944 | 33,946 | 33,946 | 33,946 | 33,946 | 33,946 | 33,946 | 33,946 | 33,946 | 33,946 | 33,946 |
| Non-Recurring | | | | | | | | | | | | |
| Gain on Sale of Assets | | | | | | | | | | | | |
| Budgeted Monthly EBITDA | (234,053) | 10,946 | 1,333,946 | 2,012,946 | 2,334,946 | 2,798,946 | 2,740,946 | 2,627,946 | 2,274,946 | 1,634,946 | 1,534,946 | 1,865,946 |

## ROLLING EBITDA BUDGETED

| Description | January 2009 | February 2009 | March 2009 | April 2009 | May 2009 | June 2009 | July 2009 | August 2009 | September 2009 | October 2009 | November 2009 | December 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Profit (Loss) | 5,172,141 | 4,121,141 | 4,301,022 | 4,554,106 | 4,665,415 | 4,742,431 | 4,780,403 | 4,782,258 | 4,885,421 | 5,086,997 | 5,200,173 | 5,617,000 |
| Interest Expense | 10,657,367 | 11,159,367 | 11,534,337 | 11,543,198 | 11,565,431 | 11,585,014 | 11,599,444 | 11,616,631 | 11,632,258 | 11,669,313 | 11,667,377 | 11,682,000 |
| Tax Expense (Benefit) | 9,420 | 10,420 | 10,578 | 10,726 | 10,894 | 11,052 | 11,210 | 11,368 | 11,526 | 11,684 | 11,842 | 12,000 |
| Depreciation Expense | 2,542,909 | 2,747,909 | 2,710,236 | 2,656,844 | 2,623,533 | 2,380,739 | 2,332,595 | 2,464,864 | 2,477,959 | 2,469,516 | 2,462,023 | 2,460,000 |
| Amortization Expense | 371,406 | 401,352 | 407,352 | 407,352 | 407,352 | 407,352 | 407,352 | 407,352 | 407,352 | 407,352 | 407,352 | 407,352 |
| Non-Recurring | | | | | | | | | | | | |
| Gain on Sale of Assets | | | | | | | | | | | | |
| Budgeted Rolling EBITDA | 18,751,243 | 18,866,189 | 19,045,525 | 19,194,230 | 19,272,625 | 19,336,608 | 19,531,369 | 19,380,473 | 19,413,618 | 19,635,054 | 19,844,429 | 26,178,351 |
| Cushion Reduction | (4,015,243) | (4,106,189) | (4,343,525) | (4,494,230) | (4,072,625) | (4,021,608) | (3,911,369) | (3,902,473) | (3,913,618) | (3,935,054) | (4,044,429) | (4,072,352) |
| Adjusted EBITDA Required | 14,700,000 | 14,760,000 | 14,700,000 | 14,700,000 | 15,200,000 | 15,310,000 | 15,400,000 | 15,400,000 | 15,500,000 | 15,700,000 | 15,800,000 | 16,100,000 |
| Interest Coverage based on Adjusted EBITDA | 1.38 | 1.28 | 1.27 | 1.27 | 1.31 | 1.32 | 1.33 | 1.33 | 1.33 | 1.35 | 1.35 | 1.38 |
| EBITDA Covenant as a % of plan | 79% | 78% | 77% | 77% | 79% | 79% | 80% | 80% | 80% | 80% | 80% | 86% |

Exhibit C
Page 16 of 20

**NORTH PACIFIC GROUP, INC.**
**FIXED CHARGES**
**TRAILING 12 SCHEDULE**
(In Dollars)

**MONTHLY FIXED CHARGES AT COVENANT LEVEL**

| Description | January 2008 | February 2008 | March 2008 | April 2008 | May 2008 | June 2008 | July 2008 | August 2008 | September 2008 | October 2008 | November 2008 | December 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adjusted Interest Expense | | | 956,000 | 948,000 | 997,000 | 917,000 | 911,000 | 956,000 | 910,000 | 911,000 | 850,000 | 844,000 |
| Tax Expense (Benefit) | | | 842 | 842 | 842 | 842 | 842 | 842 | 842 | 842 | 842 | 842 |
| Unfinanced Capital Expenditures | | | 65,000 | 405,000 | 18,000 | 375,000 | 575,000 | 35,000 | 39,000 | 51,000 | 100,000 | 100,000 |
| Principal Payments on Other Debt and Leases * | | | 1,758,000 | 106,000 | 53,000 | 53,000 | 53,000 | 52,000 | 53,000 | 52,000 | 53,000 | 337,000 |
| Monthly Fixed Charges | | | 2,779,842 | 1,459,842 | 1,068,842 | 998,842 | 1,696,842 | 1,043,842 | 1,002,842 | 1,016,842 | 1,003,841 | 1,081,842 |

**ROLLING FIXED CHARGES AT COVENANT LEVEL**

| Description | January 2008 | February 2008 | March 2008 | April 2008 | May 2008 | June 2008 | July 2008 | August 2008 | September 2008 | October 2008 | November 2008 | December 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adjusted Interest Expense | | | 956,800 | 1,904,000 | 2,891,000 | 3,808,000 | 4,779,000 | 5,735,000 | 6,645,000 | 7,556,000 | 8,406,000 | 9,251,000 |
| Tax Expense (Benefit) | | | 842 | 1,684 | 2,526 | 3,368 | 4,210 | 5,052 | 5,894 | 6,736 | 7,578 | 8,420 |
| Unfinanced Capital Expenditures | | | 65,000 | 470,000 | 488,000 | 863,000 | 1,961,000 | 1,996,000 | 1,135,000 | 1,186,000 | 1,286,000 | 1,286,000 |
| Principal Payments on Other Debt and Leases * | | | 1,758,000 | 1,864,000 | 1,917,000 | 1,970,000 | 2,072,000 | 2,074,000 | 2,127,000 | 2,179,000 | 2,232,000 | 2,469,000 |
| Rolling Fixed Charges | | | 2,779,842 | 4,239,684 | 5,298,526 | 6,265,366 | 7,966,110 | 8,910,063 | 9,912,694 | 10,923,756 | 11,933,578 | 13,015,420 |
| | | | | | | | | | | | | |
| Fixed Charge Coverage Ratio at Covenant Level | | | 0.35 | 0.50 | 0.72 | 0.93 | 0.93 | 1.08 | 1.18 | 1.34 | 1.24 | 1.21 | 1.16 |

\* All subordinated debt payments are excluded.

Exhibit C
Page 17 of 20

**NORTH PACIFIC GROUP, INC.**
**FIXED CHARGES**
**TRAILING 12 SCHEDULE**
(In Dollars)

**MONTHLY FIXED CHARGES AT COVENANT LEVEL**

| Description | January 2009 | February 2009 | March 2009 | April 2009 | May 2009 | June 2009 | July 2009 | August 2009 | September 2009 | October 2009 | November 2009 | December 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adjusted Interest Expense | 918,000 | 839,000 | 961,000 | 932,000 | 1,000,000 | 931,000 | 975,000 | 956,000 | 919,000 | 924,000 | 861,000 | 851,000 |
| Tax Expense (Benefit) | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Unfinanced Capital Expenditures | 30,000 | 30,000 | 50,000 | 205,000 | 205,000 | 305,000 | 305,000 | 305,000 | 305,000 | 205,000 | 205,000 | 205,000 |
| Principal Payments on Other Debt and Leases * | 43,000 | 44,000 | 1,459,000 | 66,000 | 53,000 | 53,000 | 52,000 | 53,000 | 52,000 | 52,000 | 52,000 | 54,000 |
| Monthly Fixed Charges * | 992,000 | 914,000 | 2,473,000 | 1,254,000 | 1,259,000 | 1,290,000 | 1,333,000 | 1,315,000 | 1,278,000 | 1,287,000 | 1,119,000 | 1,111,000 |

**ROLLING FIXED CHARGES AT COVENANT LEVEL**

| Description | January 2009 | February 2009 | March 2009 | April 2009 | May 2009 | June 2009 | July 2009 | August 2009 | September 2009 | October 2009 | November 2009 | December 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adjusted Interest Expense | 10,170,000 | 11,008,000 | 11,016,000 | 11,020,000 | 11,033,000 | 11,047,000 | 11,051,000 | 11,061,000 | 11,070,000 | 11,081,000 | 11,092,000 | 11,099,000 |
| Tax Expense (Benefit) | 9,620 | 10,420 | 10,578 | 10,754 | 10,894 | 11,052 | 11,210 | 11,368 | 11,526 | 11,684 | 11,842 | 12,000 |
| Unfinanced Capital Expenditures | 1,280,000 | 1,316,000 | 1,331,000 | 1,371,000 | 1,406,000 | 1,613,000 | 1,345,000 | 1,615,000 | 1,481,000 | 2,150,000 | 2,255,000 | 2,460,000 |
| Principal Payments on Other Debt and Leases * | 2,512,000 | 2,556,000 | 2,257,000 | 2,217,000 | 2,217,000 | 2,217,000 | 2,217,000 | 2,218,000 | 2,218,000 | 2,218,000 | 2,217,000 | 2,034,000 |
| Rolling Fixed Charges | 13,971,620 | 16,911,420 | 14,684,578 | 14,368,766 | 14,568,894 | 14,888,052 | 14,634,210 | 14,905,568 | 15,180,256 | 15,460,664 | 15,773,842 | 15,606,800 |
| Fixed Charge Coverage Ratio at Covenant Level | 1.05 | 0.99 | 1.01 | 1.02 | 1.04 | 1.03 | 1.05 | 1.03 | 1.02 | 1.02 | 1.01 | 1.03 |

* All subordinated debt payments are excluded.

Exhibit C
Page 18 of 20

NORTH PACIFIC GROUP, INC.
EBITDA SHORTFALL RESERVE
(In Dollars)

-- IF OPERATIONS ARE AT MINIMUM COVENANT LEVEL --

| | March 2008 | April 2008 | May 2008 | June 2008 | July 2008 | August 2008 | September 2008 | October 2008 | November 2008 | December 2008 |
|---|---|---|---|---|---|---|---|---|---|---|
| Rolling Budgeted EBITDA | 1,006,610 | 2,918,843 | 5,215,402 | 7,953,465 | 10,696,559 | 13,313,342 | 15,477,193 | 16,990,701 | 18,212,374 | 18,940,297 |
| Rolling Adjusted EBITDA * | 700,000 | 2,100,000 | 3,800,000 | 5,800,000 | 8,500,000 | 10,500,000 | 12,300,000 | 13,500,000 | 14,500,000 | 15,100,000 |
| Rolling EBITDA Shortfall | (306,610) | (818,843) | (1,415,402) | (2,153,465) | (2,196,559) | (2,813,342) | (3,177,193) | (3,490,701) | (3,712,374) | (3,840,297) |
| Rolling Adjusted EBITDA * | 700,000 | 2,100,000 | 3,800,000 | 5,800,000 | 8,500,000 | 10,500,000 | 12,300,000 | 13,500,000 | 14,500,000 | 15,100,000 |
| Rolling Fixed Charges | 2,779,342 | 4,239,684 | 5,278,526 | 6,269,368 | 7,886,210 | 8,910,032 | 9,912,894 | 10,939,726 | 11,933,578 | 13,015,420 |
| Fixed Charge vs EBITDA Shortfall | (2,079,342) | (2,139,684) | (1,478,526) | (469,368) | 613,790 | 1,589,968 | 2,387,106 | 2,560,274 | 2,566,422 | 2,084,580 |
| Cumulative Fixed Charge Coverage Ratio | 0.25 | 0.50 | 0.72 | 0.93 | 1.08 | 1.18 | 1.24 | 1.24 | 1.22 | 1.16 |
| EBITDA Shortfall Reserve ** | (306,610) | (858,843) | (1,415,402) | (469,368) | - | - | - | - | - | - |

* EBITDA at covenant level.

** The EBITDA Shortfall Reserve is equal to the lesser of i) the cumulative amount by which EBITDA is less than plan, or ii) the amount necessary to cause fixed charge coverage to be at least 1:1. Calculated as of month end. Applied for the following month.

Exhibit C
Page 19 of 20

**NORTH PACIFIC GROUP, INC.**
**EBITDA SHORTFALL RESERVE**
(In Dollars)

-- IF OPERATIONS ARE AT MINIMUM COVENANT LEVEL --

| | January 2009 | February 2009 | March 2009 | April 2009 | May 2009 | June 2009 | July 2009 | August 2009 | September 2009 | October 2009 | November 2009 | December 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rolling Budgeted EBITDA | 18,715,243 | 18,806,189 | 19,043,525 | 19,194,233 | 19,272,625 | 19,323,608 | 19,331,349 | 19,392,473 | 19,413,618 | 19,625,054 | 19,944,429 | 20,178,332 |
| Rolling Adjusted EBITDA * | 14,700,000 | 14,700,000 | 14,700,000 | 14,700,000 | 15,200,000 | 15,300,000 | 15,400,000 | 15,400,000 | 15,500,000 | 15,700,000 | 15,800,000 | 16,100,000 |
| Rolling EBITDA Shortfall | (4,015,243) | (4,106,189) | (4,343,525) | (4,494,233) | (4,072,625) | (4,023,608) | (3,931,349) | (3,992,473) | (3,913,618) | (3,925,054) | (4,144,429) | (4,078,332) |
| | | | | | | | | | | | | |
| Rolling Adjusted EBITDA * | 14,700,000 | 14,700,000 | 14,700,000 | 14,700,000 | 15,200,000 | 15,300,000 | 15,400,000 | 15,400,000 | 15,500,000 | 15,700,000 | 15,800,000 | 16,100,000 |
| Rolling Fixed Charges | 13,977,420 | 14,911,420 | 14,604,578 | 14,568,736 | 14,568,894 | 14,888,052 | 14,624,210 | 14,983,368 | 15,180,526 | 15,460,684 | 15,575,842 | 15,605,000 |
| Fixed Charge vs EBITDA Shortfall | 722,580 | (211,420) | 95,422 | 331,264 | 631,106 | 411,948 | 775,790 | 416,632 | 319,474 | 239,316 | 224,158 | 495,000 |
| | | | | | | | | | | | | |
| Cumulative Fixed Charge Coverage Ratio | 1.05 | 0.99 | 1.01 | 1.02 | 1.04 | 1.03 | 1.05 | 1.03 | 1.02 | 1.02 | 1.01 | 1.03 |
| | | | | | | | | | | | | |
| EBITDA Shortfall Reserve ** | - | (211,420) | - | - | - | - | - | - | - | - | - | - |

* EBITDA at covenant level.

** The EBITDA Shortfall Reserve is equal to the lesser of A) the cumulative amount by which EBITDA is less than plan, or B) the amount necessary to cause fixed charge coverage to be at least 1:1. Calculated as of month end. Applied for the following month.

Exhibit C
Page 20 of 20

### AMENDMENT NUMBER TWO TO CREDIT AGREEMENT

This Amendment Number Two to Credit Agreement ("Amendment") is entered into as of June 2, 2009 ("Amendment Effective Date"), by and among **WELLS FARGO FOOTHILL, INC.**, a California corporation, as Administrative Lender for the Lenders set forth in the signature pages of this Amendment and the Required Lenders (in such capacity, "Agent"), on the one hand, and **NORTH PACIFIC GROUP, INC.**, an Oregon corporation ("Parent"), and each of Parent's direct and indirect subsidiaries set forth in the signature pages of this Amendment (along with Parent, each individually a "Borrower" and collectively "Borrowers"), on the other hand, in light of the following:

A.      Administrative Lender, Lenders and Borrowers have previously entered into that certain Credit Agreement, dated as of December 22, 2006 (as amended, the "Agreement"); and

B.      As set forth in that certain Reservation of Rights Letter dated January 7, 2009 between Agent and Borrowers ("Reservation of Rights Letter"), Borrowers violated Section 10.1 of the Agreement by failing to achieve the minimum Fixed Charge Coverage Ratio set forth therein for the measurement period ending November 30, 2008, and each monthly period thereafter, up to and including the period ending April 30, 2009 (the "Specified Default").

**NOW, THEREFORE**, Borrowers, Administrative Lender and Required Lenders hereby amend and supplement the Agreement as follows:

1.      **DEFINITIONS**.  All initially capitalized terms used in this Amendment shall have the meanings given to them in the Agreement unless specifically defined herein.

2.      **AMENDMENTS**.

(a)      The following definition set forth in Section 1.1 of the Agreement is hereby deleted and replaced in its entirety as follows:

"**Total Commitments**" means the total of all Revolving Loan Commitments, in an amount equal to $100,000,000.

(b)      Schedule 1 to the Agreement is hereby deleted and replaced in its entirety with Schedule I attached hereto.

3.      **REPRESENTATIONS AND WARRANTIES**.  Each Borrower hereby affirms to Administrative Lender and Lenders that all of such Borrower's representations and warranties set forth in the Agreement are true, complete and accurate in all respects as of the date hereof, except to the extent that such representations and warranties related solely to an earlier date.

4.      **NO DEFAULTS**.  Each Borrower hereby affirms to Administrative Lender and the Lenders that no Defaults or Events of Default, other than the Specified Default, have occurred and are continuing as of the date hereof.

5.      **NO WAIVER**.  The execution of this Amendment and any documents related thereto shall not be deemed to be a waiver of the Specified Default or any Default or Event of Default under the Agreement or breach, default or event of default under any Loan Document, whether or not known to Agent or any of the Lenders and whether or not existing as of the date hereof.  The Reservation of Rights Letter shall continue to be in full force and effect and Agent and Lenders shall continue to have all rights and remedies available to them under the Agreement, including, but not limited to, the charging of interest at the default rate on Obligations as set forth in Section 3.4(a) of the Agreement and the right to cease making credit available (including Loans) to Borrowers as set forth in Section 7.2(a) of the Agreement.

1

6. **CONDITION PRECEDENT**.   The effectiveness of this Amendment is expressly conditioned upon receipt by Administrative Lender of a fully executed copy of this Amendment executed by the Borrowers, Administrative Lender and the Required Lenders.

7. **COSTS AND EXPENSES**.   Borrowers shall pay to Administrative Lender all of Administrative Lender's out-of-pocket costs and expenses (including, without limitation, the reasonable fees and expenses of its counsel) arising in connection with the preparation, execution, and delivery of this Amendment and all related documents.

8. **LIMITED EFFECT**.   In the event of a conflict between the terms and provisions of this Amendment and the terms and provisions of the Agreement, the terms and provisions of this Amendment shall govern.   In all other respects, the Agreement, as amended and supplemented hereby, shall remain in full force and effect.

9. **COUNTERPARTS; EFFECTIVENESS**.   This Amendment may be executed in any number of counterparts and by different parties on separate counterparts, each of which when so executed and delivered shall be deemed to be an original.   All such counterparts, taken together, shall constitute but one and the same Amendment.   This Amendment shall become effective upon the execution of a counterpart of this Amendment by each of the parties hereto and upon satisfaction of the condition set forth in Section 5 above.

[Signatures on next page]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first set forth above.

**WELLS FARGO FOOTHILL, INC.,**
a California corporation, as Administrative Lender and a Lender

By:
Name:     Amy L. Newman
Title:     Vice President

**BANK OF AMERICA, N.A.,**
as Documentation Agent and as a Lender

By: _____

Name:   Steven W. Sharp

Title:   Vice President

**THE CIT GROUP/BUSINESS CREDIT, INC.,**
as Syndication Agent and as a Lender

By:
Name:
Title:       Barbara F. Perich
             Vice President

S-3
Amendment Number Two to Credit Agreement

**NORTH PACIFIC GROUP, INC.,**
an Oregon corporation as a Borrower

By: _____
Name: _____CHRISTOPHER D. CASSARD_____
Title: _____CFO_____

**BURNS HOLDINGS, INC.,**
an Oregon corporation as a Borrower

By: _____
Name: _____CHRISTOPHER D. CASSARD_____
Title: _____TREASURER_____

**NOR PAC ENTERPRISES, INC.,**
an Oregon corporation as a Borrower

By: _____
Name: _____CHRISTOPHER D. CASSARD_____
Title: _____TREASURER_____

**RTH LUMBER CO.,**
an Oregon corporation as a Borrower

By: _____
Name: _____CHRISTOPHER D. CASSARD_____
Title: _____TREASURER_____

**SCHEDULE I**

1.   **Revolving Loan Commitments:**

     Wells Fargo Foothill, Inc.          -     $28,125,000 -  (28.125%)
     Bank of America, N.A.               -     $43,750,000 -  (43.750%)
     The CIT Group/Business Credit, Inc. $28,125,000 -  (28.125%)

     Total Commitments               -     $100,000,000

2.   **Maximum Exposure for Letter of Credit Obligations:**

     Wells Fargo Foothill, Inc.          -     $1,406,250 -  (28.125%)
     Bank of America, N.A.               -     $2,187,500 -  (43.750%)
     The CIT Group/Business Credit, Inc. $1,406,250 -  (28.125%)

     Total Exposure  -                      $5,000,000

3.   **Applicable Lending Office and Address for Notices for each Lender:**

     Wells Fargo Foothill, Inc.                    Bank of America, N.A.
     2450 Colorado Avenue                          55 South Lake Avenue, Suite 900
     Suite 3000 West                               Pasadena, CA 91101
     Santa Monica, California 90404                Attn: Steven Sharp
     Attn: Business Finance Division Manager       Fax No.: (626) 584-4602
     Fax No.: (310) 453-7413

     The CIT Group/Business Credit, Inc.
     5420 LBJ Freeway, Suite 200
     Dallas, TX 75240
     Attn: Regional Credit Manager
     Fax No.: (972) 455-1690



**Wells Fargo Foothill**
2450 Colorado Avenue
Suite 3000 West
Santa Monica, CA 90404
310 453-7300

September 15, 2009

North Pacific Group, Inc.
10200 SW Greenburg Road
Portland, Oregon 97223
Attn: Christopher Cassard, Chief Financial Officer

Re:   *Letter Agreement with Respect to Certain Terms in Credit Agreement (this "Letter Agreement").*

Ladies and Gentlemen:

Reference is hereby made to that certain Credit Agreement, dated as of December 22, 2006 (as amended and modified from time to time, the "Credit Agreement"), by and between North Pacific Group, Inc., an Oregon corporation ("Parent"), each of Parent's subsidiaries from time to time party thereto (along with Parent, each individually, a "Borrower" and collectively, the "Borrowers"), the lenders from time to time party thereto (each individually, a "Lender" and collectively, the "Lenders") and Wells Fargo Foothill, Inc., a California corporation ("WFF"), as administrative lender for the Lenders (in such capacity, the "Administrative Lender"). Reference is also hereby made to that certain Reservation of Rights Letter from WFF to Borrowers dated as of January 7, 2009 ("Reservation of Rights Letter"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

## AGREEMENTS

1.     Amendments. Borrowers, Administrative Lender and Required Lenders hereby agree to amend and supplement the Credit Agreement as follows:

(a)     The definition of "Borrowing Base" set forth in Section 1.1 of the Credit Agreement is hereby amended by deleting subsection (c)(ii) thereof and replacing it with the following:

"the lesser of: (A) $30,000,000 and (B) 150% of the amount of credit availability created by the sum of clauses (a) and (b) above, minus"

(b)     The following definition set forth in Section 1.1 of the Credit Agreement is hereby deleted and replaced in its entirety as follows:

"**Total Commitments**" means the total of all Revolving Loan Commitments, in an amount equal to: (i) $75,000,000 on September 15, 2009 and thereafter at all times prior to November 1, 2009 and (ii) $70,000,000 on November 1, 2009 and at all times thereafter.

(c)     Section 10.2 of the Credit Agreement is hereby deleted and replaced in its entirety as follows:

**10.2     Minimum Available Credit.**   Borrowers shall maintain minimum Available Credit as determined in Administrative Lender's reporting system, up to and including October 31, 2009, of no less than $1,000,000. Thereafter, Borrowers shall maintain minimum Available Credit as determined in Administrative Lender's reporting system, at any time, of no less than $1,500,000.

(d)     Schedule I to the Credit Agreement is hereby deleted and replaced in its entirety with Schedule I attached hereto.

Exhibit E
Page 1 of 7

2.    Release.

(a)    Except with respect to the rights of each Borrower expressly provided herein, in consideration of the agreements of Administrative Lender and each Lender contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Borrower, on behalf of itself and its successors, assigns and other legal representatives (each Borrower and all such other persons being hereinafter referred to collectively as "Releasors" and individually as a "Releasor"), hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Administrative Lender and each Lender, and their successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (Administrative Lender and each Lender and all such other persons being hereinafter referred to collectively as "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which Releasors may now or hereafter own, hold, have or claim to have against Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the day and date of this Letter Agreement, for or on account of, or in relation to, or in any way in connection with any of the Credit Agreement or any of the other Loan Documents or transactions thereunder or related thereto.

(b)    It is the intention of each Borrower that this Letter Agreement and the release set forth above shall constitute a full and final accord and satisfaction of all claims that may have or hereafter be deemed to have against Releasees as set forth herein. In furtherance of this intention, each Borrower, on behalf of itself and each other Releasor, expressly waives any statutory or common law provision that would otherwise prevent the release set forth above from extending to claims that are not currently known or suspected to exist in any Releasor's favor at the time of executing this Letter Agreement and which, if known by Releasors, might have materially affected the agreement as provided for hereunder. Each Borrower, on behalf of itself and each other Releasor, acknowledges that it is familiar with Section 1542 of California Civil Code:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

Each Borrower, on behalf of itself and each other Releasor, waives and releases any rights or benefits that it may have under Section 1542 to the full extent that it may lawfully waive such rights and benefits, and each Borrower, on behalf of itself and each other Releasor, acknowledges that it understands the significance and consequences of the waiver of the provisions of Section 1542 and that it has been advised by its attorney as to the significance and consequences of this waiver.

(c)    . Each Borrower understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(d)    Each Borrower agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

3.   <u>Covenant Not to Sue</u>.  Each Borrower, on behalf of itself, each Releasor and its successors, assigns and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by any Borrower pursuant to <u>Section 2</u> above.  If any Borrower or any of their successors, assigns or other legal representatives violates the foregoing covenant, each Borrower, for itself and each other Releasor, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

4.   <u>No Waiver of Defaults</u>.  The execution of this Letter Agreement and any documents related hereto shall not be deemed to be a waiver of any Default or Event of Default under the Credit Agreement or breach, default or event of default under any Loan Document, whether or not known to Administrative Lender or any of the Lenders and whether or not existing as of the date hereof.  The Reservation of Rights Letter shall continue to be in full force and effect and Administrative Lender and Lenders shall continue to have all rights and remedies available to them under the Credit Agreement, including, but not limited to, the charging of interest at the default rate on Obligations as set forth in <u>Section 3.4(a)</u> of the Agreement and the right to cease making credit available (including Loans) to Borrowers as set forth in <u>Section 7.2(a)</u> of the Agreement.

5.   <u>Effect of Amendments</u>.  The amendments provided for herein are limited to the specifics hereof, shall not excuse future non-compliance with the Credit Agreement and shall not be a practical construction, course of conduct or course of performance under the Credit Agreement or under the Loan Documents, and shall not be deemed to be consent to any amendment, waiver or modification of any other term or condition of the Credit Agreement or the Loan Documents.  Each Borrower hereby acknowledges and reaffirms: (i) all of its obligations and duties under the Loan Documents, and (ii) that the Administrative Lender, for the ratable benefit of the Lenders, has and shall continue to have valid, secured, Liens in the Collateral.

6.   <u>Loan Documents</u>.  This Letter Agreement shall constitute a Loan Document and shall be subject to the provisions regarding governing law, waiver of jury trial, jurisdiction and venue applicable to the Credit Agreement.

7.   <u>Counterparts; Effectiveness</u>.  This Letter Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Delivery of an executed counterpart of this letter by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this letter.  Any party delivering an executed counterpart of this letter by telefacsimile or other electronic method of transmission shall also deliver an original executed counterpart of this letter, but the failure to do so shall not affect the validity, enforceability or binding effect of this letter.

Very truly yours,

**WELLS FARGO FOOTHILL, INC.,**
in its capacity as Administrative Lender and a Lender

By: _____
Name: _____
Title: _____
Amy L. Newman
Vice President

Acknowledged and Agreed as of September 15, 2009

**BANK OF AMERICA, N.A.,**
as Documentation Agent and as a Lender

By: _____

Name:  STEVEN W. SHARP

Title:  VICE PRESIDENT

Acknowledged and Agreed as of September 15, 2009

**THE CIT GROUP/BUSINESS CREDIT, INC.,**
as Syndication Agent and as a Lender

By:
Name:
Title:

Barbara F. Perich
Vice President

Acknowledged and Agreed as of September 15, 2009

**NORTH PACIFIC GROUP, INC.,**
an Oregon corporation as a Borrower

By:
Name: Christopher D. Cassard
Title: CFO

**BURNS HOLDINGS, INC.,**
an Oregon corporation as a Borrower

By:
Name: Christopher D. Cassard
Title: Treasurer

**NOR PAC ENTERPRISES, INC.,**
an Oregon corporation as a Borrower

By:
Name: Christopher D. Cassard
Title: Treasurer

**RTH LUMBER CO.,**
an Oregon corporation as a Borrower

By:
Name: Christopher D. Cassard
Title: Treasurer

**SCHEDULE I**

1.    <u>**Revolving Loan Commitments**</u>:

    (a)    At all times prior to November 1, 2009:

| | | | |
|---|---|---|---|
| Wells Fargo Foothill, Inc. | - | $21,093,750 - | (28.125%) |
| Bank of America, N.A. | - | $32,812,500 - | (43.750%) |
| The CIT Group/Business Credit, Inc. | | $21,093,750 - | (28.125%) |

    <u>Total Commitments</u>    -    $75,000,000

    (b)    On November 1, 2009 and at all times thereafter:

| | | | |
|---|---|---|---|
| Wells Fargo Foothill, Inc. | - | $19,687,500 - | (28.125%) |
| Bank of America, N.A. | - | $30,625,000 - | (43.750%) |
| The CIT Group/Business Credit, Inc. | | $19,687,500 - | (28.125%) |

    <u>Total Commitments</u>    -    $70,000,000

2.    <u>**Maximum Exposure for Letter of Credit Obligations**</u> :

| | | | |
|---|---|---|---|
| Wells Fargo Foothill, Inc. | - | $1,406,250 - | (28.125%) |
| Bank of America, N.A. | - | $2,187,500 - | (43.750%) |
| The CIT Group/Business Credit, Inc. | | $1,406,250 - | (28.125%) |

    <u>Total Exposure</u> -    $5,000,000

3.    <u>**Applicable Lending Office and Address for Notices for each Lender**</u>:

Wells Fargo Foothill, Inc.
2450 Colorado Avenue
Suite 3000 West
Santa Monica, California  90404
Attn:  Business Finance Division Manager
Fax No.: (310) 453-7413

Bank of America, N.A.
55 South Lake Avenue, Suite 900
Pasadena, CA 91101
Attn: Steven Sharp
Fax No.: (626) 584-4602

The CIT Group/Business Credit, Inc.
5420 LBJ Freeway, Suite 200
Dallas, TX 75240
Attn: Regional Credit Manager
Fax No.: (972) 455-1690

BN 4401097v2



**WELLS FARGO**

**Wells Fargo Foothill**
2450 Colorado Avenue
Suite 3000 West
Santa Monica, CA 90404
310 453-7300

October 6, 2009

North Pacific Group, Inc.
10200 SW Greenburg Road
Portland, Oregon 97223
Attn: Christopher Cassard, Chief Financial Officer

      Re:    *Extension and Letter Agreement with Respect to Certain Terms in the Credit Agreement (this "Letter Agreement")*

Ladies and Gentlemen:

      Reference is hereby made to that certain Credit Agreement, dated as of December 22, 2006 (as amended and modified from time to time, the "Credit Agreement"), by and between North Pacific Group, Inc., an Oregon corporation ("Parent"), each of Parent's subsidiaries from time to time party thereto (along with Parent, each individually, a "Borrower" and collectively, the "Borrowers"), the lenders from time to time party thereto (each individually, a "Lender" and collectively, the "Lenders") and Wells Fargo Foothill, Inc., a California corporation ("WFF"), as Swingline Lender and administrative lender for the Lenders (in such capacity, the "Administrative Lender" and together with the Lenders, the "Lender Group"). Reference is also hereby made to that certain: (i) Reservation of Rights Letter from Agent to Borrowers dated as of January 7, 2009 ("January 2009 Reservation of Rights Letter"), (ii) Reservation of Rights Letter from Agent to Borrowers dated as of September 18, 2009 ("September 2009 Reservation of Rights Letter" and together with the January 2009 Reservation of Rights Letter, the "Reservation of Rights Letters"), and (iii) Letter from Agent to Borrowers dated as of September 25, 2009 with respect to, among other things, the appointment of a Chief Restructuring Officer ("CRO Letter"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

<div align="center">AGREEMENTS</div>

      1.    Extension. In the CRO Letter, Administrative Lender, on behalf of itself and the Lenders, recommended the appointment of a Chief Restructuring Officer ("CRO") to be effective on or before October 2, 2009 (the "Initial CRO Deadline"). Failure to cause such appointment by the Initial CRO Deadline would result in, among other things, restrictions on Borrowers' ability to draw Revolving Loans. Borrowers have requested and the Lender Group hereby agrees the extension of the Initial CRO Deadline to October 9, 2009 (the "Extended CRO Deadline"). Borrowers' failure to appoint the CRO by the Extended CRO Deadline will result in, among other things, the Lender Group's limitation or termination of Borrowers' ability to draw Revolving Loans.

      2.    Amendments. Borrowers, Administrative Lender and Required Lenders hereby agree to amend and supplement the Credit Agreement as follows:

      (a)    The definition of "Borrowing Base" set forth in Section 1.1 of the Credit Agreement is hereby amended by deleting subsection (c) thereof and replacing it with the following:

          "(c)    the lesser of:

          (i)    the sum of:

BN 4531854v4

North Pacific Group, Inc.
October 6, 2009
Page 2

(1)       the lesser of: (A) 60% of the value of the difference of: (y) Category A Inventory minus (z) the amount of the LCM Reserve and (B) the difference of: (I) the product of: (x) 85% times (y) the most recently determined Net Liquidation Percentage times, (z) the book value of Category A Inventory, plus

(2)       the least of: (A) 55% of the value of Domestic In-Transit Inventory, (B) the product of: (x) 85% times (y) the most recently determined Net Liquidation Percentage times, (z) the book value of Domestic In-Transit Inventory, and (C) $2,500,000, and

(ii)      the lesser of: (A) $25,000,000 and (B) 150% of the amount of credit availability created by the sum of clauses (a) and (b) above, minus"

(b)       The following definition set forth in Section 1.1 of the Credit Agreement is hereby deleted and replaced in its entirety as follows:

"Total Commitments" means the total of all Revolving Loan Commitments, in an amount equal to: $70,000,000.

(c)       Article 8 of the Credit Agreement is hereby amended by adding the following new Section 8.27 immediately after Section 8.26:

"8.27    Management Meetings..  Commencing on October 19, 2009, and on each Monday thereafter (or another day determined by the Lenders), Borrowers shall hold a meeting (at a mutually agreeable location and time or, at the option of Administrative Lender, by conference call) with all Lenders who choose to attend such meeting, at which meeting Borrowers shall update the Lenders regarding the financial condition and restructuring efforts of Parent and its Subsidiaries and any other issues the Lenders may wish to discuss.  Borrowers' executive officers (including the Chief Restructuring Officer or equivalent officer) shall be present at each such meeting."

(d)       Section 11.2(a) of the Credit Agreement is hereby deleted and replaced in its entirety as follows:

"(a)      During the continuance of any Event of Default (other than an Event of Default referred to in Section 11.1(h)), Administrative Lender may, with the consent of the Required Lenders, or shall, upon instructions from the Required Lenders, by notice to Parent, (i) terminate the obligations of Lenders to extend any further credit under any of the Loan Documents, (ii) terminate, reduce or condition any Commitment, or make any adjustment to the Borrowing Base, and (iii) declare all or any part of the Obligations to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Borrowers, and/or take such enforcement action as is permitted under any Loan Document. Upon the occurrence or existence of any Event of Default described in Section 11.1(h), immediately and without notice, (A) the obligations, if any, of Lenders to extend any further credit under any of the Loan Documents shall automatically cease and terminate, and (B) all indebtedness of Borrowers under the Loan Documents shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Borrowers.  Immediately after taking any action under this Section 11.2, Administrative Lender shall notify each Lender of such action."

Exhibit F

North Pacific Group, Inc.
October 6, 2009
Page 3


       (e)    Schedule I to the Credit Agreement is hereby deleted and replaced in its entirety with Schedule I attached hereto.

    3.    Release.

       (a)    Except with respect to the rights of each Borrower expressly provided herein, in consideration of the agreements of Administrative Lender and each Lender contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Borrower, on behalf of itself and its successors, assigns and other legal representatives (each Borrower and all such other persons being hereinafter referred to collectively as "Releasors" and individually as a "Releasor"), hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Administrative Lender and each Lender, and their successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (Administrative Lender and each Lender and all such other persons being hereinafter referred to collectively as "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which Releasors may now or hereafter own, hold, have or claim to have against Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the day and date of this Letter Agreement, for or on account of, or in relation to, or in any way in connection with any of the Credit Agreement or any of the other Loan Documents or transactions thereunder or related thereto.

       (b)    It is the intention of each Borrower that this Letter Agreement and the release set forth above shall constitute a full and final accord and satisfaction of all claims that may have or hereafter be deemed to have against Releasees as set forth herein. In furtherance of this intention, each Borrower, on behalf of itself and each other Releasor, expressly waives any statutory or common law provision that would otherwise prevent the release set forth above from extending to claims that are not currently known or suspected to exist in any Releasor's favor at the time of executing this Letter Agreement and which, if known by Releasors, might have materially affected the agreement as provided for hereunder. Each Borrower, on behalf of itself and each other Releasor, acknowledges that it is familiar with Section 1542 of California Civil Code:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Each Borrower, on behalf of itself and each other Releasor, waives and releases any rights or benefits that it may have under Section 1542 to the full extent that it may lawfully waive such rights and benefits, and each Borrower, on behalf of itself and each other Releasor, acknowledges that it understands the significance and consequences of the waiver of the provisions of Section 1542 and that it has been advised by its attorney as to the significance and consequences of this waiver.

       (c)    Each Borrower understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

BN 4531854v4

Exhibit I
Page 3 of 9

North Pacific Group, Inc.
October 6, 2009
Page 4

   (d) Each Borrower agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

   4. <u>Covenant Not to Sue</u>. Each Borrower, on behalf of itself, each Releasor and its successors, assigns and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by any Borrower pursuant to <u>Section 2</u> above. If any Borrower or any of their successors, assigns or other legal representations violates the foregoing covenant, each Borrower, for itself and each other Releasor, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

   5. <u>No Waiver of Defaults</u>. The execution of this Letter Agreement and any documents related hereto shall not be deemed to be a waiver of any Default or Event of Default under the Credit Agreement or breach, default or event of default under any Loan Document, whether or not known to Administrative Lender or any of the Lenders and whether or not existing as of the date hereof. The Reservation of Rights Letters shall continue to be in full force and effect and Administrative Lender and Lenders shall continue to have all rights and remedies available to them under the Credit Agreement, including, but not limited to, the charging of interest at the default rate on Obligations as set forth in <u>Section 3.4(a)</u> of the Agreement and the right to cease making credit available (including Loans) to Borrowers as set forth in <u>Section 7.2(a)</u> of the Agreement.

   6. <u>Effect of Amendments</u>. The amendments provided for herein are limited to the specifics hereof, shall not excuse future non-compliance with the Credit Agreement and shall not be a practical construction, course of conduct or course of performance under the Credit Agreement or under the Loan Documents, and shall not be deemed to be consent to any amendment, waiver or modification of any other term or condition of the Credit Agreement or the Loan Documents. Each Borrower hereby acknowledges and reaffirms: (i) all of its obligations and duties under the Loan Documents, and (ii) that Administrative Lender, for the ratable benefit of the Lenders, has and shall continue to have valid, perfected Liens in the Collateral.

   7. <u>Loan Documents</u>. This Letter Agreement shall constitute a Loan Document and shall be subject to the provisions regarding governing law, waiver of jury trial, jurisdiction and venue applicable to the Credit Agreement.

North Pacific Group, Inc.
October 6, 2009
Page 5

     8.     Counterparts; Effectiveness. This Letter Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Delivery of an executed counterpart of this letter by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this letter. Any party delivering an executed counterpart of this letter by telefacsimile or other electronic method of transmission shall also deliver an original executed counterpart of this letter, but the failure to do so shall not affect the validity, enforceability or binding effect of this letter.

         Very truly yours,

         WELLS FARGO FOOTHILL, INC.,
         a California corporation,
         in its capacity as Administrative Lender and a Lender

     By:         _Amy Newman_
         Amy Newman
         Vice President

Exhibit F

North Pacific Group, Inc.
October 6, 2009
Page 6

Acknowledged and Agreed as of October 6, 2009

**BANK OF AMERICA, N.A.,**
as Documentation Agent and as a Lender

By: _____

Name:   Steven W. Sharp
Title:   Vice President

North Pacific Group, Inc.
October 6, 2009
Page 7

Acknowledged and Agreed as of October 6, 2009

**THE CIT GROUP/BUSINESS CREDIT, INC.,**
as Syndication Agent and as a Lender

By:

Name:
Title:      Barbara F. Perich
                 Vice President

North Pacific Group, Inc.
October 6, 2009
Page 8

Acknowledged and Agreed as of October 6, 2009

**NORTH PACIFIC GROUP, INC.,**
an Oregon corporation as a Borrower

By: _____
Name: _Christopher D Cassard_
Title: _CEO_

**BURNS HOLDINGS, INC.,**
an Oregon corporation as a Borrower

By: _____
Name: _Christopher D Cassard_
Title: _Treasurer_

**NOR PAC ENTERPRISES, INC.,**
an Oregon corporation as a Borrower

By: _____
Name: _Christopher D Cassard_
Title: _Treasurer_

**RTH LUMBER CO.,**
an Oregon corporation as a Borrower

By: _____
Name: _Christopher D Cassard_
Title: _Treasurer_

**SCHEDULE 1**

1. **Revolving Loan Commitments:**

| | | | |
|---|---|---|---|
| Wells Fargo Foothill, Inc. | - | $19,687,500 - | (28.125%) |
| Bank of America, N.A. | - | $30,625,000 - | (43.750%) |
| The CIT Group/Business Credit, Inc. | | $19,687,500 - | (28.125%) |

Total Commitments     -  $70,000,000

2. **Maximum Exposure for Letter of Credit Obligations :**

| | | | |
|---|---|---|---|
| Wells Fargo Foothill, Inc. | - | $1,406,250 - | (28.125%) |
| Bank of America, N.A. | - | $2,187,500 - | (43.750%) |
| The CIT Group/Business Credit, Inc. | | $1,406,250 - | (28.125%) |

Total Exposure -         $5,000,000

3. **Applicable Lending Office and Address for Notices for each Lender:**

Wells Fargo Foothill, Inc.
2450 Colorado Avenue
Suite 3000 West
Santa Monica, California 90404
Attn: Business Finance Division Manager
Fax No.: (310) 453-7413

Bank of America, N.A.
55 South Lake Avenue, Suite 900
Pasadena, CA 91101
Attn: Steven Sharp
Fax No.: (626) 584-4602

The CIT Group/Business Credit, Inc.
5420 LBJ Freeway, Suite 200
Dallas, TX 75240
Attn: Regional Credit Manager
Fax No.: (972) 455-1690

January 7, 2009

North Pacific Group, Inc.
10200 SW Greenburg Road
Portland, Oregon 97223
Attn: Christopher Cassard, Chief Financial Officer

     Re:    North Pacific Group, Inc. and its Subsidiaries signatories to the Credit Agreement
           ("Borrowers") / Wells Fargo Foothill, Inc..

Ladies and Gentlemen:

     Reference is hereby made to that certain Credit Agreement, dated as of December 22, 2006 (as amended and modified from time to time, the "Credit Agreement"), by and between North Pacific Group, Inc., an Oregon corporation ("Parent"), each of Parent's subsidiaries from time to time party thereto (along with Parent, each individually, a "Borrower" and collectively, the "Borrowers"), the lenders from time to time party thereto (each individually, a "Lender" and collectively, the "Lenders") and Wells Fargo Foothill, Inc., a California corporation ("WFF"), as administrative lender for the Lenders (in such capacity, the "Agent"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

     An Event of Default has occurred and is continuing under Section 11.1(d) of the Credit Agreement as a result of Borrowers' violation of the EBITDA covenant set forth in Section 10.1 for the Applicable Period ending November 30, 2008 (the "EBITDA Default").

     The rights and remedies available to Agent and the Lenders as a result of the continuation of the EBITDA Default include, but are not limited to:

- the right to charge interest at the default rate on Obligations as set forth in Section 3.4(a) of the Credit Agreement effective as of December 1, 2008;

- the right to make Protective Loans, as set forth in Section 3.2(b) of the Credit Agreement;

- the right to cease making credit available (including Loans) to Borrowers, as set forth in Sections 7.2 (a) of the Credit Agreement;

- the right, at the direction, or with the consent, of the Required Lenders, to terminate the Lenders' obligations under the Credit Agreement, as set forth in Sections 4.4 and 11.2 (a) of the Credit Agreement;

Exhibit G
Page 1 of 3

BN 2526982v2

North Pacific Group, Inc.
January 7, 2009
Page 2

- the right to conduct visits and inspections, without prior notice to Borrowers, as set forth in Section 8.12 of the Credit Agreement;

- the right to accelerate the Obligations, as set forth in Section 11.2(a) of the Credit Agreement; and

- the right to notify account debtors, directly collect Accounts, and take other actions with respect to the Collateral as provided under Credit Agreement (all of the above referenced rights and remedies, together with any other rights now or in the future available to Agent or the Lenders under any of the Loan Documents, at law, or in equity, are referred to herein as the "Rights and Remedies").

In addition, please be advised that (1) various rights of the Borrowers and certain other parties to incur certain Debts or investments are terminated during the continuation of an Event of Default, pursuant to the terms of the Credit Agreement and (2) payments of principal with respect to certain subordinated debt will be, or continue to be, prohibited in accordance with the terms of Section of the Credit Agreement and the terms of the applicable subordinated notes.

This letter constitutes notice that: (1) except as specifically set forth below, Agent and the Lenders continue to reserve their Rights and Remedies, none of which has been waived, and all of which continue to be available to Agent and the Lenders; and (2) pursuant to the terms of the Credit Agreement, neither Agent nor any Lender is under any obligation to make any Loans, and any such Loans that are made to Borrowers are made on a day to day basis, solely at the discretion of Agent and the Lenders, as applicable pursuant to the Loan Documents.

This letter also constitutes notice of Agent's election to charge interest on the Obligations at the default rate (an increase of 2% per annum over the Level III Applicable Margin), and to increase the fees for any Letters of Credit by 2 percentage points per annum (over the Level III Applicable Margin), as set forth in the Credit Agreement. Such default rates and increased fees will be computed on the Obligations, effective as of January 1, 2009; and the accrued and unpaid default interest and fees shall be added immediately to the Obligations and charged to the Loan Account under Section 3.2(c) of the Credit Agreement.

Nothing contained herein, nor the election by Agent to exercise certain of its Rights and Remedies, shall in any way constitute a limitation, waiver, forbearance, or election of any Rights and Remedies that Agent or the Lenders may have now or in the future as a result of the existence of the EBITDA Defaults. We specifically reserve any and all of our other continuing Rights and Remedies available to us under and pursuant to the Credit Agreement, the other Loan Documents, or available at law or in equity.

North Pacific Group, Inc.
January 7, 2009
Page 3

Should you have any questions, please contact Amy Newman at (310) 453-7365.

Very truly yours,

WELLS FARGO FOOTHILL, INC.,
a California corporation

By: _Amy Newman_

Amy L. Newman
Vice President



**Wells Fargo Foothill**
2450 Colorado Avenue
Suite 3000 West
Santa Monica, CA 90404
310 453-7300

September 18, 2009

North Pacific Group, Inc.
10200 SW Greenburg Road
Portland, Oregon 97223
Attn: Christopher Cassard, Chief Financial Officer

  Re: North Pacific Group, Inc. and its Subsidiaries / Wells Fargo Foothill, Inc.

Ladies and Gentlemen:

  Reference is hereby made to that certain Credit Agreement, dated as of December 22, 2006 (as amended and modified from time to time, the "Credit Agreement"), by and between North Pacific Group, Inc., an Oregon corporation ("Parent"), each of Parent's subsidiaries from time to time party thereto (along with Parent, each individually, a "Borrower" and collectively, the "Borrowers"), the lenders from time to time party thereto (each individually, a "Lender" and collectively, the "Lenders") and Wells Fargo Foothill, Inc., a California corporation ("WFF"), as Swingline Lender and administrative lender for the Lenders (in such capacity, the "Agent"). Reference is also hereby made to that certain Reservation of Rights Letter from WFF to Borrowers dated as of January 7, 2009 ("January 2009 Reservation of Rights Letter"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

  In the January 2009 Reservation of Rights Letter we informed you that an Event of Default had occurred and was continuing as a result of Borrower's violation of the Fixed Charge Covenant set forth in Section 10.1 of the Credit Agreement. Additional Events of Defaults have occurred since the issuance of the January 2009 Reservation of Rights Letter. Therefore, be advised that Events of Default have occurred and are continuing under Section 11.1(d) of the Credit Agreement as a result of Borrowers' violation of: (i) the Fixed Charge Covenant Ratio covenant set forth in Section 10.1 for the applicable period ending November 30, 2008, and all periods thereafter up to and including the period ending July 31, 2009 (the "Fixed Charge Defaults") and (ii) the minimum Available Credit covenant set forth in Section 10.2 of the Credit Agreement commencing on August 5, 2009 and on several occasions thereafter through and including September 14, 2009 (the "Minimum Available Credit Defaults"). In addition, Events of Default have occurred and are continuing under Section 11.1(b) with respect to certain representations and warranties made by Borrowers, including with respect to Sections 6.5 and 6.18 (such Events of Default together with the Fixed Charge Defaults and Minimum Available Credit Default, the "Existing Defaults").

  The rights and remedies available to Agent and the Lenders as a result of the continuation of the Existing Defaults include, but are not limited to:

   &bull; the right to charge interest at the default rate on Obligations as set forth in Section 3.4(a) of the Credit Agreement effective as of December 1, 2008 and

North Pacific Group, Inc.
September 18, 2009
Page 2

which right was exercised effective as of January 1, 2009 (and such rate continues to be in effect as of the date hereof);

- the right to make Protective Loans, as set forth in <u>Section 3.2(b)</u> of the Credit Agreement;

- the right to cease making credit available (including Loans) to Borrowers, as set forth in <u>Sections 7.2 (a)</u> of the Credit Agreement;

- the right, at the direction, or with the consent, of the Required Lenders, to terminate the Lenders' obligations under the Credit Agreement, as set forth in <u>Sections 4.4</u> and <u>11.2 (a)</u> of the Credit Agreement;

- the right to conduct visits and inspections, without prior notice to Borrowers, as set forth in <u>Section 8.12</u> of the Credit Agreement;

- the right to accelerate the Obligations, as set forth in <u>Section 11.2(a)</u> of the Credit Agreement; and

- the right to notify account debtors, directly collect Accounts, and take other actions with respect to the Collateral as provided under Credit Agreement (all of the above referenced rights and remedies, together with any other rights now or in the future available to Agent or the Lenders under any of the Loan Documents, at law, or in equity, are referred to herein as the "<u>Rights and Remedies</u>").

In addition, please be advised that (1) various rights of the Borrowers and certain other parties to incur certain Debts or investments are terminated during the continuation of an Event of Default, pursuant to the terms of the Credit Agreement and (2) payments of principal with respect to certain subordinated debt will be, or continue to be, prohibited in accordance with the terms of Section of the Credit Agreement and the terms of the applicable subordinated notes.

This letter constitutes notice that: (1) except as specifically set forth below, Agent and the Lenders continue to reserve their Rights and Remedies, none of which has been waived, and all of which continue to be available to Agent and the Lenders; and (2) pursuant to the terms of the Credit Agreement, neither Agent nor any Lender is under any obligation to make any Loans, and any such Loans that are made to Borrowers are made on a day to day basis, solely at the discretion of Agent and the Lenders, as applicable pursuant to the Loan Documents.

This letter also constitutes notice that Agent shall continue to charge interest on the Obligations at the default rate (an increase of 2% per annum over the Level III Applicable Margin), and to charge fees for any Letters of Credit at 2 percentage points per annum over the Level III Applicable Margin, as set forth in the Credit Agreement and in the January 2009 Reservation of Rights Letter. Such default rates and increased fees have been computed on the Obligations, effective as of January 1, 2009; and the accrued and unpaid default interest and fees

North Pacific Group, Inc.
September 18, 2009
Page 3

shall continue to be added immediately to the Obligations and charged to the Loan Account under Section 3.2(e) of the Credit Agreement.

Nothing contained herein, nor the election by Agent to exercise certain of its Rights and Remedies, shall in any way constitute a limitation, waiver, forbearance, or election of any Rights and Remedies that Agent or the Lenders may have now or in the future as a result of the existence of the Existing Defaults.  We specifically reserve any and all of our other continuing Rights and Remedies available to us under and pursuant to the Credit Agreement, the other Loan Documents, or available at law or in equity.

Should you have any questions, please contact Amy Newman at (310) 453-7365.

Very truly yours,

WELLS FARGO FOOTHILL, INC.,
a California corporation

By:  _____

Amy Newman
Vice President

BN 4448194v3



**Wells Fargo Foothill**
2450 Colorado Avenue
Suite 3000 West
Santa Monica, CA 90404
310 453-7300

January 12, 2010

North Pacific Group, Inc.
10200 SW Greenburg Road
Portland, Oregon 97223
Attn: Thomas Lumsden Chief Restructuring Officer

      Re:    North Pacific Group, Inc. and its Subsidiaries / Wells Fargo Foothill, Inc.

Ladies and Gentlemen:

      Reference is hereby made to that certain Credit Agreement, dated as of December 22, 2006 (as amended and modified from time to time, the "Credit Agreement"), by and between North Pacific Group, Inc., an Oregon corporation ("Parent"), each of Parent's subsidiaries from time to time party thereto (along with Parent, each individually, a "Borrower" and collectively, the "Borrowers"), the lenders from time to time party thereto (each individually, a "Lender" and collectively, the "Lenders") and Wells Fargo Foothill, Inc., a California corporation ("WFF"), as Swingline Lender and administrative lender for the Lenders (in such capacity, the "Administrative Lender" and together with the Lenders, the "Lender Group"). Reference is also hereby made to that certain: (i) Reservation of Rights Letter from Agent to Borrowers dated as of January 7, 2009 ("January 2009 Reservation of Rights Letter") and (ii) Reservation of Rights Letter from Agent to Borrowers dated as of September 18, 2009 ("September 2009 Reservation of Rights Letter" and together with the January 2009 Reservation of Rights Letter, the "Reservation of Rights Letters"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

      We are informed by you that BlueLinx is no longer prepared to purchase substantially all of Borrowers' assets on the terms previously disclosed to the Lender Group and that Borrowers have not obtained a firm commitment to acquire substantially all of their assets on acceptable terms. We note that this is the third transaction that would have provided for the payment of the obligations to the Lenders that has failed to materialize in the past six months. We further note that the Lenders have worked with you to resolve the problems arising out of the deterioration of the financial condition of the Borrowers and the Existing Events of Default (as defined in the September 2009 Reservation of Rights Letter) for more than six months without noticeable progress. The failure of the BlueLinx transaction, the continuing deterioration of the Borrowers' financial condition, the deteriorating collateral position of the Lenders, and the lack of viable alternatives to the BlueLinx transaction, requires that the Lenders take additional actions to protect their interests. Therefore, starting today the Lenders will: (i) pursuant to Section 11.2(a)(ii) of the Credit Agreement, reduce the Total Commitments to $55,000,000 (from $70,000,000) and (ii) increase the Borrowing Base Reserves by an amount equal to $1,000,000 (the "Additional Reserves") The Additional Reserves will be implemented on January 12th 2010 through January 15th 2010 at Administrative Lenders's discretion. In addition, in the event that a final asset purchase agreement satisfactory to the Lenders has not been received by Administrative Lender by 3:00 pm, Friday, January 15, 2010, the Lenders shall cease funding all Loans.

BN 5084007v2

Exhibit I
Page 1 of 2

We would like to note that: (1) Administrative Lender and the Lenders continue to reserve their Rights and Remedies (as that term is defined in the Reservation of Rights Letters), none of which has been waived, and all of which continue to be available to Administrative Lender and the Lenders; and (2) as set forth in the Reservation of Rights Letters, the Lenders may cease funding all Loans at any time and that pursuant to the terms of the Credit Agreement, neither Administrative Lender nor any Lender is under any obligation to make any Loans, and any such Loans that are made to Borrowers are made on a day to day basis, solely at the discretion of Administrative Lender and the Lenders, as applicable pursuant to the Loan Documents.

Nothing contained herein, nor the election by Administrative Lender and the Lenders to exercise certain of their Rights and Remedies, shall in any way constitute a limitation, waiver, forbearance, or election of any Rights and Remedies that Administrative Lender or the Lenders may have now or in the future as a result of the existence of the Existing Defaults. We specifically reserve any and all of our other continuing Rights and Remedies available to us under and pursuant to the Credit Agreement, the other Loan Documents, or available at law or in equity.

Should you have any questions, please contact Amy Newman at (310) 453-7365.

Very truly yours,

WELLS FARGO FOOTHILL, INC.,
a California corporation,
as Administrative Lender

By: _Amy Newman_

Amy Newman
Vice President

## State of Oregon

### Corporation Division - UCC

Public Service Building - 255 Capitol Street NE, Suite 151
Salem, OR 97310-1327
(503) 986-2200 Facsimile (503) 373-1166

### ACKNOWLEDGMENT NOTICE

DILIGENZ
6500 HARBOUR HEIGHTS PKWY STE 400
MUKILTEO, WA 98275

**File Number:** 7471488
**File Date:** 12/14/2006
**Exp. Date:** 12/14/2011
**Entered By:** ginspo
**Doc Type:** UCC
New Filing

Your document was filed showing the file number and date listed above.

If you have any questions regarding this notice, contact the Secretary of State, Corporation Division. Please refer to the file number listed above.

Note: You can access our records or filing forms through the Internet at the address:

http://www.ucc.sos.state.or.us

**Secured party of record name(s) and address(es)**

Organization:    WELLS FARGO FOOTHILL,INC. AS ADMINISTRATIVE LENDER
AND SWINGLINE LENDER
2450 COLORADO AVE, STE 300 WEST
SANTA MONICA, CA 90404

**Debtor name(s) and address(es)**

Organization:    NORTH PACIFIC GROUP, INC.
10200 SW GREENBURG ROAD
PORTLAND, OR 97223

Exhibit J
Page 1 of 12

State of Oregon
Initial Filing 1 Page(s)

7471488
12/14/06 02:30 PM
OR Sec. of State

9027638507

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
DILIGENZ, INC.     1-800-858-5294

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

23297437
PREPARED BY:
DILIGENZ, INC.
6500 HARBOUR HEIGHTS PKWY, SUITE 400
MUKILTEO, WA 98275

Filed in: Oregon  (S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| NORTH PACIFIC GROUP, INC. | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 10200 SW GREENBURG ROAD | PORTLAND | OR | 97223 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | CORP. | OR | 055168-85 | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| WELLS FARGO FOOTHILL, INC. AS ADMINISTRATIVE LENDER AND SWINGLINE LENDER | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2450 COLORADO AVE, STE 3000 WEST | SANTA MONICA | CA | 90404 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**
ALL OF THE DEBTOR'S RIGHT, TITLE AND INTEREST, WHETHER NOW EXISTING OR HEREAFTER ACQUIRED, IN AND TO ALL PERSONAL PROPERTY OF THE DEBTOR, AND THE PROCEEDS AND PRODUCTS, WHETHER TANGIBLE OR INTANGIBLE, THEREOF.

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

**8. OPTIONAL FILER REFERENCE DATA**
OREGON SOS - F6384-1269                                                    23297437

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)



## AUTHORIZATION OF UCC FILING

Reference is hereby made to the proposed Credit Agreement (the "<u>Agreement</u>"), by and between by and among, on the one hand, the lenders identified on the signature pages thereto and WELLS FARGO FOOTHILL, INC., a California corporation, (the "<u>Secured Party</u>"), and on the other hand, NORTH PACIFIC GROUP, INC., an Oregon corporation ("<u>Debtor</u>"), and each of Parent's Subsidiaries identified on the signature pages thereto.

In anticipation of the Agreement, Debtor hereby authorizes Secured Party to file UCC financing statements against it with any filing officer deemed appropriate by Secured Party designating all assets of Debtor as the collateral.

Dated:  December _13_, 2006

**NORTH PACIFIC GROUP, INC.**
an Oregon corporation

By: _____
Name:  Jay A. Ross
Title: President/CEO

401210-Authorization of UCC Filing North Pacific.doc

Exhibit J



# State of Oregon
## Corporation Division - UCC
Public Service Building - 255 Capitol Street NE, Suite 151
Salem, OR 97310-1327
(503) 986-2200 Facsimile (503) 373-1166

### ACKNOWLEDGMENT NOTICE

DILIGENZ
6500 HARBOUR HEIGHTS PKWY STE 400
MUKILTEO, WA 98275

**File Number:** 7471505
**File Date:** 12/14/2006
**Exp. Date:** 12/14/2011
**Entered By:** ginspo
**Doc Type:** UCC
New Filing

Your document was filed showing the file number and date listed above.

If you have any questions regarding this notice, contact the Secretary of State, Corporation Division. Please refer to the file number listed above.

Note: You can access our records or filing forms through the Internet at the address:

http://www.ucc.sos.state.or.us

**Secured party of record name(s) and address(es)**

Organization:   WELLS FARGO FOOTHILL, INC. AS ADMINISTRATIVE LENDER
AND SWINGLINE LENDER
2450 COLORADO AVE, ST 300 WEST
SANTA MONICA, CA 90404

**Debtor name(s) and address(es)**

Organization:   NOR PAC ENTERPRISES, INC.
10200 SW GREENBURG ROAD
PORTLAND, OR 97223

State of Oregon
Initial Filing 1 Page(s)

**7471505**
12/14/06 02:30 PM
OR Sec. of State

9027538707

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
DILIGENZ, INC.   1-800-858-5294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

23297514
PREPARED BY:
DILIGENZ, INC.
6500 HARBOUR HEIGHTS PKWY, SUITE 400
MUKILTEO, WA 98275

Filed In: Oregon  (S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| NOR PAC ENTERPRISES, INC. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 10200 SW GREENBURG ROAD | PORTLAND | OR | 97223 | USA |

| 1d. TAX ID # SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | CORP. | OR | 403066-80 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID # SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| WELLS FARGO FOOTHILL, INC. AS ADMINISTRATIVE LENDER AND SWINGLINE LENDER | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2450 COLORADO AVE, ST 3000 WEST | SANTA MONICA | CA | 90404 | USA |

4. This FINANCING STATEMENT covers the following collateral:
ALL OF THE DEBTOR'S RIGHT, TITLE AND INTEREST, WHETHER NOW EXISTING OR HEREAFTER ACQUIRED, IN AND TO ALL PERSONAL PROPERTY OF THE DEBTOR, AND THE PROCEEDS AND PRODUCTS, WHETHER TANGIBLE OR INTANGIBLE, THEREOF.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA
OREGON SOS - F6384-1269                                   23297514

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

Exhibit J
Page 5 of 12



## AUTHORIZATION OF UCC FILING

Reference is hereby made to the proposed Credit Agreement (the "Agreement"), by and between by and among, on the one hand, the lenders identified on the signature pages thereto and WELLS FARGO FOOTHILL, INC., a California corporation, (the "Secured Party"), and on the other hand, NORTH PACIFIC GROUP, INC., an Oregon corporation ("Parent"), and each of Parent's Subsidiaries identified on the signature pages thereto, including, among other entities, NOR PAC ENTERPRISES, INC., an Oregon corporation (the "Debtor").

In anticipation of the Agreement, Debtor hereby authorizes Secured Party to file UCC financing statements against it with any filing officer deemed appropriate by Secured Party designating all assets of Debtor as the collateral.

Dated:  December 13, 2006

**NOR PAC ENTERPRISES, INC.**
an Oregon corporation

By: _____
Name: Jay A. Ross
Title: President

Exhibit J



**State of Oregon**
Corporation Division - UCC
Public Service Building - 255 Capitol Street NE, Suite 151
Salem, OR 97310-1327
(503) 986-2200 Facsimile (503) 373-1166

### ACKNOWLEDGMENT NOTICE

DILIGENZ
6500 HARBOUR HEIGHTS PKWY STE 400
MUKILTEO, WA 98275

**File Number:** 7471511
**File Date:** 12/14/2006
**Exp. Date:** 12/14/2011
**Entered By:** ginspo
**Doc Type:** UCC
New Filing

Your document was filed showing the file number and date listed above.

If you have any questions regarding this notice, contact the Secretary of State, Corporation Division. Please refer to the file number listed above.

Note: You can access our records or filing forms through the Internet at the address:

http://www.ucc.sos.state.or.us

**Secured party of record name(s) and address(es)**

Organization:    WELLS FARGO FOOTHILL, INC. AS ADMINISTRATIVE LENDER
AND SWINGLINE LENDER
2450 COLORADO AVE, STE 300 WEST
SANTA MONICA, CA 90404

**Debtor name(s) and address(es)**

Organization:    RTH LUMBER CO.
10200 SW GREENBURG ROAD
PORTLAND, OR 97223

State of L___n
Initial Filing 1 Page(s)

7471511
12/14/06 02:30 PM
OR Sec. of State

|||||||||||||||||||||||||||||
9027538807

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
DILIGENZ, INC.    1-800-858-5294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

23297528
PREPARED BY:
DILIGENZ, INC.
6500 HARBOUR HEIGHTS PKWY, SUITE 400
MUKILTEO, WA 98275

Filed In: Oregon  (S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| RTH LUMBER CO. | | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 10200 SW GREENBURG ROAD | PORTLAND | OR | 97223 | USA |

| 1d. TAX ID #  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | CORP. | OR | 280562-81 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID #  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| WELLS FARGO FOOTHILL, INC. AS ADMINISTRATIVE LENDER AND SWINGLINE LENDER | | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | | SUFFIX |
|---|---|---|---|---|---|
| | | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2450 COLORADO AVE, STE 3000 WEST | SANTA MONICA | CA | 90404 | USA |

4. This FINANCING STATEMENT covers the following collateral:
ALL OF THE DEBTOR'S RIGHT, TITLE AND INTEREST, WHETHER NOW EXISTING OR HEREAFTER ACQUIRED, IN AND TO ALL PERSONAL PROPERTY OF THE DEBTOR, AND THE PROCEEDS AND PRODUCTS, WHETHER TANGIBLE OR INTANGIBLE, THEREOF.

| 5. ALTERNATIVE DESIGNATION (if applicable): | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum  [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [optional]  [ADDITIONAL FEE] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA
OREGON SOS - F6384-1269                                    23297528

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)



## AUTHORIZATION OF UCC FILING

Reference is hereby made to the proposed Credit Agreement (the "<u>Agreement</u>"), by and between by and among, on the one hand, the lenders identified on the signature pages thereto and WELLS FARGO FOOTHILL, INC., a California corporation, (the "<u>Secured Party</u>"), and on the other hand, NORTH PACIFIC GROUP, INC., an Oregon corporation ("<u>Parent</u>"), and each of Parent's Subsidiaries identified on the signature pages thereto, including, among other entities, RTH LUMBER CO., an Oregon corporation (the "<u>Debtor</u>").

In anticipation of the Agreement, Debtor hereby authorizes Secured Party to file UCC financing statements against it with any filing officer deemed appropriate by Secured Party designating all assets of Debtor as the collateral.

Dated:    December _11_, 2006

**RTH LUMBER CO.**
an Oregon corporation

By: _____
Name: Jay A. Ross
Title:  President

Exhibit J
Page 9 of 12



**State of Oregon**
Corporation Division - UCC
Public Service Building - 255 Capitol Street NE, Suite 151
Salem, OR 97310-1327
(503) 986-2200 Facsimile (503) 373-1166

### ACKNOWLEDGMENT NOTICE

DILIGENZ
6500 HARBOUR HEIGHTS PKWY STE 400
MUKILTEO, WA 98275

**File Number:** 7471494
**File Date:** 12/14/2006
**Exp. Date:** 12/14/2011
**Entered By:** ginspo
**Doc Type:** UCC
New Filing

Your document was filed showing the file number and date listed above.

If you have any questions regarding this notice, contact the Secretary of State, Corporation Division. Please refer to the file number listed above.

Note: You can access our records or filing forms through the Internet at the address:

http://www.ucc.sos.state.or.us

**Secured party of record name(s) and address(es)**

Organization: WELLS FARGO FOOTHILL,INC. AS ADMINISTRATIVE LENDER
AND SWINGLINE LENDER
2450 COLORADO AVE, STE 300 WEST
SANTA MONICA, CA 90404

**Debtor name(s) and address(es)**

Organization: BURNS HOLDINGS, INC.
10200 SW GREENBURG ROAD
PORTLAND, OR 97223

State of Oregon
Initial Filing 1 Page(s)

7471494
12/14/06 02:30 PM
OR Sec. of State

9027538607

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
DILIGENZ, INC.    1-800-858-5294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

23297500
PREPARED BY:
DILIGENZ, INC.
6500 HARBOUR HEIGHTS PKWY, SUITE 400
MUKILTEO, WA 98275

Filed In: Oregon (S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| BURNS HOLDINGS, INC. | | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS 10200 SW GREENBURG ROAD | CITY PORTLAND | | STATE OR | POSTAL CODE 97223 | COUNTRY USA |
| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION CORP. | 1f. JURISDICTION OF ORGANIZATION OR | 1g. ORGANIZATIONAL ID #, if any 720528-80 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| WELLS FARGO FOOTHILL, INC. AS ADMINISTRATIVE LENDER AND SWINGLINE LENDER | | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS 2450 COLORADO AVE, STE 3000 WEST | CITY SANTA MONICA | | STATE CA | POSTAL CODE 90404 | COUNTRY USA |

4. This FINANCING STATEMENT covers the following collateral:
ALL OF THE DEBTOR'S RIGHT, TITLE AND INTEREST, WHETHER NOW EXISTING OR HEREAFTER ACQUIRED, IN AND TO ALL PERSONAL PROPERTY OF THE DEBTOR, AND THE PROCEEDS AND PRODUCTS, WHETHER TANGIBLE OR INTANGIBLE, THEREOF.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   [if applicable] | | 7. Check to REQUEST SEARCH REPORT (S) on Debtor(s) [ADDITIONAL FEE]   [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA
OREGON SOS - F6384-1269                    23297500

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

Exhibit J
Page 11 of 12

 

## AUTHORIZATION OF UCC FILING

Reference is hereby made to the proposed Credit Agreement (the "Agreement"), by and between by and among, on the one hand, the lenders identified on the signature pages thereto and WELLS FARGO FOOTHILL, INC., a California corporation, (the "Secured Party"), and on the other hand, NORTH PACIFIC GROUP, INC., an Oregon corporation ("Parent"), and each of Parent's Subsidiaries identified on the signature pages thereto, including, among other entities, BURNS HOLDINGS, INC., an Oregon corporation (the "Debtor").

In anticipation of the Agreement, Debtor hereby authorizes Secured Party to file UCC financing statements against it with any filing officer deemed appropriate by Secured Party designating all assets of Debtor as the collateral.

Dated:   December _13_, 2006

**BURNS HOLDINGS, INC.**
an Oregon corporation

By: _____
Name: Jay A. Ross
Title: President

Exhibit J